No. 23-1072

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

OCEAN STATE TACTICAL, LLC, d/b/a Big Bear Hunting and Fishing Supply;
JONATHAN HIRONS; JAMES ROBERT GRUNDY; JEFFREY GOYETTE; MARY BRIMER,
*Plaintiffs – Appellants*,

v.

STATE OF RHODE ISLAND; COLONEL DARNELL S. WEAVER, in his official capacity
as the superintendent of the Rhode Island State Police; PETER F. NERONHA, in his
official capacity as the Attorney General for the State of Rhode Island,
*Defendants – Appellees*.

On Appeal from the United States District Court for the District of Rhode Island
Nos.1:22-CV-00246-JJM

## BRIEF OF THE STATE OF RHODE ISLAND, COLONEL DARNELL S. WEAVER, AND PETER F. NERONHA

PETER F. NERONHA
*Attorney General*
Sarah W. Rice, Bar No. 1205724
*Assistant Attorney General*
Keith Hoffmann, Bar No. 1190318
Samuel Ackerman, Bar No. 1205884
*Special Assistant Attorneys General*
RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL
150 South Main Street
Providence, RI 02903
srice@riag.ri.gov
(401) 274-4400, ext. 2054

*Counsel for Defendants-Appellees*

June 21, 2023

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................... iii

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ........................... 1

JURISDICTIONAL STATEMENT ................................................................ 2

STATEMENT OF THE ISSUES .................................................................. 2

STATEMENT OF THE CASE ..................................................................... 3

Modern Firearms Regulation in Rhode Island and Elsewhere ................. 3

Procedural History ............................................................................... 6

SUMMARY OF THE ARGUMENT .............................................................. 11

ARGUMENT ........................................................................................... 13

I.      THIS COURT REVIEWS DENIALS OF PRELIMINARY INJUNCTION FOR ABUSE OF
        DISCRETION. ............................................................................... 14

II.     THE COURT CORRECTLY CONCLUDED OCEAN STATE TACTICAL CANNOT
        ESTABLISH LIKELIHOOD OF SUCCESS ON ANY PRELIMINARY INJUNCTION
        FACTOR ........................................................................................ 17

III.    THIS COURT CORRECTLY FOUND OCEAN STATE TACTICAL DID NOT
        ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS SECOND
        AMENDMENT CLAIMS. ..................................................................... 19

        A. Large Capacity Magazines are Not Arms ................................. 20

        B. Large Capacity Magazines are Not in Common Use for
           Self-Defense Today ................................................................ 26

        C. 'Dangerous and Unusual' Weaponry Like Large Capacity Magazine-
           Equipped Firearms Have Been Regulated Throughout History Through
           Means Analogous to Rhode Island's Restriction ...................... 30

IV.     THE DISTRICT COURT CORRECTLY CONCLUDED OCEAN STATE TACTICAL HAS
        NOT DEMONSTRATED LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS
        TAKINGS CLAIM ............................................................................. 43

        A. The Capacity Restriction is Not a Physical Taking ................... 44

        B. The Capacity Ban is Not a Regulatory Taking ......................... 46

i

V.    THE LARGE CAPACITY MAGAZINE RESTRICTION DOES NOT OFFEND DUE PROCESS ........................................................................................49

    A. The Restriction is Not Impermissibly Retroactive...................................49

    B. Ocean State Tactical Has Not Demonstrated That the Large Capacity Magazine Restriction is More-Likely-Than-Not Void for Vagueness ....52

CONCLUSION ...............................................................................................54

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT..................56

CERTIFICATE OF SERVICE ..............................................................................56

# TABLE OF AUTHORITIES

## Cases

*Akins v. United States*, 82 Fed. Cl. 619 (Fed. Cl. 2008) .........................................44

*Andrus v. Allard*, 444 U.S. 51 (1979) ................................................................46, 47

*ANSYS, Inc. v. Computational Dynamics North American, Ltd.*, 595 F.3d 75
    (1st Cir. 2010) ........................................................................................14, 15

*Association of New Jersey  Rifle & Pistol Clubs, Inc. v.
    Attorney General of New Jersey*, 910 F.3d 106 (3d Cir. 2018) .............42, 46

*Benisek v. Lamone*, 138 S. Ct. 1942 (2018) ...............................................14, 17, 18

*Borden's Farm Products Co. v. Baldwin,* 293 U.S. 194 (1934) .............................15

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) ......................................43

*Chicago, B. & Q. Railway Co. v. Illinois*, 200 U.S. 561 (1906) ...........................43

*Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985) ......................................18

*Commonwealth v. McComb*, 76 A. 100 (Pa. 1910) ...............................................37

*Contrast Jackson v. City and Cty. of San Francisco*, 746 F.3d 953
    (9th Cir. 2014) ................................................................................................26

*Corporate Technologies, Inc. v. Harnett*, 731 F.3d 6 (1st Cir. 2013) ...................15

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .....................................passim

*Doe v. Banos*, 713 F. Supp. 2d 404 (D.N.J. 2010) .................................................18

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020) ...............................................32

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) ..................................32, 42, 44, 49

*Equity in Athletics, Inc. v. United States Department of Educ.*,
    291 Fed. Appx. 517 (4th Cir. 2008) .............................................................18

*Fesjian v. Jefferson*, 399 A.2d 861 (D.C. 1979) ...................................................44

*Frese v. Formella*, 53 F.4th 1 (1st Cir. 2022) ..................................................52, 53

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ........................28

*Goldblatt v. Town of Hempstead, N. Y.*, 369 U.S. 590 (1962) ........................47, 48

*Hanson v. D.C.,* No. CV 22-2256 (RC), 2023 WL 3019777
  (D.D.C. Apr. 20, 2023) ..................................................................................29

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ............................42

*Holliday Amusement Co. of Charleston, Inc. v. South Carolina*,
  493 F.3d 404 (4th Cir. 2007) .........................................................................47

*Horne v. Department of Agriculture*, 576 U.S. 350 (2015) ......................44, 45, 46

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ...............................................38

*Kelo* v. *City of New London*, 545 U.S. 469 (2005) ...............................................45

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) .............................................27, 29, 42

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) ....................................50, 51

*Lattab v. Ashcroft*, 384 F.3d 8 (1st Cir. 2004) .........................................................50

*Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528 (2005) ......................................43, 46

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) ................45

*Lucas v. S.C. Coastal Council,* 505 U.S. 1003 (1992) ......................................46, 47

*Maryland Shall Issue, Incorporated v. Hogan*,
  963 F.3d 356 (4th Cir. 2020) .......................................................48, 50, 51

*McCutchen v. United States*, 14 F.4th 1355 (Fed. Cir. 2021) ...............................44

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) ...........................19, 26, 30

*Mugler v. Kansas*, 123 U.S. 623 (1887).............................................................10, 47

*Murr v. Wisonsin*, 137 S. Ct. 1933 (2017) ...........................................................46

*Association of New Jersey Rifle & Pistol Clubs, Inc. v. Bruck,* 142 S. Ct. 2894
  (2022) ..................................................................................................42

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)..........................................................................passim

*Oregon Firearms Federation, Inc. v. Brown*, No. 2:22-CV-01815-IM, 2022 WL
  17454829 (D. Or. Dec. 6, 2022) ..................................................................29

iv

*Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978) ........47

*Peulic v. Garland*, 22 F.4th 340 (1st Cir. 2022) ......................................53

*Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49 (2005) ...........................20

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1
    (1st Cir. 2012) ................................................14

*United States v. Baptiste*, 8 F.4th 30 (1st Cir. 2021) ..............................16

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018) ............................22

*United States v. Gonzalez*, 949 F.3d 30 (1st Cir. 2020) ..........................53

*United States v. Singleterry*, 29 F.3d 733 (1st Cir. 1994) ........................15

*Usery v. Turner Elkhorn Mining Co.* 428 U.S. 1 (1976) .........................49

*Utah Gospel Mission v. Salt Lake City Corp.,* 316 F. Supp. 2d 1201
    (D. Utah 2004) ...............................................18

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26
    (1st Cir. 2011) ...........................................17, 18

*W Holding Co. v. AIG Ins. Co.-Puerto Rico*, 748 F.3d 377 (1st Cir. 2014) ...........14

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) ................14

*Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) ........................27, 28, 40, 42

*Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244 (11th Cir. 2016) ........................18

## **Statutes**

1917 N.C. Sess. Laws 309 ................................................37

1927 Mass. Acts 413 ...................................................37

1927 Mich. Pub. Acts 887 ................................................37

1927 Mich. Pub. Acts 888 ................................................37

1927 N.J. Laws 180....................................................37

1927 R.I. Pub. Laws 256................................................4, 37

1975 R.I. Pub. Laws ch. 278, § 1 ........................................51

1927 R.I. Pub. Laws ch. 1052, § 1 ........................................................51

1932 La. Acts 336 ................................................................................37

1933 Minn. Laws 231 ..........................................................................37

1933 Ohio Laws 189 ............................................................................37

1933 S.D. Sess. Laws ch. 206 ..............................................................37

1933 S.D. Sess. Laws ch. 245 ..............................................................37

1934 S.C. Acts 1288 ............................................................................37

1934 Va. Acts 137 ...............................................................................37

1959 R.I. Pub. Laws 260 .......................................................................4

1975 R.I. Pub. Laws 738 .......................................................................4

47 Stat. 652 .........................................................................................37

28 U.S.C. § 1292 ...................................................................................2

Colo. Rev. Stat. §§ 18-12-301 .............................................................51

Colo. Rev. Stat. §§ 18-12-302 .............................................................51

Colo. Rev. Stat. §§ 18-12-303 .............................................................51

Conn. Gen. Stat. §§ 53-202w ..............................................................51

Conn. Gen. Stat. §§ 53-202q ...............................................................51

D.C. Code Ann. §§ 7-2506.01(b) ........................................................51

D.C. Code Ann. §§ 7-2507.06(a)(4) ....................................................51

Fed. R. Evid. 201 ...........................................................................15, 16

Haw. Rev. Stat. Ann. § 134–8(c) .........................................................51

Mass. Gen. Laws ch. 140, §§ 121 .......................................................51

Mass. Gen. Laws ch. 140, §§ 131M ....................................................51

Md. Code Ann., Crim. Law § 4-305 ....................................................51

N.J. Stat. Ann. §§ 2C:39-1(y) .............................................................51

N.J. Stat. Ann. §§ 2C:39-3(j) ..............................................................51

N.J. Stat. Ann. §§ 2C:39-9(h) ................................................................51

N.Y. Penal Law §§ 265.00(23) ...............................................................51

N.Y. Penal Law §§ 265.02(8) .................................................................52

N.Y. Penal Law §§ 265.10 ......................................................................52

N.Y. Penal Law §§ 265.11 ......................................................................52

N.Y. Penal Law §§ 265.20(7-f) ..............................................................52

N.Y. Penal Law §§ 265.36 ......................................................................52

N.Y. Penal Law §§ 265.37 ......................................................................52

R.I. GEN. L. § 11-47-8(a) .........................................................................3

R.I. GEN. L. § 11-47-8(b) .........................................................................3

R.I. GEN. L. § 11-47-8(d) .........................................................................4

R.I. GEN. L. § 11-47-8(e) .........................................................................3

R.I. GEN. L. § 11-47-20 ............................................................................4

R.I. GEN. L. § 11-47-20.1 .........................................................................4

R.I. GEN. L. § 11-47-21 ............................................................................3

R.I. GEN. L. § 11-47.1-2(2) .................................................................5, 42

R.I. GEN. L. § 11-47.1-3 ...............................................................4, 38, 48

R.I. GEN. L. § 11-47.1-3(2) .......................................................................5

R.I. GEN. L. § 11-47.1-3(3) .......................................................................5

R.I. GEN. L. § 11-47.1-3(b) .......................................................................5

R.I. GEN. L. § 11-47.1-3(b)(1) .................................................................51

R.I. GEN. L. § 11-47.1-3(b)(1)(i) .................................................51, 52, 53

R.I. GEN. L. § 11-47.1-3(b) (1)(ii) ...........................................................51

R.I. GEN. L. § 11-47.1-3(b) (1)(iii) ..........................................................51

Vt. Stat. Ann. tit. 13, § 4021 ...................................................................52

**Other Authorities**

Congress Undertakes to Raise a Cavalry Corps., *in* 2 PUBLIC PAPERS OF GEORGE
    CLINTON, FIRST GOVERNOR OF NEW YORK 827, 828 (Wynkoop Hallenbeck
    Crawford Co. ed., 1900) ........................................................................22, 23

HAROLD PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA 1526-1783
(Bramhall House rprt. ed. 1956) ............................................................23

Jim Supica et al., *The Illustrated History of Firearms* 244 (2d ed. 2020) ..............33

LEWIS WINANT, PEPPERBOX FIREARMS 32 (Greenberg Pub. 1952) .......................33

Meriwether Lewis, August 30, 1805 (Gary Moulton ed., U of Neb. Press 2002,
    https://lewisandclarkjournals.unl.edu/item/lc.jrn.1803-08-30 (last visited
    June 21, 2023)...............................................................................34

Natalie Bruzda, *Veteran's Quick Reactions Saved Lives During Las Vegas
    Shooting*, LAS VEGAS REV. J. (Nov. 10, 2017) .............................................41

PUBLIC PAPERS OF GEORGE CLINTON, FIRST GOVERNOR OF NEW YORK (Wynkoop
Hallenbeck Crawford Co. ed., 1900) .......................................................23

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment
    Rights*, 80 J. L. & CONTEMP. PROBS. Table 1 (2017), https://scholarship.
    law.duke.edu/cgi/viewcontent.cgi?article=4825&context=lcp ...................36

W.H. "Chip" Gross, *Throwback Thursday: Lewis and Clark's Air Rifle*, NRA
    Family (October 7, 2021), https://www.nrafamily.org/content/throwback
    thursday-lewis-and-clark-s-air-rifle/............................................................34

William Wellington Greener, *The Gun and Its Development* 81 (Cassell & Co., 8th
    ed. 1907) (1881) ...........................................................................33

Accessories PMR30, KELTEC https://www.keltecweapons.com/collections/class/
accessories/?product_class=accessories&weapon=pmr30&page=
    1&order=title& orderby=asc (last viewed June 21, 2023) ..........................24

General accessories offered by Palmetto State Armory:
    https://palmettostatearmory.com/accessories.html
    (last viewed June 21, 2023) .......................................................24

https://www.keltecweapons.com/collections/class/parts/?product_class=parts&wea
pon=pmr30&page=1&order=title&orderby=asc
    (last viewed June 21, 2023) ...............................................................23, 24

viii

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

Appellees respectfully request oral argument be heard.  This appeal arises from the denial of injunctive relief which allowed Rhode Island's restriction on magazines capable of holding more than ten rounds of ammunition to go into effect under the new standard articulated in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which this court has not had occasion to apply.  Oral argument will be helpful to this Court and to the public in considering *Bruen*'s applicability to public safety measures that do not concern arms or weapons not in common use for self-defense.

## JURISDICTIONAL STATEMENT

Plaintiffs-appellants Ocean State Tactical, LLC and four individuals (together "Ocean State Tactical") filed this suit against the State of Rhode Island, Superintendent of the Rhode Island State Police Colonel Darnell S. Weaver, and Attorney General Peter F. Neronha, challenging the constitutionality of Rhode Island's statute restricting the capacity of magazines for semiautomatic firearms which may be lawfully possessed to ten or fewer rounds of ammunition, an effort to ameliorate the devastating effects of mass shootings. Ocean State Tactical raised three federal constitutional claims, asserting that the restriction impermissibly infringes the Second Amendment's right of armed self-defense; that the statute is a compensable taking; and that the statute is impermissibly retroactive and vague. Ocean State Tactical then moved for preliminary injunction. (A5.)

On December 14, 2022, the district court denied the motion for preliminary injunction in its entirety. (A8.) Ocean State Tactical noted a timely appeal on January 13, 2023. (*Id.*) This Court has jurisdiction under 28 U.S.C. § 1292 to review the district court's final order.

## STATEMENT OF THE ISSUES

1. Did the district court correctly deny the preliminary injunction because any asserted harm is speculative and contingent and, in any event, is outweighed by the opportunity to save human life the regulation affords?

2.  Did the district court correctly deny the preliminary injunction on the additional ground that, on the merits, Ocean State Tactical did not demonstrate that large capacity ammunition feeding devices are "arms" within the text of the Second Amendment or that they are commonly used in self-defense?

3.  Did the district court correctly deny the preliminary injunction because the statute offers options to modify or transfer large capacity magazines and is therefore not a compensable taking?

4.  Did the district court correctly deny the preliminary injunction because the statutory text is prospective and definite enough to be capable of enforcement without offending the due process clause?

## STATEMENT OF THE CASE

### Modern Firearms Regulation in Rhode Island and Elsewhere

In Rhode Island, "'The Firearms Act,' has long regulated the type of firearms that may be lawfully possessed . . . ." (A13.)  This regulation "banned altogether" some weapons, like sawed-off shotguns and machine guns, *id.*, and permitted others "only when carried by persons licensed to possess them or in limited specified locations such as target shooting areas or the home." (*Id.*) *See also* R.I. GEN. L. § 11-47-8(a), (b), (e); § 11-47-21 (possessory bans of sawed-off shotguns, sawed-off

rifles, machine guns, ghost guns, undetectable firearms, any firearm produced by a 3D printing process, bombs, and bombshells).[1]

Nearly one hundred years ago, in 1927, the Firearms Act was amended to include a capacity ban when Rhode Island first outlawed "machine guns," which due to the technological environment at the time, were defined as any semiautomatic firearm that was capable of shooting more than 12 rounds without reloading.[2] 1927 R.I. Pub. Laws 256. Twelve states restricted the capacity of semiautomatic and automatic firearms between 1927 and 1934, and Congress passed the National Firearms Acts of 1934 and 1938, which restricted ownership of machineguns and submachine guns (known today as automatic weapons). (JA333.) Rhode Island has also banned silencers since 1927, which are broadly defined as a "device for deadening or muffling the sound of a firearm when discharged." § 11-47-20. Similarly, Rhode Island bans other firearms accessories, including armor-piercing bullets, § 11-47-20.1, and bump stocks. § 11-47-8(d).

In June 2022, the Rhode Island General Assembly added large capacity feeding devices to the list of accessories that are prohibited. § 11-47.1-3. It "was not alone in doing so" "[i]n the wake of recent mass shootings, many of which have

_____

[1] Unless otherwise noted, all statutory citations are to Rhode Island General Laws.

[2] In 1959 the law was amended to exempt firearms capable of shooting between 12 and 14 rounds. 1959 R.I. Pub. Laws 260. Later, in the 1970s, the modern definition, which defines machine guns by their ability to fire more than once with one pull of the trigger, was enacted. 1975 R.I. Pub. Laws 738.

occurred in schools . . ..” (A15.)  A large capacity feeding device, also referred to as a large capacity magazine, is “a magazine, box, drum, tube, belt, feed strip, or other ammunition feeding device which is capable of holding, or can readily be extended to hold, more than ten (10) rounds of ammunition to be fed continuously and directly therefrom into a semiautomatic firearm” but does not include a firearm’s “attached tubular device which is capable of holding only .22 caliber rimfire ammunition.” § 11-47.1-2(2).

Like some of the other prohibitions of weapons and accessories, the ban on large capacity magazines has exceptions. Not only does it exempt certain tubular magazines, but it also contains exceptions for active-duty police and military otherwise authorized to possess such accessories, along with qualified retired police officers. § 11-47.1-2(2); § 11-47.1-3(2), (3). And, as is evident from the above definition, ammunition feeding devices for weapons like bolt-action rifles and shotguns, which are not semiautomatic because they require manual intervention before they are ready to fire again, are not subject to the restriction. § 11-47.1-2(2).

Rhode Islanders who possessed a large capacity feeding device had the option to transfer, sell, relocate, or permanently modify the device such that it can hold no more than ten rounds of ammunition and remain in compliance with the law. § 11-47.1-3(b). Nothing in the June 2022 law sets limits on the amount of ammunition or number of compliant magazines a person can possess (although Rhode Island does

have laws regulating storage, carry, and sale to minors related to ammunition). That is, both before and after the law, a person with the appropriate permit may conceal-carry a semiautomatic handgun with the ability to fire many dozens of rounds of ammunition. The only practical difference is that to use more than ten rounds of ammunition, a shooter will need to switch magazines or re-load.

**Procedural History**

Ocean State Tactical brought "three constitutional challenges" (A11) in the five counts of its amended complaint: (1) plaintiffs' Second Amendment rights (Count I); (2) the Takings Clause (Count II and III); and (3) substantive due process (Count IV). More than a month later, in August, Ocean State Tactical filed a motion for temporary restraining order, which was converted by consent of the parties into a motion for preliminary injunction.  (A5.)

"The parties agreed to submit documentary declarations and exhibits in lieu of an evidentiary hearing," and "[b]oth parties . . . retained expert historians" and "submitted additional helpful exhibits." (A22.)  The district court additionally heard oral argument and accepted two rounds of legal briefing from the parties.  (A6-A8.)

The district court denied the requested injunction, explaining legislation designed "to lower the risk of harm that results from the availability of devices that assist someone intent on murdering large numbers of people" "does not implicate the Second Amendment and violates no one's constitutional rights."  (A13.)

Although the district court's primary holdings rejected Ocean State Tactical's likelihood of success on the merits of their constitutional claims, the district court also found that the remaining factors all required denial.

As an initial matter, the district court held that plaintiffs had not established irreparable harm that would entitle to them to a *preliminary* injunction because the only asserted harms were "conditional" and "economic" (A64), two categories of harms that are by definition reparable or avoidable—and, the court further assured itself that harm could be avoided because it ordered "any forfeited magazines be retained in a safe manner so that they may be returned to their owners if a permanent injunction is granted in the future." (A65.) The district court further found that there would be no harm to plaintiffs' "right to self-defense" during any interim period because the existence of "an occasion in which a victim threatened with violence might need to rapidly fire that eleventh, twelfth, or twentieth bullet is so speculative as to be non-existent." (*Id.*) As for any sporting use, the district court found that if "plaintiffs or other recreational gun enthusiasts might somehow enjoy firing dozens of rounds in quick succession, that is hardly impaired" because limitations on large capacity magazines present "only the inconvenience of" a slight interruption before reloading, "not the kind of irreparable harm required for a preliminary injunction to issue." (A66.)

Next, the district court went on to "consider the hardship on the nonmovant if enjoined" and the "impact" of any preliminary injunction "on the public interest." (*Id.*)  The court noted its "finding that in a mass shooting incident every pause to reject a spent magazine and load a new one represents the opportunity to preserve a specific life—or more than one." (*Id.*)  In weighing the effect of the large capacity magazine restriction against the "plaintiffs' proffered harm," the court concluded that that alleged harm "pales in comparison to the unspeakable devastation caused by mass shooters wildly spraying bullets without end into a crowd of bystanders." (A66-A67.)  The two equitable factors therefore also weighed against denial.

As for the substance of the merits, the court identified "that 'individual self-defense is "the *central component*" of the Second Amendment right.'" (A33-A34, quoting *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).)  Off the bat, the court concluded that "plaintiffs have failed to meet their burden of establishing that LCMs are 'Arms' within the textual meaning of the Second Amendment," reasoning that while a large capacity magazine is an object a person "'takes into his hands,' it is not a 'thing . . . useth in wrath to *cast at or strike* another.'" (A38, quoting *D.C. v. Heller*, 554 U.S. 570, 582 (2008)).  "[M]agazines themselves are neither firearms nor ammunition," they are rather "*holders* of ammunition," a point the court found supported by Ocean State Tactical's own expert who opined that "'[a] magazine is a container, detachable or fixed, that holds

ammunition." (A39.)  Because of these characteristics, the court correctly concluded that large capacity magazines could not be arms.

Next, the court concluded that "[t]here is simply no credible evidence in the record to support the plaintiffs' assertion that LCMs are weapons of self-defense" that are afforded the Second Amendment's protection.  (A40.)  The court looked to contemporary and historic evidence put forth by the parties, rejecting Ocean State Tactical's argument "that LCMs were 'in common use'" due to their ownership or manufacturing numbers because that "argument is untethered from the concept of self-defense." (A43.)  The court therefore additionally found that large capacity magazines do not "enjoy Second Amendment protection" because they are not "weapons of self-defense." (A44.) And, having satisfied itself that the large capacity magazine restriction therefore did not implicate the Second Amendment twice-over, it declined to "investigate whether the LCM Ban's restrictions are consistent with the regulations of history" "because the overwhelming evidence before it is that at *no* time were LCMs considered 'Arms,' nor were they used in any significant way for self-defense."  (A45.)

Turning to the Takings Clause claim, the district court began from the longstanding proposition that "'[a] prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking. . . .'"

(A47, quoting *Mugler v. Kansas*, 123 U.S. 623, 669 (1887).) The court rejected Ocean State Tactical's claim that the large capacity magazine restriction is a concrete taking and not a use restriction because, in addition to forfeiture, the statute affords a gunowner "a series of other options she may exercise, at least two of which—modification and transfer to a state where LCMs are not banned—allow retention of the LCM and substantial beneficial use." (A48.) The district court went on to find that the statute had a clear public interest in that the "asserted governmental interest of public safety stemming from mass gun murders could not be more undeniably compelling" (A52) and found "as fact" that the restriction was reasonably designed to accomplish its purpose because in the "two or three seconds" gained in re-loading time by the requirement to use smaller capacity magazines, "a child—or two children, or even three—may escape the fire of a mad person." (A53.) The court also noted that Ocean State Tactical had pointed to no facts to support that there are magazines that cannot be modified or "certain handguns that can *only* accept an LCM," and that the only identified burden, even if such limitations existed, would be that a person would need to buy or modify an item "at a cost as little as under $14.95" in order "to fire thirty rounds from three ten-round capacity magazines instead of from two fifteen-round capacity magazines or a single thirty-round device." (A58-A60.) To round out its rejection of the Takings Clause argument, the court noted the many courts that have similarly rejected Takings Clause challenges

10

to identical or similar laws regarding large capacity magazines, machine guns, bump stocks, bullet buttons, and semiautomatic firearms in cases that are not distinguishable from this one. (A60-A61.)

Finally, the district court also dispensed of the due process and vagueness challenges, holding that Ocean State Tactical "failed to carry" its "burden of demonstrating a likelihood of success" with their vagueness and substantive due process claims because the large capacity magazine restriction is understandable to people of ordinary intelligence and provides "no discretion" to law enforcement in its enforcement. (A62-A63.)

The district court therefore denied the motion for preliminary injunction, entered an order preserving any forfeited large capacity feeding devices, and this appeal timely followed.

## SUMMARY OF THE ARGUMENT

Under no conception of the Second Amendment's "text and history" is there a guarantee that civilians may possess whatever weapons accessories they desire, no matter how dangerous they render a lawful firearm when affixed or incorporated into that firearm, and with complete disregard to whether the accessory allows the bearer to gain an unfair advantage against an individual bearing only weapons in common use for self-defense. Certainly, the question is not so clear that it would entitle Ocean State Tactical to preliminary relief while awaiting full adjudication on the merits,

11

and the district court was correct that Ocean State Tactical's asserted harms were too speculative and contingent to outweigh the public interest in the potential to save a life in the event of a mass shooting.

The framers limited the Second Amendment's protections only to arms, and did not include the many accessories required to make black powder weapons of the day function within that sweep—so too, large capacity magazines are only accessories and are not themselves weapons. Moreover, when weapons, like those to which large capacity magazines are affixed, are used or are most useful for military applications rather than self-defense, government regulation has inevitably followed. And finally, when changes in technology lead to unacceptable social upheaval, like the plague of mass shootings that continues today, government has not hesitated to restrict access to the specific weapons at the center of such disorder. The district court therefore correctly concluded that Ocean State Tactical had not demonstrated a likelihood of success on the merits of its claim that a magazine capacity restriction falls within the scope of the Second Amendment.

Moreover, the regulation of personal property, especially one that does not involve physical seizure of the personal property, is not a compensable taking. Here, the government has not passed the large capacity magazine restriction for its own use; instead, it has passed a generally applicable regulation as an exercise of its police power for the public safety. And, just like in the case of designer drugs added

12

to the controlled substances list or new forms of gambling devices, owners of large capacity magazines had plenty of notice that these accessories have been the subject of regulation in Rhode Island and throughout the United States for more than one hundred years.  The district court did not err when it held no taking had occurred.

Lastly, the statutory language does not offend the due process clause.  The statute provided that possession of the specified large capacity magazines would become criminal on the date of enactment, but exempted all from penalties until 180 days after enactment.  It is specific enough to provide fair notice to individuals that they may take one of four different actions with respect to their large capacity magazines to avoid penalty, including to "permanently modify" the magazine such that it accepts less than ten rounds of "ammunition."  This description is concrete enough for individuals to be on-notice and for law enforcement officers to have objective guidance that the item in question must accommodate only ten rounds of ammunition.  Again, the district court did not err when it concluded that Ocean State Tactical had little likelihood of success on the merits of its due process claim.

Limiting "dangerous and unusual" arms, especially in extremely narrow ways like the capacity restriction at issue here, is well-grounded in the history and tradition of this country during all periods when the Second Amendment was contemplated or applicable.  The district court's decision should be affirmed.

**ARGUMENT**

I.    **THIS COURT REVIEWS DENIALS OF PRELIMINARY INJUNCTION FOR ABUSE OF DISCRETION.**

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008)). A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

"'Likelihood of success is the main bearing wall' of this 'framework.'" *W Holding Co. v. AIG Ins. Co.-Puerto Rico*, 748 F.3d 377, 383 (1st Cir. 2014) (quoting *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012).

This Court applies a "strict" standard of review for "denials of injunctive relief." *ANSYS, Inc. v. Computational Dynamics N. Am., Ltd.*, 595 F.3d 75, 77 (1st Cir. 2010). This Court "will reverse such a denial only if the district court mistook the law, clearly erred in its factual assessments, or otherwise abused its discretion in granting the preliminary injunction." *Id.* (internal quotation omitted). While "abstract" legal questions are reviewed *de novo*, "judgment calls" are reviewed "with

14

considerable deference to the trier." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (internal quotation omitted). If a case is "close," this Court will uphold the denial if "it cannot say the court abused its discretion." *ANSYS* at 78; *accord Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020) (standard for grant or denial is "abuse of discretion").

This Court has observed that clear error review does not apply to "general considerations that move a lawmaking or rulemaking body to adopt a rule, as distinct from the facts which determine whether the rule was correctly applied." *United States v. Singleterry*, 29 F.3d 733, 740 (1st Cir. 1994). But this Court has not articulated what standard of review to apply in cases where a district court finds legislative facts for its *own* analyses, let alone when the district court determines that the legislative factfinding required by a matter is so complex as to require adversarial presentation of evidence. *C.f.* Note to subdivision (a) (1972), Fed. R. Evid. 201 ("judicial access to legislative facts" should be restrained only by notice requirements "inherent in affording opportunity to hear and be heard and exchanging briefs," including "the possibility of introducing evidence through regular channels in appropriate situations"). For example, in *Borden's Farm Products Co. v. Baldwin,* 293 U.S. 194 (1934), the Supreme Court *remanded* to the trial court "for the taking of evidence as to the economic conditions and trade practices underlying the New York Milk Control Law." Note, Fed. R. Evid. 201. In other words, sometimes to

15

find legislative facts, courts choose adversarial evidentiary presentations, like the district court here.

While it appears that this Court has not yet addressed the proper standard of review for this scenario, it has "emphasiz[ed] a fundamental point." *United States v. Baptiste*, 8 F.4th 30, 42–43 (1st Cir. 2021). "'The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.'" *Id.* (quoting *NASA v. Nelson*, 562 U.S. 134, 147 n.10 (2011), in turn quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (per Scalia, J.)). At minimum, and in the context of abuse-of-discretion review of the overall decision, this Court should accord deference to the factual record as developed by the court below, especially given rulings regarding trial administration and parties' full and fair opportunity to respond, as is contemplated by the Note to Federal Rule of Evidence 201.[3]

---

[3] Specifically, the court here made three pertinent rulings in the control of its own docket that limited evidence the parties presented and had an opportunity to respond to. First, it excluded an affidavit by William Worthy because Ocean State Tactical sought to introduce it the day before oral argument and without requesting permission to do so. (A.42.) Second, it denied a request by the Firearms Policy Coalition to file an amicus brief days after oral argument and months after the brief which it intended to support was filed. (A.7.) Third, although it granted supplemental briefing after the hearing on the preliminary injunction motion, it limited the contents to "legal arguments only without introducing new factual assertions or evidence." (*Id.*)

## II.  THE COURT CORRECTLY CONCLUDED OCEAN STATE TACTICAL CANNOT ESTABLISH LIKELIHOOD OF SUCCESS ON ANY PRELIMINARY INJUNCTION FACTOR.

The issuance of an injunction "does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits" without demonstration of the other three factors. *Benisek*, 138 S. Ct. at 1943-44.  As a threshold matter, the district court did not abuse its discretion when it found Ocean State Tactical had failed to establish an immediate, irreparable injury; that it did not succeed in a balance of the equities; and that the public interest lay with Rhode Island's enactment.  For these reasons alone, this Court may affirm the district court's denial and end its inquiry.

To establish irreparable harm, a plaintiff must show a likelihood that she will suffer irreparable injury, irremediable by monetary relief or other legal remedy, before a decision may be reached on the merits. *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc*., 645 F.3d 26, 32 (1st Cir. 2011).  Ocean State Tactical's asserted harms of monetary damages, prosecution, or an impairment of the right to armed self-defense are nothing more than "conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store."  (A64, quoting *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds to Go, Inc.* 370 F.3d 151, 162 (1st Cir. 2004).)  These harms are redressable with money, are based on unlikely contingencies of which there was no evidence, or are entirely speculative.

Importantly, the court found that any apprehension that lack of access to a large capacity magazine during the pendency of the case would impede any plaintiff's ability to defend him or herself "is so speculative as to be non-existent." (A65.)

This Court, the United States Supreme Court, and other Courts of Appeals have approved of deferring any possible entry of an injunction to the end of trial even with important constitutional rights in the balance when equitable factors (like the delay between complaint and preliminary injunction motion present here) cut against findings of *immediate*, irreparable harm. *E.g. Benisek*, 138 S. Ct. at 1944; *Voice of the Arab World*, 645 F.3d at 36 ("leisurely pace and lack of urgency" "undercut[s]" a claim of irreparable harm); *see also Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244 (11th Cir. 2016) (delay of "even only a few months" "militates against a finding of irreparable harm."); *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985); *Equity in Athletics, Inc. v. US Dep't of Educ.*, 291 Fed. Appx. 517, 521-22 (4th Cir. 2008); *Doe v. Banos*, 713 F. Supp. 2d 404 (D.N.J. 2010), *aff'd on other grounds,* 416 F. App'x 185 (3d Cir. 2010); *Utah Gospel Mission v. Salt Lake City Corp.,* 316 F. Supp. 2d 1201 (D. Utah 2004), *aff'd,* 425 F.3d 1249 (10th Cir. 2005). Here, Ocean State Tactical similarly delayed between filing its complaint and moving for injunction, and this additional equitable concern further supports the district court's conclusion that the asserted harms were not immediate and irreparable.

Lastly, the district court balanced the hardships and determined public interest by observing "that in very real terms, the plaintiffs' proffered harm caused to them by an injunction pales in comparison to the unspeakable devastation caused by mass shooters wildly spraying bullets without end into a crowd of bystanders." (A.67.) It is no abuse of discretion to balance a temporary deprivation of an optional firearms accessory against the potential to avert personal and societal tragedy. This Court could affirm on Ocean State Tactical's failure on the three equitable preliminary injunction factors alone.

## III. THE COURT CORRECTLY FOUND OCEAN STATE TACTICAL DID NOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS SECOND AMENDMENT CLAIMS.

"Like most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 142 S .Ct. at 2133 (quoting *Heller*, 554 U.S. at 636 and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010)). "The Second Amendment's plain text thus presumptively protects . . . a right to 'bear' *arms* in public for *self-defense*." *Id*. at 2135 (emphasis added). Therefore, the Second Amendment does not protect a right to carry "dangerous and unusual weapons;" it only reaches those weapons "in 'common use' for self-defense today." *Id.* at 2143 (quoting *Heller*, 554 U.S. at 627). It is the plaintiffs' burden to demonstrate that the challenged regulation falls with the Second Amendment's

scope. *Id.* at 2126; *see also Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005) ("the ordinary default rule" is that "plaintiffs bear the risk of failing to prove their claims"). Only after such a demonstration must the government "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126.

Large capacity magazines are not arms, are not in common use for self-defense today, and are dangerous and unusual. They therefore do not fall within the scope of the Second Amendment's protection at all, and are subject to ordinary regulation under the police power of the state. However, even if it were to be (incorrectly) assumed that large capacity magazines *are* arms in common use for self-defense today, restrictions on weapons, like Rhode Island's large capacity magazine restriction, have been imposed throughout the history of the United States whenever technological innovation coupled with societal conditions yield new, disruptive forms of violence. It has never been the case that courts, legislatures, or the executive branch have interpreted the Constitution to require unfettered civilian access to weaponry whose primary purpose is slaughter. To hold otherwise would be a sharp left-turn from the text, history, and tradition of the Second Amendment.

## A.    Large Capacity Magazines Are Not Arms.

The Second Amendment extends only to "instruments that constitute bearable arms." *Bruen*, 142 S. Ct. at 2132. Because large capacity magazines are not arms,

they do not fall within "the Second Amendment's plain text." *Id.* at 2129. As *Heller* noted, the "object" of an individual's Second Amendment right is "Arms." 554 U.S. at 581. But large capacity magazines are not "Arms," as the term "Arms" was understood at the Founding or at the ratification of the Second or Fourteenth Amendments. *Id.* ("The 18th-century meaning is no different from the meaning today.").

*Heller* consulted 18th Century sources defining arms as "'[w]eapons of offence, or armour of defence'" and "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Id.* (quoting Samuel Johnson, 1 Dictionary of the English Language 106 (4th ed. 1773) (reprinted 1978) and Timothy Cunningham, 1 A New and Complete Law Dictionary (1771), respectively). Samuel Johnson's dictionary further defines "weapon" as an "instrument of offence; something with which one is armed to hurt another." Samuel Johnson, 2 Dictionary of the English Language (4th ed. 1773).

A large capacity magazine or other ammunition feeding device cannot be used as a weapon alone, without the lower receiver or other constituent parts of a firearm. As the district court observed, "a firearm can fire bullets without a detachable magazine, and in any event, a firearm does not need a magazine containing more than ten rounds to be useful." (A37.) As the court observed, and based on Ocean State Tactical's proffered expert, "'[a] magazine is a container, detachable or fixed,

21

that holds ammunition while it feeds into a repeating firearm." (A39.)  It is not, itself, a firearm, and, "like other accessories to weapons, [is] not used in a way that 'cast[s] at or strike[s] another.'" (A38.)  The court borrowed a particularly vivid illustration of the difference between an accessory and a weapon—with a firearm accessory like a silencer or a large capacity feeding device "'you can't hurt anybody with [one] unless you hit them over the head with it.'" (*Id.*, quoting *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *2 (D. Md. Sept. 20, 2019), *aff'd*, 26 F.4th 610 (4th Cir. 2022), *cert. denied* __ S.Ct.__, 2022 WL 6572217 (Oct. 11, 2022).). The same reasoning led the Tenth Circuit to reject the proposition that silencers were covered by the plain text of the Second Amendment.  *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence').").

The distinction between weapons on the one hand and firearm accessories on the other would have been familiar to the Founding generation.  Around that time and up through the adoption of the Fourteenth Amendment there was a "clear distinction" between "Arms" on the one hand and "accoutrements" on the other. (A40.)  One example comes from a 1778 resolution of the Continental Congress, which promised that the United States would pay for ". . .[e]very horse and all arms and accoutrements, which shall be taken, by the enemy in action . . . " for cavalry troops to be provided by the states. Congress Undertakes to Raise a Cavalry Corps.,

*in* 2 PUBLIC PAPERS OF GEORGE CLINTON, FIRST GOVERNOR OF NEW YORK 827, 828 (Wynkoop Hallenbeck Crawford Co. ed., 1900). Databases of English language sources confirm that while the category of objects that a soldier might need or carry with him was known as his "accoutrements" this term was *separate* from arms; when "arms" was used alone the word encompassed only weapons. (JA544, ¶ 61.)

Militiamen contained their ammunition in a cartridge box, an item often grouped together in the term "accoutrements" but not arms. (JA535-JA536, ¶¶ 23-24); *see also* Congress Undertakes to Raise a Cavalry Corps (required accoutrements included "[a] cartridge-box to buckle round the waist, with twelve tin pipes for the cartridges."). Contrary to Ocean State Tactical's bizarre and unsupported assertion that cartridge boxes were just boxes that "never played any role in the firing mechanism" or were not "regularly worn on one's person," (Appellant's Br. 21-22), cartridge boxes at the time were an innovation in ammunition storage and delivery—an innovation over older-model bandoliers, which, when worn across the chest, had a tendency to injure users when powder exploded. HAROLD PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA 1526-1783 63-65 (Bramhall House rprt. ed. 1956). Even today, modern firearms manufacturers often do not list magazines under "gun parts" but under "firearms accessories" sections of their websites. *E.g.*, *compare* Parts                              PMR30,                              KELTEC, https://www.keltecweapons.com/collections/class/parts/?product_class=parts&wea

pon=pmr30&page=1&order=title&orderby=asc (last viewed June 21, 2023) (listing firing pins) *with* Accessories PMR30, KELTEC https://www.keltecweapons.com/collections/class/accessories/?product_class=acce ssories&weapon=pmr30&page=1&order=title&orderby=asc (last viewed June 21, 2023) (listing magazines); *accord* General accessories offered by Palmetto State Armory: https://palmettostatearmory.com/accessories.html (last viewed June 21, 2023); (JA409-JA422).

Ocean State Tactical continues its parade of unsupported assertions with the contention that because some firearms operate with "integrated" magazines, those feeding devices are somehow "integral" to the firing mechanism of the weapon. Tellingly, Ocean State Tactical cites no source for this proposition, in the record or outside of it. Even if an ammunition feeding device is *part of* (integrated into) a firearm, it does not follow with no support that the device is *necessary to* (integral to) that firearm. Ocean State Tactical did not below, and does not now, identify any such firearm that would be inoperable without a large capacity feeding device. Even if there *were* such a (at this point, entirely hypothetical) firearm, that weapon's existence or non-existence would have no bearing on whether large capacity feeding devices are themselves weapons—they are not, as explained above. That is to say, in English, when a singular exception to a category exists, it does not negate the meaning of a category or the word describing it. (JA537, ¶ 29.) But the Constitution

is comprised of English words, and to conform to its text the Second Amendment must apply only to arms, and not the modern-day equivalent of cartridge boxes and saddlebags—containers for ammunition.

Ocean State Tactical's next argument-by-fiat, that a component which is "literally part" of a firearm is "obviously an arm, not an accessory," fares no better. There are all sorts of accessories one can affix to a firearm—barrel shrouds, silencers, magazines, infrared targeting scopes, pistol grips, and any other engineering marvel that can be made "literally part" of a firearm through rivets, epoxy, etc. And some of these accessories, like certain safety devices, can be installed in the firing chain. But just how the addition of gears does not make or break whether a certain object is a bicycle, whether an accessory is affixed to a firearm or lying separately in the "accessories" department of a gun store does not change its nature. Again, the textual frame of the Second Amendment should be the guide—it covers only arms, which the large capacity magazine restriction does not regulate.[4]

---

[4] There should be no concern that in recognizing that large capacity feeding devices of all sorts are accessories, not arms, it would open some back-door to regulating an entire class of firearms. In such a case, a plaintiff would be able to demonstrate that the regulation in fact precluded their ownership of a particular type of covered weapon (itself an Arm). Here, plaintiffs have not averred such a thing and they could not—hundreds of models of the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629, are available for use even under Rhode Island's restriction because they function quite well with feeding devices compliant with the large capacity magazine

**B.** **Large Capacity Magazines are Not in Common Use for Self-Defense Today.**

The Second Amendment extends only to an individual's right to keep and carry "arms," and does not protect a right to carry "dangerous and unusual weapons;" it only reaches those weapons "in 'common use' for self-defense today." *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). *Bruen*, *Heller*, and *McDonald*—all three—identified "individual self-defense" as "'*the central component*' of the Second Amendment right." *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767, in turn quoting *Heller*, 554 U.S. at 599). Moreover, there is no doubt that the centrality of self-defense in the Second Amendment inquiry implies that the focus is on *use* rather than mere *ownership* of arms—*Bruen* repeatedly says so. *See, e.g.*, *Bruen*, 142 S. Ct. at 2138 (referring to "commonly *used* firearms for self-defense") (emphasis added); *id.* at 2143 (noting handguns are "indisputably in 'common *use*' for self-defense today") (emphasis added); *id.* at 2156 (describing the "right to bear commonly *used* arms in public subject to certain reasonable, well-defined restrictions") (emphasis added); *see also Heller*, 554 U.S. at 636 (striking down an "absolute prohibition of handguns held and *used* for self-defense") (emphasis added).

---

restriction. *Contrast Jackson v. City and Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (eliminating access to bullets would preclude use of firearms).

It is no wonder that Ocean State Tactical seeks to avoid this result with selective quotation, but its attempt to frame the inquiry as between two types of weapons—those "in common use today" and those which are "highly unusual in society at large," Apellant's Br. 24, omits entirely *Bruen*'s emphasis in the cited paragraph that the weapons in question, handguns, are "in common use for *self-defense* today" and "are, in fact, "the quintessential *self-defense* weapon.'" *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, at 629) (emphases added). Such a blatant omission is necessary to justify their reliance on sheer numbers of manufactured or owned large capacity magazines. But big numbers from sales statistics and non-peer reviewed survey data do not yield insight into how many individuals in this country purposefully own large capacity feeding devices for *use* in self-defense.

Reducing the important constitutional question whether a specific instrument qualifies for Second Amendment protection to a numbers game rather than a legal inquiry as to whether it "facilitate[s] armed self defense," *Bruen*, 142 S. Ct. at 2132, departs from *Heller*'s assessment of the issue as well as base logic. *Kolbe v. Hogan*, 849 F.3d 114, 141-42 (4th Cir. 2017), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 ("[T]he Heller majority said nothing to confirm that it was sponsoring the popularity test"); *Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (2022) ("[M]easuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical[.]" (citing

27

*Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015))).   Simple thought experiments demonstrate the absurdity of this line of inquiry—if, for example, federal regulators repealed the ban on machineguns and gun manufacturers had a bonanza giveaway to ensure numerous civilian ownership, states would not lose their ability to regulate machineguns.  *Heller*, 554 U.S. at 624-25 (machinegun ban constitutional).  Or, perhaps more absurdly, an innovative new weapon with increased accuracy that was immediately banned before it could gain widespread adoption, without waiting to see if it was used or useful in self-defense, would be constitutionally regulated by Ocean State Tactical's reasoning.

This Court has already concluded, consistent with the district court here, that large capacity magazines have not "commonly been used for home self-defense purposes."  *Worman*, 922 F.3d at 37.  This Court observed that "wielding the proscribed weapons for self-defense within the home is tantamount to using a sledgehammer to crack open the shell of a peanut."  *Id.*  Metaphor aside, neither plaintiffs here nor plaintiffs in *Worman* "could . . . identify even a single example of a self-defense episode in which ten or more shots were fired."  *Id.*  In contrast, the district court considered Rhode Island's evidence that an experienced law enforcement officer was "unaware of any incident in which a civilian has ever fired as many as 10 rounds in self-defense," whereas large capacity magazines are "frequently" used by "persons committing criminal offenses 'in the course of their

criminal conduct.'" (A42.)  These findings are in accord with findings by other courts around the country that large capacity magazines are "most useful in military service," and are not useful for self-defense, both before and after *Bruen*.  *Heller*, 554 U.S. at 627; *see also Kolbe*, 849 F.3d at 137 ("[L]arge-capacity magazines are particularly designed and most suitable for military and law enforcement applications.") (cleaned up); *Hanson v. D.C.,* No. CV 22-2256 (RC), 2023 WL 3019777, at *12 (D.D.C. Apr. 20, 2023) (large capacity magazines not covered by Second Amendment "because they are most useful in military service" and "they are not typically possessed" or "in fact commonly used for self-defense."); *Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-CV-01815-IM, 2022 WL 17454829, at *11 (D. Or. Dec. 6, 2022) ("[W]hile large-capacity magazines are rarely used by civilians for self-defense, they are often used in law enforcement and military situations . . . [and] . . . are disproportionately used in crimes involving mass shootings.").  At this point, the collective factual record is complete—large capacity magazines are not commonly used for self-defense.

The slippery-slope scenario Ocean State Tactical invokes, where the government "decides" that only one bullet is necessary for self-defense, Appellant's Br. 27-29, is wholly untethered from the text of the Second Amendment and the numerous court cases interpreting it in just the way the district court has done here. *Heller* itself is the example of how courts can and do draw lines—while it might not

be "permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed," this is because of the reasoning expressed by the Court in the remainder of the paragraph. *Heller* 554 U.S. at 629. There, the Court analyzes in great detail the "many reasons" that make handguns preferable for "home defense": easy storage, their size means they cannot be wrestled away, they are easier to use, and they can be used one-handed. *Id.* Ocean State Tactical has provided no such litany of practical reasons why large capacity feeding devices are useful for self-defense *or* evidence of actual use.

Ocean State Tactical has not demonstrated that large capacity feeding devices facilitate armed self-defense.

### C. 'Dangerous and Unusual' Weaponry Like Large Capacity Magazine-Equipped Firearms Have Been Regulated Throughout History Through Means Analogous to Rhode Island's Restriction.

Ocean State Tactical has not fulfilled its burden of demonstrating that Rhode Island's large capacity magazine restriction burdens the Second Amendment right as articulated in *Bruen*, *McDonald*, and *Heller* at all, both because the restricted devices are not arms and because they are not in common use for self-defense. However, the district court's denial of preliminary injunctive relief may be alternatively affirmed because Rhode Island's large capacity magazine restriction "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126.

First, when a large capacity magazine is affixed to a firearm, the firearm becomes a "dangerous and unusual" weapon, a category *Bruen* recognized has been validly restricted throughout American history as recognized in *Heller*. *Bruen*, 142 S. Ct. at 2143. As discussed above, those weapons that are more useful in military application and which are not commonly used for self-defense fall within the category of "dangerous and unusual." And, as discussed below, in examining this historical designation other features coalesce as indicative of the "dangerous and unusual" characteristic—when a weapon, by dint of technological and societal change, becomes an instrument of unacceptable civilian violence, especially when that violence becomes one-sided or unfair, it is dangerous and unusual.

Second, to the extent that large capacity magazines are viewed as weapons at all (they are not), and further viewed as something other than a "dangerous and unusual" weapon, a nuanced approach of analogizing "how and why," *id.* at 2133, regulators in the past have addressed the law-abiding citizen's right to armed self-defense in light of the vast criminal utility of firearms is required. To do this, *Bruen* calls for "a well-established and representative historical *analogue*, not a historical *twin*." *Id.* To identify that analogue, the central consideration is whether the modern regulation "impose[s] a comparable burden on the right of armed self-defense and whether that burden is comparably justified" as to the historic regulation. *Id.*

31

"The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 142 S. Ct. at 2132. The use of large capacity magazines in mass shootings is an "unprecedented societal concern" spurred by "dramatic technological changes" unimaginable to the Founders or the Reconstruction generation, and analysis of historic analogues will not be "relatively simple to draw," and instead calls for "a more nuanced approach." *Id.* When regulation is understood in historic context as encompassing government action from local, state, and federal legislative, judicial *and* executive branches, a clear picture of consistent reaction to keep the instruments of mass violence out of civilian hands emerges.

(i)  Repeating firearms with large capacities have always been regarded as dangerous and unusual.  Ocean State Tactical's protestations to the contrary, Appellant's Br. 34-35, are ahistoric fantasy.  At the outset, it must be noted that Ocean State Tactical relies heavily on a vacated panel opinion from the Ninth Circuit, *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated,* 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).  As the district court here noted, such "reliance on the panel decision in *Duncan* in light of its reversal *en banc* is suspect." (A36.)

32

Turning to the particulars, whether the first firearm to have more than a 10-shot capacity was invented around 1580, Appellant's Br. 34, is entirely irrelevant to the inquiry at hand because such experimental flint- and match-lock multi-shot firearms were not adopted in the Colonies or the early United States. To the contrary, primary sources describe multi-shot firearms as mainly curiosities that had little to no practical application in warfare or self-defense. The very treatise Ocean State Tactical cites, *id.*, describes these museum-piece multi-shot firearms as having atypical, complex firing mechanisms and that "the danger of using such a weapon must be great . . . indeed, . . . a pistol of similar construction blew up whilst being experimented with." William Wellington Greener, *The Gun and Its Development* 81 (Cassell & Co., 8th ed. 1907) (1881). The treatise denotes each such weapon a "specimen," describes which *museum* the specimen resides in, and states "[t]he makers of these weapons appear to have been foreign without exception," and that "the general inutility of the weapons themselves render a detailed description of little value to the inventor or the general reader." *Id.* As for pepper-box pistols, a firearms historian describes that "it was a disconcerting but not uncommon experience to have all six barrels go off in unison." Lewis Winant, Pepperbox Firearms 32 (Greenberg Pub. 1952). And as for the fabled Girandoni *air rifle*,[5] a single example

---

[5] Air rifles today are most often conceived of as children's toys. Jim Supica et al., *The Illustrated History of Firearms* 244 (2d ed. 2020).

was brought on the Lewis and Clark expedition where it was demonstrated as a curiosity. W.H. "Chip" Gross, *Throwback Thursday: Lewis and Clark's Air Rifle*, NRA Family (October 7, 2021), https://www.nrafamily.org/content/throwback-thursday-lewis-and-clark-s-air-rifle/. An anecdote from the expedition's journals is illustrative of the disutility of the Girandoni air rifle as a weapon: during the very first demonstration of the air rifle, an accidental discharge led to the shooting of a bystander—although she was shot in the head and there was "blood gusing from her temple," and all "supposed she was dead," after a few minutes they "found the wound by no means mortal or even dangerous." Meriwether Lewis, August 30, 1805 (Gary Moulton ed., U of Neb. Press 2002, https://lewisandclarkjournals.unl.edu/item/lc.jrn.1803-08-30 (last visited June 21, 2023)). None of these arms are equivalent to a modern semiautomatic firearm, whether it be handgun or rifle, equipped with a large capacity magazine.

It was not until the mid-19th century that multi-shot firearms, namely cap and ball and rimfire revolvers, came on the scene and were widely adopted. (JA323, ¶¶ 24-25.) But these arms only had five- or six-shot capacity. *Id.* The Henry Rifle and the Winchester Repeating Rifle were the only individual-use ten-shot capacity firearms in use up through Reconstruction; while there were other multi-shot repeating rifles, like Spencers, they had limited capacity. (JA358-JA360, ¶¶ 12-16.) Henrys and Winchesters were uncommon compared to other rifles during the Civil

War and Reconstruction. (JA360, ¶ 17.) Ownership and use of these weapons were confined, at least in the United States, almost entirely to military, militia, and the police. Ocean State Tactical's contention that "'[o]ver 170,000' Winchester 66's 'were sold domestically,'" Appellant's Br. 35, is specious because 170,000 is well over the total number of Henrys and Winchesters manufactured between 1861-1877, of which 56,000 were shipped to foreign armies. (JA375, n.26.) During the same time period, 845,713 of just one make of single shot rifle were manufactured, meaning "rifles holding more than 10 rounds made up a tiny fraction of all firearms in the United States during Reconstruction." (JA375, ¶¶ 42-43.)

Reaction to the spread of Henrys and Winchesters from military to civilian hands during Reconstruction illustrates how government has historically burdened the Second Amendment right to armed self-defense by restricting certain types or features of weaponry from civilian use when confronted with rapid changes in technology that are leveraged by small, criminal groups to wreak havoc in civilian society. During the time of adoption of the Fourteenth Amendment, these weapons "were understood to be weapons of war or anti-insurrection, not weapons of individual self-defense." (A43) (internal quotation omitted). The government went about seizing civilian shipments of the weapons, and criminal groups like the Ku Klux Klan resorted to subterfuge to obtain them through shipping channels. (JA386, ¶ 68.) In Louisiana, militias imposed specific security and storage regulations to

35

keep Henrys and Winchesters secure from non-militia purposes, regulations that did not apply to other firearms. (JA400, ¶ 96.) Almost all use was curtailed to law enforcement—including pro-Reconstruction militias and pro-Redemption militias that claimed legitimacy only through their status as a militia group. (JA395, ¶ 87.) That is, while states did not pass laws to ban them, civilians were de facto precluded from ownership of high-capacity weapons throughout the south and would be suspected of insurrection if found with Henrys and Winchesters in their possession. (JA375, ¶ 41.) In other words, the government directly burdened Second Amendment rights to bear large-capacity firearms by routinely confiscating them—a practice that was not challenged even directly following the adoption of the Fourteenth Amendment. These high-capacity weapons were regarded as dangerous and unusual.

After Reconstruction, regulation of capacity continued. Many states passed laws regarding capacity in relation to hunting without apparent constitutional concern. Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 J. L. & CONTEMP. PROBS. 55, 59, tbl. 1 (2017), https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=4825&context=lcp (21 states had such laws enacted between 1868–1899 and 43 between 1900–1934). When Pennsylvania's law was challenged as unconstitutional (although no one thought to even bring up the Second Amendment), the court described the

semiautomatic weapons of the time thusly: "that a specially designed gun, which is made particularly effective and proportionately dangerous to game, comes within the class of dangerous agencies either to be regulated or prohibited, as the Legislature may decide." *Commonwealth v. McComb*, 76 A. 100 (Pa. 1910). When a firearm is "specially designed" in a way that makes it "proportionately" more dangerous than expected, it is "dangerous and unusual," and its use may be restricted.

And, of course, states began to legislate to restrict capacity directly in the 20th century. In 1927, Rhode Island, Michigan, and Massachusetts enacted statutes defining a machine gun by its capacity to fire a certain number of rounds without reloading. 1927 R.I. Pub. Laws 256 (twelve); 1927 Mich. Pub. Acts 887, 888 (sixteen); 1927 Mass. Acts 413, 413–14. Nine other states followed, with various numerical limits, through the first half of the 1930s. 47 Stat. 652; 1932 La. Acts 336; 1933 Minn. Laws 231; 1927 N.J. Laws 180; 1917 N.C. Sess. Laws 309; 1933 Ohio Laws 189; 1934 S.C. Acts 1288; 1933 S.D. Sess. Laws ch. 206, 245; 1934 Va. Acts 137. In 1934 and 1938 Congress passed the National Firearms Acts, restricting ownership of machine guns and submachine guns because of those weapons' ability to fire rapidly from large capacity magazines. (JA333, ¶ 39).

That sometimes these capacity restrictions were rolled back and then re-enacted is of no moment. For example, Rhode Island changed the definition of

capacity from 12 to 15 in 1959 and then, in 1975 altered the ban to apply to fully automatic weapons only, before capacity was once again limited between 1994-2004 under the FFA.  Finally, the legislature enacted § 11-47.1-3 last June.  Changing policy is what legislatures do; this history is very similar to California's history of regulating concealed carry, where statutes were enacted and re-enacted in response to popular perception. (JA327-JA328, ¶ 29-30).  When a regulation does not burden a fundamental right and is simply an exercise of the police power, "what the people believe is for the common welfare must be accepted as tending to promote the common welfare, whether it does in fact or not." *Jacobson v. Massachusetts*, 197 U.S. 11, 35 (1905).

Ocean State Tactical's apparent point reduces to the contention that large capacity firearms have existed for a long period of time.  But the fact that large capacity firearms have been, at least in small numbers, in civilian hands since Reconstruction has no bearing on *Bruen*'s history and tradition inquiry because, as Rhode Island has demonstrated, capacity has been a regulated feature of firearms from the start.  Analogous burdens have always been imposed for similar reasons on weaponry that, through technological or societal disruption, disturbs civil peace.

(ii)  Even were it not the case that there is a history and tradition of de facto and de jure regulation of firearms capacity in this country, today's prohibitions on

large capacity magazines stem from the same "why" as regulations of "dangerous and unusual weapons" throughout American legal history.

Beginning at the beginning, "[t]he Statute of Northampton was, in part, a product of . . . the *acute disorder* that still plagued England." *Bruen*, 142 S. Ct. at 2139 (emphasis added, internal quotation omitted). It prohibited public carry of "armor and lances," which "were generally worn or carried only when one intended to engage in lawful combat or . . . to *breach the peace*." *Id.* at 2140 (emphasis added). Although there was a lawful use for the conduct, restrictions were imposed because societal conditions led to an enhanced potential for the arms to be used to "breach the peace." That same distinction carried on throughout history. *See id.* at 2142 (specific arms that "terrify the people" restricted from public carry); *id.* at 2144 ("pocket pistols" restricted where and when "strife and excitement" caused outbreak of civilian violence in East New Jersey).

The absence of regulation also bears out this connection. Unlike the circumstances giving rise to East New Jersey's restriction on pocket pistols in 1686, on the eve of the Revolution homicide rates were at historic lows and only 10-15% of homicides were committed by firearms. (JA313, ¶ 8.) It is therefore unsurprising that firearms were not specifically subject to extensive restriction. But restrictions on *concealed* weapons did arise in the antebellum period, as homicide rates rose in the Southern states and murders were often committed with concealable weapons.

(JA319-JA320, ¶ 17-19.) These weapons were used to "'frequently insult others with impunity'" and to "gain 'secret advantages'" over opponents. (JA319, ¶ 17.) Then, beginning in the early 20th century, technology evolved once more. High-powered explosives like dynamite were used in anarchist attacks, including an attack on Wall Street. (JA331-JA333, ¶ 36-38.) And the submachine gun was used in gangland mass murders. *Id.* Restrictions followed close on the heels of these societal disruptions. *Id.* As technological and social changes amplified destructive power of material like explosives (like dynamite used by anarchists and fertilizer used by domestic terrorists) possessory bans again followed. (JA331-JA334 ¶¶ 38, 40.)

As for today, "what is . . . unthinkable is that mass murders have become a weekly—and sometimes daily—event." (A50.) As *Worman* set forth, semiautomatic rifles "equipped with LCMs have been the weapons of choice in many of the deadliest mass shootings in recent history, including horrific events in Pittsburgh (2018), Parkland (2018), Las Vegas (2017), Sutherland Springs (2017), Orlando (2016), Newtown (2012), and Aurora (2012)," 922 F.3d at 39, a list that now must be updated with "Midland-Odessa, Texas (Aug. 31, 2019, seven killed and twenty-five injured)," "Uvalde, Texas, where . . . a lone gunman murdered twenty-one victims, mostly children," and Highland Park, Illinois, where "[s]ix weeks later, a shooter opened fire on a July 4th parade . . . killing seven people and wounding thirty." (A51-52.) The destruction wrought is egregious; "[t]he ability to spray a

40

crowd with bullets results in more injuries per person, and 'cases with multiple bullet wounds are more complex, have a higher likelihood of injury that requires surgical intervention, and have a higher likelihood of death in the emergency department.'" (A56.)  The proliferation of large capacity magazines has affected how ordinary citizens regard the safety of everyday activities like going to school, attending church, or going to the mall as these places have all been the settings of bloodshed worse than the battlefield.  Natalie Bruzda, *Veteran's Quick Reactions Saved Lives During Las Vegas Shooting*, LAS VEGAS REV. J. (Nov. 10, 2017), https://www.reviewjournal.com/crime/shootings/veterans-quick-reactions-saved-lives-during-las-vegas-shooting/ (Iraq veteran survivor described occasions under fire in a war zone as "very few and far between, as opposed to however many rounds were shot at us that night").

And when bump stocks, firearms accessories that transform semiautomatic firearms to fully automatic fire, became an instrument of mass death in the Las Vegas shooting of 2017, the Trump administration acted swiftly to ban possession and require destruction or surrender of the devices.  (JA334, ¶ 40.) Technology continues to change as manufacturers continue to flood the market with new means of increasing the deadly toll of rapid-fire firearms while evading regulatory review. (JA335-JA336, ¶¶ 44-45.)  Regulators can move to stop these innovations, just as they have done throughout history under similar conditions.

(iii)   To fulfill the purpose of giving civilians a fighting chance against military-grade weaponry, Rhode Island's magazine capacity restriction imposes only a limited burden on the Second Amendment right to armed self-defense, if it imposes one at all.  In addition to not regulating "arms," as discussed above, Rhode Island's capacity restriction is not a prohibition of "an entire class," *Heller*, 554 U.S. at 628, of anything—Rhode Islanders remain free to use any type of ammunition feeding device, or otherwise lawful ammunition, under the restriction. Instead, the restriction *narrowly* limits capacity of those ammunition feeding devices to a number of rounds that, as recognized by multiple appellate courts, is *more than sufficient* for armed self-defense purposes. *Duncan*, 19 F.4th at 1104–06; *Worman*, 922 F.3d at 37; *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.* ("*ANJRPC*"), 910 F.3d 106, 121 n.25 (3d Cir. 2018), *cert. granted, judgment vacated sub nom.*, *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Bruck,* 142 S. Ct. 2894 (2022); *Kolbe*, 849 F.3d at 145; *Heller v. District of Columbia*, 670 F.3d 1244, 1262 (D.C. Cir. 2011) ("*Heller II*") *abrogated on other grounds by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  The law further exempts traditional large capacity tubular magazines with rimfire ammunition used for target shooting. § 11-47.1-2(2). And, most importantly, it imposes no limit on the *type* of magazine a person can possess, the *number* of magazines a person can possess, or *where* or *how* magazines can be used. It only restricts the capacity of permissible magazines to ten or fewer rounds.

These features demonstrate that any potential "burden on the right of armed self-defense" imposed by a large capacity magazine restriction is extremely limited.

## IV. THE DISTRICT COURT CORRECTLY CONCLUDED OCEAN STATE TACTICAL HAS NOT DEMONSTRATED LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS TAKINGS CLAIM.

The Takings Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 536 (2005). The law at issue here does not constitute a taking of personal property that requires compensation. Rather, it is a regulatory restriction on large capacity feeding devices enacted pursuant to a valid exercise of police power. Thus, the district court correctly held Ocean State Tactical was unlikely to succeed on the merits of its takings claim.

Property owners may establish takings claims in two distinct ways. "The government commits a physical taking when it uses its power of eminent domain to formally condemn property." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021). By contrast, a regulatory restriction may be a taking when government has "restricted a property owner's ability to use his own property." *Id*. at 2072. If the government exercises its police powers to protect the safety, health, and general welfare of the public, however, no compensable taking has occurred. *See, e.g.*, *Chi., B. & Q. R. Co. v. Illinois*, 200 U.S. 561, 593-94 (1906) ("It has always been held

that the legislature may make police regulations, although they may interfere with the full enjoyment of private property, and though no compensation is given.") (quotations omitted); *accord Duncan v. Bonta*, 19 F.4th at 1112 ("California reasonably chose to prohibit the possession of large-capacity magazines due to the danger that they pose to society" and prohibition was not a taking); *McCutchen v. United States*, 14 F.4th 1355, 1374 (Fed. Cir. 2021) (Wallach, J., concurring) ("Long ago the Supreme Court recognized that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community") (quotations omitted); *Akins v. United States*, 82 Fed. Cl. 619, 622 (Fed. Cl. 2008) ("Property seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Taking Clause") (internal citations and quotations omitted); *Fesjian v. Jefferson*, 399 A.2d 861 (D.C. 1979) (statute at issue was indisputably "an exercise of legislative police power;" there was no taking).

### A.    The Capacity Restriction is Not a Physical Taking.

[I]t is "inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a regulatory taking, and vice versa." *Horne v. Department of Agriculture*, 576 U.S. 350, 361 (2015) (quotations omitted).  But that is what Ocean State Tactical improperly attempts to do here.  Appellant's Br. 38-39.  But, as the district court found, the law at issue does not mandate direct government appropriation or physical invasion of any

44

individual's large capacity feeding device. (A48.) There is no taking of private property for a "public use," and, therefore, no physical taking as a matter of law.

Ocean State Tactical's reliance on physical invasion cases like *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 419-420 (1982) (in which a "permanent physical occupation" occurred) and *Kelo* v. City *of New London*, 545 U.S. 469 (2005) (taking of real property) is unavailing: "[P]hysical *invasion* cases are special" and the Supreme Court has "not repudiated the rule that any permanent physical *occupation* is a taking." *Lorretto*, 458 U.S. at 432 (emphases in original). The challenged restriction stands in stark contrast to *Horne* – the underlying facts of which appellants omit from their analysis. Appellant's Br. 40. In *Horne*, "[a]ctual raisins [were] transferred from the growers to the Government." 576 U.S. at 361. Raisin growers subject to the reserve requirement at issue thus lost "the entire 'bundle' of property rights in the appropriated raisins –'the rights to possess, use and dispose of' them." *Id*. (quoting *Loretto*, 458 U.S. at 435). Farmers were required to "give a percentage of their crop to the Government, free of charge," *id.* at 355, for the government's economic purposes.

That is decidedly not the case here. The law, far from being a physical invasion of property, left an owner of large capacity feeding devices with "a series of other options she may exercise, at least two of which—modification and transfer to a state where LCMs are not banned—allow retention of the LCM[.]" (A47.) The law does

45

not mandate direct seizure or "the functional equivalent of a practical ouster of the owner's possession." *Murr v. Wisonsin*, 582 U.S. 383, 392 (2017) (quotation omitted). And rather than serving economic goals, the regulatory restriction at issue here was enacted pursuant to the state's police powers to control mass violence. The purpose of the statute is to remove large capacity feeding devices from circulation in the State, not to transfer title to the government for use in service of the public good. The "LCM ban seeks to protect public safety and therefore it is not a taking at all." *ANJRPC*, 910 F.3d at 124 n.32. The law here is likewise not a physical taking.

## B.    The Capacity Ban is Not a Regulatory Taking

Government regulations that "completely deprive an owner of *all* economically beneficial use of her property" can constitute a compensable regulatory taking. *Lingle*, 544 U.S. at 538 (cleaned up). But unlike physical takings, regulatory takings have only been recognized by the Supreme Court in the context of real property and do not occur when the value or use of personal property is diminished. *See Horne*, 576 U.S. at 361 ("*Lucas* recognized that while an owner of personal property 'ought to be aware of the possibility that new regulation might even render his property economically worthless,' such an 'implied limitation' was not reasonable in the case of land." (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027-28 (1992)); *Andrus v. Allard*, 444 U.S. 51, 65 (1979) (regulation is by definition "the adjustment of rights for the public good").

46

Even if a property owner is deprived of the most profitable use of personal property, the Constitution does not mandate that compensation be paid by the state, provided that she is not deprived of all economic benefit. *See Andrus,* 444 U.S. at 66-67; *see also Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 131 (1978) (diminution in property value alone cannot establish a taking); *Holliday Amusement Co. of Charleston, Inc. v. South Carolina*, 493 F.3d 404, 410 (4th Cir. 2007) ("[T]he principle in [*Andrus*] was plain: it is possible to push the notion of regulatory takings to the point that the most basic exercises of the police power become the subject of ever more expense and litigation."). If a law is "otherwise a valid exercise of the [government's] police powers, the fact that it deprives the property of its most beneficial use does not render it unconstitutional." *Goldblatt v. Town of Hempstead, N.Y.*, 369 U.S. 590, 592 (1962) (ordinance regulating dredging and pit excavating not a taking).

Even if a regulatory taking were cognizable in the context of personal property, the law is not a regulatory taking for the same reasons it is not a physical taking: it is a valid exercise of the State's police powers to prevent mass violence. *Mugler v. Kansas*, 123 U.S. 623, 669 (1887) (a "prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot … be deemed a taking."); *Holliday*, 493 F.3d at 410 (with regard to possession of gambling machines made

subject to forfeiture, "by reason of the State's traditionally high degree of control over commercial dealings, [the owner] ought to be aware that new regulation might even render his property economically worthless.") (quoting *Lucas*, 505 U.S. at 1027-28).

Section 11-47.1-3 applies to personal property and not any interest in land, the owners' property was not rendered worthless, and it was enacted in accordance with the State's police powers – not its eminent domain powers. The district court determined that the "gunowner has a series of other options she may exercise, at least two of which—modification and transfer to a state where LCMs are not banned—allow retention of the LCM and *substantial beneficial use*." (A48.) (emphasis added). And the district court correctly found that the regulatory restriction on large capacity feeding devices was within the state's police powers. (A48.); *see also Goldblatt*, 369 U.S. at 594-95. The law serves the public interest as our nation is gripped by an "ultra lethal pathogen of mass murders," the government's means in enacting the ban were reasonably designed to accomplish that purpose, and the ban is not unduly oppressive upon individuals. (A49-A60.) Moreover, there are few types of property as heavily regulated throughout our country as firearms accessories like large capacity magazines. *See, e.g. Maryland Shall Issue, Incorporated v. Hogan*, 963 F.3d 356, 367 (4th Cir. 2020) (bump stock ban not a taking). The restriction therefore is not a regulatory taking. To hold

otherwise would upset settled expectations, opening up the courthouse doors and the public's wallet for, to take one example, owners of new designer drugs made newly illegal by the state legislature. *See Duncan*, 19 F.4th at 1112 ("[n]othing in the case law suggests that any time a state adds to its list of contraband—for example, by adding a drug to its schedule of controlled substances—it must pay all owners for the newly proscribed item.").

## v.     The Large Capacity Magazine Restriction Does Not Offend Due Process.

### A.     The Restriction is Not Impermissibly Retroactive.

As the district court noted, "[i]t [was] unclear…upon which theory of due process the plaintiffs [were] proceeding" in the preliminary injunction proceeding because their arguments below were unclear. (A62.)  To the extent Ocean State Tactical now seeks to argue that the large capacity magazine restriction is impermissibly retroactive, that argument provides no basis for likelihood of success on the merits.

The Supreme Court has consistently held that "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations" even if "the effect of the legislation is to impose a new duty or liability based on past acts." *Usery v. Turner Elkhorn Mining Co*. 428 U.S. 1, 16 (1976).  To determine if a law has impermissibly retroactive effects, courts must instead ask "whether the new provision attaches new legal consequences to events completed before its

49

enactment." *Landgraf v. USI Film Prods*., 511 U.S. 244, 270 (1994); *see also Lattab v. Ashcroft*, 384 F.3d 8, 14-15 (1st Cir. 2004). Although the Supreme Court has recognized that any test of retroactivity "will leave room for disagreement in hard cases," the "familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." *Landgraf*, 511 U.S. at 270.

Applying these principles, the Fourth Circuit found that a Maryland law banning "rapid fire trigger activator[s]" commonly known as "bump stocks" was not impermissibly retroactive. *Maryland Shall Issue*, 963 F.3d 356.[6] Because the bump stock ban gave six months of notice before taking effect, the Fourth Circuit held that the law did not impose "new liability back to the date of purchase" and did not alter the rights that bump stock owners "possessed when they purchased" bump stocks. *Id*. at 367. Finally, because the ban's effective date was six months after passage, the court held that Appellants had fair notice. *Id*.

Ocean State Tactical never explains how the provisions of Rhode Island's magazine capacity restriction operates retroactively. Appellant's Br. 44-45. Unsurprisingly so, because it does not. The legal consequences contained in the law attached at or six months after passage, the time when the operative event, possession, occurred.  The statute therefore does not "attach new legal consequences

---

[6] While the Fourth Circuit decision was rooted in Maryland Constitutional provisions, the court recognized that its retroactivity analysis follows the U.S. Supreme Court's retroactivity analysis under *Landgraf*.

to events completed before its enactment." *Landgraf*, 511 U.S. at 270. Instead, it attaches a new legal consequence to an *ongoing* event and defers that consequence to six months in the future.

Even assuming retroactive application, the restriction remains permissible because it amply provides fair notice and does not upset reasonable reliance or settled expectations. *See Landgraf*, 511 U.S. at 270. Like the Maryland bump stock ban, the Law provides a 180-day window for currently non-compliant individuals to conform to the Law's requirements. *Compare Maryland Shall Issue*, 963 F.3d 356 *with* R.I. Gen. Laws § 11-47.1-3(b)(1)(i)-(iii). And Appellants cannot convincingly argue that the Law upsets reasonable reliance or settled expectations. Rhode Island had proscribed large capacity magazines with the ability to hold more than 14 rounds at once from 1927 to 1975. 1927 R.I. Pub. Laws ch. 1052, § 1; 1975 R.I. Pub. Laws ch. 278, § 1. Federally, large capacity magazines were banned between 1994 and 2004. Pub. L. No. 103-322, §§ 110101-06, 108 Stat. 1796, 1996-2010 (1994). Eight other states and the District of Columbia have large capacity magazine ban laws like Rhode Island's including its neighbors Massachusetts and Connecticut. *See* Colo. Rev. Stat. §§ 18-12-301, 302, 303; Conn. Gen. Stat. §§ 53-202w, 53-202q; D.C. Code Ann. §§ 7-2506.01(b); 7-2507.06(a)(4); Haw. Rev. Stat. Ann. § 134–8(c); Md. Code Ann., Crim. Law § 4-305; Mass. Gen. Laws ch. 140, §§ 121, 131M; N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j), 2C:39-9(h); N.Y. Penal Law §§ 265.00(23),

265.02(8), 265.10, 265.11, 265.20(7-f), 265.36-265.37; Vt. Stat. Ann. tit. 13, § 4021.

Ocean State Tactical was on notice that possession of large capacity ammunition feeding device was subject to regulation, including complete possessory ban, by the government after the many decades when such possessory bans were in place.

> **B.     Ocean State Tactical Has Not Demonstrated That the Large Capacity Magazine Restriction Is More-Likely-Than-Not Void for Vagueness.**

As an initial matter, Ocean State Tactical's vagueness challenge to § 11-47.1-3(b)(1)(i) is a facial one—the complaint was brought before the statute was in force and no plaintiff averred a desire to engage in any specific course of conduct related to modifying their magazines. As such, "[t]o succeed, [Ocean State Tactical] must establish that no set of circumstances exists under which the [statute] would be valid." *Frese v. Formella*, 53 F.4th 1, 7 (1st Cir. 2022) (internal quotation omitted). "[F]acial challenges are disfavored because they often rest on speculation, run contrary to the fundamental principle of judicial restraint, and threaten to short circuit the democratic process." *Id.* (internal quotations omitted). Ocean State Tactical has not overcome this substantial burden to demonstrate likelihood of success on the merits of its claim.

Section 11-47.1-3(b)(1)(i) exempts large capacity feeding devices that— within 180 days of the Act's effective date—are "permanently modif[ied]" to render the device unable to hold more than 10 rounds of ammunition. R.I. Gen. Laws § 11-

47.1-3(b)(1)(i). There is no ambiguity—"either a given magazine has a place to insert an eleventh bullet or it does not." (A63.) For the first time on appeal, Ocean State Tactical asserts the term "ammunition," in addition to the phrase "permanently modifies" is also somehow vague.

The statute as a whole is perfectly comprehensible. Ocean State Tactical concedes that "the words 'permanent' and 'modification' are understandable enough on their own." Appellants' Br. 47. Indeed, the phrase "permanently modifies" is unmistakably clear both on its own and when read in conjunction with its accompanying text. The touchstone of a void-for-vagueness inquiry is whether "individuals have fair notice of the consequences of their conduct…and can comport themselves accordingly." *Peulic v. Garland*, 22 F.4th 340, 348 (1st Cir. 2022). A law is void-for-vagueness under the Due Process Clause only when "it is so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *United States v. Gonzalez*, 949 F.3d 30, 38 (1st Cir. 2020) (citation omitted). In terms of law enforcement discretion, a statute is not rendered vague by "the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Frese*, 53 F.4th 1, 9 (1st Cir. 2022) (cleaned up).

The district court noted that "[t]he plaintiffs have provided no evidence that modifying an LCM could leave a law enforcement officer unable to discern how many bullets it will accept." (A63.)  Ocean State Tactical seeks to avoid this common-sense solution to their imagined problem by inventing a series of hypotheticals where ammunition of various calibers is shoved into a formerly modified magazine. Appellant's Br. 47-48.  That is not how magazines work— "magazine components can degrade over time, including warping, cracking, or spring mechanisms wearing out," (JA405) and it is therefore an unwise gunowner who would shove "smaller ammunition than what is currently on the market," Appellant's Br. 47, into an already-owned magazine.  Ocean State Tactical admits that for magazines, there is a specific type of ammunition "designed to be used in or typically associated with" each device.  Appellant's Br. 48.  Given that "ordinary people" exist in the same reality as Ocean State Tactical, they are given fair notice about what ammunition means in this context.  And ordinary people as well as "law enforcement officer[s]" are perfectly able to "discern how many bullets [a modified magazine] will accept." (A63).  The one can, for example, look at the label for what type of ammunition the magazine is designed when she buys it, and the others are experts in firearms and firearms accessories who can objectively assess whether a magazine has been modified to comply with the statute.

## CONCLUSION

54

The order of the United States District Court for the District of Rhode Island should be affirmed.

Respectfully submitted,

PETER F. NERONHA
ATTORNEY GENERAL

*/s/ Sarah W. Rice*
Sarah W. Rice, Bar No. 1205724
Assistant Attorney General
Keith Hoffmann, Bar No. 1190318
Samuel Ackerman, Bar No. 1205884
Special Assistant Attorneys General
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400, Extension 2054
Fax: (401) 222-3016
SRice@riag.ri.gov
KHoffmann@riag.ri.gov
SAckerman@riag.ri.gov
*Attorneys for Defendants State of Rhode Island, Peter F. Neronha, and Darnell S. Weaver, in their official capacities*

June 21, 2023

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f) this document contains 12,965 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 MSO in 14-point Times New Roman font.

*/s/ Sarah W. Rice*
Sarah W. Rice
Attorney for Appellees-Defendants
June 21, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on June 21, 2023 I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system: Ocean State Tactical, LLC, d/b/a Big Bear Hunting and Fishing Supply; Jonathan Hirons; James Robert Grundy; Jeffrey Goyette; and Mary Brimer.

*/s/ Sarah W. Rice*

56