No. 23-1072

# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————

OCEAN STATE TACTICAL, LLC, d/b/a Big Bear Hunting and Fishing Supply;
JONATHAN HIRONS; JAMES ROBERT GRUNDY; JEFFREY GOYETTE; MARY BRIMER,
*Plaintiffs-Appellants*,

v.

STATE OF RHODE ISLAND; COLONEL DARNELL S. WEAVER, in his official capacity as
the Superintendent of the Rhode Island State Police; PETER F. NERONHA, in his
official capacity as the Attorney General for the State of Rhode Island,
*Defendants-Appellees*.

———————————

On Appeal from the United States District Court
for the District Court of Rhode Island,
No. 1:22-cv-00246-JJM

———————————

## BRIEF FOR APPELLANTS

———————————

MICHAEL A. KELLY
KELLY SOUZA
 & PARMENTER PC
128 Dorrance St
Suite 300
Providence, RI 02903

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
MARIEL A. BROOKINS
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Appellants*

April 10, 2023

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Appellants certify as follows:  Jonathan Hirons, James Robert Grundy, Jeffrey Goyette, and Mary Brimer are individuals; Ocean State Tactical, LLC, does not have a parent corporation, and no publicly held corporation owns more than ten percent of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES.................................................................................. iv

ORAL ARGUMENT STATEMENT ..................................................................... xi

INTRODUCTION .................................................................................................. 1

STATEMENT OF JURISDICTION ...................................................................... 6

STATEMENT OF THE ISSUES ........................................................................... 6

STATEMENT OF THE CASE................................................................................ 6

SUMMARY OF ARGUMENT.............................................................................. 13

STANDARD OF REVIEW ................................................................................... 17

ARGUMENT ........................................................................................................ 19

I.       HB 6614 Violates The Second Amendment ................................................ 19

         A.      The Ammunition Feeding Devices that HB 6614 Bans Are
                 "Arms"................................................................................................. 20

         B.      The Ammunition Feeding Devices that HB 6614 Bans Are
                 Typically Possessed by Law-Abiding Citizens for Lawful
                 Purposes.............................................................................................. 24

         C.      Insofar as the Burden Shifts, Rhode Island Cannot Shoulder
                 It......................................................................................................... 29

                 1.      There is no longstanding historical tradition of
                         regulating firing or ammunition capacity, let alone of
                         banning ammunition feeding devices above a certain
                         threshold................................................................................. 30

                 2.      The state cannot save its ban by claiming that the
                         devices it covers represent some dramatic
                         technological change............................................................... 34

II.      HB 6614 Violates The Takings Clause ...................................................... 38

III.   HB 6614 Violates The Due Process Clause...................................................... 44

IV.   The Remaining Preliminary Injunction Factors Support Reversal .............. 49

CONCLUSION .......................................................................................................... 50

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016)..........................................................................14, 20, 28, 37

*Cedar Point Nursery v. Hassid,*
    141 S.Ct. 2063 (2021)......................................................................................38

*Chi., Burlington & Quincy R.R. Co.*
    *v. City of Chicago,*
    166 U.S. 226 (1897).........................................................................................38

*Chi., Burlington & Quincy Railway Co. v. Illinois,*
    200 U.S. 561 (1906).........................................................................................42

*City of Chicago v. Morales,*
    527 U.S. 41 (1999)........................................................................................5, 47

*Connection Distrib. Co. v. Reno,*
    154 F.3d 281 (6th Cir. 1998)...........................................................................50

*Daggett v. Comm'n on Governmental Ethics & Election Pracs.,*
    172 F.3d 104 (1st Cir. 1999) ...........................................................................10

*Dist. 4 Lodge of the Int'l Ass'n of Machinists*
    *& Aerospace Workers Loc. Lodge 207 v. Raimondo,*
    40 F.4th 36 (1st Cir. 2022) ..............................................................................18

*Dist. of Columbia v. Heller,*
    554 U.S. 570 (2008)................................................................................ *passim*

*Duncan v. Becerra,*
    970 F.3d 1133 (9th Cir. 2020) ................................................................ *passim*

*Duncan v. Becerra,*
    142 S.Ct. 2895 (2022)........................................................................................2

*Duncan v. Becerra,*
    19 F.4th 1087 (9th Cir. 2021)............................................................................2

*Duncan v. Becerra*,
   49 F.4th 1228 (9th Cir. 2022)....................................................................2

*Duncan v. Becerra*,
   988 F.3d 1209 (9th Cir. 2021) .................................................................2

*E. Enters. v. Apfel*,
   524 U.S. 498 (1998)........................................................................ 45, 46

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ..................................................................49

*Frese v. Formella*,
   53 F.4th 1 (1st Cir. 2022) .......................................................................46

*Fyock v. City of Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015)...................................................................25

*Gebremichael v. INS*,
   10 F.3d 28 (1st Cir. 1993) ........................................................................9

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972)................................................................................46

*Haw. Hous. Auth. v. Midkiff*,
   467 U.S. 229 (1984)................................................................................41

*Heller v. Dist. Of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) .............................................................26

*Horne v. Dep't of Agriculture*,
   576 U.S. 350 (2015)................................................................... 38, 40, 44

*Hyde Park Partners, L.P. v. Connolly*,
   839 F.2d 837 (1st Cir. 1988) ..................................................................50

*Jackson v. City & Cnty. of S.F.*,
   746 F.3d 953 (9th Cir. 2014)............................................................ 21, 39

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
   710 F.3d 99 (3d Cir. 2013) .....................................................................50

*Kelo v. City of New London*,
    545 U.S. 469 (2005)................................................................... 39, 45

*Knick v. Twp. of Scott*,
    139 S.Ct. 2162 (2019)...........................................................43

*Kolender v. Lawson*,
    461 U.S. 352 (1983)...........................................................49

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013)...........................................................41

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005)...........................................................44

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)................................................... 38, 41, 43

*Lucas v. S.C. Coastal Council*,
    505 U.S. 1003 (1992)................................................... 43, 44

*Me. Forest Prods. Council v. Cormier*,
    51 F.4th 1 (1st Cir. 2022) ...................................................18

*Mugler v. Kansas*,
    123 U.S. 623 (1887)...........................................................42

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S.Ct. 2111 (2022) ................................................ *passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) ...............................................25

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*,
    287 F.3d 1 (1st Cir. 2002) ...................................................18

*Peoples Rights Org., Inc. v. City of Columbus*,
    152 F.3d 522 (1998)................................................... 47, 48

*R. J. Widen Co. v. United States*,
    357 F.2d 988 (Ct. Cl. 1966) ...............................................40

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996) ...................................................................18

*Ryan v. ICE*,
    974 F.3d 9 (1st Cir. 2020) .....................................................................18

*Se. Promotions Ltd. v. Conrad*,
    420 U.S. 546 (1975)...............................................................................27

*Siembra Finca Carmen, LLC v. Sec'y of Dep't of Agric. of P.R.*,
    437 F.Supp.3d 119 (D.P.R. 2020) .........................................................50

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008)...............................................................................32

*Staples v. United States*,
    511 U.S. 600 (1994)...............................................................................32

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
    535 U.S. 302 (2002)...............................................................................38

*Toomer v. Witsell*,
    334 U.S. 385 (1948)...............................................................................49

*United States v. Singleterry*,
    29 F.3d 733 (1st Cir. 1994) ...................................................................18

*Usery v. Turner Elkhorn Mining Co.*,
    428 U.S. 1 (1976)........................................................................... 45, 46

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates*,
    455 U.S. 489 (1982)...............................................................................47

*Williamson Cnty. Reg'l Plan. Comm'n
    v. Hamilton Bank of Johnson City*,
    473 U.S. 172 (1985)...............................................................................43

*Worman v. Healey*,
    922 F.3d 26 (1st Cir. 2019) ...............................................................2, 25

**Constitutional Provisions**

U.S. Const. amend. II ............................................................................1

U.S. Const. amend. V ...........................................................................38

**Statutes**

18 U.S.C. §922 ....................................................................................33

26 U.S.C. §§5801-72 ...........................................................................32

28 U.S.C. §1292 ....................................................................................6

28 U.S.C. §1331 ....................................................................................6

28 U.S.C. §1343 ....................................................................................6

1927 Mich. Pub. Acts 887 ...................................................................31

1927 R.I. Acts & Resolves 256 ...........................................................31

1933 Cal. Stat., ch. 450 .......................................................................31

1933 Minn. Laws ch. 190 ....................................................................31

1933 Ohio Laws 189 ............................................................................31

1934 Va. Acts ch. 96 ...........................................................................31

1959 Mich. Pub. Acts 249 ...................................................................31

1959 R.I. Acts & Resolves 260 ...........................................................31

1963 Minn. Sess. L. ch. 753 ................................................................31

1965 Cal. Stat., ch. 33 .........................................................................31

1972 Ohio Laws 1866 ..........................................................................31

1975 Va. Acts, ch. 14 ..........................................................................31

Act of July 8, 1932, Pub. L. No. 72-275, §1, 47 Stat. 650 (1932)...........................32

N.J. Stat. Ann. §2C:39-1 .....................................................................32

Pub. L. No. 73-474, 48 Stat. 1236 (1934) .................................................. 32

Pub. L. No. 103-322, 108 Stat. 1796 (1994) ...........................................33

R.I. Gen. Laws §11-13-10 ...........................................................................48

R.I. Gen. Laws §11-47.1-2 ................................................................. *passim*

R.I. Gen. Laws §11-47.1-3 ................................................................. *passim*

R.I. Gen. Laws §11-47-64 ...........................................................................48

**Other Authorities**

*Black's Law Dictionary* (10th ed. 2014) .................................................39

Christopher S. Koper et al., *An Updated Assessment of the Federal
    Assault Weapons Ban: Impacts on Gun Markets & Gun Violence*,
    1994-2003, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice
    (2004), available at https://bit.ly/3wUdGRE ......................................33

David B. Kopel, *The History of Firearm Magazines and Magazine
    Prohibitions*, 78 Alb. L. Rev. 849 (2015) .................................... *passim*

Dwight B. Demeritt, Jr., *Maine Made Guns And Their Makers*
    (rev. ed. 1997) ......................................................................................36

Guns & Ammo, *Rifle Revolution: Magazine Evolution* (June 2, 2015),
    https://bit.ly/3K4pVCC ........................................................................36

Harold F. Williamson, *Winchester: The Gun That Won The West*
    (1952) ....................................................................................................35

*Improvement in magazine fire-arms*, Patent No. US30446A
    (issued Oct. 16, 1860), available at https://bit.ly/40NMTVi .............22

*Improvement in self-loading fire-arms*, Patent No. US27393A
    (issued Mar. 3, 1860), available at https://bit.ly/3G9jq09 ..................22

Louis A. Garavaglia & Charles G. Woman, *Firearms of the American
    West 1866-1894* (1985) ........................................................................35

*Model 1873 Short Rifle*, Winchester Repeating Arms,
    https://bit.ly/3JZbAaz (last visited Apr. 10, 2023) .............................36

Nat'l Shooting Sports Found., *Firearm Production in the United States* (2020), https://bit.ly/3jfDUMt......................................................25

*News From Washington: Special Dispatches to the New-York Times*, N.Y. Times (Dec. 23, 1864), https://nyti.ms/3lYbnMS ......................................22

Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* (9th ed. 2007)..........................................35

*Oregon Voters Approve Permit-to-Purchase for Guns and Ban High-Capacity Magazines*, NPR (Nov. 15, 2022), https://n.pr/3QMJCC1 .................26

William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), https://bit.ly/3yPfoHw........................................................... 25, 26, 28

William Wellington Greener, *The Gun and Its Development* (Cassell & Co., 8th ed. 1907) (1881)....................................................34

## ORAL ARGUMENT STATEMENT

Appellants respectfully request oral argument.  This case turns on application and interpretation of the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022), which as of this writing this Court has not had occasion to address outside of the appeal-waiver context.  The case also involves the retroactive application of a new state criminal statute, which has had the effect of requiring otherwise-law-abiding citizens to forfeit their lawfully acquired property.  Appellants respectfully submit that oral argument would aid the Court in its consideration of these issues and the other issues this case presents.

# INTRODUCTION

The decision below is far out of step with the teachings of the Supreme Court. The Supreme Court was emphatic in *Bruen* that "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," are "presumptively protect[ed]" by the Second Amendment. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2126, 2132 (2022) (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). The Court was equally clear that this protection becomes iron-clad if the arms in question are "typically possessed by law-abiding citizens for lawful purposes," as opposed to "those that 'are highly unusual in society at large.'" *Heller*, 554 U.S. at 625, 627; *Bruen*, 142 S.Ct. at 2143. Indeed, if states cannot "restrict[] *the public carry* of weapons that are unquestionably in common use today," *Bruen*, 142 S.Ct. at 2143 (emphasis added), then *a fortiori* states cannot ban their mere possession. That is the irreducible minimum of the fundamental "right of the people to keep and bears Arms": A state may not "prohibit[] … an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose." U.S. Const. amend. II; *Heller*, 554 U.S. at 628.

Rhode Island apparently disagrees. Just days before the Supreme Court issued its decision in *Bruen*, Rhode Island enacted House Bill 6614, the Large Capacity Feeding Device Ban Act of 2022 (codified at R.I. Gen. Laws §11-47.1-3). The Act does what its title suggests: It flatly bans all devices that feed ammunition "into a

semi-automatic firearm" if they are "capable of holding … more than ten (10) rounds of ammunition."  R.I. Gen. Laws §11-47.1-2(2), -3(a).  And the Act does not stop with making it illegal to "manufacture, sell, offer to sell, transfer, [or] purchase" these commonplace arms (not that any of that would be consistent with *Bruen* or the Second Amendment).  *Id.* §11-47.1-3(a).   It also criminalizes their mere "possess[ion]," and empowers the state to throw citizens in prison for up to five years even if the arms now deemed contraband were lawfully acquired long ago.  *Id.*

The problem for Rhode Island—or at least its first problem—is that the arms it has banned are the furthest thing from highly unusual in society at large.  "Millions of Americans across the country own" magazines capable of holding more than 10 rounds of ammunition.  *Duncan v. Becerra*, 970 F.3d 1133, 1142 (9th Cir. 2020).[1] "[B]etween 1990 and 2015, Americans owned approximately 115,000,000" of them. *Worman v. Healey*, 922 F.3d 26, 35 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 142 S.Ct. 2111.  That 115 million figure, which has only grown in the intervening years, accounts for "half of all magazines in America hold more than ten rounds." *Duncan*, 970 F.3d at 1142.  That is no surprise:  Millions of semiautomatic handguns—the "quintessential self-defense weapon" in modern America, according

---

[1] The panel decision in *Duncan* was vacated when the Ninth Circuit went en banc; the en banc decision was vacated after *Bruen*.  *See* 988 F.3d 1209 (9th Cir. 2021); 19 F.4th 1087 (9th Cir. 2021); 142 S.Ct. 2895 (2022); 49 F.4th 1228 (9th Cir. 2022).

to the Supreme Court, *see Heller*, 554 U.S. at 629—come standard with magazines capable of holding more than ten rounds.

If *Bruen* means anything, it means that a state cannot criminalize the mere possession of firearm components that are as integral to the functioning of the quintessential self-defense weapon as a transmission is to a car. The district court here reached a contrary conclusion only by turning *Bruen* and *Heller* on their heads.

The court first held that ammunition feeding devices—without which many commonly owned firearms cannot function as intended (or at all)—are not "'Arms' within the textual meaning of the Second Amendment." A40. Thus, in the district court's view, the state may ban magazines altogether, and the Second Amendment has nothing to say about it. In reaching that conclusion, the court brushed aside Supreme Court precedent as being "of little help." A38. In reality, *Bruen* and *Heller* leave no doubt about the definition of "Arms": "'[A]rms' [means] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Heller*, 554 U.S. at 581. "[T]he Second Amendment's definition of 'arms'" thus covers all "modern instruments that facilitate armed self-defense." *Bruen*, 142 S.Ct. at 2132. That obviously includes the components via which "ammunition [is] fed continuously and directly therefrom into a semi-automatic firearm." *See* R.I. Gen. Laws §11-47.1-2(2). After all, without the means to load ammunition into the firing chamber, firearms will not fire.

3

The district court alternatively posited that even if *some* magazines are "Arms," the ones the Act bans are not protected because citizens rarely need to expend more than ten rounds of ammunition in self-defense situations. But as the Supreme Court has now said over and over again, that is not the right question. "[T]he right to 'bear arms' refers to the right to 'wear, bear, or carry … for the purpose … *of being armed and ready* for offensive or defensive action in a case of conflict with another person.'" *Bruen*, 142 S.Ct. at 2134 (ellipses in original; emphasis added) (quoting *Heller*, 554 U.S. at 584). That right does not turn on how frequently people actually confront such situations or how many rounds they typically fire when they do. It turns on "the traditions of the American people"— and the very fact that a class of arms is "overwhelmingly chosen by American society" proves that there is no tradition of banning those arms outright. *Id.* at 2131; *Heller*, 554 U.S. at 628-29. So, when confronting a flat ban on a class of arms, the relevant question is whether the arms are "typically possessed by law-abiding citizens for lawful purposes" or instead "are highly unusual in society at large." *Bruen*, 142 S.Ct. at 2143; *Heller*, 554 U.S. at 625, 627. Because the arms that Rhode Island has banned indisputably fall in the former camp, the Large Capacity Feeding Device Ban Act of 2022 is unconstitutional.

That suffices to confirm that neither the decision below nor the Act can stand. But Rhode Island's confiscatory ban violates more than just the Second Amendment.

Unlike the Massachusetts law this Court confronted in *Worman*, Rhode Island's ban applies retrospectively. Residents who lawfully acquired magazines capable of holding more than ten rounds of ammunition years before the Act took effect must dispossess themselves of their property or else face time behind bars. There is a word for this sort of command: "taking." And under our constitutional system, when the government forces individuals to turn over, destroy, or send away their property, the government has an obligation to pay just compensation for what has been taken.

The district court concluded otherwise only by denying reality. According to the court, the Act merely prohibits the *use* of property for certain purposes. That would be news to Appellants and the many thousands of other Rhode Islanders who must get rid of their property or become felons. Indeed, if the only way to uphold the Act against a takings challenge is to deny its actual effect, then that just confirms that the ban runs headlong into the Due Process Clause, which imposes a near-zero-tolerance policy for vagueness when it comes to laws that not only authorize criminal punishment, but implicate fundamental constitutional rights. *See City of Chicago v. Morales*, 527 U.S. 41, 58-64 (1999).

In the end, Appellants are more than just likely to succeed on the merits of their challenges to Rhode Island's ban. This Court should reverse the district court's denial of injunctive relief and restore Appellants' constitutional rights.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§1331 and 1343, as Appellants have challenged, pursuant to 42 U.S.C. §§1983 and 1988, a state statute as violating the U.S. Constitution.  The district court denied Appellants' motion for a preliminary injunction on December 14, 2022.  Appellants timely filed a notice of appeal on January 13, 2023.  This Court has jurisdiction under 28 U.S.C. §1292.

## STATEMENT OF THE ISSUES

Whether Rhode Island's confiscatory ban on ammunition feeding devices capable of holding more than ten rounds violates the Second Amendment, the Takings Clause, and the Due Process Clause of the Fourteenth Amendment.

## STATEMENT OF THE CASE

1. On June 20, 2022, Rhode Island enacted House Bill 6614, the Large Capacity Feeding Device Ban of 2022 ("HB 6614" or "the Act"), which makes it unlawful for persons within the state to "manufacture, sell, offer to sell, transfer, purchase, possess, or have under [their] control a large capacity feeding device." R.I. Gen. Laws §11-47.1-3.  The statute defines "large capacity feeding device" broadly to mean any "magazine, box, drum, tube, belt, feed strip, or other ammunition feeding device" that is "capable of holding, or can readily be extended to hold, more than ten (10) rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm," except for "attached tubular device[s] … capable of holding only .22 caliber rimfire ammunition."  *Id.* 11-47.1-2(2).  This is

6

a criminal prohibition, and the penalties are steep: "Any person convicted of violating the provisions of this section shall be punished by imprisonment of not more than five (5) years[.]"  *Id.* §11-47.1-3(a).

Unlike most of the (unconstitutional) restrictions on arms that a handful of states have enacted in recent years, Rhode Island's ban is not limited to conduct that postdates its enactment.  Anyone who "lawfully possessed a large capacity feeding device" before the statute was enacted and still possessed one on the date the Act took effect was required to do one of three things—none of which included keeping their property intact—within 180 days of the Act's passage:  (1) permanently alter their feeding devices to hold no more than ten rounds; (2) surrender them to the police; or (3) transfer or sell them to a federally licensed firearm dealer or person outside the state.  *Id.* §11-47.1-3(b)(1); *see id.* §11-47.1-2(1) (defining "[f]ederally licensed firearm dealer").  The 180-day mark came and went on December 18, 2022, which means that anyone in Rhode Island who currently possesses an ammunition feeding device capable of holding more than ten rounds, save for the few narrow classes of people the Act exempts—federally licensed firearms dealers, authorized law enforcement officers, and active-duty members of the U.S. Armed Forces or National Guard, *see id.* §11-47.1-3(b)(2-3)—is now a criminal.

2. Facing the potential of up to a half-decade behind bars for continuing to possess property they lawfully acquired and believe to be constitutionally protected,

Appellants[2] filed suit on June 23, 2022, seeking a declaration that HB 6614 is unconstitutional and an injunction preventing the state from enforcing it against them. Specifically, Appellants alleged that the Act violates the Second Amendment, effects a taking without just compensation in violation of the Fifth Amendment and the Due Process Clause in its retroactive application, and is void for vagueness because it "fail[s] to define what constitutes 'permanent modification' of an LCM to accept no more than ten bullets," A61; *see* R.I. Gen. Laws §11-47.1-3(b)(1)(i).

In resolving Appellants' request for a preliminary injunction, the district court was resistant to the Supreme Court's instructions right out of the gate. The court began by quoting from the dissent in *Bruen* and noting that some "English and early American historians (including experts at top universities)" had, in its view, persuasively argued that *Heller*'s historical analysis was "wrong." A20-A21 (alteration in original) (quoting *Bruen*, 142 S.Ct. at 2177-78 (Breyer, J., dissenting)). Not surprisingly given that inauspicious introduction, the court went on to apply an

---

[2] Appellants are four individuals (Hirons, Brimer, Grundy, and Goyette) and one retailer (Ocean State Tactical, LLC). The individuals are residents of Rhode Island who own, for self-defense and other lawful purposes, ammunition feeding devices capable of holding more than ten rounds. Ocean State Tactical, LLC, which is located in Glocester, Rhode Island, stocks and sells ammunition feeding devices that hold more than ten rounds as well as firearms that do not come standard with or accept magazines that hold fewer than ten; Ocean State Tactical has an extensive inventory of magazines and firearms that hold more than ten rounds.

analytical methodology that bore not even a passing resemblance to what the majority opinion in *Bruen* requires.

First, whereas the district court acknowledged that it "ordinar[il]y" starts its opinions with "the applicable law," it chose to begin here by making various "findings of fact" based on "evidentiary declarations" that the parties had submitted alongside their respective preliminary injunction briefs. A12, A23; *see* A23-A28. This was curious. As the court itself acknowledged, the "questions that the Court needs to answer in order to follow the analytical path dictated by *Bruen*"—*e.g.*, Does the proscribed conduct (here, keeping and bearing certain ammunition feeding devices) come "within the embrace of the Second Amendment's text"?—are questions of law that call for "a historical analysis," not questions of fact that call for expert testimony. A19-A20. Indeed, as the court again admitted, "both *Heller* and *Bruen* … undertook their own historical analyses," A20, which is not something a court does in cases that turn on *adjudicative* facts (which call for expert testimony, credibility determinations, etc.), as opposed to *legislative* facts (which do not).[3] Nevertheless, likening the legal questions before it to factual questions such as

---

[3] "[A]djudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent." *Gebremichael v. INS*, 10 F.3d 28, 37 n.25 (1st Cir. 1993). "Legislative facts," by contrast, "are those which 'do not usually concern the immediate parties but are the general facts which help the tribunal decide questions of law and policy and discretion.'" *Id.*

whether "a criminal defendant ha[s] a mental disorder that is sufficient to excuse her from criminal responsibility" or whether "a steel slab [was] made defectively," the district court went on to compile "an evidentiary record upon which to base its findings," A22-A23, which drove the conclusions that followed.

Turning to the actual legal claims at issue, the court first ruled that ammunition feeding devices are not "Arms" as that term is used in the Constitution. A34-A40. In so ruling, the court explicitly parted ways with numerous decisions. *See* A35-A36 (noting that many courts "have held that LCMs *are* 'Arms,'" whereas "no Circuit Courts of Appeals hold[] that LCMs are not 'Arms'").[4]  The court also brushed aside Supreme Court precedent as being "of little help" to the inquiry. A38. *But see Heller*, 554 U.S. at 581-82 (exhaustively defining "Arms"); *Bruen*, 142 S.Ct. at 2130-32 (embracing *Heller*'s definitional analysis). From there, the court went on to chastise Appellants for not offering any "expert opinion on the meaning of the word 'Arms.'" A36. *But see Daggett v. Comm'n on Governmental Ethics & Election Pracs.*, 172 F.3d 104, 112 (1st Cir. 1999) ("'[L]egislative facts,' which go to the justification for a statute, usually are not proved through trial evidence but rather by material set forth in the briefs[.]"). And rather than apply the definition the Supreme Court has (twice) embraced, the court credited the testimony of "a

---

[4] The district court labeled ammunition feeding devices that hold more than ten rounds "large-capacity magazines," which it short-handed to "LCMs."

professor of linguistics" who opined that, "in the 18th Century, bullets were kept in cartridge boxes or cases, called 'accoutrements,' and the word 'magazine,' which was used at that time to mean 'storehouse' did not come to mean a compartment holding ammunition until the late 19th Century." A40. *But see infra* pp.21-22 & n.6. That, in the court's view, "suffice[d] for the Court to conclude that the plaintiffs have failed to meet their burden of establishing that LCMs are 'Arms.'" A40.

The district court next turned to whether ammunition feeding devices that hold more than ten rounds are "instruments of self-defense." A40 (capitalization omitted). Once again, the court relied on "the State's experts," not Supreme Court precedent, to resolve that question. A41. Based solely on declarations from state witnesses opining that individuals rarely need to expend more than ten rounds in self-defense situations, the court ruled that "plaintiffs have failed to establish that they have a likelihood of success in demonstrating that LCMs are weapons of self-defense, such that they would enjoy Second Amendment protection." A44. And having ruled that "LCMs appear to be neither 'Arms' nor weapons related to self-defense," "the Court's Second Amendment analysis simply end[ed]." A45-A46.

Appellants' remaining claims fared no better. Unlike the Massachusetts law in *Worman*, Rhode Island's ban has no grandfather clause; it "prohibit[s] continued physical possession of LCMs" even by residents (like Appellants) who lawfully acquired them long ago. A46. HB 6614 thus "forces them to divest themselves of

11

any LCMs designed to hold more than ten rounds of ammunition." A46. Even though the Act literally requires dispossession "of LCMs," and even though the court "assum[ed] that the only way to comply with the statute for some plaintiffs … is to forfeit" property they had lawfully acquired, the court found "no 'taking' within the meaning of the Fifth Amendment." A46. According to the court, a law that mandates forfeiture of lawfully obtained property is a mere "use restriction[]," which the court deemed exempt from Takings Clause scrutiny entirely so long as it is an exercise of the "police power." A47-A48. So, after "find[ing that] the LCM Ban [is] a valid exercise of police power," the court simply stopped. A60-A61.

The court held that Appellants failed to demonstrate a likelihood of success on their Fourteenth Amendment claim as well. A61-A63. Appellants alleged two different due process violations: that the retroactive and confiscatory aspects of the statute violate due process for much the same reasons it violates the Takings Clause; and that the statute's carve-out for "large capacity feeding device[s]" that are "[p]ermanently modifie[d] … such that [they] cannot hold more than ten (10) rounds of ammunition," R.I. Gen. Laws §11-47.1-3(b)(1)(i), is unduly vague. The court denied the first theory in a single sentence, noting that "the First Circuit has already ruled that a similar Massachusetts restriction on LCMs"—which (dissimilarly) was not retroactive—"survived intermediate scrutiny." A62. On the second theory, the court saw "nothing vague about the statutory language," noting that "[t]he necessary

12

modification is defined in the statute itself as 'such that [the magazine] cannot hold more than ten rounds of ammunition.'" A62-A63 (first alteration added).

Finally, having found that Appellants are unlikely to succeed on the merits of any of their claims, the court quickly dispatched the remaining injunction factors, finding all of them to favor the state. A63-A66. The court thus denied Appellants' motion for a preliminary injunction. A67-A68. This appeal followed.[5]

## SUMMARY OF ARGUMENT

Appellants are likely to succeed on the merits of all (and certainly at least one) of their claims. First and foremost, HB 6614 violates the Second Amendment. The framework for addressing flat bans on a class of arms may not have been pellucid when this Court decided *Worman*, which applied intermediate scrutiny to a prospective-only ban on magazines. But there is no longer any room for debate. After *Bruen*, the first question a court must ask in addressing a claim that a law violates the Second Amendment is whether "the Second Amendment's plain text covers [the] conduct" that the challenged law restricts. 142 S.Ct. at 2126. In the context of a flat ban à la HB 6614, the restricted conduct is keeping (and bearing) arms, which the plain text obviously covers. *Bruen*'s first step is thus satisfied as

---

[5] "[I]n fashioning its Order," which was issued 177 days into a 180-day grace period and thus inevitably resulted in individuals forfeiting their property, the court "ensur[ed] that any forfeited magazines be retained in a safe manner so that they may be returned to their owners if a permanent injunction is granted in the future." A65.

long as the feeding devices Rhode Island has banned are "Arms." They most certainly are. *Bruen* and *Heller* leave no doubt about that. Both now and at the Founding, "'arms' [means] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Heller*, 554 U.S. at 581. "[T]he Second Amendment's definition of 'arms'" thus covers all "modern instruments that facilitate armed self-defense." *Bruen*, 142 S.Ct. at 2132; *see Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (per curiam) (vacating state-court decision that held that stun guns are not protected because they did not come into existence until modern times). That clearly includes ammunition feeding devices, without which many firearms cannot operate as intended (or at all).

Because the magazines HB 6614 bans easily fit "the Second Amendment's definition of 'arms,'" the only remaining question is whether they are "in common use today." *Bruen*, 142 S.Ct. at 2132, 2143. If they are (and they are), then Rhode Island cannot ban them. Indeed, even the *Heller* dissenters recognized that, under "[t]he majority" opinion, the "Amendment protects those weapons 'typically possessed by law-abiding citizens for lawful purposes.'" 554 U.S. at 720 (Breyer, J., dissenting). *Bruen* confirmed that understanding, reiterating that the only "arms" that fall outside the Second Amendment—and thus the only ones a state can ban— are those that are not "in common use today," but rather are "highly unusual in society at large." 142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). That makes

this an easy case, because the arms banned here are the furthest thing from "highly unusual." As multiple courts of appeals have recognized (and none has disputed), millions of Americans own hundreds of millions of ammunition feeding devices that can hold more than ten rounds. *See infra* pp.25-26 (citing cases). And while a small number of bad actors have put these arms to illicit ends, the *typical* person who possesses them does so for lawful purposes, including self-defense.

That is the end of the inquiry. Under *Bruen*, when a law trenches on conduct covered by the Second Amendment's plain text—as a blanket prohibition on bearing or even keeping ubiquitous arms does—the state must "affirmatively prove that its … regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S.Ct. at 2127. And as *Heller* and *Bruen* make clear, the historical tradition in this country is that the government may not ban arms that law-abiding citizens commonly choose for lawful purposes like self-defense. But even if there were a need to further examine the history, it cuts sharply against the state. Indeed, the very fact that Americans have chosen these arms in the hundreds of millions confirms that there is no historical tradition of banning them. HB 6614's flat ban on common arms thus flatly violates the Second Amendment.

HB 6614 violates the Takings Clause as well, as it forces Rhode Islanders to dispossess themselves of lawfully acquired property without any (let alone "just") compensation from the state. The decision below concluded otherwise only by

embracing positions profoundly at odds with binding precedent—and reality. The court held that Rhode Island's ban effects no physical taking because it merely restricts how individuals can use their property, and that the ban is exempt from the obligation to pay just compensation because it is an exercise of the police power. That is wrong at every turn. A requirement that citizens dispossess themselves of their property is not a use restriction; it is a paradigmatic taking of personal property. Indeed, none of the non-forfeiture "options" that HB 6614 makes available—transferring the property to someone else, taking it out of state, or permanently modifying it so that it cannot hold ten rounds—provides a viable way for ordinary citizens to keep their lawfully obtained property without fundamentally altering it. And the fact that a state law is a valid exercise of the police power merely confirms that a state had the authority to enact it *vel non*, not that it is exempt from the Takings Clause. HB 6614 effects a taking without just compensation.

It also violates due process. The ban's retroactive and confiscatory aspects violate the Fourteenth Amendment for largely the same reasons that the statute violates the Takings Clause. And HB 6614 is void for vagueness too. In the context of a criminal prohibition that contains no *mens rea* requirement and implicates a fundamental constitutional right, the state has a special obligation to speak with especial clarity and precision. HB 6614 does the opposite. The Act allows residents to keep ammunition feeding devices they lawfully acquired before it took effect if,

after a 180-day grace period, the devices have been "[p]ermanently modifie[d] …
such that [they] cannot hold more than ten (10) rounds of ammunition.'" R.I. Gen.
Laws §11-47.1-3(b)(1)(i).  But the Act does not define what it means by
"[p]ermanent[] modifi[cation]," or "hold," or "ammunition."  If manufacturers next
year develop smaller ammunition than what is currently on the market, does a
modified magazine become contraband simply because eleven of the new rounds
could fit?  Is the relevant ammunition only what the device is designed to accept, or
will any ammunition count?  The statute does not say, about these questions or many
others.  The Act thus gives law enforcement vast discretion to bring criminal charges
against ordinary citizens who had no reason to know that they allegedly violated the
law, leaving them with no real option other than to dispossess themselves.

Finally, given that Appellants are likely to succeed on the merits of their
claims, all of which are based on the Bill of Rights, the remaining injunction factors
follow as a matter of course.  Infringements of fundamental rights are irreparable by
definition, and a state has no cognizable interest in enforcing laws that effect them.

## STANDARD OF REVIEW

To obtain a preliminary injunction, "moving parties must show that the
balance of four factors tips in their favor:  [1] a 'likelihood of success on the merits;
[2] whether and to what extent [they] will suffer irreparable harm in the absence of
preliminary injunctive relief; [3] the balance of relative hardships … ; and [4] the

effect, if any, that either a preliminary injunction or the absence of one will have on the public interest.'" *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 5 (1st Cir. 2022) (ellipsis in original) (quoting *Ryan v. ICE*, 974 F.3d 9, 18 (1st Cir. 2020)). The first factor is "the 'sine qua non' of preliminary injunctive relief" and thus "weighs most heavily in the preliminary injunction calculus." *Ryan*, 974 F.3d at 18 (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)).

This Court "review[s] the district court's legal findings under the 'likelihood of success' prong de novo." *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 40 F.4th 36, 39 (1st Cir. 2022) (quoting *Water Keeper All. v. Dep't of Def.*, 271 F.3d 21, 30 (1st Cir. 2001)). Findings of fact typically are reviewed for clear error, *see, e.g.*, *Ryan*, 974 F.3d at 18, but "[t]he clear error standard does not apply … when the fact-finding at issue concerns 'legislative,' as opposed to [adjudicative,] facts." *United States v. Singleterry*, 29 F.3d 733, 740 (1st Cir. 1994). Finally, "any judgment calls concerning the balancing of the four factors" are reviewed for abuse of discretion. *Ryan*, 974 F.3d at 18. "A district court may be held to have abused its discretion by, say, making a material error of law, 'ignor[ing] pertinent elements deserving significant weight, [or] consider[ing] improper criteria …." *Id.* (penultimate alteration added) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)).

## ARGUMENT

## I.     HB 6614 Violates The Second Amendment.

As the Supreme Court made clear last year, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2126.  The first question this Court must ask in analyzing HB 6614 thus is whether the ammunition feeding devices it bans fit within "the Second Amendment's definition of 'arms.'"  *Id.* at 2132.  If the answer is yes (which it is, *see infra* pp.20-24), the Court then must ask whether the banned arms are "highly unusual in society at large."  *Id.* at 2143 (quoting *Heller*, 554 U.S. at 627).  If the answer to that question is no (which it is, *see infra* pp.24-29), then the inquiry is over and the statute is invalid, because a state may not "prohibit[] … an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose."  *Heller*, 554 U.S. at 628; *see also Bruen*, 142 S.Ct. at 2143 ("[T]he Second Amendment protects … weapons that are unquestionably in common use today.").  At the very least, the state must "affirmatively prove that its … regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Bruen*, 142 S.Ct. at 2127.  That it cannot do, as the very fact that tens of millions of Americans have chosen these arms in the hundreds of millions confirms that there is no historical tradition of banning them outright.

A.     **The Ammunition Feeding Devices that HB 6614 Bans Are "Arms."**

The Supreme Court has definitively interpreted the meaning of the term "Arms" in the Second Amendment.   The scope of "the Second Amendment's definition of 'arms'" is restricted neither to "only those arms in existence in the 18th century" nor to only those arms that the government deems necessary for self-defense.  *Bruen*, 142 S.Ct. at 2132; *Heller*, 554 U.S. at 582.  Rather, "the Second Amendment's definition of 'arms'" covers all "modern instruments that facilitate armed self-defense," "'even those that were not in existence at the time of the founding,'" regardless of whether they are strictly "necessary" for self-defense. *Bruen*, 142 S.Ct. at 2132 (quoting *Heller*, 554 U.S. at 582); *see Caetano*, 577 U.S. at 411-12 (stun guns).  In short, "[t]he 18th-century meaning is no different from the meaning today…. '[A]rms' [means] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Heller*, 554 U.S. at 581.

Ammunition feeding devices are plainly "thing[s]" that citizens carry for use in self-defense.  As their name suggests, ammunition feeding devices are not just "*holder*[*s*] of ammunition." A36-A37 n.25.  Rather, as the text of HB 6614 itself makes pellucid, they are an integral part of the mechanism by which "ammunition [is] fed continuously and directly … into a semi-automatic firearm."  R.I. Gen. Laws §11-47.1-2(2).   Ammunition  feeding  devices  are  thus  part  of  what  makes

semiautomatic firearms work:  When a user pulls the trigger, the round in the chamber fires, and the magazine and semiautomatic action combine to feed a new round into the firing chamber.  Without ammunition feeding devices, semiautomatic firearms cannot operate semiautomatically—or in some cases, at all.  *See, e.g.*, Dist.Ct.Dkt.22-1 at 45 ("A magazine is an essential and deceptively complicated component of a self-loaded firearm.… Tiny inconsistencies in the angle of the feed lips, the spring tension, the walk thickness, or other components of the magazine can render a firearm nonfunctional.").  After all, it is not the gun, but bullets *fed by the magazine*, that "strike another."  *See Heller*, 554 U.S. at 581.  Citizens thus carry firearms equipped with ammunition feeding devices for the same reason they carry firearms loaded with ammunition:  "[W]ithout bullets, the right to bear arms would be meaningless."  *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014).

In ruling to the contrary, the district court not only inexplicably brushed aside binding Supreme Court precedent on the meaning of "arms" as "of little help," A38, but betrayed a basic misunderstanding of how firearms work.  The court saw no difference between ammunition feeding devices and quivers of arrows or pouches of stones.  A39.  But ammunition feeding devices are nothing like "cartridge boxes" and other storage "accoutrements" of yesteryear.  A40.  Cartridge boxes were literally just that—cardboard boxes.  They never played any role in the firing mechanism; nor were they ever attached to any firearm or other weapon (or even

regularly worn on one's person). A cartridge box is no different from any other box. Saying that a cartridge box is analogous to modern ammunition feeding device because both hold ammunition is like saying that a gas can is analogous to a combustion engine because they both hold fuel. That people "in the 18th century" may have referred to "cartridge boxes" as "'accoutrements,'" not "arms," A40; *see* Defs.' Br. in Opp'n to Pls.' Mot. for Prelim. Inj. 39, Dist.Ct.Dkt.19 (D.R.I. Oct. 14, 2022) (hereinafter "Defs.' PI Opp'n"), is thus both sensible and irrelevant. The term "arms" encompasses the constituent parts that make an "arm" function as intended, which, unlike a cartridge box, a feeding device plainly does.[6]

---

[6] The witness who rendered this opinion about cartridge boxes, Professor Baron, also opined that "the word 'magazine' … did not come to mean a compartment holding ammunition until the late 19th Century." A40; *see* Dist.Ct.Dkt.19-7 (Baron Decl.) ¶9. While that is likewise irrelevant given that function, not labels, is what matters, it is also incorrect. The patents for the prominent Henry and Spencer rifles, for instance, use the term "magazine" to refer to the tubular device that feeds ammunition into the firing chamber. *See Improvement in magazine fire-arms*, Patent No. US30446A (issued Oct. 16, 1860), available at https://bit.ly/40NMTVi; *Improvement in self-loading fire-arms*, Patent No. US27393A (issued Mar. 3, 1860), available at https://bit.ly/3G9jq09. And in 1864, a front-page article in the *New York Times* reported that officers from "the War Department" would soon "convene at the Springfield armory … for the purpose of examining, testing and recommending for adoption a suitable breach-loader for muskets and carbines, and a repeater *or magazine carbine*." *News From Washington: Special Dispatches to the New-York Times*, N.Y. Times (Dec. 23, 1864), https://nyti.ms/3lYbnMS (emphasis added). Those who ratified the Fourteenth Amendment after having just fought the deadliest war in world history would have understood what a magazine was: part of an arm. Professor Baron, by contrast, took the remarkable position that the term "arms" does not even encompass "the trigger of a gun." Dist.Ct.Dkt.19-7 (Baron Decl.) ¶6.

The district court's analysis makes particularly little sense because HB 6614 bans ammunition feeding devices even when they are fixed or "integrated"—*i.e.*, permanently attached to a firearm, such that they cannot be removed without rendering the firearm inoperable. *See* Defs.' PI Opp'n 22 (acknowledging that HB 6614 bans arms with fixed feeding devices capable of holding more than ten rounds).[7] The state tried to brush that aside by noting that "[m]any integrated magazines in modern weapons are in bolt-action rifles or in shotguns, which would not fall under the large capacity magazine restriction because they are not semiautomatic." *Id.*; *see* R.I. Gen. Laws §11-47.1-2(2) (limiting the ban to devices from which "ammunition [is] fed continuously and directly … into a semi-automatic firearm"). But that misses the point. Something that is not just integral to the firing mechanism of a firearm, *but literally part of it*, is obviously an arm, not an accessory. And nothing in law or logic supports the notion that a component integral to the functioning of a mechanical object ceases to be integral just because engineers figure out how to make it detachable.

---

[7] While the district court's decision made zero mention of the fact that HB 6614 applies to fixed magazines, at the very least it must be reversed to the extent it applies to fixed magazines, as even the district court would have to accept the proposition that firearms with fixed feeding devices remain "arms" no matter how many rounds of ammunition they hold.

Finally, the district court posited that the devices HB 6614 bans are not "Arms" because "a firearm does not need a magazine containing more than ten rounds to be useful." A37. That has absolutely nothing to do with the test the Supreme Court has articulated for what qualifies as an "arm," which asks not what is "necessary" for self-defense, but simply whether something "facilitate[s] armed self-defense." *Bruen*, 142 S.Ct. at 2132; *see also Heller*, 554 U.S. at 635 (teaching that the Second Amendment leaves to "the people," not the government, the choice of how best to defend themselves). Devices that play an integral role in the firing mechanism by feeding ammunition to the firing chamber—which is ultimately what distinguishes firearms from clubs and allows the "quintessential self-defense weapon" to work as intended, *see Heller*, 554 U.S. at 629—plainly fit that bill. The ammunition feeding devices that Rhode Island has banned are "Arms."

### B.    The Ammunition Feeding Devices that HB 6614 Bans Are Typically Possessed by Law-Abiding Citizens for Lawful Purposes.

Because the feeding devices that HB 6614 bans fit "the Second Amendment's definition of 'arms,'" the next question is whether they are "in common use today" or instead are "'highly unusual in society at large.'" *Bruen*, 142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). The answer to that question could not be clearer, as the arms that HB 6614 bans are the furthest thing from "highly unusual."

Magazines that hold more than ten rounds of ammunition are commonly owned by tens of millions of Americans for all manner of lawful purposes, including

24

self-defense, sporting, and hunting.  This is not a matter of debate.  "One estimate based in part on government data shows that from 1990 to 2015, civilians possessed about 115 million LCMs out of a total of 230 million magazines in circulation." *Duncan*, 970 F.3d at 1142; *accord Worman*, 922 F.3d at 35; *see also, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("[A]bout 25 million large-capacity magazines were available in 1995," and "nearly 50 million such magazines … were approved for import by 2000[.]"); *Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) ("[M]illions of … large-capacity magazines[] have been sold over the last two decades in the United States."). According to the most recent National Firearms Survey, approximately 39 million Americans—more than 10% of the nation's total population and more than 15% of American adults—own or have owned ammunition feeding devices that hold more than ten rounds.  William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 22-23 (May 13, 2022), https://bit.ly/3yPfoHw; *accord* Nat'l Shooting Sports Found., *Firearm Production in the United States* 7 (2020), https://bit.ly/3jfDUMt (finding based on industry data that American consumers purchased more than 304 million magazines across both pistols and rifles from 1990 to 2018, 52% of which—almost 160 million—had a capacity larger than ten rounds).  As the D.C. Circuit put it more than a decade ago, while "[t]here may well be some capacity above which magazines are not in common

use[,] … that capacity surely is not ten." *Heller v. Dist. Of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011).

Nor is there any question that the typical individual who possesses these commonplace arms does so for lawful purposes. In the vast majority of states, they are perfectly lawful. *See* Lillian Mongeau Hughes, *Oregon Voters Approve Permit-to-Purchase for Guns and Ban High-Capacity Magazines*, NPR (Nov. 15, 2022), https://n.pr/3QMJCC1. And the most frequently cited reasons by the millions of Americans who own magazines capable of holding more than ten rounds are target shooting (64.3% of owners), home defense (62.4%), hunting (47%), and defense outside the home (41.7%). English, *2021 National Firearms Survey*, *supra*, at 23. This makes sense: "When a firearm being used for defense is out of ammunition, the defender no longer has a functional firearm." David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851 (2015).

Of course, as with any arms, there are some who misuse these arms for unlawful—indeed, awful—purposes. But that was equally true of the semiautomatic handguns at issue in *Heller*. The *Heller* dissenters protested that handguns "are specially linked to urban gun deaths and injuries" and "are the overwhelmingly favorite weapon of armed criminals." 554 U.S. at 682 (Breyer, J., dissenting). The majority did not dispute these points; it just found them irrelevant to whether handguns are constitutionally protected, because that question does not turn on

26

whether arms are misused by criminals.  It turns on whether law-abiding citizens commonly own and use them for lawful purposes.  That is why it was enough in *Heller* that handguns are *typically* possessed for lawful purposes.  *See id.* at 624-25 (majority op.).  What was true in *Heller* is no less true here, given the millions of law-abiding Americans who own the arms that Rhode Island has banned.  *See Duncan*, 970 F.3d at 1149 n.8 ("[C]riminal use of LCMs is relatively low compared to their market saturation.").  Just as in *Heller*, the flat ban here is flatly unconstitutional.  After all, blanket bans violate the foundational principle that "a free society prefers to punish the few who abuse [their] rights … after they break the law than to throttle them and all others beforehand."  *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

The district court did not deny the ubiquity of the arms Rhode Island has banned.  It instead posited that they are not commonly "*used* for self-defense" because citizens rarely fire more than ten rounds in self-defense situations.  A45 (emphasis added); *see* A40-A44.  That how-many-do-you-really-need view of the fundamental right the Second Amendment protects is fundamentally at odds with *Bruen*, which explicitly "confirmed that the right to 'bear arms' refers to the right to 'wear, bear, or carry … for the purpose … *of being armed and ready* for offensive or defensive action in a case of conflict with another person.'"  142 S.Ct. at 2134 (first ellipsis in original; emphasis added) (quoting *Heller*, 554 U.S. at 584).  That

right does not turn on how frequently people actually confront such situations or how many rounds they typically fire when they do. Nor could it: Under the district court's view, a state not only could permissibly restrict firing capacity to just one round, but could seemingly ban keeping or bearing firearms that are loaded at all, since most people fortunately never have to fire their firearms for self-defense. *See* English, *2021 National Firearms Survey*, *supra*, at 26 ("in most defensive gun uses the gun was not fired"). That is why "the pertinent Second Amendment inquiry is whether" the class of arms in question—here, ammunition feeding devices that can hold more than ten rounds—"are commonly *possessed* by law-abiding citizens for lawful purposes." *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (emphasis added).

Ultimately, the district court's theory that the scope of the right to keep and bear arms depends on what the government decides people need to exercise it is inconsistent with the very notion that the Second Amendment protects a fundamental right. The argument that free speech rights are reserved for only those with an unusually compelling need to criticize the government would be laughed out of court. That is no less true when it comes to the Second Amendment. In fact, the Supreme Court has already held as much, explicitly rejecting the idea that a state may restrict the right to bear arms to those with a special "need" to exercise it. *See Bruen*, 142 S.Ct. at 2156. As *Bruen* and *Heller* make clear, "the very enumeration of the right" in the text of the Constitution "takes out of the hands of government …

28

the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Id.* at 2129 (quoting *Heller*, 554 U.S. at 634). That includes the power to decide what the people really *need* to protect themselves.

Finally, the district court posited that HB 6614 does not seriously burden Second Amendment rights because the people of Rhode Island may still possess as many sub-ten-round-capacity magazines as they please and have other means of defending themselves that the state deems sufficient. A50-A51. But the Supreme Court rejected this we-have-not-banned-everything-yet argument in *Heller* itself. "It is no answer to say … that it is permissible to ban the possession of ['large-capacity' magazines] so long as the possession of other [magazines] is allowed." *Heller*, 554 U.S. at 629. Just as in *Heller*, the people have spoken, choosing to arm themselves in overwhelming numbers with ammunition feeding devices capable of holding more than ten rounds. Because the arms it bans are typically possessed by law-abiding citizens for lawful purposes, HB 6614 violates the Second Amendment.

## C.    Insofar as the Burden Shifts, Rhode Island Cannot Shoulder It.

The Court can and should end its analysis there. "[T]he traditions of the American people … demand[] our unqualified deference," *Bruen*, 142 S.Ct. at 2131, and the tradition of the American people is that law-abiding citizens may keep and bear arms that are commonly possessed for self-defense. That *is* the historical test—*i.e.*, the key inquiry under *Bruen*—and it forecloses the state's effort to ban these

commonly possessed arms. After all, a state may not prohibit what the Constitution protects. Nevertheless, even if further historical inquiry were necessary, Rhode Island has not come close to meeting its burden of demonstrating any historical tradition of prohibiting firearms capable of firing more than ten rounds without reloading. Indeed, the very fact that millions of Americans have chosen these arms in the hundreds of millions confirms that there is not, and never has been, any tradition of banning them. To the contrary, the historical record reveals a long tradition of welcoming technological advancements that enable civilian firearms to fire more rounds more accurately and efficiently.

> **1.    There is no longstanding historical tradition of regulating firing or ammunition capacity, let alone of banning ammunition feeding devices above a certain threshold.**

While arms that could fire more than ten rounds without reloading would by no means have been "unforeseen inventions to the Founders," *Duncan*, 970 F.3d at 1147, laws prohibiting their possession most certainly would. "At the time the Second Amendment was adopted, there were no laws restricting ammunition capacity." Kopel, *supra*, 78 Alb. L. Rev. at 864. That did not change anytime soon: Laws regulating firing capacity did not come around for another hundred-plus years. As for magazines in particular, not a single state restricted the manufacture, sale, or possession of magazines or other ammunition feeding devices *until the 1990s*.

To be sure, a few states enacted laws restricting firing capacity of semiautomatic weapons in the early twentieth century. *See* 1927 Mich. Pub. Acts 887, 888; 1927 R.I. Acts & Resolves 256, 256-57; 1933 Minn. Laws ch. 190. But all of these laws were either repealed outright or replaced with laws that restricted only fully automatic weapons, *i.e.*, machine guns—which, unlike semiautomatics, were never widely adopted by law-abiding citizens for lawful purposes. *See* 1959 Mich. Pub. Acts 249, 250; 1959 R.I. Acts & Resolves 260, 260, 263; 1963 Minn. Sess. L. ch. 753, at 1229. And none of these laws—which were outliers even while on the books—was ever understood to apply to magazines or other feeding devices, regardless of capacity. *See* Kopel, *supra*, 78 Alb. L. Rev. at 864-66.[8] Only the District of Columbia restricted magazines or other ammunition feeding devices themselves before 1990—and that law was even more of an outlier than the handful of state laws just mentioned.[9] That explains why the Supreme Court, when

---

[8] California and Ohio also enacted licensing laws for certain semiautomatics, but did not enact outright bans. *See* 1933 Cal. Stat., ch. 450; 1933 Ohio Laws 189, 189. And while a Virginia law enacted in this era could be read to include semiautomatics that hold more than 16 rounds, it applied only to the use of the weapon in a "crime of violence" or "for offensive or aggressive purpose," and was not a general ban. 1934 Va. Acts ch. 96, §§1(a), 4(d). In all events, as with the three laws cited in the text, all of these were either repealed outright or replaced with laws restricting only fully automatic weapons. *See* 1965 Cal. Stat., ch. 33, at 913; 1975 Va. Acts, ch. 14, at 67; 1972 Ohio Laws 1866, 1963; Kopel, *supra*, 78 Alb. L. Rev. at 864-66.

[9] In 1932, Congress passed a local D.C. law prohibiting the possession of firearms that "shoot[] automatically or semiautomatically more than twelve shots without reloading." Act of July 8, 1932, Pub. L. No. 72-275, §§1, 14, 47 Stat. 650, 650, 652

discussing modern semiautomatic rifles that come standard with 20- or 30-round magazines, correctly opined that such arms "traditionally have been widely accepted as lawful possessions" in the United States. *Staples v. United States*, 511 U.S. 600, 612 (1994). In all events, given the ubiquity by the Prohibition Era of firearms with a capacity of more than ten rounds, *see infra* Part C, these few, late-breaking state laws do not an enduring tradition make. *See Bruen*, 142 S.Ct. at 2137-38 (rejecting reliance on "a handful of late-19th-century [laws]" allegedly similar to the challenged restriction, because laws first enacted long after ratification "come too late to provide insight into the meaning of [the Constitution]" (first alteration added) (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting))).

Indeed, outside the District of Columbia, the first state law restricting magazine capacity did not come *until 1990*—two centuries after the founding and well over a century after the ratification of the Fourteenth Amendment. *See* 1990 N.J. Laws 217, 221, 235 (codified at N.J. Stat. Ann. §2C:39-1(y), -3(j)). And the

---

(1932), *repealed via* 48 Stat. 1236 (1934), *currently codified as amended at* 26 U.S.C. §§5801-72. This law was not understood to sweep up ammunition feeding devices as an original matter. Indeed, when Congress enacted the National Firearms Act imposing stringent regulations on machine guns just two years later, it chose not to impose any restrictions on magazines. Pub. L. No. 73-474, 48 Stat. 1236 (1934). Nevertheless, after the District achieved home rule in 1975, the new D.C. government interpreted the 1932 law "so that it outlawed all detachable magazines and all semiautomatic handguns." Kopel, *supra*, 78 Alb. L. Rev. at 866.

vast majority of states still today allow ordinary law-abiding citizens to choose for themselves what ammunition capacity they believe best suits their needs. As for the federal government, it did not regulate magazine capacity until 1994, when Congress adopted a nationwide ban on ammunition feeding devices with a capacity of more than ten rounds. *See* Pub. L. No. 103-322, 108 Stat. 1796 (1994) (formerly codified at 18 U.S.C. §922(w)). Unlike Rhode Island's ban here, however, that federal law was time-limited and operated only prospectively, allowing people who had already lawfully acquired such magazines to keep them. *Id.* And Congress allowed the law to expire in 2004 after a study by the Department of Justice revealed that it had produced "no discernable reduction" in violence with firearms across the country. Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence*, 1994-2003, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice 96 (2004), available at https://bit.ly/3wUdGRE.

In short, while there is a long historical tradition of law-abiding citizens possessing for lawful purposes the class of arms Rhode Island has now prohibited, there is no similar national tradition of government regulation of these commonplace arms—let alone of outright bans. *See Heller*, 670 F.3d at 1260 ("We are not aware of evidence that prohibitions on ... large-capacity magazines are longstanding[.]").

**2.    The state cannot save its ban by claiming that the devices it covers represent some dramatic technological change.**

The lack of any historical (or even modern-day) tradition supporting the state's ban is certainly not owing to any "dramatic technological changes." *See Bruen*, 142 S.Ct. at 2132. Firearms capable of firing more than ten rounds of ammunition without reloading are nothing new—and neither are ammunition feeding devices up to that task. "[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580." *Duncan*, 970 F.3d at 1147; *see also* William Wellington Greener, *The Gun and Its Development* 80-81 (Cassell & Co., 8th ed. 1907) (1881). Several such arms pre-dated the Revolution, some by nearly a hundred years. For example, the popular Pepperbox-style pistol could "shoot 18 or 24 shots before reloading individual cylinders," and the Girandoni air rifle, which "had a 22-round capacity," "was famously carried on the Lewis and Clark expedition." *Duncan*, 970 F.3d at 1147. These and other models of firearms capable of firing more than ten rounds of ammunition without reloading became widespread in the United States well before the framing of the Fourteenth Amendment.

As for "cartridge-fed" "repeating" firearms in particular, they came onto the scene "at the earliest in 1855 with the Volcanic Arms lever-action rifle that contained a 30-round tubular magazine, and at the latest in 1867, when Winchester created its Model 66, which was a full-size lever-action rifle capable of carrying 17 rounds"

34

that "could fire 18 rounds in half as many seconds." *Duncan*, 970 F.3d at 1148; *see* Louis A. Garavaglia & Charles G. Woman, *Firearms of the American West 1866-1894*, at 128 (1985); *see also* Kopel, *supra*, 78 Alb. L. Rev. at 854-55 (discussing the advent of the "first metallic cartridge … similar to modern ammunition" in the 1850s). These multi-shot arms were not novelties; they were ubiquitous among civilians by the end of the Civil War. "[O]ver 170,000" Winchester 66's "were sold domestically," and the successors that replaced the Model 66, the 73 and 92, sold more than ten times that amount in the ensuing decades. *Duncan*, 970 F.3d at 1148. And Winchesters were far from unique in this regard. *See* Harold F. Williamson, *Winchester: The Gun That Won The West* 28-31 (1952) (discussing the Henry lever action rifle, which could fire 16 rounds without reloading); Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* 305 (9th ed. 2007) (noting that 14,000 of these Henry rifles were sold between 1860 and 1866).

To be sure, feeding devices capable of holding more than ten rounds were not as common in the nineteenth century as they are today. But the same could be said of pretty much any type of arm. The more relevant point is that history refutes any notion that there is something novel about what Rhode Island has banned. What fed ammunition into the chamber of these firearms *were magazines and other ammunition feeding devices capable of holding more than ten rounds*. "The Winchester M1873 and then the M1892 were lever actions holding ten to eleven

rounds in tubular magazines." Kopel, *supra*, 78 Alb. L. Rev. at 855; *see, e.g.*, *Model 1873 Short Rifle*, Winchester Repeating Arms, https://bit.ly/3JZbAaz (last visited Apr. 10, 2023). Similarly, the Evans Repeating Rifle, which first hit "the market in 1873," came standard with a fixed magazine located in the buttstock that "held thirty-four rounds." Kopel, *supra*, 78 Alb. L. Rev. at 856; *see also* Dwight B. Demeritt, Jr., *Maine Made Guns And Their Makers* 293-95 (rev. ed. 1997).

In short, semiautomatic firearms and feeding devices capable of holding more than ten rounds have been part of the fabric of American life for well more than 100 years. That much is not disputable. Indeed, it is not even disputed. In its district court briefing, Rhode Island freely admitted that "weapons with large capacity feeding devices of one type or another" first became popular in the United States with "their incorporation into the Henry and Winchester rifles in the 1860s." Defs.' PI Opp'n 21. The state noted only one difference between those antebellum devices and the ones on the market "today": The latter are "much more reliable than they used to be." *Id.* (quoting Guns & Ammo, *Rifle Revolution: Magazine Evolution* (June 2, 2015), https://bit.ly/3K4pVCC). That, of course, is a helpful feature when it comes to self-defense, not a flaw.

The fact that modern firearms and magazines are more accurate and capable of quickly firing more rounds than their founding-era predecessors does not make them any less linear descendants of the "small-arms weapons used by militiamen …

36

in defense of person and home" when the Second Amendment was ratified. *Heller*, 554 U.S. at 624-25; *see also Caetano*, 577 U.S. at 416-17 (Alito, J., concurring) (noting that "revolvers and semiautomatic pistols" are protected as descendants of arms in common use at the founding). After all, it would be particularly perverse to confine the people to arms that are less accurate, efficient, and reliable for self-defense—which likely explains why no such historical tradition exists. Moreover, much of what the state said below about why the magazines it now deems too "large" are supposedly different from arms long in common use could be said equally of the handguns *Heller* held protected. That is precisely why the Supreme Court eschewed a test focused on which arms are capable of doing the most damage in the hands of the small number of people bent on misusing them, in favor of a test focused on which arms law-abiding citizens commonly conclude best serve their needs. The state derided that test below—as it must, since it enacted a law that literally *confiscates* arms that tens of millions of people have chosen for self-defense. But the Second Amendment is more than a mere parchment barrier against government disarmament. Because the state's effort to ban arms commonly chosen by the people for self-defense flatly contradicts constitutional text and historical tradition, its law violates the Second Amendment.

## II.    HB 6614 Violates The Takings Clause.

The Takings Clause provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V; *see Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 239 (1897) (incorporating the Takings Clause against the states). A physical taking occurs whenever governments "dispossess [an] owner" of lawfully obtained property. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 324 n.19 (2002); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982). That is true of personal property no less than real property; the "categorical duty" imposed by the Takings Clause applies "when [the state] takes your car, just as when it takes your home." *Horne v. Dep't of Agriculture*, 576 U.S. 350, 358 (2015). And it is true even when the state-authorized "invasion" is only partial. *See Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2072 (2021) (temporary visit by union organizers).

HB 6614 plainly runs afoul of those settled principles: It forces citizens to dispossess themselves of their lawfully acquired property, with no compensation from the state. Under the Act, people who lawfully obtained long ago what the state now deems a verboten "large capacity feeding device" could avoid criminal liability only if, as of December 18 of last year (*i.e.*, 180 days after June 20, 2022), they:

> (i) Permanently modifie[d] the large capacity feeding device such that it cannot hold more than ten (10) rounds of ammunition;
>
> (ii) Surrender[red] the large capacity feeding device to the police …; or

(iii) Transfer[red] or s[old] the large capacity feeding device to a federally licensed firearm dealer or person or firm outside the State … that is lawfully entitled to own or possess such a feeding device.

R.I. Gen. Laws §11-47.1-3(a), (b)(1).

There can be no question that surrendering the magazine to law enforcement and transferring or selling it to a third party requires physical dispossession; in either case, the owner must literally hand the property over to someone else. That is the definition of a taking. *See Black's Law Dictionary* (10th ed. 2014) (defining "taking" to include the "transfer of possession"). The fact that the transfer under romanette iii may be to a private party rather than the state does not change things. In *Kelo*, for instance, it made no difference that the law allowed Ms. Kelo to sell her property to a "private nonprofit entity." *Kelo v. City of New London*, 545 U.S. 469, 473-75 (2005). That makes sense: Whether the government edict forces the owner to hand the property over to the government or to a third party, there is still a taking—and still an obligation for the state to pay just compensation.

The option to move the lawfully acquired property out of Rhode Island to another state where it is lawful "to own or possess such a feeding device," R.I. Gen. Laws §11-47.1-3(b)(1)(iii), is no less a taking either. First of all, Rhode Island cannot invoke the permissive laws of another state to validate its own unconstitutional restriction. *See Jackson*, 746 F.3d at 967 ("That Jackson may easily purchase ammunition elsewhere is irrelevant."). But even putting that problem

aside, requiring someone to remove property from the state is no less a dispossession than a forced confiscation. Like a mandatory sale or a surrender to the government, a mandatory transfer of property out of state directly interferes with the owner's right to *possess* the property, not just to her right to *use* it as she pleases. And as the Supreme Court has long held, "to constitute a taking under the Fifth Amendment it is not necessary that property be absolutely 'taken' in the narrow sense of that word …; it is sufficient if the action by the government involves a direct interference with or disturbance of property rights." *R. J. Widen Co. v. United States*, 357 F.2d 988, 993 (Ct. Cl. 1966) (citing cases).

The option to alter the magazines to accept fewer than ten rounds does not eliminate the taking either. As an initial matter, the district court wisely "accept[ed] that there are some LCMs that cannot be modified" to comply with the first option. A46. Literal dispossession is the only option for that universe of property—and to say that dispossession is not a taking is to deny reality. In all events, even as to magazines that *can* be so "[p]ermanently modified," *see* R.I. Gen. Laws §11-47.1-3(b)(1)(i)—assuming that one knows what that means, *but see infra* pp.46-48—that option does not take the statute outside the Takings Clause. Once again, recent Supreme Court precedent is on point. In *Horne*, for instance, it made no difference that the raisin growers could have avoided the taking by "plant[ing] different crops" or selling "their raisin-variety grapes as table grapes or for use in juice or wine." 576

U.S. at 365.  Likewise in *Loretto*, it made no difference that the owner could have avoided the taking by converting her building into something other than an apartment complex.  458 U.S. at 439 n.17.  This case is no different.[10]

The district court brushed all of these cases aside on the theory that they dealt with "concrete takings, not use restrictions."  A48.  That is true—but it is equally true of HB 6614.  A requirement that law-abiding citizens turn over or fundamentally alter their lawfully acquired property is not a restriction on *use*; it is a physical *invasion* of the property itself.  And as the district court itself recognized, "physical *invasion* cases are special" and require the strictest application of the Takings Clause's unflagging command.  A48 (quoting *Loretto*, 458 U.S. at 432).

The district court's embrace of Rhode Island's police power was equally faulty.  To be sure, the police power may make a taking *permissible*, insofar as it tends to show that the state took property for a public use.  *See Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 240 (1984) ("[T]he 'public use' requirement is … coterminous with the scope of a sovereign's police powers.").  But that has nothing to do with whether the government has an obligation to pay just compensation.  The district court's conclusion that Rhode Island's reliance on its police power allowed

---

[10] At a minimum, forcing citizens to sell their property, move it out of state, or permanently alter it to make it less useful places an unconstitutional condition on constitutionally protected possession, which thereby effects a taking.  *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604-07 (2013).

it to take property scot-free gets things fundamentally confused. Unlike the federal government, which possesses only its enumerated powers, states possess plenary power (at least as far as the federal Constitution is concerned). Yet that power, plenary as it may be as a matter of state law, is constrained by the incorporation of the restrictions in the Bill of Rights—which (obviously) includes the Takings Clause.

The district court claimed that *Mugler v. Kansas*, 123 U.S. 623, 669 (1887), recognized a police power exception to the just compensation requirement. A47. That is wrong twice over. All *Mugler* actually held was that landowners who had constructed distilleries were owed no compensation from the operation of a Kansas liquor restriction that did "not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it." 123 U.S. at 668-69. And even if some dicta in *Mugler* could arguably be read to lend support to the district court's state-empowering, rights-constraining reading, history did not stop in 1887— and the Supreme Court has long since rejected the idea that the government may evade its obligations to pay just compensation when it takes private property simply by invoking the police power as the justification for its taking. For instance, the Court made clear in *Chicago, Burlington & Quincy Railway Co. v. Illinois*, 200 U.S. 561 (1906), that "if, in the execution of any power, *no matter what it is*, the government … finds it necessary to take private property for public use, it must obey the constitutional injunction to make or secure just compensation to the owner." *Id.*

42

at 593 (emphasis added).  Moving further along, *Loretto* reaffirmed that holding just a few decades ago.  The law at issue there was "within the State's police power," yet it still amounted a physical taking that required compensation.  458 U.S. at 425.

Simply put, the force of the Takings Clause obligation to pay just compensation does not vary with the source of power the state invokes.  Whether a law effects a taking is "a separate question" from whether the state has the power to enact it—and an uncompensated taking is unconstitutional "without regard to the public interests that it may serve."  *Id.* at 425-26; *see also Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 197 (1985) (distinguishing between physical taking and exercise of police power), *abrogated on other grounds by Knick v. Twp. of Scott*, 139 S.Ct. 2162 (2019).  This is not a close question.  Indeed, the Supreme Court has held that a law enacted pursuant to a state's "police power" is not immune from Takings Clause scrutiny even under the *regulatory* takings doctrine.  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1020-27 (1992).  As the Court explained there, the "legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated."  *Id.* at 1026.  The same is true *a fortiori* for the categorical rule that the government must compensate for physical takings.

Moreover, *Lucas* emphasized the importance of asking whether a property owner could use his property in a particular manner *before* the state tried to restrict

43

it. *See id.* at 1027. Here, the state seeks to dispossess its citizens of magazines that they lawfully obtained before the state decided to prohibit them. Of course, a citizen who *unlawfully* obtained such a magazine after the ban was already in place could not object (at least under the Takings Clause) to having it confiscated. But just as "confiscatory regulations" of real property "cannot be newly legislated or decreed (without compensation)," *id.* at 1029, nor can confiscations of personal property be decreed after the fact. After all, whatever expectations people may have regarding property regulations, they "do not expect their property, real or personal, to be actually occupied or taken away." *Horne*, 576 U.S. at 361. That is especially true when, as here, the property is protected by another provision of the Constitution.

## III.   HB 6614 Violates The Due Process Clause.

HB 6614 is one of the rare state acts that violates not one, or even just two, but three provisions of the Bill of Rights. In addition to violating the Second Amendment and the Takings Clause, HB 6614 violates the Due Process Clause of the Fourteenth Amendment.

First, HB 6614 violates due process for largely the same reasons that it effects a taking without just compensation. Retroactively prohibiting the possession of lawfully acquired (and constitutionally protected) property does not substantially advance a "legitimate governmental objective." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 542 (2005). Our legal system "for centuries … has harbored a singular

distrust of retroactive statutes, and that distrust is reflected in [the Supreme Court's] due process jurisprudence." *E. Enters. v. Apfel*, 524 U.S. 498, 502 (1998). "If retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership." *Id.* at 548. It therefore "does not follow … that what [a legislature] can legislate prospectively it can legislate retrospectively. The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." *Usery v. Turner Elkhorn Mining Co*., 428 U.S. 1, 16-17 (1976). Courts accordingly have "given careful consideration to due process challenges to legislation with retroactive effects," *E. Enters*., 524 U.S. at 547-48 (Kennedy, J., concurring in part and dissenting in part) (collecting cases), subjecting such laws to a "heightened scrutiny," *Kelo*, 545 U.S. at 493 (Kennedy, J., concurring).

Rhode Island's retroactive ban cannot satisfy that high bar. To be sure, the state asserts an interest in public safety, which is generally considered compelling. But applying a criminal prohibition *retroactively* against property owners like Appellants, who have complied with the law at every turn, does not meaningfully further that interest. There is no reason to think that applying a criminal prohibition to individuals who lawfully possessed the now-banned magazines *for decades* before the Act took effect will have any tangible public safety benefit. To the contrary,

45

depriving Appellants of their magazines may well *reduce* public safety by preventing individuals from effectively exercising self-defense—and it has the perverse effect of effectively punishing compliance with the law. The state's effort to "change the legal consequences of transactions long closed," *E. Enters.*, 524 U.S. at 548, cannot "meet the test of due process," *Usery*, 428 U.S. at 17.

Second, putting the retroactivity issue aside, HB 6614 violates due process because it is impermissibly vague. HB 6614 exempts from liability the possession of an ammunition feeding device that *was* capable of holding more than ten rounds if, after the 180-day grace period, the device has been "[p]ermanently modifie[d] … such that it cannot hold more than ten (10) rounds of ammunition.'" R.I. Gen. Laws §11-47.1-3(b)(1)(i). But it does not define what it means by *either* "[p]ermanent[] modifi[cation]" *or* "ammunition," leaving individuals wishing to comply without sufficient direction, and leaving law enforcement with a vast degree of discretion.

This is no small deal. Due process requires the government to define what it requires with sufficient definiteness that people of ordinary intelligence can understand whether their actions will result in adverse consequences. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). "[I]f criminal penalties may be imposed for violations of a law," as is the case here, "a stricter standard is applied in reviewing the statute for vagueness." *Frese v. Formella*, 53 F.4th 1, 6 (1st Cir. 2022). And the standard is ratcheted up even further when, as here, a criminal law not only

46

lacks any "*mens rea* requirement," *Morales*, 527 U.S. at 55, but regulates conduct implicating fundamental constitutional rights, *Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498-99 (1982).

Yet the language Rhode Island has deployed here is anything but clear. While the words "permanent" and "modification" are understandable enough on their own, in the context of what the statute actually requires, they beg more questions than they resolve. For instance, what would happen if manufacturers next year developed smaller ammunition than what is currently on the market? Would a feeding device that had already been modified so that it cannot accept more than ten rounds of the standard ammunition that existed on the date the statute was enacted all of a sudden become contraband because eleven of the new, smaller rounds may fit? Does "permanent modification" mean that the magazine has to have been rendered unable to be restored to full capacity by a master gunsmith using the facilities of a fully equipped machine shop, or will it suffice that "the person in possession" cannot restore it to its initial capacity? *See Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 537 (1998) (holding "unconstitutionally vague" a municipal ordinance that banned "assault weapons" and defined that term in part to mean "any firearm which may be restored to an operable assault weapon as defined in [other provisions]," because "the phrase 'may be restored' fails to provide sufficient guidance to a person of average intelligence as to what is prohibited"). The statute

does not say, leaving citizens to guess as to what, if anything, will be enough to allow them to keep their (modified) property without winding up in prison.

This provision is all the more problematic because ammunition does not come in a single shape or size, yet nothing in HB 6614 (or anything else in General Laws Chapter 11) defines "ammunition," except insofar as HB 6614 clarifies that the term "'[l]arge capacity feeding device' … shall not include an attached tubular device which is capable of holding only .22 caliber rimfire ammunition." *Id.* §11-47.1-2(2). To be sure, a different section in Chapter 11 defines "ammunition" to "mean[] a loaded cartridge, consisting of a primed case, propellant or projectile, designed for use in any firearm." *Id.* §11-47-64(a). But that section makes clear that its definition applies only to "th[at] section." *Id.* And while yet another provision (dealing with fireworks) defines "[s]mall-arms ammunition" to mean "any shotgun, rifle, pistol, or revolver cartridge and cartridges for propellant-actuated power devices and industrial guns," *id.* §11-13-10(8), that is not the term used in HB 6614. As written, then, it is anyone's guess whether a feeding device is legal or illegal if more than ten of *some* fire-able projectiles (other than .22 caliber rimfire ammunition), even if not designed to be used in or typically associated with the device in question, will fit.

"This provision is a trap for the unwary." *Peoples Rights Org.*, 152 F.3d at 536. It gives law enforcement vast discretion to prosecute ordinary citizens who had no reason to know they had done anything wrong. *See Kolender v. Lawson*, 461

U.S. 352, 358 (1983) (most "important aspect of vagueness doctrine" is "the requirement that a legislature establish minimal guidelines to govern law enforcement"). The inevitable result is obvious: Citizens will see no real option to comply other than to dispossess themselves entirely. Due process demands far more.

## IV. The Remaining Preliminary Injunction Factors Support Reversal.

As with all fundamental constitutional rights, "[i]nfringements of" "the right to possess firearms for protection" "cannot be compensated by damages." *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). The district court's contrary conclusion was not just unavailing; it betrays an unwillingness to accept *Bruen* and *Heller*. For instance, the district court insisted that HB 6614 could not irreparably injure Appellants because they could always use other weapons for self-defense. A59-A60. But as *Heller* made clear, "[i]t is no answer to say … that it is permissible to ban the possession of [one type of protected firearm] so long as the possession of other firearms … is allowed." 554 U.S. at 629. Because Appellants are likely to succeed on their constitutional claims, irreparable injury is satisfied.[11]

Finally, it is black-letter law that enforcing an unconstitutional law like HB 6614 is never in the public interest, and that enjoining a state from enforcing

---

[11] What is more, now that the 180-day period has run, Rhode Islanders who possess magazines capable of holding more than ten rounds face the Hobson's choice of availing themselves of one of the options in HB 6614 that the state has no power to require of them or else spending years behind bars. Putting citizens to such a choice is further irreparable harm. *See Toomer v. Witsell*, 334 U.S. 385, 392 (1948).

such a law causes its officials no cognizable harm. *See Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 854 (1st Cir. 1988) ("[S]hould the statute be unconstitutional, the public interest would be adversely affected by denial of such an injunction."); *accord, e.g.*, *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). Indeed, the public interest here cuts sharply the other way. "Just as a government has no interest in enforcing an unconstitutional law, the public interest is harmed by the enforcement of laws repugnant to the United States Constitution." *Siembra Finca Carmen, LLC v. Sec'y of Dep't of Agric. of P.R.*, 437 F.Supp.3d 119, 137 (D.P.R. 2020).

## CONCLUSION

For the reasons set forth above, this Court should reverse and remand with instructions to grant the preliminary injunction.

Respectfully submitted,

s/Erin E. Murphy

MICHAEL A. KELLY
KELLY SOUZA
  & PARMENTER PC
128 Dorrance St
Suite 300
Providence, RI 02903

PAUL D. CLEMENT
ERIN E. MURPHY
  *Counsel of Record*
MATTHEW D. ROWEN
MARIEL A. BROOKINS
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Appellants*

April 10, 2023

**CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,924 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman size 14-point font with Microsoft 2016.


Date: April 10, 2023

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy

# ADDENDUM

# TABLE OF CONTENTS

U.S. District Court Docket Sheet..............................................................A1

Memorandum and Order (Dec. 14, 2022)............................................A10

APPEAL

# U.S. District Court
## District of Rhode Island (Providence)
## CIVIL DOCKET FOR CASE #: 1:22-cv-00246-JJM-PAS

Ocean State Tactical, LLC, et al v. State of Rhode Island          Date Filed: 06/23/2022
Assigned to: Chief Judge John J. McConnell, Jr.                    Jury Demand: None
Referred to: Magistrate Judge Patricia A. Sullivan               Nature of Suit: 440 Civil Rights: Other
Case in other court:  First Circuit Court of Appeals, 23-01072   Jurisdiction: Federal Question
Cause: 42:1983 Civil Rights Act

**Plaintiff**

**Ocean State Tactical, LLC**                  represented by   **Thomas E. Romano**
*doing business as*                                             Kelly, Souza, & Parmenter
Big Bear Hunting and Fishing Supply                             128 Dorrance Street
                                                                Suite 300
                                                                Providene, RI 02903
                                                                401-490-7334
                                                                Email: tromano@ksplawpc.com
                                                                *TERMINATED: 09/29/2022*
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Dane Evan Ardente , I**
                                                                Kelly, Souza & Parmenter, P.C.
                                                                128 Dorrance Street
                                                                Suite 300
                                                                Providence, RI 02903
                                                                401-490-7334
                                                                Email: dardente@ksplawpc.com
                                                                *TERMINATED: 02/28/2023*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Michael A. Kelly**
                                                                Kelly, Souza, Rocha & Parmenter PC
                                                                128 Dorrance Street
                                                                Suite 300
                                                                Providence, RI 02903
                                                                401-490-7334
                                                                Fax: 490-7874
                                                                Email: mkelly@ksplawpc.com
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jonathan Hirons**                            represented by   **Thomas E. Romano**
                                                                (See above for address)
                                                                *TERMINATED: 09/29/2022*
                                                                *LEAD ATTORNEY*

**A1**

*ATTORNEY TO BE NOTICED*

**Dane Evan Ardente , I**
(See above for address)
*TERMINATED: 02/28/2023*
*ATTORNEY TO BE NOTICED*

**Michael A. Kelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Robert Grundy**                    represented by     **Thomas E. Romano**
(See above for address)
*TERMINATED: 09/29/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dane Evan Ardente , I**
(See above for address)
*TERMINATED: 02/28/2023*
*ATTORNEY TO BE NOTICED*

**Michael A. Kelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jeffrey Goyette**                    represented by     **Thomas E. Romano**
(See above for address)
*TERMINATED: 09/29/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dane Evan Ardente , I**
(See above for address)
*TERMINATED: 02/28/2023*
*ATTORNEY TO BE NOTICED*

**Michael A. Kelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mary Brimer**                    represented by     **Thomas E. Romano**
(See above for address)
*TERMINATED: 09/29/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dane Evan Ardente , I**
(See above for address)
*TERMINATED: 02/28/2023*

**A2**

*ATTORNEY TO BE NOTICED*

**Michael A. Kelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**State of Rhode Island**                    represented by   **Keith David Hoffmann**
                                                              Rhode Island Office of the Attorney General
                                                              150 South Main Street
                                                              Providence, RI 02903
                                                              401-274-4400, Ext. 1882
                                                              Email: khoffmann@riag.ri.gov
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Samuel Ackerman**
                                                              RI Department of Attorney General
                                                              150 South Main Street
                                                              Providence, RI 02903
                                                              401-274-4400
                                                              Email: sackerman@riag.ri.gov
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Sarah Rice**
                                                              RI Department of Attorney General
                                                              150 South Main Street
                                                              Providence, RI 02903
                                                              401-274-4400
                                                              Email: srice@riag.ri.gov
                                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Colonial Darnell S. Weaver**              represented by   **Keith David Hoffmann**
*In their Official Capacity as the*                          (See above for address)
*Superintendent of the Rhode Island State*                  *ATTORNEY TO BE NOTICED*
*Police*
                                                              **Samuel Ackerman**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Sarah Rice**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Peter F. Nerhona**                        represented by   **Keith David Hoffmann**
*In their Official Capacity as the Attorney*                 (See above for address)
*General for the State of Rhode Island*                      *ATTORNEY TO BE NOTICED*

                                                              **Samuel Ackerman**
                                                              (See above for address)

*ATTORNEY TO BE NOTICED*

**Sarah Rice**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Firearms Policy Coalition**                    represented by    **Cody J. Wisniewski**
Firearms Policy Coalition
5550 Painted Mirage Rd., Suite 320
Las Vegas, NV 89149
916-378-5785
Email: cwi@fpchq.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph Greenlee**
FPC Action Foundation
5550 Painted Mirage Rd., Suite 320
Las Vegas, NV 89149
916-517-1665
Email: jgreenlee@fpclaw.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas W. Lyons , III**
Strauss, Factor, Laing & Lyons
One Davol Square
Suite 305
Providence, RI 02903
456-0700
Fax: 421-4730
Email: tlyons@straussfactor.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/23/2022 | 1 | COMPLAINT ( filing fee paid $ 402.00, receipt number ARIDC-1770820 ), filed by Ocean State Tactical, LLC d/b/a Big Bear Hunting and Fishing Supply, Jeffrey Goyette, James Robert Grundy, Jonathan Hirons, Mary Brimer. (Attachments: # 1 Exhibit A-C, # 2 Civil Cover Sheet Coversheet)(Kelly, Michael) (Entered: 06/23/2022) |
| 06/24/2022 |  | Case assigned to Chief Judge John J. McConnell, Jr. and Magistrate Judge Patricia A. Sullivan. (Simoncelli, Michael) (Entered: 06/24/2022) |
| 06/24/2022 | 2 | CASE OPENING NOTICE ISSUED (Simoncelli, Michael) (Entered: 06/24/2022) |
| 06/30/2022 | 3 | Summons Request filed by Mary Brimer, Jeffrey Goyette, James Robert Grundy, Jonathan Hirons, Ocean State Tactical, LLC. (Kelly, Michael) (Entered: 06/30/2022) |
| 06/30/2022 | 4 | Summons Issued as to State of Rhode Island. (DaCruz, Kayla) (Entered: 06/30/2022) |
| 07/07/2022 | 5 | SUMMONS Returned Executed by Ocean State Tactical, LLC, Jeffrey Goyette, James Robert Grundy, Jonathan Hirons, Mary Brimer. State of Rhode Island served on 7/6/2022, |

**A4**

| | | |
|---|---|---|
| | | answer due 7/27/2022. (Kelly, Michael A.) Modified on 7/7/2022 to correct docket text (DaCruz, Kayla). (Entered: 07/07/2022) |
| 07/19/2022 | 6 | NOTICE of Appearance by Keith David Hoffmann on behalf of State of Rhode Island (Hoffmann, Keith) (Entered: 07/19/2022) |
| 07/19/2022 | 7 | Assented MOTION for an Extension of Time to File Answer re 1 Complaint, filed by State of Rhode Island. **Responses due by 8/2/2022.** (Hoffmann, Keith) (Entered: 07/19/2022) |
| 07/20/2022 | | TEXT ORDER granting 7 Assented MOTION for an Extension of Time to File Answer re: 1 Complaint; State of Rhode Island answer due 8/26/2022. So Ordered by Chief Judge John J. McConnell, Jr. on 7/20/2022. (Jackson, Ryan) (Entered: 07/20/2022) |
| 08/09/2022 | 8 | MOTION for Temporary Restraining Order filed by All Plaintiffs. (Attachments: # 1 Exhibit A-C)(Kelly, Michael) (Entered: 08/09/2022) |
| 08/17/2022 | | NOTICE of Hearing: Chambers Conference re: 8 Motion for TRO *scheduled for Thursday 8/18/2022 at 2:00 PM as a Remote Conference* before Chief Judge John J. McConnell, Jr.; Zoom information below is for *COUNSEL ONLY* - any other party or individual attempting to join will be removed by the Court.<br><br>(Zoom Meeting ID: 160 574 2763, Passcode: 653986) (Jackson, Ryan) (Entered: 08/17/2022) |
| 08/18/2022 | | Minute Entry for proceedings held before Chief Judge John J. McConnell, Jr.: Chambers Conference via Zoom held on 8/18/2022. Counsel present: M. Kelly, T. Romano, D. Ardente; S. Rice, K. Hoffman (Jackson, Ryan) (Entered: 08/18/2022) |
| 08/18/2022 | | TEXT ORDER: With the consent of the parties, the Court will convert the Motion for a Temporary Restraining Order 8 to a Motion for a Preliminary Injunction. Defendant State of RI's Response to the motion to be filed on or before 10/14/22; Plaintiffs' Reply to same is to be filed on or before 10/24/22. In advance of their briefing deadline, Defendant State of RI is hereby ordered to provide an informal preview of evidence they plan to submit to the Court in support of their Response. The State shall submit the identification and a summary of any experts' "testimony" by 10/1/22. So Ordered by Chief Judge John J. McConnell, Jr. on 8/18/2022. (Jackson, Ryan) (Entered: 08/18/2022) |
| 08/23/2022 | 9 | NOTICE of Appearance by Sarah Rice on behalf of State of Rhode Island (Rice, Sarah) (Entered: 08/23/2022) |
| 08/26/2022 | 10 | MOTION to Dismiss filed by State of Rhode Island. **Responses due by 9/9/2022.** (Attachments: # 1 Supporting Memorandum)(Hoffmann, Keith) (Entered: 08/26/2022) |
| 09/01/2022 | 11 | Assented MOTION for an Extension of Time to File Response/Reply as to 10 MOTION to Dismiss filed by All Plaintiffs. **Responses due by 9/15/2022.** (Kelly, Michael) (Entered: 09/01/2022) |
| 09/12/2022 | | TEXT ORDER granting 11 Assented MOTION for an Extension of Time to File Response to 10 MOTION to Dismiss; **Responses due by 9/26/2022.** So Ordered by Chief Judge John J. McConnell, Jr. on 9/12/2022. (Jackson, Ryan) (Entered: 09/12/2022) |
| 09/15/2022 | 12 | AMENDED COMPLAINT filed by Ocean State Tactical, LLC, Jeffrey Goyette, James Robert Grundy, Jonathan Hirons, Mary Brimer. (Attachments: # 1 Exhibit A-C)(Kelly, Michael) Modified on 9/23/2022 to correct docket text. (Kenny, Meghan). (Entered: 09/15/2022) |
| 09/23/2022 | 13 | Summons Request filed by Mary Brimer, Jeffrey Goyette, James Robert Grundy, Jonathan Hirons, Ocean State Tactical, LLC. (Kelly, Michael) (Entered: 09/23/2022) |

| 09/23/2022 | 14 | Summons Request filed by Mary Brimer, Jeffrey Goyette, James Robert Grundy, Jonathan Hirons, Ocean State Tactical, LLC. (Kelly, Michael) (Entered: 09/23/2022) |
|---|---|---|
| 09/23/2022 | 15 | Summons Issued as to Peter F. Nerhona, Darnell S. Weaver. (Kenny, Meghan) (Entered: 09/23/2022) |
| 09/29/2022 | 16 | NOTICE by Mary Brimer, Jeffrey Goyette, James Robert Grundy, Jonathan Hirons, Ocean State Tactical, LLC *NOTICE OF WITHDRAWAL* (Kelly, Michael) (Entered: 09/29/2022) |
| 10/03/2022 | 17 | SUMMONS Returned Executed by James Robert Grundy, Jonathan Hirons, Jeffrey Goyette, Ocean State Tactical, LLC, Mary Brimer. Peter F. Nerhona served on 10/3/2022, answer due 10/24/2022. (Kelly, Michael) Modified on 10/4/2022 to correct docket text. (DaCruz, Kayla) (Entered: 10/03/2022) |
| 10/03/2022 | 18 | SUMMONS Returned Executed by James Robert Grundy, Jonathan Hirons, Jeffrey Goyette, Ocean State Tactical, LLC, Mary Brimer. Darnell S. Weaver served on 10/3/2022, answer due 10/24/2022. (Kelly, Michael) Modified on 10/4/2022 to correct docket text. (DaCruz, Kayla) (Entered: 10/03/2022) |
| 10/14/2022 | 19 | RESPONSE In Opposition to 8 MOTION for Temporary Restraining Order filed by Peter F. Nerhona, Darnell S. Weaver. **Replies due by 10/21/2022.** (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E, # 6 Exhibit Exhibit F, # 7 Exhibit Exhibit G, # 8 Exhibit Exhibit H, # 9 Exhibit Exhibit I, # 10 Exhibit Exhibit J, # 11 Exhibit Exhibit K)(Rice, Sarah) (Entered: 10/14/2022) |
| 10/19/2022 | | NOTICE of Hearing on 8 MOTION for Temporary Restraining Order/Preliminary Injunction: Motion Hearing *scheduled for Wednesday 11/2/2022 at 9:30 AM in Courtroom 1* before Chief Judge John J. McConnell, Jr. (Jackson, Ryan) (Entered: 10/19/2022) |
| 10/24/2022 | 20 | Assented MOTION for an Extension of Time to File Response/Reply filed by All Plaintiffs. **Responses due by 11/7/2022.** (Kelly, Michael) (Entered: 10/24/2022) |
| 10/24/2022 | 21 | ANSWER to 12 Amended Complaint by Peter F. Nerhona, Darnell S. Weaver.(Rice, Sarah) (Entered: 10/24/2022) |
| 10/25/2022 | | TEXT ORDER granting 20 Motion for Extension of Time to File Reply to 8 MOTION for Temporary Restraining Order; **Replies due by 10/27/2022**. So Ordered by Chief Judge John J. McConnell, Jr. on 10/25/2022. (Jackson, Ryan) (Entered: 10/25/2022) |
| 10/27/2022 | 22 | REPLY to Response re 19 Response to Motion,, filed by Mary Brimer, Jeffrey Goyette, James Robert Grundy, Jonathan Hirons, Ocean State Tactical, LLC. (Attachments: # 1 Exhibit A-F)(Kelly, Michael) (Entered: 10/27/2022) |
| 10/31/2022 | | Reset Hearings re: Notice of Hearing on 8 MOTION for Temporary Restraining Order/Preliminary Injunction: Motion Hearing *RE-SCHEDULED to THURSDAY 11/3/2022 at 2:00 PM in Courtroom 1* before Chief Judge John J. McConnell, Jr. The hearing previously scheduled for Wednesday 11/2/22 is hereby CANCELLED and re-scheduled to 11/3/22. (Jackson, Ryan) (Entered: 10/31/2022) |
| 11/03/2022 | 23 | AFFIDAVIT *of William Worthy* by All Plaintiffs. (Kelly, Michael) (Entered: 11/03/2022) |
| 11/03/2022 | | Minute Entry for proceedings held before Chief Judge John J. McConnell, Jr.: Motion Hearing held on 11/3/2022 re: 8 MOTION for Temporary Restraining Order/Preliminary Injunction: counsel present: M. Kelly, D. Ardente; S. Rice, K. Hoffman; Plaintiffs argues their motion; Court questions Plaintiffs; Defendant argues against the motion; Court questions Defendant. Court takes matter under advisement. Court directs Plaintiffs to file a |

**A6**

| | | |
|---|---|---|
| | | motion for leave to file a supplemental brief. (Court Reporter Denise Veitch in Courtroom 1 at 2:00 PM) (Jackson, Ryan) (Entered: 11/03/2022) |
| 11/04/2022 | 24 | MOTION *to Exclude* re: 23 Affidavit filed by Peter F. Nerhona, Darnell S. Weaver. **Responses due by 11/18/2022.** (Attachments: # 1 Exhibit)(Hoffmann, Keith) (Entered: 11/04/2022) |
| 11/09/2022 | 25 | MOTION for Leave to File Amicus Brief filed by Firearms Policy Coalition. **Responses due by 11/23/2022.** (Lyons, Thomas) (Entered: 11/09/2022) |
| 11/09/2022 | 26 | Amicus Curiae APPEARANCE entered by Thomas W. Lyons, III on behalf of Firearms Policy Coalition. (Lyons, Thomas) (Entered: 11/09/2022) |
| 11/09/2022 | 27 | AMICUS BRIEF by Firearms Policy Coalition. (Lyons, Thomas) (Entered: 11/09/2022) |
| 11/09/2022 | 28 | MOTION for Joseph Greenlee to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-1811680 ) filed by Firearms Policy Coalition. (Lyons, Thomas) (Entered: 11/09/2022) |
| 11/09/2022 | 29 | MOTION for Cody J. Wisniewski to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-1811681 ) filed by Firearms Policy Coalition. (Lyons, Thomas) (Entered: 11/09/2022) |
| 11/09/2022 | | TEXT ORDER granting 28 Motion to Appear Pro Hac Vice of Joseph Greenlee. So Ordered by Chief Judge John J. McConnell, Jr. on 11/9/2022. (Kenny, Meghan) (Entered: 11/09/2022) |
| 11/09/2022 | | TEXT ORDER granting 29 Motion to Appear Pro Hac Vice of Cody J. Wisniewski. So Ordered by Chief Judge John J. McConnell, Jr. on 11/9/2022. (Kenny, Meghan) (Entered: 11/09/2022) |
| 11/09/2022 | 30 | MOTION for Leave to File Document filed by All Plaintiffs. **Responses due by 11/23/2022.** (Kelly, Michael) (Entered: 11/09/2022) |
| 11/09/2022 | 31 | RESPONSE In Opposition to 25 MOTION for Leave to File Amicus Brief filed by Peter F. Nerhona, Darnell S. Weaver. **Replies due by 11/16/2022.** (Rice, Sarah) (Entered: 11/09/2022) |
| 11/10/2022 | | TEXT ORDER denying 25 Motion for Leave to File Amicus Brief: The Firearms Policy Coalition moved on November 9, 2022, to file an *amicus* brief in support of the position of the Plaintiffs. (ECF No. 25.) The Motion is DENIED. The Court faces a short time to issue a decision, in consideration of the looming effective date of the statute whose constitutionality is challenged, and this Motion is filed well after the opening Memorandum of the party it supports. So Ordered by Chief Judge John J. McConnell, Jr. on 11/10/2022. (Jackson, Ryan) (Entered: 11/10/2022) |
| 11/10/2022 | | TEXT ORDER granting 30 Motion for Leave to File: The Plaintiffs' Motion to File a Supplemental Brief (ECF No. 30) is GRANTED. The Supplemental Brief is limited to ten (10) pages, must be filed no later than Monday, November 14, 2022, and shall address legal arguments only without introducing new factual assertions or evidence. The Defendant may file a response of no more than ten (10) pages, no later than Friday, November 18, 2022, which shall similarly address legal arguments only without introducing new factual assertions or evidence. So Ordered by Chief Judge John J. McConnell, Jr. on 11/10/2022. (Jackson, Ryan) (Entered: 11/10/2022) |
| 11/14/2022 | 32 | SUPPLEMENTAL MEMORANDUM by All Plaintiffs in support of 8 MOTION for Temporary Restraining Order . (Kelly, Michael) (Entered: 11/14/2022) |

| 11/18/2022 | 33 | TRANSCRIPT ORDER for proceedings held on 11/03/2022 before Judge Chief Judge John J. McConnell, Jr.. Ordinary Transcript delivery selected. Transcript to be delivered in 30 days.. (Rice, Sarah) (Main Document 33 replaced on 11/29/2022) (McGuire, Vickie). (Entered: 11/18/2022) |
| 11/18/2022 | 34 | TRANSCRIPT ORDER ACKNOWLEDGMENT Entered re: 33 Transcript Order. Court Reporter/Transcriber: Denise Veitch. (Dias, Jennifer) (Entered: 11/18/2022) |
| 11/18/2022 | 35 | Supplemental RESPONSE In Opposition to 8 MOTION for Temporary Restraining Order filed by Peter F. Nerhona, Darnell S. Weaver. **Replies due by 11/25/2022.** (Rice, Sarah) (Entered: 11/18/2022) |
| 11/18/2022 | 36 | RESPONSE In Opposition to 24 MOTION *to Exclude* re: 23 Affidavit filed by All Plaintiffs. **Replies due by 11/25/2022.** (Kelly, Michael) (Entered: 11/18/2022) |
| 12/14/2022 | 37 | MEMORANDUM AND ORDER Re: 8 Motion for TRO/Motion for Preliminary Injunction filed by Jonathan Hirons, Jeffrey Goyette, Ocean State Tactical, LLC, Mary Brimer, James Robert Grundy, 24 Motion for Miscellaneous Relief/Motion to Exclude Affidavit filed by Darnell S. Weaver, Peter F. Nerhona. - So Ordered by Chief Judge John J. McConnell, Jr. on 12/14/2022. (McGuire, Vickie) (Entered: 12/14/2022) |
| 12/14/2022 |  | TEXT ORDER: For reasons stated in the Memorandum and Order (ECF#37) the Court grants 24 MOTION *to Exclude* re: 23 Affidavit; MOTION for Temporary Restraining Order/ Motion for Preliminary Injunction 8 is denied. - So Ordered by Chief Judge John J. McConnell, Jr. on 12/14/2022. (McGuire, Vickie) (Entered: 12/14/2022) |
| 01/03/2023 | 38 | TRANSCRIPT ORDER for proceedings held on 11/3/2022 before Judge John J. McConnell, Jr.. 3-Day Transcript Selected. Transcript to be delivered within 3 calendar days.. (Kelly, Michael) (Main Document 38 replaced on 1/4/2023) (McGuire, Vickie). (Entered: 01/03/2023) |
| 01/03/2023 | 39 | TRANSCRIPT ORDER ACKNOWLEDGMENT Entered re: 38 Transcript Order. Court Reporter/Transcriber: Denise Veitch. (Dias, Jennifer) (Entered: 01/03/2023) |
| 01/06/2023 | 40 | TRANSCRIPT of Motion for Temporary Restraining Order, held on November 3, 2022, before Chief Judge John J. McConnell, Jr.. Court Reporter Denise P. Veitch, Telephone number 401-752-7031. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter or PACER. **NOTICE TO COUNSEL: Redaction Requests must be filed for personal identifiers only. All other redactions must be requested by motion. For local policy and sample redaction request visit our website at www.rid.uscourts.gov and select Transcripts under the Case Information menu option. Redaction Request due 1/27/2023. Redacted Transcript Deadline set for 2/6/2023. Release of Transcript Restriction set for 4/6/2023.** (Veitch, Denise) (Entered: 01/06/2023) |
| 01/09/2023 |  | TEXT ORDER denying as moot 10 Motion to Dismiss in light of the filing of 12 AMENDED COMPLAINT. So Ordered by Chief Judge John J. McConnell, Jr. on 1/9/2023. (Jackson, Ryan) (Entered: 01/09/2023) |
| 01/13/2023 | 41 | NOTICE OF APPEAL by Mary Brimer, Jeffrey Goyette, James Robert Grundy, Jonathan Hirons, Ocean State Tactical, LLC as to 37 Memorandum and Order, ( filing fee paid $ 505.00, receipt number ARIDC-1831063 )<br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF** |

**A8**

| | | |
|---|---|---|
| | | Information section at **http://www.ca1.uscourts.gov/cmecf** Appeal Record due by 1/20/2023. (Kelly, Michael) (Entered: 01/13/2023) |
| 01/13/2023 | 42 | CLERK'S CERTIFICATE AND APPELLATE COVER SHEET: Abbreviated record on appeal consisting of notice of appeal, order(s) being appealed, and a certified copy of the district court docket report transmitted to the U.S. Court of Appeals for the First Circuit in accordance with 1st Cir. R. 11.0(b). 41 Notice of Appeal. (Attachments: # 1 Record on Appeal)(DaCruz, Kayla) (Entered: 01/13/2023) |
| 01/13/2023 | | USCA Case Number 23-1072 for 41 Notice of Appeal,, filed by Jonathan Hirons, Jeffrey Goyette, Ocean State Tactical, LLC, Mary Brimer, James Robert Grundy. (Kenny, Meghan) (Entered: 01/13/2023) |
| 01/20/2023 | 43 | NOTICE of Appearance by Samuel Ackerman on behalf of Peter F. Nerhona, State of Rhode Island, Darnell S. Weaver (Ackerman, Samuel) (Entered: 01/20/2023) |
| 01/25/2023 | 44 | Joint MOTION to Stay *Proceedings Pending Resolution of Appeal* filed by All Defendants. **Responses due by 2/8/2023.** (Rice, Sarah) (Entered: 01/25/2023) |
| 01/27/2023 | | TEXT ORDER granting 44 Motion to Stay Proceedings Pending Resolution of Appeal. So Ordered by Chief Judge John J. McConnell, Jr. on 1/27/2023. (Jackson, Ryan) (Entered: 01/27/2023) |
| 02/17/2023 | 45 | NOTICE by Mary Brimer, Jeffrey Goyette, James Robert Grundy, Jonathan Hirons, Ocean State Tactical, LLC *WITHDRAWAL* (Ardente, Dane) (Entered: 02/17/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/01/2023 12:10:32 | | |
| **PACER Login:** | clementmurphy | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00246-JJM-PAS |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

**A9**

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| OCEAN STATE TACTICAL, LLC; JONATHAN HIRONS; JAMES ROBERT GRUNDY; JEFFREY GOYETTE; and MARY BRIMER <br>     Plaintiffs, <br><br>     v. <br><br> STATE OF RHODE ISLAND; COLONEL DARNELL S. WEAVER; and PETER F. NERONHA, <br>     Defendants. | No. 22-CV-246 JJM-PAS |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Four gun owners and a registered firearms dealer (collectively, "plaintiffs") have come to this Court challenging a six-month-old Rhode Island law that prohibits the possession of Large Capacity Feeding Devices[1] ("LCMs"), which turn firearms into multiple-shot weapons. The legislation was passed on June 21, 2022, with a grace period of 180 days, by which time all those in possession of such devices must have

---

[1] Large Capacity Feeding Devices are typically referred to as Large Capacity Magazines or High-Capacity Magazines. The plaintiffs refer to them as "Standard Capacity Magazines." The Court refers to them as LCMs. They are defined by R.I. Gen. Laws § 11-47.1-2, which became effective upon its passage on June 21, 2022, as "a magazine, box, drum, tube, belt, feed strip, or other ammunition feeding device which is capable of holding, or can readily be extended to hold, more than ten (10) rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm." Tubes which hold exclusively .22 caliber ammunition are explicitly excluded.

(a) permanently modified them to be incapable of holding more than ten rounds; or (b) divested themselves of them by selling them to a federally registered dealer or turning them in to law enforcement. R.I. Gen. Laws § 11-47.1-3(b) ("LCM Ban"). Although the law does not address other dispositions, its delayed effective date until December 18, 2022 allowed those owning such magazines to lawfully move them from the state by transporting them to a place where the owner could lawfully possess them or by selling them to an out of state firearms dealer. The LCM Ban declares unlawful possession after December 18, 2022 a felony. *Id.* § 11-47.1-3(a).

The plaintiffs, suing the State of Rhode Island, its Attorney General, and its Superintendent of State Police ("the State"), mount three constitutional challenges: (a) that the statute violates the Second Amendment (Count I); (b) that the statute's command amounts to a "taking" of the magazines without just compensation, in violation of the Fifth Amendment (Counts II and III); and (c) that the statute violates the Fourteenth Amendment's guarantee of Due Process in that its terms are vague and its reach is not justified by the police power of the State (Count IV).[2] These allegations, and their invocation of 42 U.S.C. §§ 1343(a)(3), 1983, 1988 to redress a deprivation of rights under color of state law, successfully call on the federal question jurisdiction of this Court under 28 U.S.C. § 1331.

---

[2] Both the Second Amendment and Fifth Amendment arguments are technically Fourteenth Amendment challenges, as the Second and Fifth Amendments control state action only because they are incorporated into the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010) (2nd Amendment) and *Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 239 (1897) (due process taking). They are referred to throughout this opinion as simply "Second Amendment" and "Fifth Amendment" claims.

The plaintiffs moved for a preliminary injunction that the defendants oppose. ECF No. 8.[3] Both sides have submitted extensive briefs, accompanied by evidentiary declarations from a number of expert witnesses. They agreed the Court would accept those submissions as evidence in lieu of an evidentiary hearing. On November 5, 2022, the Court heard oral arguments. This Memorandum and Order follows and, for the reasons stated, the Court denies preliminary injunctive relief.[4]

In summary, the Court finds that the plaintiffs lack a likelihood of success on the merits, that they will not suffer irreparable harm if the law is allowed to take effect, and that the public interest is served by denying injunctive relief. Specifically, regarding the merits, the plaintiffs have failed in their burden to demonstrate that LCMs are "Arms" within the meaning of the Second Amendment's text. Moreover, even were they "arms," the plaintiffs have failed to prove that LCMs are weapons relating to self-defense. There is no Second Amendment violation from the LCM Ban because of those two shortfalls of persuasion. The Court must therefore consider the

_____

[3] With consent of both parties, the Court on August 18, 2022, converted the Motion for Temporary Restraining Order (ECF No. 8) to a Motion for Preliminary Injunction.

[4] While the State has challenged Article III standing, the Court finds that the plaintiffs have standing. The individuals have declared that they own firearms whose possession will be outlawed if the LCM Ban is not overturned before December 18th. ECF Nos. 8B, 22D, 22E. The statute imposes an affirmative duty on them to modify those weapons or relieve themselves of possession. The retail plaintiff has alleged a clear economic injury through his claim that his inventory of LCMs now cannot be sold. ECF No. 8C. Other courts have found that plaintiffs have standing with respect to similar statutes and similar challenges. *See, e.g., N.Y. State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 990 F. Supp. 2d 349, 358 (W.D.N.Y. 2013), *rev'd in part on other gnds.*, 804 F.3d 242 (2d Cir. 2015) (standing by virtue of ownership of large-capacity magazines and intention, but for the ban, to purchase them).

LCM Ban outside the core of Second Amendment protection. The Court further finds that the statute is not vague. Because the LCM Ban is a valid exercise of police power, there is no "taking" requiring just compensation and, consequently, no violation of the Fifth Amendment. The Rhode Island General Assembly passed, and the Governor signed, legislation to lower the risk of harm that results from the availability of devices that assist someone intent on murdering large numbers of people. This common-sense public safety legislation does not implicate the Second Amendment and violates no one's constitutional rights.

## I.    BACKGROUND

Chapter 47 of Title 11 of the Rhode Island General Laws, known as the "Firearms Act," has long regulated the type of firearms that may be lawfully possessed in Rhode Island. Some weapons have been banned altogether, such as sawed-off shotguns and machine guns.[5] Still others are lawful only when carried by persons licensed to possess them or in limited specified locations such as target shooting areas or the home. R.I. Gen. Laws §§ 11-47-8 (license or permit except to keep at home), 11-47-10 (target range). Some people are excluded altogether from possessing firearms. *Id.* §§ 11-47-5 (possession by felons), 11-47-6 ("mental incompetents" and "drug addicts"), 11-47-7 (undocumented immigrants).

On June 21, 2022, Rhode Island amended Chapter 47.1 to prohibit additional weaponry that had become popular additions to the arsenals of some individuals

---

[5] *See* State's Memorandum for a more complete catalog of prohibited weapon-related items. ECF No. 19 at 7-8.

relatively recently and have been employed in recent mass shootings. For example, Chapter 47 added to its list of prohibited items "ghost guns," which are guns that lack serial or any other identifying numbers, *Id.* § 11-47-2(8);[6] "3D print[ed]" guns, which are assembled under computer control from computer files, *Id.* § 11-47-2(1);[7] and "bump-fire stocks" which, by replacing a semiautomatic weapon's standard stock with

---

[6] The obliteration of serial numbers has been prohibited in Rhode Island for some time. "Ghost guns," however, are privately made weapons that *never* had a serial number, nor any other identifying information on any of the parts. Joseph Greenlee, a historian cited frequently by the plaintiffs, maintains that there was historically an unrelated practice of building guns, but the use of the phrase "ghost guns" is of recent origin. Jake Charles, *Ghost Guns, History, and the Second Amendment*, DUKE CENTER FOR FIREARMS LAW (Apr. 27, 2022) https://firearmslaw.duke.edu/2022/04/ghost-guns-history-and-the-second-amendment/. The parts are sold in kits, accompanying an "unfinished frame," and are easily assembled. *What are Ghost Guns?*, BRADY: UNITED AGAINST GUN VIOLENCE: RESOURCES, https://www.bradyunited.org/fact-sheets/what-are-ghost-guns (last visited Nov. 15, 2022). They cannot be traced. *Id.* Ghost guns were used in at least four mass shootings in California: in 2013 (Santa Monica), 2017 (Tehama County), 2019 (Santa Clarita), and Saugus (2019). Carter Evans, *Santa Monica Shooter Built His Own Weapon*, CBS NEWS (June 14, 2013, 8:12 PM), https://www.cbsnews.com/news/santa-monica-shooter-built-his-own-weapon/; *Tehama County Rampage Puts Spotlight on Homemade 'Ghost Guns'*, KRON4 News (Nov. 16, 2017, 8:42 PM), https://www.kron4.com/news/tehama-county-rampage-puts-spotlight-on-homemade-ghost-guns/; Dakin Andone, *The Gunman in the Saugus High School Shooting Used a 'Ghost Gun,' Sheriff Says*, CNN (Nov. 21, 2019, 3:52 PM), https://www.cnn.com/2019/11/21/us/saugus-shooting-ghost-gun/index.html; Alain Stephens, *Officials Confirm Santa Clarita Shooter Used A Ghost Gun*, LAIST (Nov. 20, 2019, 2:45 PM), https://laist.com/news/feds-investigating-whether-saugus-santa-clarita-shooter-used-ghost-gun.

[7] 3D guns first appeared for popular consumption, according to *The New Republic*, when a "25 year old gun activist named Cody Wilson uploaded his open-design plans to the internet in 2013. Kim Kelly, *The Rise of the 3D-Printed Gun*, THE NEW REPUBLIC: THE SOAPBOX (May 21, 2020), https://newrepublic.com/article/157753/rise-3d-printed-gun. By the time the U. S. Department of State closed the site down, more than 100,000 people had downloaded them and virtually any 3D printer at home could be used to assemble them." *Id.*

one that does not require a trigger-pull between rounds, makes the firearm function similarly to a machine gun, *Id.* § 11-47-2(4).[8]

None of the foregoing prohibitions is challenged here. But, when it amended Chapter 47, the General Assembly enacted § 11-47.1-1 *et seq.*, which specifically ban LCMs. Rhode Island was not alone in doing so. In the wake of recent mass shootings, many of which have occurred in schools, a number of states have enacted limitations on the capacity of magazines that enable a firearm to fire multiple rounds. While the maximum number of rounds permitted in a single magazine varies, the majority of states with bans prohibited the sale or possession of any magazine containing more than ten rounds. ECF No. 22-1, Ex. B, at 2 (internal pagination).[9] For the uninitiated—which, until this case appeared on its docket, the Court considered itself—magazines are devices holding extra ammunition and are inserted into and removed from the frame of the firearm, much as an extra battery-pack gets swapped

---

[8] The Department of Justice banned bump stocks in the wake of the 2017 massacre that killed 58 people in Las Vegas. Luis Gomez, *A Brief History of Bump Stocks Leading up to the Ban by the Trump Administration*, The San Diego Union-Tribune: The Conversation (Dec. 18, 2018, 3:15 PM), https://www. sandiegouniontribune.com/opinion/the-conversation/sd-brief-history-bump-stocks-before-they-were-banned-20181218-htmlstory.html. The shooter there, using weapons with bump stocks attached, "sprayed" bullets into the crowd. *Id.* This article claims that about the time bump stocks were temporarily (and mistakenly, it later maintained) approved by the ATF, videos of them first appeared on YouTube, showing viewers how to rig a semiautomatic rifle "to fire continuously with a single pull of the trigger." *Id.*

[9] Where indicated, page numbers refer to the internal pagination of the document cited. Where that is not indicated, page numbers refer to the electronically assigned page numbers of the filed document. This distinction is made necessary because of the filing of multiple documents in the same electronic filing, particularly by the plaintiffs.

in and out of a battery-operated tool, like a leaf blower, for example. "Reloading," in this context, means removing an empty magazine and substituting it with a full one.[10] The process may be as simple as pressing a button to eject the spent magazine, in order to push a new one in. ECF No. 22-1, Ex. B at n.33.

The reader should have at least a cursory understanding of handguns and how they operate. Handguns are built with an internal mechanism that holds the bullets. They may be revolving cylinders or fixed chambers. "A 'magazine' is a vehicle for carrying ammunition. It can be either integral to the gun or detachable." ECF No. 22-1, Ex. B at n.2. The handguns that use magazines are built with slots into which the magazines are inserted. Magazines became prevalent around the mid-nineteenth century. ECF No. 22-1, Ex. A at 36. "Most pistols sold in the United States come equipped with magazines that hold between 10 and 17 rounds." ECF No. 22-1, Ex. B at 3 (internal pagination). "Most modern semi-automatic firearms, whether handguns or semi-automatic rifles like AR-15s, use detachable box magazines." ECF No. 19-3 at ¶ 5.

When a multiple-round device like an LCM is attached, a handgun becomes a "semiautomatic" weapon, meaning that it is capable of rapidly firing several bullets,

---

[10] The declarations and exhibits from the parties, the briefs of the parties, and some published material the Court has unearthed on its own, provide explanations to the unfamiliar of how these weapons and their accessories work. Facts such as how a magazine works, *when undisputed,* are presented by the Court largely without citation. Any facts *found* by the Court from disputed assertions carry citations to where in the record they are supported. In addition, the Court has taken care to cite outside sources—articles not cited by the parties—only for non-controversial and presumably undisputed matters. The facts on which the Court actually relies are gleaned from the evidentiary submissions of the parties.

one right after another. However, the gun still requires a trigger-pull for each round fired. *Semiautomatic*, Merriam-Webster (Dec. 8, 2022), https://www.merriam-webster.com/dictionary/semiautomatic. Nevertheless, a semiautomatic weapon can fire at rates of 300 to 500 rounds per minutes. *Kolbe v. Hogan*, 849 F.3d 114, 136 (4th Cir. 2017) (en banc). A fully automatic weapon, such as a machine gun, differs from a semiautomatic weapon in that only one trigger-pull is necessary to release a barrage of bullets that are then sprayed continuously from the barrel until a manual action is taken to stop them.

As described *infra*, there is no legacy provision in the LCM Ban and thus, on the day it is effective, those who already possess such magazines will be guilty of a felony. The law, however, granted a 180-day period for those individuals to avoid that predicament. These individuals can modify the magazine to a lower capacity, they can sell or transfer the magazine to a person or location where it is lawful, or they can surrender it to law enforcement. The plaintiffs maintain that the whole LCM Ban—lock, stock and barrel—violates the Second Amendment as an unconstitutional restriction on gun ownership and the Fifth Amendment because it is a "taking" without just compensation by forcing "the mandatory dispossession" of previously lawful LCMs. ECF No. 12 at 4.

## II.    STANDARD OF REVIEW

"A request for a preliminary injunction is a request for extraordinary relief." *Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022). "To secure a preliminary injunction, a plaintiff must show '(1) a substantial likelihood of success on the merits,

(2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Marquez v. Puerto Rico*, 353 F.2d 108, 120 (1st Cir. 2003)). As the Court examines how this case measures up against these criteria, it is mindful that "the first two factors, likelihood of success and of irreparable harm, [are] 'the most important' in the calculus." *Brunx v. Mayhew*, 750 F.3d 61, 65 (1st Cir. 2014) (quoting *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009)).[11]

In evaluating whether the plaintiffs have met the most important requirement of likelihood of success on the merits, a Court must keep in mind that the merits need not be "conclusively determine[d];" instead, at this stage, decisions "are to be understood as statements of probable outcomes only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020) (partially quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success – rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato*

---

[11] Some courts have held that certain preliminary injunctions are "disfavored" and that a plaintiff seeking one of those has an even "heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019) (stating that an injunction that "grants all the relief that the moving party could expect from a trial win" falls into the disfavored category). In this case, the plaintiffs seek a declaration that the statute is unconstitutional and an injunction against its enforcement, precisely the relief sought on the merits.

9

A18

*Puertorriqueno de Trabajadores, SEIU Local 1996 v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam).

## III.    DISCUSSION

### A.    The Second Amendment and Magazines

#### 1.    Background on the Second Amendment

The Court finds that the plaintiffs have failed to show that their claim that the LCM Ban violates the Second Amendment enjoys a likelihood of success.  The Second Amendment, which protects the right to bear arms, is intended at its core to safeguard the individual's right to self-defense.  For the reasons discussed below, the Court finds that the plaintiffs have not demonstrated that LCMs are "Arms" within the textual meaning of the Amendment, nor have they demonstrated that LCMs are weapons of self-defense.  LCMs therefore fall outside the embrace of any guarantee the Second Amendment confers.

In the twin cases of *Heller v. District of Columbia*, 554 U.S. 570 (2008), and *N.Y State Rifle & Pistol Assoc., Inc. v. Bruen*, ___ U.S. ___, 142 S. Ct. 2111 (2022), the Supreme Court instructs us that a Second Amendment approach to the constitutionality of a weapons restriction must entail a journey into America's history.  Courts must examine not only the text itself, but the historical context in which the text was written. *See Heller*, 554 U.S. 570; *Bruen*, 142 S. Ct.  There are questions that the Court needs to answer in order to follow the analytical path dictated by *Bruen*.  For the most part, those answers are found only after a historical analysis.  For example, are LCMs even "Arms" within the embrace of the Second

Amendment's text? If so, are they by virtue of their function central to the "core" right to self-defense inside *or* outside the home? In assessing the constitutionality of a restriction, courts must inquire whether LCMs were in common use during the relevant historical period and whether they were unusual and dangerous. *See Bruen*, 142 S. Ct.

In both *Heller* and *Bruen*, the five-justice majorities undertook their own historical analyses. Both majority opinions are replete with direct references to ancient tomes and original research.[12] As Justice Breyer noted in his *Bruen* dissent,

---

[12] Note, for example, these references:

William Blackstone, for example, wrote that Catholics convicted of not attending service in the Church of England suffered certain penalties, one of which was that they were not permitted to "keep arms in their houses." 4 Commentaries on the Laws of England 55 (1769) (hereinafter Blackstone); see also 1 W. & M., ch. 15, § 4, in 3 Eng. Stat. at Large 422 (1689) ("[N]o Papist ... shall or may have or keep in his House ... any Arms ..."); 1 W. Hawkins, Treatise on the Pleas of the Crown 26 (1771) (similar).

*Heller*, 554 U.S. at 584.

Henry VIII issued several proclamations decrying the proliferation of handguns, and Parliament passed several statutes restricting their possession. See, *e.g.*, 6 Hen. 8 c. 13, § 1 (1514); 25 Hen. 8 c. 17, § 1 (1533); 33 Hen. 8 c. 6 (1541); Prohibiting Use of Handguns and Crossbows (Jan. 1537), in 1 Tudor Royal Proclamations 249 (P. Hughes & J. Larkin eds. 1964). ...
    Similarly, James I considered small handguns—called dags— "utterly unserviceable for defence, Militarie practise, or other lawful use." A Proclamation Against Steelets, Pocket Daggers, Pocket Dagges and Pistols (R. Barker printer 1616). But, in any event, James I's proclamation in 1616 "was the last one regarding civilians carrying dags,"

*Bruen*, 142 S. Ct. at 2140.

---

11

"[t]he majority in *Heller* undertook 40 pages of textual and historical analysis."  "Two

years later, [however,] 21 English and early American historians (including experts

at top universities) told us in *McDonald v. Chicago* ... [that historical analysis was]

wrong."  *Bruen*, 142 S. Ct. at 2177-78 (internal citations omitted).  He warned that

*Bruen's* reliance almost exclusively on history for constitutional interpretation "will

pose a number of practical problems ... especially acute in the lower courts."

> Lower courts – especially district courts – typically have fewer research
> resources, less assistance from *amici* historians, and higher caseloads
> than we do.  They are therefore ill equipped to conduct the type of
> searching historical surveys that the Court's approach requires.

*Id.* at 2179.  Nevertheless, the majority commands this Court to undertake such an

analysis.

There is another difference beyond resources between the Supreme Court and

district courts, however, that redounds to our benefit.  Unlike the Supreme Court,

trial courts have the ability to receive evidence and rely on that evidence to find facts

that support the legal reasoning and lead to conclusions.  *Bruen* itself was decided on

no factual record.  *See id.*  The district court had granted a motion to dismiss in what

was then known as *State Rifle & Pistol Assn., Inc. v. Beach*, which, of course, took

allegations at their face value.  *N.Y. State Rifle & Pistol Assn., Inc. v. Beach*, 354 F.

Supp. 3d 143 (N.D.N.Y. 2018).  Even more significantly, the issue raised by the

plaintiffs in the case was the *very same* that had previously been rejected by the

Second Circuit six years earlier in *Kachalsky v. County of Westchester*, 701 F.3d 81

(2d Cir. 2012). The only purpose in litigating *Beach* was to get another Second Circuit

rejection of plaintiff's Second Amendment theory so that the plaintiffs could try to

bring the issue to the United States Supreme Court. They forthrightly acknowledged to the district court that "the result they seek is contrary to *Kachalsky*, [they] do not dispute that the precedential effect of its holding binds [the district court], and [they] have not advanced any other factual allegations suggesting legally plausible claims." *Beach*, 354 F. Supp. 3d at 149. Thus, dismissal was granted as a matter of law without the development of a factual record. *Id.* The Second Circuit then summarily affirmed. *N.Y. State Rifle & Pistol Assn., Inc. v. Beach*, 818 Fed. Appx. 99 (2d Cir. 2020) (Mem).

Unlike the *Bruen* Court, this Court *has* an evidentiary record upon which to base its findings.[13] The parties agreed to submit documentary declarations and exhibits in lieu of an evidentiary hearing, and the Court has pored over them. Both parties have retained expert historians to inform the Court's factfinding. The curricula vitae ("CVs") of some of the experts are before the Court as are their writings directed at pivotal factual disputes, and both parties have submitted additional helpful exhibits. While this Court professes no independent scholarly historical knowledge, it does have solid experience in resolving disputes between experts. Parties, in both civil and criminal cases, routinely rely on expertise in topics well beyond the ken of any particular factfinder to decide contested issues of fact. For example, does a criminal defendant have a mental disorder that is sufficient to excuse her from criminal responsibility? Was a steel slab made defectively and did that

---

[13] The State noted in its opening Memorandum that no court has developed a full evidentiary record concerning LCMs post-*Bruen*. ECF No. 19 at 2 (internal pagination).

defect cause it to give way?  Did a product infringe on a pre-existing patent by employing the same basic design?  Without any expertise in psychiatry, metallurgy, or industrial design, courts regularly resolve factual disputes between expert witnesses, and they do so relying on tried-and-true, conventional considerations related to credibility and reliability.

In the ordinary course of an opinion, the Court might examine the applicable law before addressing the facts to which it would then apply that law.  In this case, however, it is useful to discuss the facts, and the Court's assessment of the evidence before it, before engaging in the *Heller/Bruen* analysis.

### 2. The Court's Findings of Fact

In the procedural posture of a motion for preliminary injunction, the Court does not have to make final findings of fact.  Instead, an examination of all the evidence and consideration of the expertise of those proffering opinions occurs in the framework of an inquiry into whether the plaintiffs have shown a *likelihood* that their experts' opinions will be accepted.  In that context, the Court has, in considering the evidence, asked itself basic questions that courts pose all the time and, indeed, direct juries to employ when making decisions based on expert opinions.  These questions include: what are the experts' respective qualifications?  Are their opinions intelligible to a lay judge or jury?  Is there other evidence that casts doubt on the opinions or corroborates them?  *See Woodman v. United States*, ___ F. Supp. 3d ___, 2022 WL 1444529, *2 (D.N.H. May 6, 2022) (plaintiff's non-specialist expert's opinion given less weight than others because his testimony was contradicted by treating

providers). Do the opinions appear to have sufficient support? *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 84 (1st Cir. 1998) (whether articles relied on by expert were published and subject to peer review was an indicum of the reliability of the expert's opinion). Are they based on sufficient data? *Malden Transp., Inc. v. Uber Tech., Inc*, 404 F. Supp. 3d 404, 423 (D. Mass. 2019) (expert's opinion unreliable where he excluded major variables). And did the expert approach the problem objectively or with a partisan bias? *See Collazo-Santiago v. Toyota Motor Corp.*, 149 F.3d 23, 28 (1st Cir. 1998) (jury could find defendant's expert not a disinterested witness because he was a former employee of the defendant and testified often on its behalf).

In this case, the credentials of the proffered experts weigh heavily in the Court's view of which opinions to accept where there is a conflict. The Court must discount to some extent the declaration of both the plaintiffs' experts because neither has been engaged in relevant *neutral* scholarly research.

- Ashley Hlebinsky, a historian versed in the history of firearms, is a private consultant. Her only academic appointments seem to have been a decade ago as a course-specific teaching assistant at the University of Delaware, while she received both her Bachelor's and Master's in American History from that institution. She is a co-founder and senior fellow of the University of Wyoming's College of Law's Firearms Research Center.[14] She has extensive

---

[14] While the aim of the Center will be to promote academic research, it has yet to be formally founded, according to an article authored by Ms. Hlebinsky. The Center is "going through the University of Wyoming's approval process...." but

experience in firearms museums and appears to be very active in the National Shooting Sports Foundation. She has many published pieces, the majority of which have appeared in niche magazines such as *American Frontiersman*, *Recoil Magazine*, and *Glock Magazine*. ECF No. 22-1 at 35-37. One of the disadvantages of relying on documentary submissions is that the Court has no opportunity to explore the nature of an expert's research or how politically neutral or advocacy-oriented her prior work has been. The Court can only take at face value an expert's CV. Matthew Larosier, the plaintiffs' second expert, was at the time he wrote the article a legal researcher employed by the CATO Institute, a public policy thinktank. His submission is entitled "Losing Count: The Empty Case for 'High-Capacity' Magazine Restrictions," that appeared in CATO's Legal Policy Bulletin's July 17, 2018, issue. ECF No. 22-2. The submission's only note "about the author" reveals that he is a former legal associate. ECF No. 22-2 at 59. CATO lists several fellows whom it terms

---

apparently is not yet formally affiliated. Ms. Hlebinsky does not appear to have a faculty appointment at the College of Law. *Faculty: College of Law*, UNIV. OF WYOMING, https://www.uwyo.edu/law/directory/ (last visited Dec. 13, 2022). The Center does not appear to have a website of its own, nor is it listed as a Department on the University of Wyoming's website, but the article appears under the auspices of the United States Concealed Carry Association (USCCA). Ashley Hlebinsky, *University of Wyoming Law School's Firearms Research Center*, U.S. CONCEALED CARRY ASS'N (Apr. 27, 2022), https://www.usconcealedcarry.com/blog/firearms-research-center/. The USCCA on its website solicits members with the following pitch: "Let's face it: There are people who HATE the fact that you and I carry guns. They're determined to teach us a lesson just for exercising our inalienable God-given right to self-defense." *Are You Prepared to Face Our "Justice" System?*, U.S. CONCEALED CARRY ASS'N, https://www.deltadefense.com/offers/5f6c9c07df964/join-the-uscca-today?tID=61e9a2b6538f0 (last visited Dec. 13, 2022).. Ms. Hlebinsky's biases are obvious.

"scholars," but Mr. Larosier is not one of those, nor is he identified as an "adjunct scholar" or as an "expert" fellow, formerly or presently. *Experts: Fellows*, CATO INST., https://www.cato.org/people/fellows (last visited Dec. 13, 2022). The Court has no information about his background or credentials, except that he seems to no longer be associated with CATO. Beyond that, while the CATO Institute is a well-known repository of research, it is not a neutral actor in the raging gun control vs. gun rights debate. Its website proclaims that it exists to "promote libertarian ideas in policy debates." *About*, CATO INST., https://www.cato.org/about (last visited Nov. 22, 2022). Thus, while the Court casts no aspersions on Mr. Larosier's scholarship, his report does not carry the indicia of reliability of a scholarly article published in a respected peer-review forum.[15] *See, e.g., Ruiz-Troche*, 161 F.3d at 84 (exposure to peer review demonstrates "a measure of acceptance of the methodology within the scientific community"). Nor has the Court been provided with a CV for him. "Though DACO cries foul due to the court's 'gratuitous swipe' at Dr. Logan's bona fides, such credibility determinations are the prerogative — indeed, the duty — of the district judge in a bench trial." *Texaco P. R., Inc. v. Dep't of*

_____

[15] Mr. Larosiere's opinion strikes the Court as flawed for another reason. He opens the section on "Legal Background and Constitutional Concerns" by describing *Heller* as protecting "arms in 'common use,' … which would cover the 20-round magazines that are standard equipment for a significant portion of weapons currently in lawful use." ECF No. 22-B at 46. The Second Amendment extends, he declares, "to all instruments that constitute bearable arms in common use…." *Id.* at 47. In describing *Heller* that way, he completely untethers it from the required use for self-defense.

*Consumer Affairs ("DACO")*, 60 F.3d 867, 878 n.5 (1st Cir. 1995) (finding such where appellant's expert was "intimate[ly] involve[d]" with one of the parties). The State's historians are more traditional neutral academics.

- Randolph Roth, an expert in the history of crime, is a Distinguished Professor of History and Sociology at The Ohio State University. He received his B.A. from Stanford University and his Ph.D. from Yale University, both in History. He has taught at several institutions and was an Assistant Professor of History at Grinnell College for seven years before moving to Ohio State. His two books were published by Cambridge University Press and the Belknap Press of Harvard University. Like Ms. Hlebinsky, Prof. Roth has published a number of articles, but, unlike hers, his have appeared primarily in scholarly journals. ECF No. 19-1 at 4-8. Michael Vorenberg is a tenured Associate Professor of History at Brown University, previously an assistant professor at The State University of New York at Buffalo, and before that, a post-doctoral fellow and lecturer at Harvard University. His A.B., A.M., and Ph.D. were all awarded by Harvard University. He has published three books and contributed to well over a dozen more. While there is no contest of numbers here, his writings have appeared primarily in academic texts, and his list of fifty-seven lectures during the last two decades, generally in university settings, is impressive. ECF No. 19-2 at 4-13. Dennis Baron is a professor of English and Linguistics at the University of Illinois. His Ph.D. was obtained from the University of Michigan and his Master's from Columbia University. A Professor Emeritus

now, he taught for 47 years, wrote ten published books and contributed chapters to twenty-two more.  ECF No. 19-7 at 4-16.[16]

The opinions offered by the experts for both parties, and the Court's reaction to them, are discussed below, as relevant.

### 3.   Legal Landscape of the Second Amendment

The pertinent application of the Second Amendment begins with *District of Columbia v. Heller,* which concerned a challenge to the prohibition of handguns in the District of Columbia.[17]  Specifically, the plaintiff, a D.C. special police officer, claimed a Second Amendment right to possess such firearms in his home without registering or licensing them.  *Heller,* 554 U.S. at 575-76.  The Court held that the prefatory words "[a] well-regulated Militia, being necessary to the security of a free State," did not confine the Amendment's protection to those connected to military or law enforcement.  *Id.* at 627-28.  Instead, the Court held, the Amendment protected the right of the unaffiliated individual to protect herself.  *Id.* at 628-29.

---

[16] The State has presented the opinions of two other experts relevant to factual issues.  Edward Troiano is Chief of the Bureau of Criminal Identification and Investigation, R.I. Office of the Attorney General, and is a former Special Agent for the Bureau of Alcohol, Tobacco, Firearms, and Explosives.  ECF No. 19-3.  Megan L. Ranney, M.D. is a Professor of Emergency Medicine at Brown University Medical School, as well as Professor of Behavioral and Social Sciences and Health Services, Policy, and Practice at the Brown University School of Public Health.  ECF No. 19-10.  Because these two experts have expressed opinions that are not directly contradicted by the plaintiffs' experts, the Court need not choose between them.  It suffices to say that their credentials show them to be well-qualified to render the opinions they hold.

[17] The D.C. law also regulated certain aspects of maintaining other weapons, such as long guns that had to be kept unloaded and either disassembled or locked. *Heller,* 554 U.S. at 575.

19

The right established in *Heller*, however, was not without context or limitation. Instead, the right of the individual is circumscribed by the "use [of handguns] for self-defense in the home." *Id.* at 636. The Amendment was not adopted, the majority made clear, "to protect the right of citizens to carry arms for *any sort* of confrontation...." *Id.* at 595. Rather, the right was understood historically to be tied to "the right of having and using arms for self-preservation and defence." *Id.* at 594 (citing, *inter alia*, 1 BLACKSTONE, 140). In addition, the Court cautioned, nothing in *Heller* was intended to confer a right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

The holding of *Heller* was relatively narrow. It linked the right to possess firearms tightly to self-defense and the home, but even in the home it did not confer unlimited freedom to the gunowner. In particular, the majority cautioned, only those weapons "in common use at the time" are entitled to Second Amendment protection, and in particular, that would not include "weapons that are most useful in military service...." *Id.* at 627. Laws promoting safety, such as those regulating storage could coexist with the Amendment so long as they did not "burden the right of self-defense." *Id.* at 632. The Court specifically eschewed "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. And in granting relief to Heller, it directed that "the District [of Columbia] must permit him to register his handgun and must issue him a license

to carry it in the home," *Id.* at 635, thus implicitly validating at least in concept both registration and licensing schemes.

That *Heller* was specifically concerned with protecting an individual's right to exercise self-defense in her home was confirmed two years later in *McDonald v City of Chicago*, 561 U.S. 742, 749-50 (2010), the case that held the Second Amendment applicable to the states through the Fourteenth Amendment. *McDonald* was decided by a Court almost identical to the one issuing the *Heller* opinion. The five-justice majority remained the same and, in the minority, retiring Justice David H. Souter had been replaced by Justice Sonia M. Sotomayor.

*McDonald* granted *certiorari* on the single question of "[w]hether the Second Amendment right to keep and bear arms is incorporated as against the States by the Fourteenth Amendment's Privileges or Immunities or Due Process Clauses." *McDonald v. Chicago*, No. 08-1521, 2009 WL 1640363, at *1 (June 9, 2009) (Petition for Writ of Certiorari). In answering "Yes," the Court did not address the scope of *Heller* but merely considered whether its holding was binding on the states. The plaintiffs had asserted only a right to be free from state restriction on the ability to "keep handguns in their homes for self-defense," *McDonald*, 561 U.S. at 750, and that is all that was decided. The discussion of incorporation itself reflected the Court's long-held view that the application of incorporated rights to the states is identical with that when applied to the Federal Government. *Id.* at 765.

*McDonald* described *Heller* as holding "that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense...." *Id.* at 749-50.

"[W]e stressed [in *Heller*] that the right was also valued because the possession of firearms was thought to be essential for self-defense. As we put it, self-defense was 'the *central component* of the right itself.'" *McDonald*, 561 U.S. at 787 (quoting *Heller*, 554 U.S. at 599) (emphasis in original). More than a decade passed before the Court addressed the *scope* of *Heller*, and the scope of the Second Amendment protection in *N.Y State Rifle & Pistol Assoc., Inc. v. Bruen*.

In the interim, the Circuit Courts of Appeals were busy applying *Heller*. They were near-unanimous on two things. First, they agreed that *Heller* conferred maximum protection only with respect to the exercise of self-defense in the home. Second, as to the world outside the home, *Heller* determined that intermediate scrutiny was appropriate, requiring only that those statutes be "substantially related" to a compelling government interest and that there be a reasonable fit between that interest and the means outlined in the statute to advance it. The First Circuit applied *Heller* first in *Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018), reviewing a challenge to the state licensing statute as implemented by the cities of Boston and Brookline. *Id.* at 662. The plaintiffs sought the right to carry firearms generally. *Id.* at 664. While allowing unrestricted possession in the home, the licenses issued for public carry were restricted at the discretion of the municipality, which made determinations based on the purported purpose of carrying the firearm, such as an individualized need for self-defense, employment, hunting, or target practice. *Id.*

22

A31

The question posed in *Gould* was precisely that later answered—differently—in *Bruen*: "Does the Second Amendment protect the right to carry a firearm outside the home for self-defense?" *Id.* at 666.[18] In answering the question in the negative, the First Circuit employed the same construct adopted by its sister Circuits. *Id.* at 668-69. This construct used a two-step analysis that determined first "whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee."[19] *Id.* This first step "is a backward-looking inquiry, which seeks to determine whether the regulated conduct 'was understood to be within the scope of the right at the time of ratification.'" *Id.* at 669 (quoting *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010)). The second step, if the desired conduct falls *outside* the "core" and some regulation is therefore permitted, is to decide what

---

[18] The second question put to the Court was, if the answer to the first were "yes," may the granting of a license be conditioned on an applicant's showing a particularized need to defend herself beyond that of the general public—i.e., a "good reason (beyond a generalized desire for self-defense) for carrying a firearm outside the home?" *Id.*

[19] The two-step analytic paradigm adopted in *Gould* was identical to that adopted by nearly all the Circuit Courts of Appeals. *See Gould*, 907 F.3d at 668-69 (citing *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012)); *Drake v. Filko*, 724 F.3d 426, 429 (3d Cir. 2013); *Woollard v. Gallagher*, 712 F.3d 865, 874 (4th Cir. 2013); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of ATFE (NRA)*, 700 F.3d 185, 194-95 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 703-04 (7th Cir. 2011); *Young v. Hawaii*, 896 F.3d 1044, 1051 (9th Cir. 2018); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *Heller v. Dist. Of Columbia (Heller II)*, 670 F.3d 1244, 1252-53 (D.C. Cir. 2011). "*Bruen* resoundingly repudiated the 'two-step analysis' widely embraced in the lower courts.... As the last decade of experience shows, the lower courts have in virtually every case used the two-part test to balance away Second Amendment rights." Mark W. Smith, *NYSRPA v. Bruen: A Supreme Court Victory for the Right to Keep and Bear Arms – and a Strong Rebuke to "Inferior Courts,"* 2022 Harvard. J. Law & Pub. Pol'y Per Curiam 24, at *6 (2022).

level of scrutiny must be brought to bear upon the regulation. *Id.* The Circuit Courts of Appeals, including the First Circuit, again acting in harmony, determined that intermediate scrutiny was appropriate. *Gould*, 907 F.3d at 668-69; *see supra* at n. 13 (citing cases from other circuits).

In *Bruen*, the Supreme Court bluntly cast aside the reasoned analysis of all these Circuit Courts of Appeals. While acknowledging that "the Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny," *Bruen*, 142 S. Ct. at 2125, the high court nonetheless "decline[d] to adopt that two-part approach." *Id.* at 2126. In its place, the Court raised a presumptive umbrella of protection whenever "the Second Amendment's plain text covers an individual's conduct…." *Id.* Rather than looking at the scope of the *right* to determine whether a statute such as the LCM Ban is constitutional (and then applying a means-end analysis), the focus is on the *restriction* to determine whether it is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.[20]

Although *Bruen* did not purport to define the parameters of lawful purposes, it stressed that "individual self-defense is 'the *central component*' of the Second

---

[20] *Bruen* did not appear out of the blue in 2022. In 2015, Justice Clarence Thomas, who would ultimately write the majority opinion in *Bruen*, joined by the late Justice Antonin G. Scalia, dissented from a denial of *certiorari* in an opinion that hinted at what would become the *Bruen* analysis. *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., dissenting). The ultimate question under *Heller*, Justice Thomas wrote, is "whether the law bans types of firearms commonly used for a lawful purpose – regardless of whether alternatives exist." *Id.* at 449 (citing *Heller*, 554 U.S. at 627-29).

Amendment right." *Id.* at 2133 (quoting *McDonald*, 561 U.S. at 767). The *Bruen* opinion opens with the declaration that "[W]e . . . now hold, consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun *for self-defense outside the home.*" *Id.* at 2122 (emphasis added). This Court's focus, therefore, must be on whether the LCM Ban unduly impairs the right of an individual to engage in self-defense. That this is the primary focus of the Second Amendment analysis is the constant refrain of *Bruen*—e.g., "[w]e therefore turn to whether the plain text of the second Amendment protects [plaintiffs'] proposed course of conduct – carrying handguns publicly for self-defense." *Id.* at 2134. And, later, "[t]he Second Amendment's plain text thus presumptively guarantees petitioner's [ ] a right to 'bear' arms in public for self-defense." *Id.* at 2135.

### 4. Magazines Do Not Constitute "Arms"

The threshold issue in this Second Amendment analysis must be whether a detachable magazine is "Arms" within the meaning of the text of the Constitution.[21] The Amendment on its face protects only "the right of the people to keep and bear Arms, [which] shall not be infringed." If a magazine is not encompassed by "Arms,"

---

[21] It is worth noting now that Rhode Island's statute avoids the pitfall of being directed against the *firearm* and not the magazine. Some other states' statutes "proscribe weapons that are 'capable of accepting' a large-capacity magazine, however defined." ECF No. 22-B. That language, according to plaintiffs' expert Matthew Darosiere, is problematic because many weapons designed to use limited magazines will actually accept large-capacity magazines instead. ECF No. 22-1 at 44-45. Rhode Island's statute prohibits the LCM because of what it *does*, not the firearm for what it *could do*.

it falls outside the protection of the Second Amendment.[22] In the First Circuit, Courts address this question on a nearly blank slate. In *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), which upheld a ban on LCM's and assault rifles pre-*Bruen*, the First Circuit "assume[d], without deciding, that the proscribed weapons have some degree of protection under the Second Amendment." *Id.* at 30.[23]

There appear to be no Circuit Courts of Appeals holding that LCMs are not "Arms." Some, like *Worman*, have assumed *arguendo* that they are. This issue, that large-capacity magazines are entirely outside of Second Amendment protection for the independent reason that such magazines constitute firearms "accessories" rather than protected "Arms," was raised by *amici* in *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 263 n. 127 (2d Cir. 2015). Like the First Circuit, the Second Circuit found it sufficient to "proceed on the assumption that these laws ban weapons protected by the Second Amendment" because it upheld the prohibition of LCMs.[24] *Id.* at 257. In *Kolbe v. Hogan*, the Fourth Circuit reviewed and vacated a panel

---

[22] The Court discusses separately, *infra*, whether LCMs fail to achieve *Bruen's* protection because they are not weapons of self-defense. In fact, two issues—"arms" and "self-defense" —are related, as *Bruen* states, "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments *that facilitate armed self-defense.*" *Bruen*, 142 S. Ct. at 2132 (emphasis added).

[23] The issue of whether LCMs are "Arms" at all was raised only by *amici* in *Worman*, and explicitly for that reason, although terming it a "clever" argument, the Court declined to consider it. *Worman*, 922 F.3d at 33 n.3.

[24] The Second Circuit did strike down the provision of the statute that forbade the *loading* of a magazine with more than seven rounds, but it upheld the restriction on the *capacity* of the LCM at ten rounds. *New York State Rifle & Pistol Ass'n*, 804 F.3d at 269.

decision that had declared magazines protected "Arms" without addressing that issue, finding LCMs not protected by the Second Amendment for other reasons. *Kolbe v. Hogan*, 849 F.3d 114, 136, 137 n.12 (4th Cir. 2017) (en banc).

Courts that have held that LCMs *are* "Arms" have for the most part equated LCMs with bullets and, by doing so, have been able to declare that LCMs are an integral part of firearms such that the weapons are useless without them. Thus, they reason, LCMs must be protected as "Arms" in the same way that the firearms themselves are. Although it is their burden to show that large-capacity magazines fall within the purview of the Second Amendment, the plaintiffs offer no expert opinion on the meaning of the word "Arms." Instead, the plaintiffs simply assert that "without the magazine, many weapons would be useless" (ECF No. 32 at 7) and rely on *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020), *rev'd*, *Duncan v. Bonta*, 19 F.4th 1087, 1096 (9th Cir. 2021) (en banc), which stated that "[f]irearm magazines are 'arms' under the Second Amendment" because "[w]ithout a magazine, many weapons would be useless." The plaintiffs' reliance on the panel decision in *Duncan* in light of its reversal *en banc* is suspect. What is more concerning, though, is that the panel opinion engaged in no textual or historical analysis of the word "Arms." Further, this Court finds the panel opinion's equation of "magazines" with "bullets" unpersuasive.[25] The Ninth Circuit also noted that the statement, "without a

---

[25] Indeed, *Duncan* specifically relied on its previous holding in *Jackson v. City and Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), which applied the Second Amendment to bullets. *Jackson*, however, noted the lack of historical evidence in the record. The *Duncan* court relied on *Jackson* without recognizing the distinction between bullets and magazines, between ammunition and the *holder* of

magazine, [the] weapon would be useless," is not really true. Without *bullets*, a firearm would be useless. But a firearm can fire bullets without a detachable magazine, and in any event, a firearm does not need a magazine containing more than ten rounds to be useful.

The analysis under *Bruen* is twofold. First, the plain text itself must be examined; second, the Court can consider the historical context to discern what would have been the meaning accepted at the time. To assist our analysis, we turn first to *Heller*:

> Before addressing the verbs "keep" and "bear," we interpret their object: "Arms." The 18th-century meaning is no different from the meaning today. The 1773 edition of Samuel Johnson's dictionary defined "arms" as "[w]eapons of offence, or armour of defence." 1 Dictionary of the English Language 106 (4th ed.) (reprinted 178) (hereinafter Johnson). Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 1 A New and Complete Law Dictionary; see also N. Webster, American Dictionary of the

_____

ammunition. Moreover, the judgment in *Duncan* was vacated and rehearing *en banc* was granted. *Duncan v. Becerra*, 988 F.3d 1209 (9th Cir. 2021). On rehearing, the district court was reversed, *Duncan v. Bonta*, 19 F.4th 1087, 1096 (9th Cir. 2021) (en banc), the Court holding that the ban "outlaws no weapon, but only limits the size of the magazine that may be used with firearms...." While there is no discussion of whether magazines are included under "Arms," the Ninth Circuit's description of the complete ban on large-capacity magazines as "outlaw[ing] no weapon" is consistent with finding a magazine an accessory, not itself a firearm. In any event, the current status of *Duncan* is that it has been remanded again to the district court post-*Bruen*. *Duncan v. Bonta*, 49 F.4th 1228 (9th Cir. 2022) (Mem).

*Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1276 (N.D. Cal. 2014), upon which the State relies, did not distinguish between magazines and ammunition. It reasoned that if "magazines and ammunition" were not Arms, any state could end-run *Heller* by banning them. The Court did not recognize any difference between bullets and the container from which they are fed into the firearm. *Fyock,* however, ultimately refused to preliminarily enjoin the ban on LCMs, and that decision was affirmed with no discussion of whether LCMs are "Arms." *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015).

English Language 1828) (reprinted 1989) (hereinafter Webster) (similar).

*Heller*, 554 U.S. at 581. Whether LCMs were in existence in the 18th century is of little concern. *Heller* teaches that "the Second Amendment extends prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. But *Heller* is of little help in resolving whether LCMs are "Arms." *Heller* dispensed quickly with the discussion of the meaning of "Arms," as there was little question that the handguns at issue there were "weapons of offence." It is less clear that a magazine is such a weapon because, while it is something that a person "takes into his hands," it is not a "thing . . . useth in wrath to *cast at or strike* another." *Heller*, 554 U.S. at 582 (emphasis added). In this Court's view, LCMs, like other accessories to weapons, are not used in a way that "cast[s] at or strike[s] another." What one judge has said of silencers is equally apt when applied to LCMs: they "generally have no use independent of their attachment to a gun" and "you can't hurt anybody with [one] unless you hit them over the head with it." *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *2 (D. Md. Sept. 20, 2019), *aff'd*, 26 F.2d 610 (4th Cir. 2002), *cert. den.* 2022 WL 6572217 (Oct. 11, 2022); *accord United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence.')").

This is where it is useful to turn to the opinion of historians and linguists. In interpreting the word "Arms," we look to the word's ordinary meaning, "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words

29

A38

and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Heller*, 554 U.S. at 577. To the ordinary reader, magazines themselves are neither firearms nor ammunition. They are *holders* of ammunition, as a quiver holds arrows, or a tank holds water for a water pistol, or a pouch probably held the stones for David's sling.[26]

The plaintiffs' expert Ashley Hlebinsky, a firearms historian, seems to agree with the characterization of a magazine as less of a weapon and more of a *holder* of ammunition: She wrote, "[a] magazine is a container, detachable or fixed, that holds ammunition while it feeds into a repeating firearm." ECF No. 22-1 at 8 ¶ 12. The fact that a magazine is an *attachment* to a firearm, rather than a necessary or integral part of the firearm itself, is acknowledged by her in the following language: "In the periods being discussed, there are repeating firearms that do not use magazines, such as revolvers, which use a rotating cylinder." *Id.* Neither Ms. Hlebinsky nor the plaintiffs' other proffered expert addresses whether a magazine is encompassed by the definition of "Arms."[27]

---

[26] This view accords with the way at least some gun manufacturers themselves understand "magazines." As the State points out, "Modern firearms manufacturers often do not list magazines under "gun parts" but under firearms "accessories" sections of their websites. ECF Nos. 19 at 30 (internal pagination), 19-4.

[27] Ms. Hlebinsky's opinion is confined, in her words, to the technology of repeaters and magazine-fed repeaters, the relationship between civilian and military weaponry, and the history of regulation. *Id.* at 1, 3-4. The plaintiffs' expert Matthew Larosier focused on the history of restrictions, the plaintiffs' vagueness argument that asserts a lack of common understanding for "high capacity," and an argument that high-capacity magazines render firearms safer than other firearms because they have a greater likelihood of malfunctioning. His assertion that magazines are "Arms" was supported only by citation to *Duncan v. Becerra,* which, as the Court has noted *supra* at note 25, was reversed.

In this case, only the State has supported its argument with historical analysis. The Court finds credible the state's expert, Prof. Dennis Baron, a professor of linguistics with an emphasis on "historical language usage," and accepts his opinion. According to Prof. Baron, there was a clear distinction between "Arms" and "accoutrements" from the founding era through the period following ratification of the Fourteenth Amendment. The word "Arms" was a general term for weapons such as swords, knives, rifles, and pistols, but it did not include ammunition, ammunition containers, flints, scabbards, holsters, or "parts" of weapons such as the trigger, or a cartridge box. The reader is referred to State's Exhibit G for a detailed analysis, but Prof Baron points out that in the 18th Century, bullets were kept in cartridge boxes or cases, called "accoutrements," and the word "magazine," which was used at that time to mean "storehouse" did not come to mean a compartment holding ammunition until the late 19th Century.

For the purposes of a preliminary injunction, it suffices for the Court to conclude that the plaintiffs have failed to meet their burden of establishing that LCMs are "Arms" within the textual meaning of the Second Amendment.

### 5.    LCMs Are Not Instruments of Self-Defense

There is simply no credible evidence in the record to support the plaintiffs' assertion that LCMs are weapons of self-defense and there is ample evidence put forth by the State that they are not.[28] This Court has painstakingly examined the

---

[28] In *Worman v. Healey*, the constitutionality of restrictions on the possession of LCMs (and assault rifles) was squarely presented to the First Circuit. *Worman*, 922 F.3d at 26. *Worman* was abrogated by *Bruen*, which rejected its use of a two-step

evidence put forth by the plaintiffs on this point and finds it wanting.[29]  On the other

hand, the State's experts address the question head-on.  Edward Troiano, who spent

_____

intermediate tier scrutiny standard, but its significance to this case is that *Worman*
sidestepped the question of whether LCMs were weapons of self-defense.  It

> assume[d] without deciding that [assault weapons and LCMs] have
> some degree of protection under the Second Amendment.  We further
> assume, again without deciding, that the Act [prohibiting them]
> implicates the core Second Amendment right of self-defense in the home
> by law-abiding, responsible individuals.

*Id.* at 30.  While the First Circuit posed the question of "whether the proscribed
weapons are in common use for lawful purposes like self-defense," it specifically
eschewed the need "to plunge into this factbound morass."  *Id.* at 35.  The *Worman*
analysis did not depend upon an answer to the question because it went on to
determine, applying the pre-*Bruen* ends-means balancing, that any burden on the
right of self-defense was minimal.  "Viewed as a whole, the record suggests that
wielding the proscribed weapons for self-defense within the home is tantamount to
using a sledgehammer to crack open the shell of a peanut." *Id.* at 37.

*Bruen* does not allow the Court to balance the extent of an intrusion into a
Second Amendment protected right against the strength of the public interest served
by the LCM Ban or the closeness of the means of the statute and its end.  The Court
cannot, like *Worman*, conclude that the impairment is "modest" and "the fit between
[legislative] interests and the restrictions imposed by the Act is both close and
reasonable."  Instead, any intrusion into a right protected by the Second Amendment
thrusts us into the territory of justifying the regulation as one historically placed on
similar weapons.  That latter issue is hotly contested between the parties.

[29] The plaintiffs' evidentiary package consists of the following:  Ex. 8-1A is the
statute.  Ex. 8-1B is the Affidavit of Plaintiff Jonathan Hirons who owns a number of
LCMs but makes no reference at all to their use.  Ex. 8-1C is the Affidavit of Andre
Mendes, principal of the retailer plaintiff, which describes an inventory that includes
LCMs but makes no reference to their use by him or his customers.  Ex. 22-1A is the
Declaration of expert Ashley Hlebinsky, a firearms historian.  While Ms. Hlebinsky
provides an extensive history of firearm development, use, and regulation in the
founding era specifically, she offers no discussion at all about what LCMs were
actually used for.  In her discussion of the development of target shooting, for
example, she mentions rifles and, in passing, "repeaters of all sorts" in models
"indicating sporting vs. military variants." *Id.* at 11 ¶ 17.  She particularly elaborates
on the interchangeability between civilian and military uses for weapons, *Id.* at ¶ 18,
but fails to connect any of that information to the use of LCMs in self-defense.  Her
exposition on the development of repeating firearms is similarly lacking. *Id.* at 12

32

**A41**

25 years as a Special Agent for the Bureau of Alcohol, Tobacco & Firearms ("ATF"), and now is the Chief of the Rhode Island Bureau of Criminal Identification and Investigation, conducted a review of self-defense incidents in Rhode Island in which a semiautomatic firearm was used. That review, combined with the awareness of firearm investigations that his job requires, led him to assert that he is "unaware of any incident in which a civilian has ever fired as many as 10 rounds in self-defense." ECF No. 19-3 ¶ 10. In contrast, LCMs have "frequently" been used by persons committing criminal offenses "in the course of their criminal conduct." *Id.*

---

¶ 21. The closest Ms. Hlebinsky comes to linking LCMs to lawful use is a quotation from William F. "Buffalo Bill" Cody who pronounced Winchesters his favorite for "hunting or Indian fighting." *Id.* at 19 ¶ 31. In short, Ms. Hlebinsky's report does nothing to inform the discussion of whether LCMs are in any way connected to the purpose of self-defense. Ex. 22-1B is an article written by Researcher Matthew Larosiere, then of the Cato Institute. It challenges restrictions on LCMs. It asserts that "[d]efensive uses of firearms can preserve human life," *Id.* at 43. Nowhere does Mr. Larosiere discuss the actual use of LCMs in self-defense. The only empirical data he offers concerns the lower percentage of "hits" novice shooters have compared to more experienced shooters. "That [, he argues,]combined with the fact that an assailant is rarely stopped by a single bullet, makes magazine capacity all the more important for the effective defensive use of firearms." *Id.* at 52. Mr. Larosiere presents only one anecdote of a victim of an attempted ambush firing 12 times at his assailants. *Id.* at 52-53. Ex. 22-1C is a brochure entitled "The Best Duck Hunting Shotguns of 2022." Ex. 22-1D is an Affidavit of a plaintiff firearms dealer directed primarily at the allegation of "vagueness" of the term "permanent" modification. It does not mention self-defense. ECF No. 22-1, Ex. E is a second Affidavit of Plaintiff Jonathan Hiron, elaborating on his plans should the injunction not issue and the difficulty of modifying the plastic magazines he owns.

The Plaintiffs attempted to file an additional affidavit from Mr. Worthy, introducing new factual allegations, after the deadline for submissions had expired, without requesting permission to do so. ECF No. 23. The affidavit was signed two days before the hearing but not filed until the day before the hearing. The defendants' Motion to Exclude the Affidavit (ECF No. 24) is GRANTED.

The Court finds credible the submission of Prof. Michael Vorenberg, a historian with expertise particularly concerning the Civil War and Reconstruction periods. Prof. Vorenberg offered the direct opinion that "high-capacity firearms during the era were understood to be weapons of war or anti-insurrection, not weapons of individual self-defense." ECF No. 19-2 at 16 ¶ 3. Veterans who retained them after their military service had concluded possessed the same understanding. *Id.* at 25 ¶ 21.

> If [owners of LCMs] along with their weapons were transported by a time machine back to the Reconstruction-era South, they would find themselves suspected of being outlaws by law enforcement officers. If they then gathered together into organized companies, they would be considered insurrectionary militias, which is precisely how the Ku Klux Klan was regarded during Reconstruction by the U.S. army, the state militias, and other legitimate, pro-Union law enforcement officials.

ECF No. 19-2 at 63 ¶ 99.

In its supplemental memorandum, the plaintiffs fail to discuss whether there is a link between LCMs and the use of firearms for self-defense. They argue vociferously that LCMs were "in common use" (ECF No. 32 at 3 (citing *Bruen*, 142 S. Ct. at 2143)), but their argument is untethered from the concept of self-defense. Instead, the plaintiffs proceed on the premise that "[t]he Second Amendment's protection extends to those sorts of weapons that are in common use, and typically possessed by law abiding citizens for lawful purposes at the time." ECF No. 32 at 3. The selective citation ignores the sentences in *Bruen* that *immediately* follow what the plaintiffs cite: "Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common

34

A43

use' *for self-defense today.* They are, in fact, 'the quintessential *self-defense* weapon.'"
*Bruen*, 142 S. Ct. at 2143 (emphasis added) (citation omitted).

The Court finds, on the evidence submitted, that the plaintiffs have failed to establish that they have a likelihood of success in demonstrating that LCMs are weapons of self-defense, such that they would enjoy Second Amendment protection.

### 6.    Historical Tradition

*Bruen* sets forth the standard for analyzing Second Amendment claims: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.    The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30.   The parties vehemently dispute whether LCMs were in common usage at various historical times.   They talk at length about long guns and repeaters.  *See generally* ECF No. 19-1 (State's expert Roth) and ECF No. 22-1 (plaintiffs' expert Hlebinsky).   And in doing so, they disagree on *which* historical era is most appropriate to examine:    the "founding era" or the "reconstruction era."   The Second Amendment itself was drafted during the former; however, it was made applicable to the states only through the adoption, during the Reconstruction era, of the Fourteenth Amendment.

The Court has already, for reasons expressed  *supra* made clear that it finds the plaintiffs' proffered experts less credible than those of the State, and it could resolve the historical tussle by simply crediting the latter and rejecting the former on

this point.  But a simpler path is available which, while also looking to the record, is more straightforward.

Because of its holding that LCMs are neither "Arms" within the meaning of the Second Amendment's text, nor weapons of "self-defense," the Court need not investigate whether the LCM Ban's restrictions are consistent with the regulations of history, regardless of which historical period is more apt.  The Court does not have to choose a historical backdrop, because the overwhelming evidence before it is that at *no* time were LCMs considered "Arms," nor were they used in any significant way for self-defense.  They were not then, and they are not today.

What remains, then, is where the Court goes in its analysis after it has found that LCMs deserve no "presumptive protection" under the Second Amendment. *Bruen*, 142 S. Ct. at 2135.  Does it examine the restriction using a routine rational basis analysis?  Is there any basis for turning to intermediate scrutiny, not for the now-abrogated rationale of *Worman*,[30] but because weapons that are neither "Arms" nor used for self-defense deserve some favorable treatment anyway like a contender who fails to win a ribbon but nonetheless deserves honorary mention?

The answer, it seems, is that the Court's Second Amendment analysis simply ends here.  It has found that because LCMs appear to be neither "Arms" nor weapons related to self-defense, they are entitled to no presumptive protection under the

---

[30] *Worman* chose intermediate scrutiny because it found the Massachusetts ban "implicated" the right to possess weapons of self-defense but did not "heavily burden" that right.  *Worman*, 922 F.3d at 38.

Second Amendment.  On Count I, therefore, the plaintiffs have failed to demonstrate a likelihood of success on the merits so as to warrant preliminary injunctive relief.

### B. Banning High-Capacity Magazines and Takings Without Just Compensation

#### 1. Background on Takings

The plaintiffs contend that the LCM Ban amounts to a "taking without just compensation" in violation of the Fifth and Fourteenth Amendments to the United States Constitution because it forces them to divest themselves of any LCMs designed to hold more than ten rounds of ammunition.  While compliance with the LCM Ban does prohibit continued physical possession of LCMs, the statute gives LCM owners four options from which to choose by December 18, 2022.  They may modify the magazine's capacity to hold ten or fewer rounds, they may sell the offending LCM to a registered gun dealer, they may transport the offending gun to a place where it is lawfully possessed, or they may forfeit the LCM to a law enforcement entity.  The statute provides no payment in the event of forfeiture.

The parties dispute the prevalence of magazines that cannot be converted to lower capacity, but the Court need not resolve this dispute and accepts that there are some LCMs that cannot be modified.[31]  Even assuming that the only way to comply with the statute for some plaintiffs vis-à-vis some weaponry is to forfeit them, the Court finds that no "taking" within the meaning of the Fifth Amendment has occurred and there is, therefore, no entitlement to "just compensation."

---

[31] None of the plaintiffs through their affidavits professes to own an LCM that definitively cannot be modified.

37

There are two types of "takings" that may require compensation. First, there is a physical taking where property is appropriated by the government for public use. *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017). This type of taking is accomplished by direct seizure or "the functional equivalent of a practical ouster of the owner's possession." *Id.* A second type of "taking," deemed a regulatory taking, is accomplished when the owner is deprived of all economic or productive use of the product. *Id.* at 1942-43.

More than a century ago, the United States Supreme Court declared that "[a] prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit." *Mugler v. Kansas*, 123 U.S. 623, 669 (1887).

> The exercise of the police power by the destruction of property which is itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use, or from depriving a person of his property without due process of law.

*Id.*; *Fesjian v. Jefferson*, 399 A.2d 861, 866 (D.C. 1979) (holding that a "proper exercise of police power to prevent a perceived public harm[] does not require compensation"). "Property seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause." *Akins v. United States*, 82 Fed. Cl. 619, 622 (Fed. Cl. 2008) (quoting *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1152 (Fed. Cir. 2008)). If legislation is a valid exercise of police power, "the fact that it

deprives the property of its most beneficial use does not render it unconstitutional." *Goldblatt v. Town of Hempstead, N.Y.*, 369 U.S. 590, 592 (1962).

The plaintiffs attempt to characterize the LCM Ban as a "physical taking," in order to avoid the valid police power doctrine, and cite *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982). In *Loretto*, the Supreme Court held that the installation of cable equipment on private property was a valid exercise of police power but nonetheless required just compensation. *Loretto* is restricted, however, only to concrete takings, not use restrictions: "Although this Court's most recent cases have not addressed the precise issue before us, they have emphasized that physical *invasion* cases are special and have not repudiated the rule that any permanent physical *occupation* is a taking." *Id.* at 432 (emphasis in original). While the LCM Ban does include a forfeiture option, it does so as one option among several, not as a compelled taking. The gunowner has a series of other options she may exercise, at least two of which—modification and transfer to a state where LCMs are not banned—allow retention of the LCM and substantial beneficial use. Sale to a registered gun dealer is another option that gives the owner beneficial use. Only as a last resort—and only if the gun owner voluntarily eschews other options—might one choose forfeiture. That recourse to forfeiture is possible does not turn the LCM Ban into a physical taking and *Loretto* is not applicable here.

Thus, the Court returns to the doctrine that a regulatory restriction that is a valid exercise of police power does not entitle the property owner to compensation. In order to constitute a valid exercise of police power, legislation is required (A) to serve

the public interest, (B) the means must be reasonably designed to accomplish the purpose, and (C) they must not be unduly oppressive upon individuals. *Goldblatt*, 369 U.S. at 594-95.

### 2. Public Interest

On top of an epidemic of violence in American society there has been layered the ultra-lethal pathogen of mass murders—shootings in which multiple people are killed and, often, dozens of others injured.[32] The shootings are the acts usually of a single stranger,[33] mowing down random bystanders in the line of fire only because of where they happened to be at a tragic moment in time. On August 1, 1966, Charles Whitman climbed twenty-eight stories to the observation deck of the main building on the campus of The University of Texas at Austin and began indiscriminately shooting at people below. He fired for ninety-six minutes, killing fourteen and wounding thirty-one others. At the time, such murders seemed unthinkable. David Montgomery, *Texas Marks '66 Sniper Attack as University Prepares for 'Campus Carry' Law*, NEW YORK TIMES (July 30, 2016),

---

[32] Mass shootings are defined by the Gun Violence Archive as a shooting in which at least four people are wounded in the same place at the same time. By that definition, there have been more than 600 mass shootings in 2022 as of November, an average of 1.8 per day. There have been thirty-six mass murders in the same time period, shootings in which at least four people are killed. *Gun Violence Archive 2022: Charts and Maps*, GUN VIOLENCE ARCHIVE, https://www.gunviolence archive.org/ (last visited Nov. 28, 2022). The number has more than doubled since 2014 and increased by 50% from 2019 to 2020. *Id.*

[33] The mass shootings and killings that occupy our attention are those of a lone shooter. American history contains numerous instances of mass shootings perpetrated by mobs, *e.g.,* Nat Turner's rebellion, Bloody Monday in Louisville, and the massacres of countless unarmed Native Americans. ECF No. 19-1 at 50 ¶ 34.

https://www.nytimes.com/2016/07/31/us/university-of-texas-marks-sniper-attack-with-memorial-and-new-gun-law.html.    But while the Texas sniper is often considered the first of the modern wave of mass shootings, a New Jersey man mowed down thirteen people with a semiautomatic weapon in 1949.   David M. Zimmer, *America's First Mass Shooting: 70 Years Ago, A WWII Veteran Killed 13 of His Neighbors*, USA TODAY (Aug. 28, 2019), https://www.usatoday.com/story/news/nation/2019/08/28/wwii-veteran-became-americas-first-mass-shooter-1949/2139054001/.

At the time of this writing, what is more unthinkable is that mass murders have become a weekly—and sometimes daily—event.   For example, on Sunday, November 13, a University of Virginia student opened fire on a bus, killing three of his classmates and leaving a fourth seriously wounded.   Six days later, on Saturday, November 19, a shooter opened fire at a gay and lesbian nightclub in Colorado Springs, killing five and injuring twenty-five others.   Three days later, a Walmart employee in El Paso walked into a break room and started shooting at fellow employees, killing six and wounding at least six more.   According to *The Washington Post*, "[n]ot a single week in 2022 has passed without at least four mass shootings." Júlia Ledur, *There Have been More than 600 Mass Shootings So Far in 2022*, WASHINGTON POST (Nov. 23, 2022, 11:49 AM), https://www.washingtonpost.com/nation /2022/06/02/mass-shootings-in-2022/.

The events are referred to now simply by shorthand name, which sadly is enough without elaboration to bring the grizzly details to mind.   Remember just a

few: San Ysidro, California (July 18, 1984, twenty-one dead and nineteen wounded); Columbine, Colorado (Apr. 20, 1999, thirteen dead and twenty-four wounded); Edmond, Oklahoma (Aug. 20, 1986, fourteen dead and six injured); Red Lake, Minnesota (Mar. 21, 2005, seven dead); Virginia Polytechnic Institute, Blacksburg, Virginia (Apr. 16, 2007, thirty-two killed and seventeen wounded); Bingham, New York (Apr. 3, 2009, thirteen dead and four wounded); Fort Hood, Texas (Nov. 5, 2009, thirteen dead and thirty-one injured); Oakland, California (Apr. 2, 2012, seven dead and three wounded); Cinemark Century Theater in Aurora, Colorado (July 20, 2012, twelve killed and fifty-eight wounded); Sandy Hook Elementary in Newtown, Connecticut. (Dec. 14, 2012, twenty-six dead and two wounded); Marysville, Washington (Oct. 24, 2014, four dead and four wounded); San Bernardino, California (Dec. 2, 2015, fourteen killed and twenty-two wounded); Pulse Night Club in Orlando, Florida (June 12, 2016, forty-nine dead and fifty-three wounded); Dallas, Texas (July 7, 2016, five dead and eleven injured); Las Vegas, Nevada (Oct. 1, 2017, fifty-eight dead and 850 wounded); Sutherland Springs, Texas (Nov. 5, 2017, twenty-six dead and twenty wounded); Stoneham-Douglas High School in Parkland, Florida (Feb 14, 2018, seventeen dead and seventeen wounded); Santa Fe, Texas (May 18, 2018, ten dead and thirteen wounded); Temple of Life Synagogue in Pittsburgh, Pennsylvania (Oct. 27, 2018, eleven dead and six wounded); Midland-Odessa, Texas (Aug. 31, 2019, seven killed and twenty-five injured).[34]  And then there was Uvalde,

---

[34] Sources: Matthew Lynch, *Definitive List of School Shootings in The United States In The 21st Century*, THE EDVOCATE (June 8, 2022) https://www.theedadvocate.org/definitive-list-of-school-shootings-in-the-united-

Texas, where video cameras inside Robb Elementary School on May 24, 2022, allowed a stunned and horrified public to watch 376 law enforcement officers stand by while a lone gunman murdered twenty-one victims, mostly children, in a seventy-five-minute massacre; eighteen more, also mostly children, were wounded. Six weeks later, a shooter opened fire on a July 4th parade in Highland Park, Illinois, killing seven people and wounding thirty.

The asserted governmental interest of public safety stemming from mass gun murders could not be more undeniably compelling.

### 3.  Reasonably Designed to Accomplish the Purpose

The prohibition against LCMs is a reasonable response to the public safety interest of the state. Indeed, it is "substantially related to the promotion of the

---

states-in-the-21st-century/; Mandi Cai, *Texas has had eight mass shootings in the past 13 years, while lawmakers have steadily loosened restrictions on carrying firearms*, THE TEXAS TRIBUNE (Nov. 12, 2019) https://apps.texastribune.org/features/2019/texas-10-years-of-mass-shootings-timeline/?_ga=2.137769844.599227537.1669671525-424901157.1669671525; Mark Berman, *'I'm Not Gonna Lay Here and Just Get Shot:' Survivors Describe the Terror and Chaos of Las Vegas Massacre*, WASHINGTON POST (May 17, 2018), https://www.washingtonpost.com/news/post-nation/wp/2018/05/16/im-not-gonna-lay-here-and-just-get-shot-survivors-describe-the-terror-and-chaos-of-las-vegas-massacre/; *A Study of Active Shooter Incidents in the United States*, U.S. DEPT. OF JUSTICE BULLETIN (Sept. 16, 2013); Zach Despart, *"Systemic Failures" in Uvalde Shooting Went Far Beyond Local Police, Texas House Report Details*, THE TEXAS TRIBUNE (July 17, 2022), https://www.texastribune.org/2022/07/17/law-enforcement-failure-uvalde-shooting-investigation/; Christine Hauser & Livia Albeck-Ripka, *Victims of Highland Park Shooting Sue Gun Maker and Retailers*, NEW YORK TIMES (Sep. 29, 2022), https://www.nytimes.com/2022/09/29/us/highland-park-shooting-victims-lawsuit.html; (ECF No. 19-11); Campbell Robertson, Christopher Mele & Sabrina Tavernise, *11 Killed in Synagogue Massacre; Suspect Charged with 29 Counts*, N.Y. TIMES (Oct. 27, 2018), https://www.nytimes.com/2018/10/27/us/active-shooter-pittsburgh-synagogue-shooting.html.

general welfare." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 138 (1978). While a ban on LCMs does not prevent mass shootings, it unquestionably makes them less deadly.[35] As the District of Columbia Circuit Court said in its consideration of *Heller* after remand, LCMs are designed to "shoot multiple human targets very rapidly" and to "allow the shooter to spray-fire from the hip position." *Heller II*, 670 F.3d at 1262-63. An LCM may be designed for quick reloading, but logic dictates that any reloading time saves lives.

The plaintiffs rebut by minimizing estimated reloading time, to two or three seconds, in an attempt to shrink its life-saving impact.[36] "Such a minuscule difference in practical fire rate would be unlikely to have any appreciable effect on lethality." ECF No. 22-1 at 50. But the Court finds as fact that in those two or three seconds a child—or two children, or even three—may escape the fire of a mad person. In Las Vegas, one young woman who got up and ran during a moment's pause was able to get as far as the door before being shot in the arm. Berman, *supra* note 34. Others

---

[35] The analogy to automobiles and speed limits comes to mind. Imposing a national highway speed limit of fifty-five miles per hour in 1974 did not eliminate accidents, but it made them significantly less deadly. *Long Term Effects of Repealing the National Maximum Speed Limit in the United States*, AM J. PUB. HEALTH, at 1626-31 (Sept. 2009) (noting that in the year after enactment, fatalities were reduced by 16.4%).

[36] The plaintiffs also argue that, because LCMs are complex machinery, they are subject to jamming and breakdowns. These fortuitous events allow victims to escape, making firearms fitted with LCMs *safer* in the plaintiffs' opinion than those with lower-capacity chambers. "One can argue that true high-capacity magazines would be 'safer' in a mass shooting situation than multiple low-capacity magazines." ECF No. 22-1 at 50. The plaintiffs omit mentioning the irony of this position: what they point to as a fatality-reducing event that they would rely on to promote safety happens only occasionally, but it is *exactly* what the legislation tries to achieve by plan and design – a pause in the shooting.

describe running for cover in the few pauses where the shooter reloaded. ECF No. 19-1 at 23 (citing Natalie Bruzda, *Veteran's Quick Reactions Saved Lives During Las Vegas Shooting*, LAS VEGAS REV. J. (Nov. 10, 2017)) (internal pagination). A gunman's need to reload twice using three ten-round magazines instead of a single thirty-round magazine, clearly saves lives. It is undisputed that requiring a pause in the shooting saves lives. This assertion is based on society's experience with what is now a catastrophic number of these incidents, not merely conjecture. In Tucson, while two bystanders tackled the gunman, a sixty-one-year-old woman wrestled a fresh magazine from him as he tried to reload.[37] In California, twelve people were able to escape out the back window of the bar while the gunman paused to reload.[38] As the *en banc* Fourth Circuit observed in *Kolbe v. Hogan*, the use of ten-round magazines instead of LCMs would afford "six to nine chances" for bystander intervention for every 100 rounds fired. *Kolbe*, 849 F.3d at 128.

The plaintiffs' estimate of "two seconds" to reload a new magazine presumably assumes ideal circumstances. In reality, however, "[m]any criminals are not

---

[37] Jessica Hopper et al., *Heroes of Tucson Shooting: 'Something Had to Be Done'*, ABC NEWS (Jan. 10, 2011), https://abcnews.go.com/US/heroes-rep-gabrielle-giffords-shooting-tucson-arizona-subdued/story?id=12580345; Kevin Dolak & Justin Weaver, *Women Wrestled Fresh Ammo Clip from Tucson Shooter as He Tried to Reload*, ABC News (Jan. 9, 2011), https://abcnews.go.com/Politics/patricia-maisch-describes-stopping-gunman-reloading/story?id=12577933.

[38] *California Bar Shooting: Witnesses Describing Escaping as Gunman Reloaded*, CBS Mornings (Dec. 7, 2018), https://www.cbsnews.com/news/borderline-bar-shooting-thousand-oaks-california-12-dead-witnesses-describe-gunman-storming-in/; *Witnesses on "Utter chaos" and Escape from California Bar Shooting*, CBS News (Nov. 8, 2018), https://www.cbsnews.com/video/witnesses-on-utter-chaos-and-escape-from-california-bar-shooting/.

practiced in changing magazines, and the stress of a confrontation can also increase the time to change a magazine ... allowing valuable moments for victims or law enforcement to act." ECF No. 19-3, Affidavit of Edward Troiano ¶ 13.

The reduction of how many rounds can be shot in a given time period, due to the need to reload, serves public safety in another way as well. "[C]riminals' use of large capacity magazines increases the likelihood of their indiscriminate fire resulting in a strike, or multiple strikes, to a victim." *Id.* Because bullets "can travel through the walls of homes and even car doors, [and] the use of large capacity magazines in criminal activity also increases the risk that innocent bystanders will be injured." *Id.*

The more shots fired, the greater the number of people wounded, the more bullets that hit a single person, the more serious the injuries, and the less able emergency rooms are to treat them or save lives. The state has supplied a declaration of Dr. Megan Ranney, an expert in the field of emergency medicine with impeccable credentials. She received her A.B. *summa cum laude* from Harvard College, her medical degree from Columbia University, and a Master of Public Health from Brown University. She is a Diplomate of the American Board of Emergency Medicine and a Fellow of the American College of Emergency Medicine. Her awards, appointments, and publications in peer-reviewed journals, reflecting original research in this field, are numerous. ECF No. 19-10 at 4-71.

The State has submitted the credible evidence of Dr. Ranney's first-person description of care and treatment of gunshot wounds that takes the reader into the

46

**A55**

trauma rooms of an emergency medicine facility. It describes, from the arrival of the ambulances to the patient outcomes, a play-by-play of treatment procedures. The ability to spray a crowd with bullets results in more injuries per person, and "cases with multiple bullet wounds are more complex, have a higher likelihood of injury that requires surgical intervention, and have a higher likelihood of death in the emergency department." *Id.* at 2 ¶ 8.

> Trying to simultaneously stop the blood loss from a lacerated liver, spleen, and lung is much more complex than addressing a single such injury. Internal organs bleed a lot; a heart with a hole in it doesn't work; blood in the lungs makes us unable to get enough oxygen to the body; and we simply can't stem all of these at the same time, even with multiple physicians in the room.

*Id.* at 3 ¶ 10. When there are multiple victims arriving at the same time, the inability to treat adequately is exacerbated. From her practice for the past fourteen years as an attending physician in emergency medicine at both Miriam and Rhode Island Hospitals she reports, "I have worked evenings when the number of patients arriving in the emergency department with gunshot wounds stretches our staff, our number of available operating rooms, and even our number of blood supplies available." *Id.* at ¶ 11.

The data provided by Dr. Ranney, while in her estimation are still sparse, nonetheless support the direct connection between employment of LCMs and increased injuries, both in number and seriousness. Among the explicit findings were that cases in which LCMs were used "had an average of 11.8 deaths per incident (compared with 7.3 per incident when a large-capacity magazine was not used.)." ECF No. 19-J at 78-79. In Tucson, Arizona, the shooter who wounded U.S.

Representative Gabby Giffords fired thirty-one rounds, *each* of which found a human target, resulting in six dead and twelve injured—an average of 1.6 bullets hitting each person. ECF No. 22A ¶ 49. One preeminent researcher in this field has estimated that "restrictions on magazine capacity would decrease the number of deaths in mass shootings by 11-15%." *Id.* (citing Koper, C.S., *Assessing the Potential to Reduce Deaths and Injuries From Mass Shootings through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, CRIMINAL PUB. POL'Y 2020, Vol. 19, 147-170); *see also* ECF No. 22A, Affidavit of Randolph Ross ¶ 46 ("[T]he development of semiautomatic rifles and handguns dramatically increased the number killed or wounded in mass shootings from 1966 to the present.").[39]

Beyond the feeble argument that the Court described *supra* at note 36, the plaintiffs have nothing to say to rebut this argument, save for the suggestion that the reloading time is so *de minimus* that any loss of life or bloodshed it achieves is

---

[39] From 1966 to the present, mass shootings with non-semiautomatic weapons resulted in an average of 5.4 persons killed. The use of a semiautomatic handgun raised that to 6.5—an additional person dead; and the use of a semiautomatic rifle produced an average of 9.2 persons killed—an increase of 50%. The number of those wounded was even more dramatically affected. The use of non-semiautomatic weapons produced an average of 3.9 wounded (but not killed); use of a semiautomatic handgun increased the number wounded by more than 50% to 5.8, and the use of a semiautomatic rifle nearly *tripled* the number of people wounded, to an average of 11.0. ECF No. 22A ¶ 46. "[W]ith extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and semiautomatic handguns 184 percent more than regular firearms. In combination, semiautomatic firearms and extended magazines are extraordinarily lethal." *Id.* at ¶ 48.

*de minimus* as well.[40]  The Court rejects that assertion:  the eleven children who escaped the Sandy Hook massacre during an apparent reloading[41] are compelling evidence that the LCM Ban is a reasonable public safety regulation designed to reduce harm to society.

### 4.    Not Unduly Oppressive on Individuals

The statute clearly has an adverse impact on individuals who own LCMs.  It places a burden on them to disengage from the weapon, by modifying it, selling it, transporting it elsewhere, giving it away, or forfeiting it.  The Court considers this burden minor.  It is not at all clear, at least from the evidence the plaintiffs have offered, that it is impossible to modify the LCMs in current use to accept fewer than eleven rounds.  While the plaintiffs assert that, they have given the Court no way to quantify the resulting "injury":  which, exactly, are the magazines that cannot be modified?  How many of them are in use in Rhode Island?  Even if there are some, at a cost as little as under $14.95 for some thirty-round magazines (ECF No. 19-4 at 15, 30), it does not seem much of a burden even if they must be discarded in favor of another, lower-capacity one.  The same failure of proof affects the plaintiffs' assertion

---

[40] The plaintiffs' expert declared, "Such a minuscule difference in practical fire rate would be unlikely to have any appreciable effect on lethality."  ECF No. 22-1 at 50.

[41] Corky Siemaszko, *Want to Save Lives in Mass Shootings? Ban Large-Capacity Magazines, Researchers Say*, NBC NEWS (Oct. 17, 2019), https://www.nbcnews.com/news/us-news/want-save-lives-mass-shootings-ban-large-capacity-magazines-researchers-n1066551.  Nine children had managed to run out of Classroom 10, and two had escaped to the classroom's restroom.  ECF No. 6 at 15.  In one of the two classrooms in which children were massacred, three separate 30-round magazines were found; one had twenty-four rounds in it, one had ten, and the third was empty.  Eighty empty casings were found on the classroom floor.  *Id.* at 26.

that there are certain handguns that can *only* accept an LCM and cannot accommodate a lower-capacity magazine made by any manufacturer. The plaintiffs have submitted no data to support that assertion. "The impracticability of any particular option, such as the alleged lack of a market for these [large-capacity] magazines, the burden in removing these magazines from the state, or the lack of guidance on what constitutes a permissible permanent modification does not transform the regulation into a physical taking. *Wiese v. Becerra*, 306 F. Supp. 3d 1190, 1198 (E.D. Cal. 2018). Nor does a physical modification of an LCM to accept no more than 10 rounds "destroy[s] the functionality." *Id.*; *see Goldblatt*, 369 U.S. at 592 (a valid exercise of police power does not become a "taking" even if it "deprives the property of its most beneficial use").

To the extent that the statute, by prohibiting LCMs, diminishes the shooting ability of the person holding the firearm, it is truly *de minimus*. The law puts no limit on the number of ten-round magazines an owner may have at her feet at any one time. The ground can be littered with magazines that, in the aggregate, give the recreational shooter dozens, or even hundreds, of bullets to fire. It is worth noting again that there is no evidence that any person has ever had any need to fire more than ten rounds in self-defense. But even if such an occasion existed, by the plaintiffs' own admission, the reloading process is so quick and easy, it would seem hardly burdensome for a person to fire thirty rounds from three ten-round capacity magazines instead of from two fifteen-round capacity magazines or a single thirty-

round device. If this is even a burden at all, it pales in comparison to the substantial nature of the public safety interest at stake.

###    5.    Conclusion

The Court finds the LCM Ban to be a valid exercise of the police power. Statutes similar to Rhode Island's, which outlaw possession of LCMs with no provision for compensation, have been upheld against Takings Cause challenges, as have a number of laws prohibiting particularly deadly firearm accessories. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney General New Jersey*, 910 F.3d 106, 124-25 (3d Cir. 2018), *vac. on other gnds sub nom, Assn. of N.J. Rifle & Pistol Clubs, Inc. v. Bruck*, 142 S. Ct. 2894 (June 30, 2022) (LCMs); [42] *Duncan v. Bonta*, 19 F.4th at 1112 (California statute similar to Rhode Island's); *Wiese v. Becerra*, 306 F. Supp. 3d at 1198 (California prohibition of LCMs); *Cf. Akins*, 82 Fed. Cl. at 622-23 (no taking by the ATF's classification of a certain weapon as a "machine gun," thus prohibiting its sale to civilians); *Fesjian*, 399 at 866 (D.C. 1979) (Firearm Control Act of 1975 prohibiting registration of machine guns not a 5th Amendment taking); *Maryland Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 417 (D. Md. 2018) (ban of bump stocks and other rapid-fire trigger activators not a taking); *McCutchen v. United States*, 14 F.4th 1355, 1368 (Fed. Cir. 2021) (inclusion of bump stocks in category of

---

[42] While a number of these decisions have either been implicitly abrogated by *Bruen* because of their Second Amendment "intermediate scrutiny" holdings, or remanded for reconsideration, *Bruen* did not address a "takings" argument and therefore cast no doubt on the integrity of these decisions on that account. Indeed, *certiorari* was not granted to address the takings portion of the Second Circuit's decision.

prohibited machine guns not a taking, even though ATF changed its position);
*Mitchell Arms, Inc. v. United States*, 26 Cl. Ct. 1, 5 (1992), *aff'd*, 7 F.3d 212 (Fed.
Cir. 1993), *cert. den.*, 511 U.S. 1106 (1994) (declaration by ATF that semiautomatic
assault-type rifles were not suitable for "sporting" purposes, which made them not
importable, not a taking); *Roberts v. Bondi*, No. 8:18-cv-1062-T-33TGW, 2018 WL
3997979, at *3 (M.D. Fla. 2018) (prohibition of bump stocks not a taking); *Rupp v.
Becerra*, No. 8:17-cv-00746-MLS-JDE, 2018 WL 2138452, at *8 (C.D. Cal. May 9,
2018), *rem. for cons. of Bruen*, 2022 WL 2382319 (9th Cir. June 28, 2022) (prohibition
of "bullet buttons," which allowed a quick detaching and replacement of magazine,
used in San Bernardino 2015 mass shooting to shoot thirty-six people in less than
four minutes, not a taking).

For these reasons, the Court finds the LCM Ban to be a valid exercise of police
power, and therefore not a taking that would implicate Fifth Amendment protection.
The plaintiffs have failed to show the likelihood of success of their Fifth Amendment
claims.

## C.    The Rhode Island Statute and Due Process and Vagueness

The plaintiffs challenge the LCM Ban with two direct Fourteenth Amendment
arguments: that it violates due process and that it is vague in its failure to define
what constitutes "permanent modification" of an LCM to accept no more than ten
bullets. ECF No. 8 at 13-14. They claim by affidavit and in their memorandum that
they are in a "tough corner" where they have to choose between forfeiture without

compensation or modification without knowing exactly whether the modification that they choose will be sufficient.

It is unclear to the Court upon which theory of due process the plaintiffs are proceeding, although presumably it is substantive due process. To the extent that the plaintiffs challenge the rationality or capriciousness of the LCM Ban, the Court has found it is a valid exercise of police power. *See supra*. Moreover, the First Circuit has already ruled that a similar Massachusetts restriction on LCMs survived intermediate scrutiny. *Worman*, 922 F.3d at 26.

The Court sees nothing vague about the statutory language. The necessary modification is defined in the statute itself as "such that [the magazine] cannot hold more than ten rounds of ammunition." Permanent in ordinary parlance uniformly means "in a way that continues without changing or ending; in a way that is not brief or temporary." *Permanently*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/permanently (last visited Dec. 14, 2022). It means "lasting for a long time or for all time in the future." *Permanent*, OXFORD ADVANCED LEARNER'S DICTIONARY, https://www.oxfordlearnersdictionaries.com/us/definition/english/permanent_1#:~:te xt=permanent-,adjective,future%3B%20existing%20all%20the%20time (last visited Dec. 14, 2022). It is defined similarly in dictionaries of common usage. "Lasting for a long time or forever." *Permanent*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/permanent (last visited Dec 14, 2022).

This statute "provide[s] people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). And it is hard to see how it could encourage "arbitrary and discriminatory enforcement." *Id.* There seems no discretion for a law enforcement officer to exercise in a way that abuses power: either a given magazine has a place to insert an eleventh bullet or it does not. The plaintiffs have provided no evidence that modifying an LCM could leave a law enforcement officer unable to discern how many bullets it will accept.

At the least, the plaintiffs have failed to carry their burden of demonstrating a likelihood of success with their direct Fourteenth Amendment arguments.

### D.    Irreparable Injury and Balance of the Harms

In addition to demonstrating a likelihood of success on the merits, a plaintiff seeking a preliminary injunction must show that, without the requested relief, she will suffer irreparable harm.[43] "'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005) (finding that imminent foreclosure qualified as irreparable injury). In this

---

[43] As the Court has found insufficient likelihood of success on the merits, it need not examine the other factors relevant to the issuance of a preliminary injunction. *Ryan v. U.S. Immigration & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020) (*quoting New Comm. Wireless Servs, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 19 (1st Cir. 2002)) ("If the movant 'cannot demonstrate that he is likely to succeed in his ques, the remaining factors become matters of idle curiosity."). The Court has continued beyond the first step, however, in order to provide the parties with a complete opinion.

case, the plaintiffs claim several potential injuries.  The plaintiffs first cite *Flower Cab Co. v. Petitte*, 685 F.2d 192, 194-95 (7th Cir. 1982), for the proposition that "[a] violation of 'personal' constitutional rights is a per-se irreparable harm where the protected right has been personal and the violation non-compensable."  ECF No. 22 at 34.  That may be, but the essence of the injury here is clearly economic.  Indeed, by virtue of their Fifth Amendment Takings Clause argument, the individual plaintiffs virtually concede that there exists "just compensation" for their being deprived of their LCMs or for firearms that cannot use any magazine but an LCM.  The injury alleged by the firearms dealer is entirely economic—an inventory that can no longer be lawfully sold and, perhaps, lost profits on what may have been future sales of the prohibited LCM.  Plaintiff Jonathan Hirons alleges he would suffer irreparable harm by having to forfeit his LCMs—a compensable event.  ECF No. 8-1, Ex. B.  He also complains that he would become a felon if he did not dispossess himself of his LCMs.  But, like any "if it were not assizes-time" statement,[44] the harm does not come to pass if he complies with the statute.  "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store."  *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).  The retail plaintiff alleges any number of harms—all economic injuries:  financial harm from being unable to sell LCMs in-store, loss of business revenue from selling LCMs,

---

[44] The phrase is reported to come from *Tuberville v. Savage*, 1 Mod. Rep. 3, 86 ER 684 (1669); it refers to a conditional event that is avoided if the condition does not occur.

having to find another business location from which to sell LCMs in-store, and the inability to sell models for which lower-capacity magazines are made. ECF No. 8-1 at 11-15.

None of these feared consequences constitutes irreparable harm. Besides, the Court in fashioning its Order is ensuring that any forfeited magazines be retained in a safe manner so that they may be returned to their owners if a permanent injunction is granted in the future. *See San Francisco Veteran Police Officers Ass'n v. City & Cty. of San Francisco,* 18 F. Supp. 3d 997, 1005 (N. D. Cal. 2014) ("In the event that plaintiffs prevail on the merits, however, the City and County of San Francisco is ordered to return plaintiffs' surrendered magazines back to them."). Any plaintiff who is confident of ultimate victory may ensure that the loss of enjoyment of her LCM is temporary by choosing forfeiture and safekeeping of the weapon.

To the extent that the plaintiffs complain that their right to self-defense may be imperiled, the Court is persuaded by the Declaration of Rhode Island Bureau of Criminal Identification and Investigations Chief Edward Troiano that an occasion in which a victim threatened with violence might need to rapidly fire that eleventh, twelfth, or twentieth bullet is so speculative as to be non-existent. In Mr. Troiano's experience, from 1994 to the present, confirmed by his review of self-defense incidents, there has not been "any incident in which a civilian has ever fired as many as 10 rounds in self-defense." ECF No. 22-C ¶ 10. Rhode Island is not alone with no incidents of self-defense use of LCM-equipped firearms. *Kolbe,* 849 F.3d at 127 ("neither the plaintiffs nor Maryland law enforcement officials could identify a single

incident in which a Marylander has … needed to fire more than ten rounds, to protect herself."). *See also Worman*, 922 F.3d at 37 ("[N]ot one of the plaintiffs or their six experts could identify … even a single example of a self-defense episode in which ten or more shots were fired."). *See Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 WL 17454829, at *11 (D. Ore. Dec. 6, 2022) (NRA Armed Citizen Database found more than ten bullets fired by self-defender only twice in 736 incidents).

Finally, to the extent that the plaintiffs or other recreational gun enthusiasts might somehow enjoy firing dozens of rounds in quick succession, that is hardly impaired. Nothing prevents such people from having dozens of lower-capacity magazines at their feet, allowing them to spray as many bullets as they like, with only the inconvenience of—as the plaintiffs concede—two seconds at a time to reload. That momentary interruption is not the kind of irreparable harm required for a preliminary injunction to issue.

Against what the Court has found is an absence of irreparable harm on the part of the plaintiffs, it must still consider the hardship to the nonmovant if enjoined and the impact of the Court's decision, either way, on the public interest. *Ryan*, 974 F.3d at 18. Earlier, the Court examined the tightness of the relationship between the LCM Ban and public safety, finding that in a mass shooting incident every pause to reject a spent magazine and load a new one represents the opportunity to preserve a specific life—or more than one. That finding need not be embellished here. Suffice it to say that in very real terms, the plaintiffs' proffered harm caused to them by an

injunction pales in comparison to the unspeakable devastation caused by mass shooters wildly spraying bullets without end into a crowd of bystanders. Rhode Island has yet to suffer the kind of massacre that occurred just across our border at Sandy Hook Elementary. But, if and when it does, at least while this lawsuit is pending, the State is entitled to enforcement of R.I. Gen. Laws § 11-47.1-1 *et seq.*

## IV.   CONCLUSION

It is not entirely accurate to say that the victims of mass shootings are chosen randomly. True, they are random in that their identities are usually not known to the shooter, and it appears to matter not to the shooter whether the next one killed is a particular person or the woman standing next to him. But in actuality, victims have not been chosen randomly. They have been chosen because they were attending synagogue in Pittsburgh or church in Sutherland Springs. Or because they were sitting in an elementary school classroom in Newtown or a high school classroom in Parkland. Or because they were at a concert in Las Vegas or a nightclub in Orlando. They were not chosen because of anything they did, but because of what they represented to a particular person with a gun and a lot of ammunition.

Consistent with its obligation to protect public safety, but consonant with its fealty to the Constitution, the Rhode Island General Assembly has responded with, among other firearms regulations, the LCM Ban. It is perhaps inevitable that Rhode Island will one day be the scene of a mass shooting. The LCM Ban is a small but measured attempt to mitigate the potential loss of life by regulating an instrument associated with mass slaughter. It prohibits a device that itself is neither "Arms" nor

58

A67

embraced by the core right to self-defense. The LCM Ban is reasonable, it is measured, and the plaintiffs have failed to persuade the Court that it is likely unconstitutional.

The motion for preliminary injunction (ECF No. 8) is DENIED.[45]


IT IS SO ORDERED:

_____

John J. McConnell, Jr.
Chief Judge
United States District Court


December 14, 2022

---

[45] The defendants Attorney General and Rhode Island State Police Superintendent shall make arrangements with state and local law enforcement to preserve in safe and undamaged condition any LCMs turned in by citizens in compliance with the LCM Ban so that they may be returned to their owners should the plaintiffs ultimately prevail on the merits. If the plaintiffs do not prevail, the Court and parties will work together to ensure a grace period during which owners may make arrangements to direct a disposition of their LCMs out of safe keeping in a way that complies with the statute.