No. 23-1072

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

---

OCEAN STATE TACTICAL, LLC,
d/b/a Big Bear Hunting and Fishing Supply; JONATHAN HIRONS; JAMES ROBERT
GRUNDY; JEFFREY GOYETTE; MARY BRIMER,

*Plaintiffs-Appellants*,

v.

STATE OF RHODE ISLAND; COLONEL DARNELL S. WEAVER, in his official capacity
as Superintendent of the Rhode Island State Police; PETER F. NERONHA, in his
official capacity as the Attorney General for the State of Rhode Island,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Rhode Island
1:22-cv-00246-JJM

---

# BRIEF OF *AMICUS CURIAE* NATIONAL SHOOTING SPORTS
# FOUNDATION IN SUPPORT OF PLAINTIFFS-APPELLANTS
# AND SUPPORTING REVERSAL

---

<div style="margin-left:40%">

David H. Thompson
Peter A. Patterson
Athanasia O. Livas
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, D.C. 20036
(202) 220-9600

</div>

April 17, 2023

<div style="margin-left:40%">

*Counsel for Amicus Curiae*
*National Shooting Sports Foundation*

</div>

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1 and Fed. R. Civ. P. 7.1, *Amicus Curiae* National Shooting Sports Foundation submits the following disclosure statement: National Shooting Sports Foundation, a national trade association, has no parent corporations, and no publicly held corporation owns 10% or more of its stock.

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ...................................................... i

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF INTETEST OF AMICUS CURIAE .........................................1

SUMMARY OF ARGUMENT .............................................................3

ARGUMENT ...........................................................................5

I.    The Rhode Island Magazine Ban Violates the Second Amendment. .............5

      A.    Magazines Fall Within the Plain Text of the Second Amendment.......5

      B.    The Supreme Court Has Already Completed the Relevant Historical
            Analysis, Concluding that Only Dangerous And Unusual Arms May
            Be Banned. ........................................................8

      C.    The Meaning of the Second Amendment Was Fixed in 1791............12

      D.    Magazines Capable of Holding More Than 10 Rounds of Ammunition
            Are In Common Use and Are Not Dangerous And Unusual. ............15

CONCLUSION ........................................................................21

## TABLE OF AUTHORITIES

**Cases**                                                                                 **Page**

*Agostini v. Felton*, 521 U.S. 203 (1997) ...............................................................14

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N. J.*,
    910 F.3d 106 (3d Cir. 2018) ......................................................6, 7, 18

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) .............................................10, 11

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ....................................*passim*

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015)..................................................18

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ........................................................19

*Jackson v. City & Cnty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014)...............................................................6

*Luis v. United States*, 578 U.S. 5 (2016) ................................................................6

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) ......................................13

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022).....................................................................*passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015)..............................................................19

**Statutes**

R.I. GEN. LAWS § 11-47.1-2 .................................................................................3

**Other**

MASSAD AYOOB, THE COMPLETE BOOK OF HANDGUNS (2013)..............................17

Frank H. Easterbrook, *Abstraction and Authority*,
    59 U. CHI. L. REV. 349 (1992).........................................................11

William English, *2021 National Firearms Survey:*
    *Updated Analysis Including Types of Firearms Owned*
    (May 13, 2022), *available at* https://bit.ly/3yPfoHw ...........................15, 16, 17

GUN DIGEST 2018 (Jerry Lee and Chris Berens, ed. 2017) ....................................17

Michael J. Klarman, *Rethinking the Civil Rights and Civil Liberties Revolutions*,
    82 VA. L. REV. 1 (1996)..................................................................11

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849 (2015).................................................................................17

Mem. and Order, No. 1:22-cv-00246-JJM-PAS (D. R.I. Dec. 12, 2022).................7

NSSF, *Industry Intelligence Reports, Firearm Production in the United States*, *available at* https://bit.ly/3MHUDob ...............................................................15

NSSF, *Modern Sporting Rifle Comprehensive Consumer Report*, *available at* https://bit.ly/3GLmErS (last accessed Apr. 13, 2023) .......................................17

Mark W. Smith, *"Not all History is Created Equal": In the Post-*Bruen *World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022), *available at* https://bit.ly/3Dm2HEI..........................................................13, 14

TRO, *Rocky Mountain Gun Owners v. Town of Superior, Colo.*, No. 1:22-cv-01685-RM-NRN, Doc. 18 (D. Colo. July 22, 2022)......................9

*Which States Have Magazine Capacity Limitations?*, CONCEALEDCARRY.COM, *available at* http://bit.ly/3KkXCBy (last accessed Apr. 13, 2023)....................18

**STATEMENT OF INTERESTS OF AMICUS CURIAE**

The National Shooting Sports Foundation, Inc. ("NSSF") is the national trade association for the firearm, ammunition, hunting, and shooting sports industry. Formed in 1961, NSSF is a 501(c)(6) tax-exempt Connecticut non-profit trade association. NSSF's membership includes over 10,500 federally licensed firearms manufacturers, distributors, and retailers; companies manufacturing, distributing, and selling shooting and hunting related goods and services; sportsmen's organizations; public and private shooting ranges; gun clubs; and endemic media.

NSSF's mission is to promote, protect, and preserve hunting and the shooting sports by providing trusted leadership in addressing industry challenges; advancing participation in and understanding of hunting and shooting sports; reaffirming and strengthening its members' commitment to the safe and responsible sale and use of their products; and promoting a political environment that is supportive of America's hunting and shooting heritage and Second Amendment freedoms.

NSSF's interest in this case derives principally from the fact its federally licensed firearms manufacturer, distributor, and retail dealer members engage in lawful commerce in firearms and ammunition throughout the United States, which makes the exercise of an individual's constitutional right to keep and bear arms under the Second Amendment possible. The Second Amendment protects NSSF members from statutes and regulations seeking to ban the exercise of Second Amendment

1

rights. As such, the determination of whether a statute improperly infringes upon the exercise of Second Amendment rights is of great importance to NSSF and its members. NSSF, therefore, submits this brief in support of Plaintiffs-Appellants.

All parties have consented to the filing of this brief, which is the source of Amici's authority to file. *See* FED. R. APP. P. 29(a)(2).

No party or party's counsel authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief, and no person other than Amicus or its counsel contributed money that was intended to fund preparing or submitting this brief.

## SUMMARY OF ARGUMENT

Rhode Island has banned the possession of ammunition magazines capable of holding more than 10 rounds of ammunition. R.I. GEN. LAWS § 11-47.1-2. While Rhode Island labels such magazines "large capacity," *id.*, that label is inaccurate. As NSSF's own data shows, magazines capable of holding more than ten rounds are common to the point of ubiquity, and they are standard equipment on many firearms. Rhode Island's ban on these arms in common use is unconstitutional. This Court should follow the clear path laid by the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), and reverse the district court.

The Supreme Court's decision in *Bruen* makes this Court's task straightforward. 142 S. Ct. 2111. The Supreme Court has already done the historical work to determine what kinds of arms the government may ban, concluding that only those arms that are both dangerous *and* unusual may be banned. Under *Bruen*'s analytical framework, then, this Court need only determine whether the magazines banned by Rhode Island are "in common use" for lawful purposes and therefore necessarily not dangerous and unusual.  If they are, they are protected by the Second Amendment's "unqualified command." *Id.* at 2126, 2128.

Magazines capable of holding more than ten rounds are indeed arms in common use for lawful purposes. In fact, recent survey data indicates that there are

3

hundreds of millions of them owned by Americans. Thus, Rhode Island's ban on these magazines violates the Second Amendment, and Plaintiffs are entitled to an injunction of the unconstitutional law.

There are two relevant analytical questions: (1) are magazines covered by the Second Amendment and (2) are they in common use.

*First*, magazines capable of holding more than 10 rounds fall under the Second Amendment's protection. As a matter of plain text, "the Second Amendment's definition of 'arms' " covers all "instruments that facilitate armed self-defense." *Id*. at 2132. Ammunition magazines are an integral component of many common firearms, and thus serve as an "instrument" that facilitates self-defense. Further, a prohibition on magazines capable of holding more than 10 rounds necessarily operates as a prohibition on firearms capable of shooting more than 10 rounds without reloading.

*Second*, because magazines capable of holding more than 10 rounds of ammunition are in common use, an outright ban on them violates the Constitution. The Second Amendment protects an unqualified right to possess all arms that are in "common use *today*." *Id*. at 2128 (emphasis added). Magazines capable of holding more than 10 rounds of ammunition are common features of many of the most commonly owned handguns and rifles in the country. Estimates suggest there are as many as over *half a billion* such magazines in use in the United States today. Because

4

such magazines are in common use, there is no historical justification for Rhode Island's outright ban.

Taking these points together, Plaintiffs are entitled to a preliminary injunction. They are likely to succeed on the merits because the Rhode Island ban is an unconstitutional restriction on the Second Amendment. That ongoing constitutional violation of the freedom to keep and bear arms is irreparable. And the public interest always favors the injunction of unconstitutional laws. The district court's contrary judgment, which misconceived the test established by the Supreme Court in *Bruen*, should be reversed.

## ARGUMENT

## I.     The Rhode Island Magazine Ban Violates the Second Amendment.

## A. Magazines Fall Within the Plain Text of the Second Amendment.

The Second Amendment protects the right to "keep and bear Arms." As for what constitutes "Arms," the Supreme Court in *Heller* explained that "the Second Amendment extends, prima facie, to *all instruments that constitute bearable arms*." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) (citations omitted, emphasis added). *Bruen* further clarifies that the term "arms" under the Second Amendment includes all "modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132.

Therefore, the relevant question for this Court is whether the Rhode Island ban impacts the right to possess any bearable instrument that facilitates armed self-defense.

The ammunition magazines banned by Rhode Island fall within the scope of the Second Amendment. As just explained, the Second Amendment definition of arms includes all instruments that *facilitate* armed self-defense. And this is as it must be, since constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J. concurring in the judgment). As relevant here, that means that the Second Amendment must protect not just firearms themselves but also the components that make up firearms. Else, the government could evade the Second Amendment by banning triggers or, as in this case, limiting ammunition capacity to a substandard amount. "[W]ithout bullets, the right to bear arms would be meaningless. A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). The magazines that Rhode Island bans are integral for the operation of many common firearms, whether the magazines are detachable or not. *See* Dist. Ct. Op. at 7 ("Most pistols sold in the United States come equipped with magazines that hold between 10 and 17 rounds."); *see also Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*, 910 F.3d 106, 116 (3d Cir.

2018), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (holding that "magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended"). Because magazines are an integral part of the use of a firearm, a limitation on magazines operates as a limitation on the firearms themselves. Indeed, Rhode Island, in effect, bans all arms capable of firing in excess of 10 rounds without reloading.

Just as the First Amendment would not allow the government to ban the ink used to print newspapers or computers used to write letters to elected officials to oppose or support legislation, the Second Amendment does not permit the government to ban triggers, barrels, magazines, or any other component integral to exercising the Second Amendment right. A contrary holding would be unprecedented and would make this Circuit an outlier among the Federal Courts of Appeals. *See* Mem. and Order at 26, No. 1:22-cv-00246-JJM-PAS (D. R.I. Dec. 12, 2022) ("Dist. Ct. Op.") ("There appear to be no Circuit Courts of Appeals holding that [large capacity magazines] are not 'Arms.' ").

The district court, in concluding that the Second Amendment offered no protection whatsoever to magazines, reasoned that "the plaintiffs have failed to prove that [large capacity magazines] are weapons relating to self-defense." *Id*. at 3. But that is a test of the district court's own making, not the test articulated by the Supreme Court. The proper inquiry is whether the banned magazines are

7

"instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132. And, as explained above, there is no doubt that they are.

In sum, Rhode Island has banned an instrument that facilitates armed self-defense, which falls under the protection of the Second Amendment. *Id* at 2132. For that reason alone, the district court should be reversed.

**B. The Supreme Court Has Already Completed the Relevant Historical Analysis, Concluding that Only Dangerous And Unusual Arms May Be Banned.**

Properly analyzed, Rhode Island bans "Arms" within the meaning of the Second Amendment. For this reason, the ban is presumptively invalid unless Rhode Island can prove that it is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

Under that test, the Supreme Court has already done the historical work to determine what kinds of arms may be banned. Both *Bruen* and *Heller* have already established the relevant contours of the tradition at issue in this case: bearable arms cannot be banned unless doing so would fit into the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). And a law by definition *does not* fit into that tradition if it bans "possession and use of weapons that are 'in common use at the time.' " *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627); *see also Heller*, 554 U.S. at 625 ("We therefore read *Miller* to say only that the Second Amendment does not

protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.").

This test is based on historical practice and "the historical understanding of the scope of the right," but with reference to modern realities of firearm (or in this case, magazine) ownership. *Heller*, 554 U.S. at 625; *see also Bruen*, 142 S. Ct. at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); TRO at 10, *Rocky Mountain Gun Owners v. Town of Superior, Colo.*, No. 1:22-cv-01685-RM-NRN, Doc. 18 (D. Colo. July 22, 2022) (granting, post-*Bruen*, a temporary restraining order against enforcement of a ban on certain semiautomatic rifles because "the Court is unaware of historical precedent that would permit a governmental entity to entirely ban a type of weapon that is commonly used by law-abiding citizens for lawful purposes").

Therefore, under the test established by the Supreme Court, the only question here is whether magazines capable of holding more than 10 rounds are "dangerous and unusual" and therefore permitted to be banned. Or, put in affirmative terms, whether the banned magazines are "in common use at the [present] time," meaning that they cannot be banned.

For this reason, much of the district court's independent historical analysis below, focused primarily on the credentials of the parties' experts—as well as the

district court's criticism of Plaintiffs' lack of independent historical evidence—ignores the Supreme Court's historical work and is ultimately irrelevant to the constitutional question. *See* Dist. Ct. Op. at 10–19; *see also id.* at 27 (criticizing Plaintiffs for submitting "no expert opinion on the meaning of the word 'Arms' "); *id.* at 31 ("[O]nly the State has supported its argument with historical analysis.").

Instead, this Court's task under *Bruen* is a straightforward one: it need only determine whether the banned magazines are "dangerous and unusual." "[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous and unusual." *Caetano v. Mass.*, 577 U.S. 411, 417 (2016) (Alito, J., concurring). Thus, magazines that are in common use for lawful purposes, by definition, *do not* fall within this category and cannot be banned. *Bruen*, 142 S. Ct. at 2143.

To determine whether a firearm is "unusual" the Supreme Court has likewise made clear that the Second Amendment focuses on the practices of the American people *nationwide*, not just, say, in Rhode Island. *See id.* at 2131 ("It is this balance—struck by the traditions of the American people—that demands our unqualified deference."); *Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by American society" for self-defense); *Caetano*, 577 U.S. at 420 (Alito, J., concurring) ("stun guns are widely owned and accepted as a legitimate means of self-defense across the country"). Therefore, the Second Amendment protects those who live in states or localities with a less robust practice of protecting the right to

keep and bear arms from outlier legislation (like Rhode Island's ban here) just as much as it protects those who live in jurisdictions that have hewed more closely to America's traditions.

In this way, the Second Amendment is like the other constitutional guarantees that serve to hold state and local governments to minimum standards that are applicable nationwide. After all, "constitutional adjudication frequently involves the justices' seizing upon a dominant national consensus and imposing it on resisting local outliers." Michael J. Klarman, *Rethinking the Civil Rights and Civil Liberties Revolutions*, 82 Va. L. Rev. 1, 16 (1996). More pithily, the Supreme Court "obliterates outliers." Frank H. Easterbrook, *Abstraction and Authority*, 59 U. Chi. L. Rev. 349, 370 (1992).

Finally, the Second Amendment inquiry focuses on the choices commonly made by *contemporary* law-abiding citizens. *Heller* rejected as "bordering on the frivolous" "the argument . . . that only those arms in existence in the 18th century are protected," *id*. at 582. And in *Caetano*, the Supreme Court reiterated this point, holding that "Arms" protected by the Second Amendment need not have been "in existence at the time of the Founding." 577 U.S. 411–12 (quoting *Heller*, 554 U.S. at 582). The *Caetano* Court flatly denied that the banned item is "a thoroughly modern invention" is relevant to determining whether the Second Amendment protects it. *Id.* And *Bruen* cements the point. Responding to laws that allegedly

11

restricted the carrying of handguns during the colonial period, the Court reasoned that "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 142 S. Ct. at 2143.

In summary, the Supreme Court has already done the historical work required under the *Bruen* framework. The Court has established that the only arms that historically may be banned are those arms that are both dangerous and unusual. Conversely, if an arm is in common use by contemporary law-abiding citizens across the nation, the government may not ban the commonly used arm.

**C. The Meaning of the Second Amendment Was Fixed in 1791.**

The district court below declined to determine the relevant historical timeframe, reasoning that the Second Amendment provided no protection under either the Founding era or Reconstruction era history. *See* Dist. Ct. Op. at 35–36. The district court was right that the outcome of this case would be the same whether 1791 or 1868 were considered controlling—although Plaintiffs would *prevail* under either timeframe.

Still, binding Supreme Court precedent establishes 1791 as the critical year. Although *Bruen* refrained from addressing this issue, it is not an open question. The Second Amendment must be analyzed from the time of its ratification, which was in

the year 1791. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-*Bruen *World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022), *available at* https://bit.ly/3Dm2HEI ("*Not all History is Created Equal*").

Two principles establish this point. First, with respect to rights against the Federal Government, the Supreme Court has always treated 1791 as the key date for determining the meaning of the Bill of Rights. In fact, "[n]o Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights." *Id.* at 4. In *Heller* itself, for example, the Court held that "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." 554 U.S. at 634–35 (emphasis added).

Second, the Supreme Court has also held that Bill of Rights provisions, including the Second Amendment, mean the same thing whether applied against a state through the Fourteenth Amendment or against the Federal Government directly. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 765 (2010). As *Bruen* stated, "[i]ndividual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S. Ct. at 2137 (collecting cases). "The Court does not apply two different versions of the Second Amendment, or two versions of other

13

incorporated provisions of the first eight amendments in the Bill of Rights." Smith, *Not all History is Created Equal* at 7. There is only one Second Amendment.

Taking these principles together, Supreme Court precedent mandates that 1791 be the key date for determining the meaning of incorporated Bill of Rights provisions. And this makes sense: while the history surrounding the adoption of the 14th Amendment is key for determining *whether* a provision of the Bill of Rights is incorporated, the *content* of incorporated Bill of Rights provisions was established in 1791.

*Bruen* does not cast doubt on this precedent. It too treated evidence surrounding 1791 and the Founding as generally dispositive of the contours of incorporated constitutional rights, stating that "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 142 S. Ct. at 2136. *Bruen* cautioned that courts "must … guard against giving postenactment history more weight than it can rightly bear." *Id.* "As [the Court] recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.' " *Id.* at 2137 (quoting *Heller*, 554 U.S. at 614). In any case, this Court is bound to follow the earlier decisions establishing 1791 as the critical historical timeframe, even if *Bruen had* cast doubt on them. *See, e.g.*, *Agostini v. Felton*, 521 U.S. 203, 237 (1997).

### D. Magazines Capable of Holding More Than 10 Rounds of Ammunition Are In Common Use and Are Not Dangerous And Unusual.

This case thus comes down to a single, straightforward question: are the magazines banned by Rhode Island in "common use" according to the lawful choices of contemporary Americans? The answer is yes.

Standard capacity magazines are widely owned by millions of Americans. Indeed, a report by NSSF, based on data from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States International Trade Commission (ITC), and industry estimates, found that there were nearly *160 million* magazines capable of holding more than ten rounds of ammunition in the possession of U.S. consumers between 1990 and 2018. NSSF, *Industry Intelligence Reports, Firearm Production in the United States* at 7, *available at* https://bit.ly/3MHUDob (last accessed Apr. 14, 2023). NSSF further reported that Americans possessed a total of 304 million magazines of any kind during the relevant time period. *Id.* Thus, the majority of magazines owned by Americans are the magazines that Rhode Island has banned—those capable of holding more than ten rounds of ammunition.

Further support is provided by the 2021 National Firearms Survey conducted by Professor William English, a political economist at Georgetown University. The survey, which "was administered to a representative sample of approximately fifty-four thousand U.S. residents aged 18 and over," "aims to provide the most comprehensive assessment of firearms ownership and use patterns in America to

15

date." William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), *available at* https://bit.ly/3yPfoHw. Professor English believes its includes "the largest sample of firearms owners ever queried about their firearms ownership and firearms use in a scientific survey in the United States." *Id*. at 22. The survey details its methodology at length, *id.* at 2–7, and was "approved by Georgetown University's Institutional Review Board," *id.* at 4. For example, "[a]s a benchmark to assess the accuracy of the teaser question used to ascertain firearm ownership," *id.* at 8, the survey "compare[d] ownership rates of other items reported by respondents," *id.,* namely, bicycles. The survey revealed that 52% of the respondents reported owning a bicycle, "which closely matches Pew's finding that 53% of Americans own a bicycle, according to a poll conducted in 2014." *Id.*

The comprehensive 2021 National Firearms Survey found that 48% of gun owners have owned magazines that hold more than 10 rounds. *Id*. at 22. Given the survey's estimate that 81.4 million Americans own firearms, that means that approximately *39 million Ame*ricans have owned a magazine that holds more than 10 rounds. Even that staggering number is a conservative estimate, since the figure only included current gun owners. Further, many individuals own more than one standard capacity magazine. In fact, Professor English estimated that, based on how many such magazines the survey participants owned over their lifetimes, American

16

gun owners have owned as many as 269 million handgun magazines that hold over 10 rounds and an additional 273 million rifle magazines over that threshold for a total of 542 million such magazines. *Id.* at 25.

This ubiquity is not surprising—many of the most popular handguns in the country are manufactured with magazines holding more than 10 rounds. *See, e.g.,* GUN DIGEST 2018 386-88 (Jerry Lee and Chris Berens, ed. 2017) (Glocks); *id.* at 374 (Beretta); *id.* at 408 (Smith & Wesson); *id.* at 408 (Sig Sauer); MASSAD AYOOB, THE COMPLETE BOOK OF HANDGUNS 87, 90 (2013) (noting that Glock pistols, which are "hugely popular for . . . home and personal defense," typically come equipped with magazines with a capacity over ten rounds). The same is true of many of the most popular semi-automatic rifles. *See, e.g.*, David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 859 (2015) ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds."). In a consumer survey, NSSF determined that over *three quarters* of modern sporting rifle magazines in the country have a capacity of more than 10 rounds, and 52% have a capacity of 30 rounds. *See* NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* at 31, *available at* https://bit.ly/3GLmErS (last accessed Apr. 13, 2023). Even the district court recognized that "[m]ost pistols sold in the United States come equipped with magazines that hold between 10 and 17 rounds." Dist. Ct. Op. at 7.

These magazines are commonly possessed by law-abiding citizens for lawful purposes. According to the National Firearms Survey, the most common reasons cited for owning these magazines are target shooting (64.3% of owners), home defense (62.4%), hunting (47%), and defense outside the home (41.7%). English, *supra*, at 23. And such magazines may be lawfully owned in the majority of states; only eight other States have laws as strict as Rhode Island's that limit magazine capacity to 10 rounds for all firearms. *See Which States Have Magazine Capacity Limitations?*, CONCEALEDCARRY.COM, *available at* http://bit.ly/3KkXCBy (last accessed Apr. 13, 2023). By contrast, the wide majority of 36 other States have *no restrictions* on magazine capacity. *Id.*

These statistics conclusively demonstrate that magazines capable of holding more than 10 rounds are commonly owned and used by law-abiding Americans for lawful purposes. Courts have recognized this straightforward conclusion. *See also, e.g.*, *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) ("[W]e cannot say that the district court abused its discretion by inferring from the evidence of record that, at a minimum, [large-capacity] magazines are in common use."); *Ass'n of N.J. Rifle & Pistol Clubs, Inc.*, 910 F.3d at 116–17 ("The record shows that millions of magazines are owned, often come factory standard with semi-automatic weapons, are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense, and there is no longstanding history of [large capacity

magazine] regulation.") (cleaned up); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the . . . large-capacity magazines at issue are 'in common use' as that term was used in *Heller*."); *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000. There may well be some capacity above which magazines are not in common use but, if so . . . that capacity surely is not ten.").

The district court erred below in focusing not on whether Rhode Island bans arms in common use, but instead on whether *other* arms that are also "useful" are still permitted. *See* Dist. Ct. Op. at 28 ("[I]n any event, a firearm does not need a magazine containing more than ten rounds to be useful."). This is plainly not the test the Court established in *Heller* and *Bruen*. Little wonder, given the district court's express disapproval of the Supreme Court's binding precedent on this issue. *See* Dist. Ct. Op. at 24 ("In *Bruen*, the Supreme Court bluntly cast aside the reasoned analysis of all the[] Courts of Appeals."). The relevant question is whether the *banned* arms are in common use, not whether *other* arms *not* banned could also be commonly used. The district court's reasoning is akin to saying that a content-based

ban on certain speech is permissible because individuals could still make other "useful" comments. Besides making little sense, this reasoning is contrary the Supreme Court's clear precedent expounding on the right to keep and bear arms. *See, e.g.*, *Heller*, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.").

Because the magazines Rhode Island has banned are in common use for lawful purposes, under *Bruen* and *Heller*, Rhode Island's magazine ban is unconstitutional.

\*\*\*

The standard is set and all the historical work necessary to resolve this case has been done. The banned magazines are "Arms" within the plain text of the Amendment and the Supreme Court's caselaw. The only question remaining under *Bruen*'s analytical framework is whether history provides a justification for Rhode Island's ban. As the Supreme Court has explained, given " 'the historical tradition of prohibiting the carrying of dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.' " *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). Therefore, if an instrument facilitating armed self-defense is in common use, it cannot be banned.

20

As explained above, the magazines banned by Rhode Island are among *the most common* arms in the nation and are overwhelmingly used by law-abiding citizens for lawful purposes. That settles the matter. Rhode Island's outright ban on magazines capable of holding more than ten rounds of ammunition—arms in common use that are not dangerous and unusual—cannot stand.

## CONCLUSION

The district court's judgment should be reversed.

Dated: April 17, 2023

Respectfully Submitted,

s/ David H. Thompson
David H. Thompson
Peter A. Patterson
Athanasia O. Livas
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, D.C. 20036
(202) 220-9600

*Counsel for Amicus Curiae*
*National Shooting Sports Foundation*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Brief of Amicus Curiae National Shooting Sports Foundation complies with the type-volume limitation of FED. R. APP. P. 29(a)(5) and FED. R. APP. P. 32(a)(7)(B)(i) because it contains 4,703 words excluding the portions of the brief exempted by FED. R. APP. P. 32(f). The brief also complies with FED. R. APP. P. 32(a)(5)(A) and FED. R. APP. P. 32(a)(6) because it has been prepared in 14-point Times New Roman, a proportionally spaced serif font.


Dated: April 17, 2023                          /s/David H. Thompson

                                               *Counsel for Amicus Curiae*
                                               *National Shooting Sports Foundation*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2023, I electronically filed the foregoing Brief of Amicus Curiae National Shooting Sports Foundation with the Clerk of Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. All parties' counsel are registered CM/ECF users and will be served by the Notice of Docket Activity sent by the appellate CM/ECF system.

Dated: April 17, 2023                         /s/David H. Thompson

*Counsel for Amicus Curiae*
*National Shooting Sports Foundation*