No. 23-1072

# United States Court of Appeals for the First Circuit

OCEAN STATE TACTICAL, LLC, d/b/a Big Bear Hunting and Fishing Supply;
JONATHAN HIRONS; JAMES ROBERT GRUNDY; JEFFREY GOYETTE;
MARY BRIMER,
Plaintiffs - Appellants,

v.

STATE OF RHODE ISLAND; COLONEL DARNELL S. WEAVER, in his
official capacity as the Superintendent of the Rhode Island State Police;
PETER F. NERONHA, in his official capacity as the Attorney General for the
State of Rhode Island,
Defendants - Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS, BOSTON

**BRIEF *AMICUS CURIAE* OF NATIONAL AFRICAN AMERICAN GUN
ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS
ASSOCIATION, DC PROJECT FOUNDATION, INC., OPERATION
BLAZING SWORD, INC., GABRIELA FRANCO, AND LIBERAL GUN
CLUB IN SUPPORT OF PLAINTIFFS-APPELLANTS
AND IN SUPPORT OF REVERSAL**

Christopher Renzulli, Bar #60739
RENZULLI LAW FIRM, LLP
One North Broadway, Suite 1005
White Plains, NY 10601
Telephone: (914) 285-0700
E-mail: crenzulli@renzullilaw.com
*Counsel for Amici Curiae*

Dated: May 4, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* certifies that none of the *Amici* has a parent corporation and no publicly held corporation owns 10% or more of the stock of any of the *Amici*.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF *AMICI CURIAE* ................................................................1

INTRODUCTION ...........................................................................6

BACKGROUND ............................................................................7

    African Americans / NAAGA ........................................................7

    Asian Americans and Pacific Islander Americans / APAGOA ...................11

    Women / DCPF...................................................................13

    Latinos / Gabby Franco ........................................................15

    LGBTQ / OBSPP...................................................................17

QUESTION PRESENTED ...................................................................19

ARGUMENT .............................................................................19

    I.    R.I. Gen. Laws § 11-47.1-3(b) is Unconstitutional and Impedes Upon Every Rhode Island Citizen's Right to Self Defense ...............20

    II.    Enforcement of R.I. Gen. Laws § 11-47.1-3(b) is an Unconstitutional Taking and Imposes Vague Requirements .............24

CONCLUSION ...........................................................................27

CERTIFICATE OF COMPLIANCE....................................................278

CERTIFICATE OF SERVICE .........................................................289

# TABLE OF AUTHORITIES

**CASES:**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty Gen. of N.J.*,
    910 F.3d 106 (3d Cir. 2018) ...........................................................................22

*Castle Rock v. Gonzales*,
    545 U.S. 748 (2005)........................................................................................23

*Chicago, B&Q Ry. Co. v. Chicago*,
    166 U.S. 226 (1897)........................................................................................24

*DeShaney v. Winnebago Cty*,
    489 U.S. 189 (1989)........................................................................................23

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)........................................................................................22

*Fyock v. City of Sunnyvale*,
    25 F. Supp. 3d. 1267 (N.D. Cal. 2014), *aff'd,* 779 F.3d 991
    (9th Cir. 2015) ................................................................................................22

*Jackson v. City & Cnty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014) .........................................................................21

*Johnson v. United States*,
    135 S. Ct. 2551 (2015)...................................................................................25

*Konigsberg v. State Bar of Cal.*,
    366 U.S. 36 (1961).........................................................................................20

*Koons v. Reynolds*,
    No. 22-7464 (RMB/EAP), 2023 WL 128882 (D. N.J. Jan. 9, 2023)...... 20-21

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)........................................................................................24

*Luis v. United States*,
    578 U.S. 5 (2016)............................................................................21

*McDonald v. City of Chicago*,
    561 U.S 742 (2010).............................................................7, 23, 24

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022)......................................................19, 20, 21

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) .........................................................22

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
    535 U.S. 302 (2002).......................................................................25

*Warren v. District of Columbia,*
    444 A.2d 1 (D.C. 1981) .................................................................12

*Worman v. Healey,*
    922 F.3d 26 (1st Cir. 2019)...........................................................22

**CONSTITUTIONAL PROVISIONS:**

Second Amendment .............................................................*passim*

Fifth Amendment 19, 25

Fourteenth Amendment ..............................................7, 19, 25

**STATUTES:**

R.I. Gen. Laws § 11-47.1-3...............................................*passim*

**RULES:**

Federal Rule of Appellate Procedure 26.1 ....................................i

**OTHER AUTHORITIES:**

*A Crisis of Hate: A Report on Lesbian, Gay, Bisexual, Transgender and Queer Hate Violence Homicides in 2017*, National Coalition of Anti-violence Programs (2017)...........................................................................18

Centers for Disease Control and Prevention, *Web-based Injury Statistics Query and Reporting System (WISQARS) Fatal Injury Reports, National, Regional and State, 1981 – 2020*....................................................9

Centers for Disease Control and Prevention, *WISQARS Nonfatal Injury Reports, 2000 – 2020*......................................................................9

Centers for Disease Control and Prevention, *WISQARS Leading Causes of Death Reports, 1981 – 2020*............................................................9

Center for The Study of Hate and Extremism, California State University San Bernardino, *FACT SHEET: ANTI- ASIAN PREJUDICE*, March 2021 (2021)....................................................................................11

Charles E. Cobb, Jr., *This Nonviolent Stuff'll Get You Killed* (2014) .......................8

Ericka Dixon, Audacia Ray, Beverly Tillery, Michelle Leigh, *Pride and Pain: A Snapshot of Anti-LGBTQ Hate and Violence during Pride Season 2019*, National Coalition of Anti-violence Programs (2020).......................17

*Domestic Violence Homicides in Rhode Island 2016-2020*, Rhode Island Coalition Against Domestic Violence (2022) ...............................................13

Tim Elfrink, *New York man charged with hate crime in Asian American attack that bystanders watched without helping*, WASHINGTON POST, March 31, 2021 ...............................................................................12

*Experiences of Victimization Among Latinos: Studies Confirm Significant Victim Mental Health Impact and Mistrust of Authorities,* National Institute of Justice (2022) ...........................................................................15

Federal Bureau of Investigation, Supplementary Homicide Reports 1980-2020 ..................................................................................................13

Andrew Flores, Lynn Langston, Ilan Meyer, and Adam Romero, *Victimization rates and traits of sexual and gender minorities in the United States: Results from the National Crime Victimization Survey*, 2017, Science Advances, October 2, 2020..........................................................................17

Stephen Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms* (1998) ..........................................................................7

*Hispanics and the Criminal Justice System: Low Confidence, High Exposure*, Pew Hispanic Center (2009)..........................................................16

Jonghyun Lee, *Return of the Yellow Peril? Racism, Xenophobia and Bigotry Against Asian Americans*, Bridgewater Review (Dec. 2022) ......................11

Marian Liu & Rachel Hatzipanagos, *"Nobody came, nobody helped": Fears of anti-Asian violence rattle the community*, WASHINGTON POST, Feb. 25, 2021 ................................................................................12

Nicholas Johnson, *Negroes and the Gun: The Black Tradition of Arms* (2014) ........................................................................................8

Suzanne Gamboa and the AP, *Rise in reports of hate crimes against Latinos pushes overall number to 11-year high*, NBC NEWS, November 16, 2020 ..........................................................................................15

Wendy Grossman Kantor, *Filipino American Man Recounts Brutal Attack With Box Cutter on N.Y.C. Subway: 'Nobody Helped'*, PEOPLE, February 18, 2021 ............................................................... 11-12

Nancy La Vigne, Jocelyn Fontaine, and Anamika Dwivedi, *How do People in High-Crime, Low-Income Communities View the Police?*, Urban Institute (Feb. 2017)..........................................................................10

*Racial and Ethnic Differences in Homicides of Adult Women and the Role of Intimate Partner Violence—United States, 2003–2014*, Morbidity and Mortality Weekly Report, 2017....................................................14

Aaron Smith, *More Asian-Americans Are Buying Guns for Protection from Hate Crimes*, FORBES, Mar. 18, 2021 ........................................................12

Ida B. Wells, *Southern Horrors: Lynch Law in All its Phases,* 16 (1892)...............9

*When Men Murder Women – An Analysis of 2020 Homicide Data*, Violence Policy Center (2022)................................................................................13, 14

Adam Winkler, "Racist Gun Laws and the Second Amendment.*" Harvard Law Review* (2022) ...........................................................................................8

## INTEREST OF *AMICI CURIAE*[1]

National African American Gun Association, Inc. (NAAGA), Asian Pacific American Gun Owners Association (APAGOA), DC Project Foundation, Inc. (DCPF), Operation Blazing Sword, Inc. (operating as Operation Blazing Sword - Pink Pistols) (OBSPP), and The Liberal Gun Club (LGC) are associations with thousands of members residing throughout the United States, including Rhode Island. Gabriela Franco, an individual, is in the planning stages of founding another member association focused on responsible firearms ownership and self-defense. APAGOA and OBSPP are non-profit organizations, exempt from federal taxation under section 501(c)(3) of the Internal Revenue Code. NAAGA, DCPF, and LGC are non-profit organizations with an approval under section 501(c)(4) of the Internal Revenue Code.

NAAGA was founded on February 28, 2015, to defend the Second Amendment rights of members of the African American community. NAAGA has over 130 chapters in 38 states, and over 50,000 members living in every state of the United States and the District of Columbia. NAAGA's mission is to establish a fellowship by educating about the rich legacy of firearm ownership by African

---

[1] No party's counsel authored this brief in whole or in part. No party or its counsel contributed financial support intended to fund the preparation or submission of this brief. The National Association of Sporting Goods Wholesalers contributed financial support to fund the preparation and submission of this brief.

Americans, offering training that supports safe firearms use for self-defense and sportsmanship, and advocating for the inalienable right to self-defense for African Americans. Its goal is to have every African American introduced to firearm use for home protection, competitive shooting, and outdoor recreational activities. NAAGA welcomes people of all religious, social, and racial perspectives, including African American members of law enforcement and active/retired military. NAAGA's interest in this case stems in part from the fact that there has been a long history of discrimination against African Americans with respect to the exercise of their Second Amendment right to bear arms. More specifically, African Americans were denied their Second Amendment right to bear arms under the antebellum Slave Codes, the post-Civil War Black Codes, and the Jim Crow laws that persisted into the twentieth century. R.I. Gen. Laws § 11-47.1-3(b) is just another prohibition on the African American community's ability to exercise their Second Amendment right to bear arms for self-defense.

APAGOA was founded in 2021 to create a community of firearms owners with an Asian Pacific American heritage. APAGOA advocates for strong firearms safety, education, and community building initiatives. A core focus of APAGOA is to promote safe and responsible firearm ownership within the Asian Pacific American community by providing educational materials and other supportive resources to its members and other interested parties. APAGOA has a significant

interest in this case as an organization that represents racial groups who have been disproportionately targeted for racial violence over the past year and who have increasingly purchased firearms to defend themselves.

DCPF was established in 2016 by retired police officer and professional shooting competitor, Dianna Muller. A woman from each state originally met in Washington DC to organize nationally and advocate in each state for the right of women in America to own firearms and for the training and the safe use of firearms by women. DCPF members work together in a bipartisan fashion to educate legislators on firearm safety and culture. Currently there are over 3,000 members. DCPF believes that R.I. Gen. Laws § 11-47.1-3(b) will negatively impact women's right to self-defense and the rights to bear arms secured by the Second Amendment.

OBSPP was established to advocate on behalf of lesbian, gay, bisexual, transgender, and queer ("LGBTQ") firearm owners, with specific emphasis on self-defense issues. Operation Blazing Sword, founded in 2016 the day after the Orlando Pulse Nightclub Massacre, has over 1,500 volunteer firearm instructors in nearly a thousand locations across all 50 states who will teach anyone the basics of firearm safety, operation and ownership for no cost and without judgment for race, gender, sexual orientation, biology, or manner of dress. Pink Pistols, founded in 2000 and incorporated into Operation Blazing Sword in 2018, is a shooting society that honors gender and sexual diversity and advocates the responsible use of firearms for self-

defense. It represents portions of the American population that are disproportionately the targets of hate crimes and armed criminal violence, and consists of 45 chapters across the country. Pink Pistols does not maintain a list of members out of respect for those who wish to stay "inside the gun closet." Membership of both aspects of this organization is open to anyone, regardless of sexual orientation or gender identity, who supports the rights of LGBTQ firearm owners.

Gabriela "Gabby" Franco is a competitive shooter, firearms instructor, and industry advocate committed to introducing safe and responsible firearms ownership to women and the Latino community. Gabby was born and raised in Venezuela where she had a lengthy professional pistol shooting career, winning numerous gold medals at international competitions as a member of the Venezuelan National Team, and then participating at the 2000 Olympic Games in Sydney on behalf of Venezuela. After arriving in the United States and obtaining her citizenship, she embraced the rights provided under the Second Amendment which had been stripped away by the authoritarian government of her home country. While pursuing her new passion as a firearms instructor, Gabby was a participant on "Top Shot" on the History Channel where she was the first woman contestant to reach the individual stage of competition and joined the show in later seasons as an All-Star contestant. In addition to competitive shooting, Gabby relies on firearms for protection and self-

defense and helps train other women and members of the Latino community to safely use firearms for sport and protection. Unreasonable limits on magazine capacity deprive Gabby and other women of the ability to adequately defend themselves against individuals with physical strength and size advantages.

LGC was founded to provide a forum and resources for left-of-center firearms owners who are pro-Second Amendment but do not subscribe to the right-wing ideology and rhetoric that is often associated with other Second Amendment groups. Given this alternative perspective that resonates with a large contingent of politically moderate and left-of-center firearms owners, LGC membership has grown significantly over the past seven years with new chapters opening across the country. In particular, many members of LGC fall within the protected classes represented by *Amici Curiae* in this brief. LGC encourages expression of differing viewpoints and active debate among its members and focuses on root cause mitigation to address violence such as strengthening mental health treatment and finding solutions for poverty, homelessness and unemployment rather than imposing prohibitions on firearms and firearms owners. In particular, LGC is opposed to so-called assault weapons bans and limits on magazine capacity, such as the ban set forth in R.I. Gen. Laws § 11-47.1-3(b) in part because of their disproportionate effect on already marginalized communities, members of whom make up a significant proportion of

LGC's membership. Instead, LGC advocates for targeted enforcement of existing laws as well as concealed carry minimum standards and reciprocity among the states.

## **INTRODUCTION**

African Americans, Asian Pacific Americans, Latinos, Women, and LGBTQ people have the right to defend themselves against violent crimes. The Second Amendment to the United States Constitution guarantees them that right. Rhode Island owes them that right. However, R.I. Gen. Laws § 11-47.1-3(b) will severely infringe upon that right by denying them the ability to be adequately armed for self-defense.

The *Amici* submit this brief to discuss the negative and unconstitutional effects that R.I. Gen. Laws § 11-47.1-3(b) will have on the ability of their respective members in Rhode Island to defend themselves and conduct lawful activity. They offer this Court a perspective that no other party offers in this action – the perspective of citizens in Rhode Island that are at a greater risk of being victims of violence based entirely upon their lifestyles and personal identity. The *Amici* seek the protection of the federal court because, as history shows, the Constitution is the place of refuge when the majority – in the name of safety – seek to disarm them, disenfranchise them, and devalue them.

## BACKGROUND

Because of the unique perspective of each of the *Amici* and their troubled history as targets of hate and violence in our society, both nationally and in Rhode Island, *Amici* offer the following historical backgrounds and insight into the effects resulting from infringements of their constitutional rights. Most significantly, the groups that comprise the *Amici* have suffered violence and oppression at a disproportionately higher rate than members of the majority.

### African Americans / NAAGA[2]

The Fourteenth Amendment guaranteed the right to bear arms to all Rhode Islanders. African Americans needed that protection. "[I]n debating the Civil Rights Act of 1871, Congress routinely referred to the right to keep and bear arms and decried the continued disarmament of blacks in the South." *McDonald v. City of Chicago*, 561 U.S. 742, 776 (2010) (citing Stephen Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms*, 120-131 [1998]). African Americans have the right to adequately and legally defend themselves and their families in a world that is too often inhospitable, to say the least.

Nevertheless, there is a long history of racist firearm laws designed to deprive blacks of this right. Even though R.I. Gen. Laws § 11-47.1-3(b) is not racially

---

[2] LGC is not listed in a particular background section because its membership, and leadership at a national and state level, is comprised of members of all the groups listed here.

motivated, magazine capacity limitation laws such as this have a disproportionate impact on people of color. *See* Adam Winkler, "Racist Gun Laws and the Second Amendment*." Harvard Law Review* 135, no. 8 (2022) 544-545, available at https://harvardlawreview.org/forum/vol-135/racist-gun-laws-and-the-second-amendment/. There is evidence demonstrating that citizens of all identities have declined to discard now-illegal magazines in states where bans are already in place. *See id*. Since the government's ability to enforce such laws is constitutionally and practically limited, criminal charges for banned magazines are usually incidental to stops or arrests by police for other offenses. *See id*. "Due to condemnable but nonetheless highly predictable practices of overpolicing in minority communities, a disproportionate percentage of those convicted of violating the ban on high-capacity magazines are likely to be people of color." *Id*. These social consequences must also be considered in combination with the unconstitutionality of magazine capacity restriction laws.

African American communities have at different times in history been subjected to lynchings, racist attacks, and gang violence. Law-abiding African Americans, including civil rights icons, have a long tradition of use of firearms to protect themselves and their communities.[3]  Ida B. Wells wrote that a "Winchester

---

[3] *See* Nicholas Johnson, *Negroes and the Gun: The Black Tradition of Arms* (2014); Charles E. Cobb, Jr., *This Nonviolent Stuff'll Get You Killed* (2014).

rifle should have a place of honor in every black home, and it should be used for that protection which the law refuses to give."[4]

African Americans are subject to more violence than White Americans. *See* Centers for Disease Control and Prevention, *Web-based Injury Statistics Query and Reporting System (WISQARS) Fatal Injury Reports, National, Regional and State, 1981 - 2020*, available at https://wisqars.cdc.gov/fatal-reports (last accessed Jan. 6, 2023). Between 2001 and 2020, African Americans experienced a homicide rate 5.67 times greater than White Americans; between 2001 and 2020, African Americans were nearly 3.6 times more likely to be assaulted and sustain injuries requiring medical treatment; between 2001 and 2020, the No. 1 leading cause of death for African Americans ages 15 to 34 was homicide, while being No. 7 overall for all ages. By contrast, homicide was highest ranked as the No. 3 leading cause of death for White Americans ages 15-24, and No. 19 overall for all ages. *Id.*; Centers for Disease Control and Prevention, *WISQARS Nonfatal Injury Reports, 2000 – 2020*, available at https://wisqars.cdc.gov/nonfatal-reports (last accessed Jan. 6, 2023); Centers for Disease Control and Prevention, *WISQARS Leading Causes of Death Reports, 1981 – 2020*, available at https://wisqars.cdc.gov/fatal-leading (last accessed Jan. 6, 2020).

---

[4] Ida B. Wells, *Southern Horrors: Lynch Law in All its Phases,* 16 (1892).

Compounding the increased violence against them is that many African Americans don't trust the police. Recent studies show that American communities where many minorities reside, including African Americans, have a low trust for law enforcement.

> "In certain American communities, public trust in law enforcement, a critical ingredient in public safety, is tenuous at best. Residents of these high-crime, heavily disadvantaged communities witness and experience intensive police presence, high rates of incarceration and community supervision, and concentrated violence and question the intent, effectiveness, and equity of the criminal justice system. Indeed, police may carry out aggressive strategies that target quality-of-life infractions and drug-, gun-, and gang-related violence in ways that undermine public confidence. Perhaps not surprisingly, areas with high levels of mistrust tend to be those that are heavily policed, where police use tactics such as pretextual stops that damage their relationship with the people they are charged to protect. The results can be far- reaching: a distrust of the criminal justice system, an unwillingness to cooperate with the police, and a cynical view of the law that can perpetuate crime and victimization." Nancy La Vigne, Jocelyn Fontaine, and Anamika Dwivedi, *How do People in High-Crime, Low-Income Communities View the Police?,* p. 1, Urban Institute (Feb. 2017), available at https://www.urban.org/research/publication/how-do-people-high-crime-low-income-communities-view-police.

It has been this lack of trust between law enforcement and African Americans that have been contributing factors to some of the worse incidents of police-citizen violent encounters and subsequent civil unrest as seen in recent years, such as in Ferguson, Missouri, and the weeks that followed the murder of George Floyd.

It is little wonder why African Americans demand the right to possess firearms fitted with a magazine that can hold enough ammunition to fully defend themselves. R.I. Gen. Laws § 11-47.1-3(b) prevents them from doing so.

### Asian Americans and Pacific Islander Americans / APAGOA

In modern times, Asian Pacific Americans (APA) have been targets of violence in Rhode Island and elsewhere in America. During the Covid-19 pandemic, APA have been disproportionately targeted for racially motivated violence. Although hate crimes in general dropped by 6% nationally in 2020, hate crimes against APA spiked by 145%. Center for The Study of Hate and Extremism, California State University San Bernardino, *FACT SHEET: ANTI- ASIAN PREJUDICE*, March 2021, 1 (2021). *See* Jonghyun Lee, *Return of the Yellow Peril? Racism, Xenophobia and Bigotry Against Asian Americans*, Bridgewater Review (Dec. 2022) ("It is estimated that over two million Asian American individuals have experienced hate incidents since the Covid-19 pandemic started.").

Violence against Asian Pacific Americans can happen in a crowd or in broad daylight. Noel Quintana, a Filipino-American, was slashed from ear to ear with a box cutter on a crowded subway in New York City. Yet, "nobody helped, . . . [n]obody moved."[5] An unidentified Asian-American woman was brutally beaten in

---

[5] Wendy Grossman Kantor, *Filipino American Man Recounts Brutal Attack With Box Cutter on N.Y.C. Subway: 'Nobody Helped'*, PEOPLE, February 18, 2021,

New York in broad daylight in front of multiple witnesses, yet nobody intervened, and one witness even closed a door to the victim after the attacker left.[6]  The rise in violence against APA has led many to arm themselves for self-defense as the confidence in the police is low, believing that the police "are not always there to protect . . . [t]hey're only there to take the report."[7]  As the D.C. Court of Appeals explained in *Warren v. District of Columbia,* police usually have no general duty to protect an individual citizen, since their duty is owed to the public at large. 444 A.2d 1, 3 (D.C. 1981).  Most APA remember the Rodney King riots in Los Angeles, California, in 1992 and the fact that the residents of Koreatown were left by the police to protect themselves. APA "have been historically underrepresented among gun owners,"[8] but that has changed since the Covid-19 pandemic. APA are buying

---

https://people.com/crime/filipino-american-man- recounts-brutal- attack-with-box-cutter-on-n-y-c-subway-nobody- helped/

[6] Tim Elfrink, *New York man charged with hate crime in Asian American attack that bystanders watched without helping*, WASHINGTON POST, March 31, 2021, https://www.washingtonpost.com/nation/2021/03/30/asian-american-attack-newyork-condo/.

[7] Marian Liu & Rachel Hatzipanagos, *"Nobody came, nobody helped": Fears of anti-Asian violence rattle the community*, WASHINGTON POST, Feb. 25, 2021, https://www.washingtonpost.com/nation/2021/02/25/asian-hate-crime-attack-patrol/.

[8] Aaron Smith, *More Asian-Americans Are Buying Guns for Protection from Hate Crimes*, FORBES, Mar. 18, 2021, https://www.forbes.com/ sites/aaronsmith/2021/03/18/asian-americans-buy-guns-for-protection-from-hate-crimes/?sh=7fa242c53edd

firearms for self-defense in record numbers in response to the increase in anti-APA hate crimes.[9]

### Women / DCPF

While the laws in Rhode Island have been neutral with regards to sex for a long time, society at large does not put women on an equal plane. Nationally, there were 2,059 females murdered by males in single victim/single offender incidents in 2020 based upon reports submitted to the FBI for its Supplementary Homicide Report. *See, When Men Murder Women – An Analysis of 2020 Homicide Data*, p. 3, Violence Policy Center (2022), available at https://vpc.org/when-men-murder-women/. By comparison, only 228 females were murdered by other females in single victim/single offender incidents in 2020. Federal Bureau of Investigation, Supplementary Homicide Reports 1980-2020. In Rhode Island specifically, 71% of the homicide victims in intimate partner incidents between 2016 and 2020 were female. *See, Domestic Violence Homicides in Rhode Island 2016-202*0, p. 2, Rhode Island Coalition Against Domestic Violence (2022), available at https://www.wpri.com/wp-content/uploads/sites/23/2022/11/RI-DV-HOMICIDE-RPT_FINAL.pdf. Since 2014, the rate of women murdered by men has continued to increase from 1.06 per 100,000 women in that year to 1.34 per 100,000 women in 2020. *See, When Men Murder Women*, p. 3. Throughout the United States, women

---

[9] *Id.* at note 8.

are the primary victims of domestic violence. Specifically, in cases where the relationship between the victim and offender is known, 89 percent of female victims were murdered by a male they knew, and 60 percent of those victims were the wives or intimate acquaintances of their killers. *Id.* at 4. Notably, women are significantly more likely to be killed by spouses or an intimate acquaintance than men. *Id.* at 5. The numbers are even worse for racial/ethnic minority women who face disproportionately higher homicide rates than white women. *Id.* at 7, citing *Racial and Ethnic Differences in Homicides of Adult Women and the Role of Intimate Partner Violence—United States, 2003–2014*, pp. 741–746, Morbidity and Mortality Weekly Report, 2017, vol. 66, available at https://www.cdc.gov/mmwr/volumes/66/wr/mm6628a1.htm. In particular, black females were murdered by males at a rate (2.96 per 100,000) nearly three times as high as white females (1.07 per 100,000). *See, When Men Murder Women*, p. 5.

These statistics demonstrate that women are disproportionately victimized by male attackers who often have physical advantages. When confronted with one or more men and threatened with violence, a woman needs a firearm as an equalizer. The choice of what firearm and the amount of ammunition needed for an individual woman to protect herself and her family is a decision for her to make, not politically motivated government bodies.

14

**Latinos / Gabby Franco**

Amid increased political tension over the influx of immigrants and asylum seekers crossing the U.S. southern border, hate crimes perpetrated against members of the Latino community have been on the rise. *See, Experiences of Victimization Among Latinos: Studies Confirm Significant Victim Mental Health Impact and Mistrust of Authorities,* National Institute of Justice (2022), available at https://nij.ojp.gov/topics/articles/experiences-victimization-among-latinos-studies-confirm-significant-victim-mental. In 2019, anti-Hispanic[10] hate crimes, which include robberies, assaults and other crimes, rose 8.7 percent from the prior year even though hate crimes in general had been declining year over year.[11] In one of the most horrific hate-based attacks in recent history, a radicalized white supremacist murdered and seriously wounded over 30 Latinos after releasing numerous racist statements and a manifesto targeted at the Latino community. He specifically indicated that his attack was in response to the "invasion" of Mexican immigrants and fears that the majority would be replaced by people of color.[12] The continued

---

[10] The term "Hispanic" is often used instead of "Latino" by Federal Agencies throughout statistical compilations and annual reports.

[11] Suzanne Gamboa and the AP, *Rise in reports of hate crimes against Latinos pushes overall number to 11-year high*, NBC NEWS, November 16, 2020, https://www.nbcnews.com/news/latino/rise-hate-crimes-against-latinos-pushes-overall-number-highest-over-n1247932

[12] *Id.* at Note 9.

spread of hateful viewpoints such as this will undoubtedly lead to further targeting and victimization of members of the Latino population.

In addition to increased levels of hate crime victimization, Latinos and the communities they live in experience violent and personal crimes more frequently and at a higher rate than the majority. Based upon data collected in the Bureau of Justice Statistics' National Crime Victimization Survey from 2006, the personal crime victimization rate among Hispanics was 28.4 per 1,000 individuals which is notably higher than the rate among Whites (23.9 per 1,000). *Hispanics and the Criminal Justice System: Low Confidence, High Exposure*, p. 4, Pew Hispanic Center (2009), available at https://www.pewresearch.org/wp-content/uploads/sites/5/reports/106.pdf. Similarly, in 2006 the property crime victimization rate among Hispanic households was 211.7 incidents per 1,000 households compared to 156.7 per 1,000 for White households. *Id*. Certain property crimes, such as a break-ins, are more likely to result in a violent confrontation between the resident and a potentially armed intruder.

Many Latinos, including Gabby Franco, have taken proactive steps to avoid being the next victim by exercising their constitutional right to self-defense. As with other firearm owners in protected classes represented by *Amici Curiae*, responsible and law-abiding Latino firearm owners should have a reasonable choice in how they defend their home and family. The arbitrary limits on magazine capacity set by R.I.

Gen. Laws § 11-47.1-3(b) inhibits that choice and undercuts the efforts of Latinos to defend themselves against hate-based violence and other crimes.

**LGBTQ / OBSPP**

Rhode Island, like most of the rest of this country, has a history of legal discrimination against the LGBTQ community that has only been recently addressed. Despite growing acceptance, the LGBTQ community still suffers a higher rate of violence in America than the majority. LGBTQ people are nearly <u>four times</u> more likely than non-LGBTQ people to experience violent victimization, including rape, sexual assault, and aggravated or simple assault. Andrew Flores, Lynn Langston, Ilan Meyer, and Adam Romero, *Victimization rates and traits of sexual and gender minorities in the United States: Results from the National Crime Victimization Survey*, 2017, Science Advances, October 2, 2020, available at <u>https://www.science.org/doi/10.1126/sciadv.aba6910?fbclid=IwAR01oLZW1Xfp</u> <u>YlZIif_XRxO   TzgBjmddp6ML9zTl6URfqFYCw6vL88CwguHc</u>. *See* Ericka Dixon, Audacia Ray, Beverly Tillery, Michelle Leigh, *Pride and Pain: A Snapshot of Anti-LGBTQ Hate and Violence during Pride Season 2019*, National Coalition of Anti-violence Programs (2020), available at <u>https://avp.org/reports/</u>.[13]

---

[13] The National Coalition of Anti-violence Programs (NCAVP) recorded the homicides of 14 LGBTQ people from May 15 – July 15, 2019, an average of nearly 2 (1.75) homicides each week and more than three times the hate violence homicides recorded between January 1 and May 14, 2019. Eleven of the homicides were hate violence related. Ten of these victims (91%) were Black and seven (64%) were

In 2017, The National Coalition of Anti-violence Programs (NCAVP) recorded reports of 52 hate violence related homicides of LGBTQ people, the highest number ever recorded by NCAVP. *See A Crisis of Hate: A Report on Lesbian, Gay, Bisexual, Transgender and Queer Hate Violence Homicides in 2017*, National Coalition of Anti-violence Programs (2017), available at https://avp.org/reports/. This number represents an 86% increase in single incident reports from 2016. *Id*. In 2017, there was the equivalent of one homicide of an LGBTQ person in the U.S. each week. *Id*. "Of the total number of homicides in 2017, 71% of the victims were people of color, 31 (60%) of the victims were Black, 4 (8%) were Latino, 2 (4%) were Asian, and 1 (2%) was Native. Additionally, 12 (23%) of the victims were white and 2 victims' racial and ethnic identity is unknown to NCAVP at this time." *Id*.

It is no wonder that LGBTQ people who have chosen to responsibly own and use firearms for protection are worried about being able to adequately defend themselves with the passage of R.I. Gen. Laws § 11-47.1-3(b).

---

Black trans women. Of the three intimate partner violence homicides, one victim was a white, gay man, one was a Black woman, and one was a white woman who identifies as asexual. The youngest victim was 17 years old, with the majority (86%) of all homicide victims being under the age of 35.

## QUESTION PRESENTED

Should R.I. Gen. Laws § 11-47.1-3(b) be stricken because it violates the Second Amendment, the Fifth and Fourteenth Amendment, and the Takings Clause of the United States Constitution?

Answer: Yes. R.I. Gen. Laws § 11-47.1-3(b) significantly hinders the ability of individuals to fully defend themselves with a firearm in Rhode Island, is unconstitutionally vague, and deprives them of their property. The Court should grant the Plaintiffs' motion for a preliminary injunction against R.I. Gen. Laws § 11-47.1-3(b).

## ARGUMENT

With reference to history and the original regulations on the right to bear arms, there is no evidence that demonstrates an "enduring American tradition," of government restrictions based on magazine size or ammunition quantity. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2155-56 (2022). Even though multi-shot firearms long pre-dated the Founding of this country, there were no laws restricting ammunition capacity when the Second Amendment was adopted. The magazine capacity restrictions set by Rhode Island in R.I. Gen. Laws § 11-47.1-3(b), and other states with similar unconstitutional laws, are recent developments and lack a historical foundation.

I.     **R.I. Gen. Laws § 11-47.1-3(b) is Unconstitutional and Impedes Upon Every Rhode Island Citizen's Right to Self Defense**

In *Bruen*, the Supreme Court clarified the basic lens through which all courts must view the Second Amendment when it held that this is no "second-class right" subject to a uniquely pro-government set of rules and that it is not available only to those with a "special need" to exercise it. *Bruen*, 142 S.Ct. at 2134-35, 2156.  The individual right to keep and bear arms is afforded the same protection as all other constitutional rights held by individuals. The proper analysis courts must undertake reads:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historic tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961).

Thus, the *Bruen* rule requires the government to prove the historical basis for its regulations. In applying this standard, the District Court of New Jersey held:

> [The State] must be able to rebut the presumption that the challenged conduct is constitutionally protected by "demonstrate[ing] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.  To reiterate, [the State] "may not simply posit that the regulation promotes an important interest. Rather, the [State] must demonstrate that the regulation is consistent

with this Nation's historical tradition of firearm regulation." *Id.* (emphasis added).

*Koons v. Reynolds*, No. 22-7464 (RMB/EAP), 2023 WL 128882, at *9 (D. N.J. Jan. 9, 2023) (citation in original) (granting Motion for Temporary Restraining Order staying enforcement of New Jersey's recently enacted gun control legislation). As relevant to magazine capacity limitations, the Supreme Court specifically restricted the kind of historical tradition on which the government may rely to "an enduring American tradition of state regulation," and not just a handful of laws in "outlier jurisdictions." *Bruen,* 142 S.Ct. at 2155-56.

As the Plaintiffs have comprehensively argued in their brief, magazines fall within the scope of the Second Amendment. As noted by Justice Thomas, "[c]onstitutional rights implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26-27 (2016). The right to "keep and bear arms" implies the right to use those arms, and R.I. Gen. Laws § 11-47.1-3(b) significantly impedes the ability to use firearms as intended. Even before *Bruen*, the Ninth Circuit confirmed that "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014).

The Rhode Island District Court's holding that magazines are not "arms" is in conflict with widespread precedent, including from the First Circuit, that recognize magazines are subject to protection under the Second Amendment. *See, e.g.,*

21

*Worman v. Healey*, 922 F.3d 26, 36 (1st Cir. 2019) (implicitly holding that a magazine restriction implicates the Second Amendment); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 257 (2d Cir. 2015) ("we proceed on the assumption that [bans on "assault weapons" and "large capacity magazines"] ban weapons protected by the Second Amendment"); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty Gen. of N.J.*, 910 F.3d 106, 116 (3d Cir. 2018) ("The law challenged here regulates magazines, and so the question is whether a magazine is an arm under the Second Amendment. The answer is yes."); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d. 1267, 1276 (N.D. Cal. 2014), *aff'd,* 779 F.3d 991 (9th Cir. 2015) ("[T]he court finds that the prohibited magazines are 'weapons of offence…' as they are integral components to vast categories of guns.")

Moreover, the Second Amendment protects arms that are "typically possessed by law abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 624-25 (2008). Magazines with a capacity of greater than 10 rounds of ammunition are commonly owned and utilized by law-abiding firearms owners across the country and previously in Rhode Island, including members of the represented groups. *See, e.g., N.Y. State Rifle & Pistol Ass'n*, 804 F.3d at 255-57 (noting "large-capacity magazines" are "in common use" based on even the most conservative estimates). In particular, such magazines are "typically possessed" for the core lawful purpose of self-defense. *Heller*, 554 U.S. at 624-25.

22

As discussed above, the represented minorities suffer higher rates of violence and, arguably, have a higher need for tools of self-defense. All Rhode Islanders have the right to defend themselves and their families. How one does that is up to the individual. R.I. Gen. Laws § 11-47.1-3(b), whether intended or not, has the effect of making minority Rhode Islanders even more vulnerable to violence than the majority by disarming them in the name of public safety. As members of these groups well know, the police do not always respond in time to help. Indeed, the government is not liable if the police fail to show up at all. *See DeShaney v. Winnebago Cty*, 489 U.S. 189 (1989) (due process does not give rise to an affirmative right to government assistance with protecting an individual's life, liberty, or property; the government does not assume a permanent guarantee of an individual's safety once it provides protection for a temporary period); *see also Castle Rock v. Gonzales*, 545 U.S. 748 (2005).

The U.S. Supreme Court, in *McDonald v. City of Chicago*, commented about governments that disarm and subject minorities to criminal attack:

> "*Amici* supporting incorporation of the right to keep and bear arms contend that the right is especially important for women and members of other groups that may be especially vulnerable to violent crime. If, as petitioners believe, their safety and the safety of other law-abiding members of the community would be enhanced by the possession of handguns in the home for self-defense, then the Second Amendment right protects the rights of minorities and other residents of high-crime areas whose needs are not being met by elected public officials."

*McDonald*, 561 U.S. at 790 & n.33 (citing, *inter alia*, Brief of Pink Pistols). Having to repeatedly reload low capacity magazines, or simply not having enough rounds of ammunition to end an attack underway, leaves individuals exposed and vulnerable. Accordingly, any government regulation that limits magazine capacity substantially inhibits self-defense.

## II.    Enforcement of R.I. Gen. Laws § 11-47.1-3(b) is an Unconstitutional Taking and Imposes Vague Requirements

*Amici* also support the Plaintiffs' motion for a preliminary injunction since the limitations on magazine capacity imposed by R.I. Gen. Laws § 11-47.1-3(b) is a de facto seizure or taking by the government. The Takings Clause provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V; *see Chicago, B&Q Ry. Co. v. Chicago*, 166 U.S. 226, 239 (1897) (applying the Takings Clause to the states). A physical taking occurs whenever the state "absolutely dispossess[es] the owner" of property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982). Whenever a physical taking occurs, the government is required to pay just compensation for the property taken. *Id.* at 421.

Members of the represented minority groups living in Rhode Island are required to relinquish magazines with a capacity of greater than ten rounds.  It is of no significance that their magazines can be sold to private dealers or modified to only carry ten or less rounds since it is the state that "has a categorical duty to

compensate the former owner" for the loss of use of their property. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002). R.I. Gen. Laws § 11-47.1-3(b) provides no such compensation and thus violates the constitutional rights of its law-abiding citizens.

Furthermore, Rhode Island's ban leaves *Amici* without any guidance as to what would satisfy the exception for those who "[p]ermanently modif[y] the large capacity feeding device such that it cannot hold more than ten (10) rounds of ammunition," R.I. Gen. Laws § 11-47.1-3(b)(1)(i), thus violating due process of the law afforded under the Fifth and Fourteenth Amendments. A criminal statute is unconstitutionally vague in violation of due process for either of two reasons: first, if "it fails to give ordinary people fair notice" of what is proscribed; and, second, if it is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015).

The proposed ban fails both tests since even experienced firearm owners are unable to discern what an adequate "permanent modification" would be in the subjective eyes of the government. Moreover, law enforcement will be similarly perplexed when they are forced to make such arbitrary determinations in the field. For instance, would the government consider the installation of a rivet, screw, or other pin that restricts the magazine's ability to accept more than 10 rounds of ammunition a sufficient modification? What if a plastic insert or some other type of

blocking mechanism is added internally to the magazine that limits its ability to accept more than 10 rounds of ammunition? Alternatively, does the magazine owner need to change or otherwise modify the magazine's spring and, if so, does the old spring need to be surrendered to the government? To take it another step, could someone be charged with a felony criminal offense under R.I. Gen. Laws § 11-47.1-3(a) if they change their magazine spring in an effort to satisfy R.I. Gen. Laws § 11-47.1-3(b) but continue to possess the old magazine spring separately from the magazine itself? Simply put, nothing in this vague statute safeguards against the government – or individual law enforcement officers in their daily encounters with Rhode Island citizens – from making subjective determinations, on a case-by-case basis, that a particular modification does not qualify under R.I. Gen. Laws § 11-47.1-3(b). Whether someone can be charged with a felony criminal offense should never rest on a difference of opinion, which is why the Constitution prohibits enforcement of vague criminal statutes such as R.I. Gen. Laws § 11-47.1-3(a).

## **CONCLUSION**

For the reasons stated above, NAAGA, APAGOA, DCPF, OBSPP, Gabriela

Franco, and LGC ask this Court to reverse the decision of the District Court.

Respectfully submitted,

/s/ *Christopher Renzulli*
Christopher Renzulli, Bar #60739
RENZULLI LAW FIRM, LLP
One North Broadway, Suite 1005
White Plains, NY 10601
Telephone: (914) 285-0700
E-mail: crenzulli@renzullilaw.com
*Counsel for Amici Curiae*

Dated: May 4, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Brief *Amicus Curiae* of the National African American Gun Association, Inc., *et al.* complies with Rule 29(a)(5) and 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure. According to the word count feature of the word-processing system used to prepare the brief, it contains 5,967 words.

I further certify that the attached brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6). It was prepared in a proportionately spaced typeface using 14-point Times New Roman font in Microsoft Word.

/s/ *Christopher Renzulli*
Christopher Renzulli
*Counsel for Amici Curiae*

Dated: May 4, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2023, an electronic PDF of the foregoing Brief *Amici Curiae* of National African American Gun Association, Inc., *et al.* was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

*/s/ Christopher Renzulli*
Christopher Renzulli
*Counsel for Amici Curiae*
