No. 23-1072

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

―――――――――――

OCEAN STATE TACTICAL, LLC, d/b/a Big Bear Hunting and Fishing Supply;
JONATHAN HIRONS; JAMES ROBERT GRUNDY; JEFFREY GOYETTE; MARY BRIMER,

*Plaintiffs-Appellants*,

*v.*

STATE OF RHODE ISLAND; COLONEL DARNELL S. WEAVER, in his official capacity
as the superintendent of the Rhode Island State Police; PETER F. NERONHA, in his
official capacity as the Attorney General for the State of Rhode Island,

*Defendants-Appellees*.

―――――――――――

Appeal from a Judgment of the United States District Court
for the District of Rhode Island

―――――――――――

## BRIEF OF EVERYTOWN FOR GUN SAFETY AS AMICUS CURIAE
## IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

―――――――――――

Janet Carter
William J. Taylor, Jr.
Eleuthera O. Sa
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
wtaylor@everytown.org
(646) 324-8215

June 28, 2023

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ...................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 2

ARGUMENT ..................................................................................................... 3

    I.    Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct ............................... 3

    II.    The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Consistent 20th-Century Regulations ................... 8

    III.    This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as "Outliers" ................................................... 20

CONCLUSION ................................................................................................. 23

# TABLE OF AUTHORITIES

## *Cases*

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.,*
　910 F.3d 106 (3d Cir. 2018)................................................................ 2

*Davenport v. Wash. Educ. Ass'n,*
　551 U.S. 177 (2007) ......................................................................... 23

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.,*
　No. 1:22-cv-00951, 2023 WL 2655150 (D. Del. Mar. 27, 2023) ....................... 19

*District of Columbia v. Heller,*
　554 U.S. 570 (2008) ...................................................................passim

*Dobbs v. Jackson Women's Health Org.,*
　142 S. Ct. 2228 (2022) ...................................................................... 23

*Drummond v. Robinson Twp.,*
　9 F.4th 217 (3d Cir. 2021) .................................................................. 11

*Ezell v. City of Chicago,*
　651 F.3d 684 (7th Cir. 2011) ........................................................... 11, 15

*Friedman v. City of Highland Park,*
　784 F.3d 406 (7th Cir. 2015) .............................................................. 22

*Gould v. Morgan,*
　907 F.3d 659 (1st Cir. 2018) .............................................................. 11

*Hanson v. District of Columbia,*
　No. 1:22-cv-02256, 2023 WL 3019777 (D.D.C. Apr. 20, 2023), *appeal docketed,*
　No. 23-7061 (D.C. Cir. May 17, 2023) ................................................ 7, 18, 19

*Heller v. District of Columbia* (*Heller II*),
　670 F.3d 1244 (D.C. Cir. 2011)............................................................ 18

*Kennedy v. Bremerton School District,*
　142 S. Ct. 2407 (2022) ....................................................................... 5

*McDonald v. City of Chicago,*
　561 U.S. 742 (2010) .............................................................. 6, 15, 22

*Nat'l Rifle Ass'n v. Bondi*,
    61 F.4th 1317 (11th Cir. 2023), *pet'n for reh'g en banc filed* (Mar. 30, 2023)........... 10

*New York State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) .................................................................................passim

*Or. Firearms Fed'n, Inc. v. Brown*,
    No. 2:22-cv-01815, 2022 WL 17454829 (D. Or. Dec. 6, 2022), *appeal dismissed*,
    No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022).......................passim

*Rehaif v. United States*,
    139 S. Ct. 2191 (2019) ........................................................................................ 2

*Rupp v. Becerra*,
    401 F. Supp. 3d 978 (C.D. Cal. 2019) *vacated and remanded*, No. 19-56004, 2022
    WL 2382319 (9th Cir. June 28, 2022) ................................................................ 2

*United States v. Alaniz*,
    No. 22-30141, __ F.4th __, 2023 WL 3961124 (9th Cir. June 13, 2023) ........ 4, 6

*United States v. Greeno*,
    679 F.3d 510 (6th Cir. 2012) ............................................................................ 11

*United States v. Meyer*,
    No. 4:22-cr-10012, 2023 WL 3318492 (S.D. Fla. May 9, 2023)....................... 14

*United States v. Reyna*,
    No. 3:21-cr-00041, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ................... 4

*United States v. Rowson*,
    No. 1:22-cr-00310, 2023 WL 431037 (S.D.N.Y. Jan. 27, 2023) ....................... 19

**Statutes**

1784 N.Y. Laws 627, ch. 28 ....................................................................................... 9

1786 N.H. Laws 383, § 1 ........................................................................................... 9

**Other Authorities**

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998)..................... 14

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.) ........................................................................... 16, 21

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) ................. 16, 21

Everytown Center for the Defense of Gun Safety, *Weapon Types, Weapon Features, Accessories, and Ammunition*, Everytown Law, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/weapon-types-accessories-ammunition-and-features (last visited June 25, 2023) ................................................................................................................. 10

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 .... 14, 15

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ...................................................................................................... 13

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) ................................................................................................ 17

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund; hereafter "Everytown") is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country, including nearly 40,000 in Rhode Island. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. The mayors of four cities and towns in Rhode Island are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Over the past several years, Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 90 amicus briefs in Second Amendment and other firearms cases, offering historical and doctrinal analysis, as

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to its filing.

well as social science and public policy research, that might otherwise be overlooked. *See, e.g.*, *Bevis v. City of Naperville, Ill.*, No. 23-1353, Dkt. 89 (7th Cir. May 10, 2023); *Granata v. Campbell*, No. 22-1478, Dkt. 00117972457 (1st Cir. Feb. 6, 2023); *Or. Firearms Fed'n, Inc. v. Kotek*, No. 2:22-cv-01815, Dkt. 192 (D. Or. May 19, 2023). Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms cases. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92, 992 n.11 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210 n.4, 2211 n.7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Rhode Island's large-capacity magazine restriction is constitutional under the approach to Second Amendment cases established in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons set out in the State's brief, Dkt. 00118022922 ("State Br.").[2] Everytown submits this amicus brief to expand on three methodological points. *First*, on the initial, textual inquiry of the *Bruen* framework, Plaintiffs have the burden to establish that large-capacity magazines are protected "arms" within the meaning of the Second Amendment,

---

[2] This amicus brief addresses only aspects of Plaintiffs' Second Amendment claim. The Court should affirm the district court's denial of a preliminary injunction for the reasons the State set out.

and they have not met that burden. *Second*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified. Moreover, 1868 is not a cutoff; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added). And, as *Bruen* instructs, this is particularly so where, as here, the challenged law implicates "unprecedented societal concerns or dramatic technological changes." 142 S. Ct. at 2132. *Third*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. Although not directly implicated here, given the robust historical record before the Court, we highlight that point in case the Court chooses to address it.

## ARGUMENT

### I. Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask "whether the challenger is 'part of "the people" whom the Second Amendment protects,' whether the weapon at issue is '"in common use"

today for self-defense,' and whether the 'proposed course of conduct' falls within the Second Amendment." *United States v. Alaniz*, No. 22-30141, __ F.4th __, 2023 WL 3961124, at *3 (9th Cir. June 13, 2023) (quoting *Bruen*, 142 S. Ct. at 2134-35). If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)). If not, the inquiry ends: self-evidently, if people, weapons, or conduct are outside the Second Amendment's protection, then the government may regulate them without infringing the Second Amendment. *See, e.g.*, *Alaniz*, 2023 WL 3961124, at *3 (describing step one as a "threshold inquiry" and explaining that "[i]f the first step is satisfied, we proceed to *Bruen* step two"); *United States v. Reyna*, No. 3:21-cr-00041, 2022 WL 17714376, at *5 (N.D. Ind. Dec. 15, 2022) (dismissing challenge because "§ 922(k)'s regulated conduct [possessing a firearm with an obliterated serial number] is outside [the] scope of the Second Amendment" and that "is enough to decide" the case; declining to reach historical inquiry).

As the State notes, *see* State Br. 19-20, the burden to satisfy the initial, textual inquiry is on the plaintiff challenging a law. *Bruen* makes this clear by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141

n.11. If the burden were on the government throughout—in what would be an unusual departure from ordinary litigation principles—the Court would have said so. Placing the initial burden on the plaintiff also accords with the Court's approach to other constitutional rights. For example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the [First Amendment]. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421. Accordingly, the district court below and multiple other courts have read *Bruen* to place the burden on plaintiffs to establish that the Second Amendment's plain text covers their conduct. A12; A36; *see, e.g.*, *Or. Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815, 2022 WL 17454829, at *11 (D. Or. Dec. 6, 2022) ("Plaintiffs *have not shown* that large-capacity magazines are weapons in common use for lawful purposes like self-defense such that they fall within the plain text of the Second Amendment." (cleaned up) (emphasis added)), *appeal dismissed*, No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022).

Plaintiffs have failed to satisfy their burden under *Bruen*'s textual inquiry, because they have failed to establish that large-capacity magazines are among the "arms" that the Second Amendment protects. To fall within the Second Amendment's text, *Heller* established that a weapon must not only be a "bearable

arm" or "[w]eapon[] of offence," but must also be one "in common use" and

"typically possessed by law-abiding citizens for lawful purposes" like self-defense.

*Heller*, 554 U.S. at 581-82, 625-27.[3] *Bruen* further confirmed that the inquiry should

focus specifically on common use for the lawful purpose of self-defense.[4] As the

---

[3] Specifically, *Heller* began with dictionary definitions of "arms," including as "[w]eapons of offence, or armour of defence" and observed that the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 581-82. But it then made clear that the Second Amendment applies only to weapons "in common use" and "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes" like self-defense. *Id.* at 625-27; *see also id.* at 627 (noting that "M-16 rifles and the like" may be banned). And, as the Supreme Court subsequently explained its ruling, *Heller* "held that the Second Amendment protects the right to keep and bear arms *for the purpose of self-defense*." *McDonald v. City of Chicago*, 561 U.S. 742, 749-50 (2010) (emphasis added).

[4] Contrary to Plaintiffs' contention, the question does not simply boil down to whether a weapon is "highly unusual in society at large," Dkt. 00117996954 ("Pls.' Br.") 4, 14-15 (quoting *Bruen*, 142 S. Ct. at 2143). As the State explains, *see* State Br. 27-28, that articulation of the "common use" test is both illogical and contrary to *Bruen*'s own application of the test. In *Bruen*, New York did not dispute either that the "people" involved ("two ordinary, law-abiding, adult citizens") or the arms they sought to carry ("handguns") fell within the Second Amendment's text, *see* 142 S. Ct. at 2134, so the Court did not need to linger long on the textual inquiry with respect to "arms." Nevertheless, the Court's articulation of the test— "[n]or does any party dispute that handguns are *weapons 'in common use' today for self-defense*," *id.* (emphasis added)—indicates that the "arms" the Second Amendment covers are those commonly used for self-defense. This limitation coheres with the Supreme Court's repeated emphasis that "individual self-defense is the central component of the Second Amendment right." 142 S. Ct. at 2133 (cleaned up) (quoting *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599)); *see also id.* at 2132 (explaining that "the Second Amendment's definition of 'arms' … covers modern instruments that facilitate armed self-defense"). The Ninth Circuit recently confirmed in a published opinion that the textual inquiry involves a determination whether the weapons at issue are "'in common use' today *for self-defense*." *Alaniz*, 2023 WL 3961124, at *3 (quoting *Bruen*, 142 S. Ct. at 2134) (emphasis added).

district court correctly held, Plaintiffs have not carried their burden here. *See* A34-44, A45 (explaining that plaintiffs have failed to show that large-capacity magazines are "Arms" or are "weapons relating to self-defense"); *see also Or. Firearms Fed'n*, 2022 WL 17454829, at *9-12 (making similar findings in denying motion for a temporary restraining order as to Oregon large-capacity magazine law); *see also Hanson v. District of Columbia*, No. 1:22-cv-02256, 2023 WL 3019777, at *12 (D.D.C. Apr. 20, 2023) (concluding, under textual inquiry of *Bruen*'s framework, that "the Second Amendment does not cover [large-capacity magazines] because they are not typically possessed for self-defense"), *appeal docketed*, No. 23-7061 (D.C. Cir. May 17, 2023).[5]

_____

[5] To support their arguments that the Second Amendment protects large-capacity magazines, Plaintiffs and their supporting amicus National Shooting Sports Foundation ("NSSF") rely heavily on a firearms survey conducted by Georgetown professor William English. *See* Pls.' Br. 25-28; Dkt. 00118003632 ("NSSF Br.") 15-17. That survey is not reliable evidence. Its findings are unpublished and were not peer-reviewed, and it fails to disclose its funding sources or measurement tools. Even a professor closely associated with gun rights advocacy—whom plaintiffs in other similar gun cases have often used as an expert witness—recently testified, in a challenge to a large-capacity magazine law in Oregon: "I don't think you can rely on" English's survey. He testified that English is "vague about exactly how he developed his sample. And there's nothing in his report to contradict the assumption that what he had was a self-selected sample …. And that's not a valid sample technique to generate a sample that's representative of the larger US population." When asked "without that information that is missing, you would not rely on that survey for any purpose?," he stated: "That is correct. I would not rely." *Or. Firearms Fed'n*, No. 2:22-cv-01815, Dkt. 175-7 at 12-13.

In sum, because Plaintiffs have failed to carry their burden to establish that large-capacity magazines are "arms" protected by the Second Amendment's text, this Court should affirm without proceeding to a historical analysis.[6]

## II. The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Consistent 20th-Century Regulations

If the Court proceeds to the second, historical inquiry, it should first conclude that the most relevant time period for that inquiry centers around 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states. And it should further conclude that the historical inquiry extends thereafter—including into the 20th century—given the "dramatic technological changes" and "unprecedented societal concerns," *Bruen*, 142 S. Ct. at 2132, present in this case.

To be clear, this Court can uphold the challenged provision under a historical analysis without deciding whether it should focus on the period around 1791 or the period around 1868: The historical tradition is consistent in both periods in demonstrating the constitutionality of restrictions relevantly similar to the large-capacity magazine provision challenged here. Laws regulating

---

[6] If, by contrast, this Court concludes that large-capacity magazines are arms in common use for self-defense, it *must* proceed to the historical step, and afford the State the opportunity to establish that its law is "consistent with this Nation's historical tradition of firearm regulation"—just as *Bruen* itself did after concluding that the petitioners, their arms, and their proposed conduct were protected by the Second Amendment's text. *See Bruen*, 142 S. Ct. at 2126, 2134-56.

particularly dangerous weapons and accessories stretch back centuries and include the pre-colonial Statute of Northampton, a colonial-era restriction on pocket pistols, founding-era gunpowder storage laws, and prohibitions on carrying concealable weapons from the early national period. *See, e.g.*, State Br. 39 (discussing Statute of Northampton and pocket pistols); 1784 N.Y. Laws 627, ch. 28; 1786 N.H. Laws 383, § 1 (prohibiting the storage of gunpowder over a certain weight); JA319-20 (discussing laws restricting the carry and/or possession of certain concealable weapons); *see also Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815, 2022 WL 17454829, at *13 (D. Or. Dec. 6, 2022) (describing government's evidence that, "in the 1800s, states often regulated certain types of weapons, such as Bowie knives, blunt weapons, slingshots, and trap guns because they were dangerous weapons commonly used for criminal behavior and not for self-defense").[7] Restrictions on dangerous weapons continued to the end of the nineteenth century. *See* Everytown Center for the Defense of Gun Safety, *Weapon Types, Weapon Features, Accessories, and Ammunition*, Everytown Law, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/weapon-types-accessories-ammunition-and-features (last visited June 25,

---

[7] Because many of these laws targeted the weapons themselves, rather than merely accessories that could increase the number of rounds fired without reloading, they are more burdensome than Rhode Island's law—which, as explained above, does not regulate "Arms" under the Second Amendment at all. *See supra* pp. 5-7.

2023) (listing nineteenth-century prohibitions on the possession or carry of weapons such as bowie knives, slungshots, trap guns, and pocket pistols). And that long tradition continued with a series of states passing firearm capacity restrictions between 1927 and 1934—direct precursors to Rhode Island's law. *See* State Br. 37; JA333.[8] The historical record therefore demonstrates an unbroken tradition of restricting dangerous weapons as new technologies emerged, and this Court need not decide which time period to focus on. Nevertheless, if the Court prefers to settle the issue the Supreme Court left open, it should conclude that 1868 is the correct focus of the historical inquiry.

As to the choice between 1791 and 1868, the Eleventh Circuit recently explained that it is 1868 that controls. *See Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023) ("In short, because the Fourteenth Amendment is what *caused* the Second Amendment to apply to the States, the Reconstruction Era understanding of the right to bear arms—that is, the understanding that prevailed when the States adopted the Fourteenth Amendment—is what matters."), *pet'n for reh'g en banc filed* (Mar. 30, 2023). Several circuits, including this Court, reached that

---

[8] For a detailed compendium of historical laws that support modern-day restrictions on especially dangerous weapons and accessories, see Compendium of Historical Laws, *Rupp v. Bonta*, No. 8:17-cv-00746 (C.D. Cal. May 26, 2023), Dkt. 152; *see also* Def.'s Surv. of Relevant Statutes (Pre-Founding to 1888) & Def.'s Surv. of Relevant Statutes (1889 to 1930s), *Duncan v. Bonta*, No. 3:17-cv-01017 (S.D. Cal. Jan. 11, 2023), Dkt. 139-1, 139-2.

same conclusion in analyzing state and local laws under the Second Amendment at the first, historical step of the framework that applied prior to *Bruen*.[9] *See Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*; *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and Fourteenth* Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)).

*Bruen* does not alter that conclusion. The Supreme Court expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when defining its

---

[9] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that Second Amendment analysis should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it did not need to resolve issue because public understanding "for all relevant purposes" in case before it was the same in 1791 and 1868). Moreover, although *Bruen* disapproved the second, scrutiny-based step of the predominant framework lower courts had applied, it declared that "[s]tep one of" that framework "is broadly consistent with *Heller*." *Id.* at 2127. Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

To begin with, in a case involving a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states under the U.S. Constitution until 1868; as *Bruen* observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the public understanding of the Bill of Rights changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either

abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. *Bruen*, 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id.* But contrary to the arguments of amicus NSSF, *see* NSSF Br. 14, if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against

the Federal Government)." *Id.* at 2138. And the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).[10]

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[11] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill

---

[10] *See also, e.g.*, *United States v. Meyer*, No. 4:22-cr-10012, 2023 WL 3318492, at *2 n.4 (S.D. Fla. May 9, 2023) (noting that "Justice Thomas, writing for the majority in *Bruen*, signaled an openness to the feedback-effect theory of the Fourteenth Amendment").

[11] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

There is good reason for this to be the leading originalist view: Insisting that the 1791 understanding should apply against states does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See* 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Any claim that the founding era is the only relevant period is also inconsistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive-places restrictions. There, the Court indicated that restrictions on guns in legislative assemblies, polling places, and

courthouses found in "18th- *and 19th-century*" laws are adequate to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if it believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, all the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[12]

Finally, further confirmation that 1868 is the correct focus occurred in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?

> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

---

[12] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843). Mr. Clement and his new firm, Clement & Murphy, represent Plaintiffs in this appeal.

In sum, any historical inquiry this Court chooses to conduct should focus on the period around 1868 rather than 1791. But 1868 is not a cutoff. *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same).[13] *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2136-37 & 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison).

Furthermore, *Bruen* recognized that new technologies or new societal concerns may "require a more nuanced approach" to the historical inquiry. *Id.* at 2132; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1275 (D.C. Cir.

---

[13] Nor is 1868 a starting line for the inquiry. Both *Heller* and *Bruen* examined history preceding even 1791. *See Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45. And the State correctly points to such history in its brief. *See, e.g.*, State Br. 39.

2011) (Kavanaugh, J., dissenting) (explaining that "constitutional principles …
must be faithfully applied not only to circumstances as they existed in 1787, 1791,
and 1868, for example, but also to modern situations that were unknown to the
Constitution's Framers"). If a modern technological development or modern
societal concern that warrants a modern firearms regulation did not exist in the
time period a court is examining, then self-evidently there will be no historical laws
addressing the development or concern to be found in that period.

That is precisely the situation in this case. As the State explains, *see* State Br.
32, the challenged measure was adopted in response to the exponential increase in
the lethality of firearms and magazines—*i.e.*, "dramatic technological changes,"
*Bruen*, 142 S. Ct. at 2132—and the "unprecedented societal concern[]," *id.*, that
followed, namely, an epidemic of mass shootings. *See, e.g.*, *Or. Firearms Fed'n*, 2022
WL 17454829, at *12-13 (in denying plaintiffs' motion for a temporary restraining
order, finding that "large-capacity magazines represent the kind of dramatic
technological change envisioned by the *Bruen* Court" and "also implicate
unprecedented societal concerns" arising from mass shootings); *Hanson*, 2023 WL
3019777, at *12-14 (reaching same conclusion in denying plaintiffs' preliminary
injunction motion as to D.C. large-capacity magazine law). A "more nuanced
approach" to history, *Bruen*, 142 S. Ct. 2132, and "a broader search for historical

analogies" is thus fully warranted, *United States v. Rowson*, No. 1:22-cr-00310, 2023 WL 431037, at *24 (S.D.N.Y. Jan. 27, 2023).

Here, state and local laws from the period beginning around Reconstruction and continuing into the 20th century—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of Rhode Island's law. *See* State Br. 36-37 (discussing late 19th- and early 20th-century regulation of weapon capacity, including control and prohibition of multi-shot guns and automatic and semiautomatic firearms capable of firing a large number of rounds without reloading, which were consistent with earlier laws restricting access to weapons and weapon features associated with crime); *Hanson*, 2023 WL 3019777, at *12-17 (finding that D.C.'s similar law restricting large-capacity magazines "is consistent with this country's historical tradition of firearm regulation," and specifically noting that "it is appropriate to apply 20th century history" to the analysis because it "does not contradict any earlier evidence").[14] And, in any event, regardless of whether the Court concludes that the relevant focus for its analysis is 1791 or 1868, it should consider this later historical evidence

---

[14] *See also Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, No. 1:22-cv-00951, 2023 WL 2655150, at *13 (D. Del. Mar. 27, 2023) (finding that Delaware's "LCM and assault long gun prohibitions … are consistent with the Nation's historical tradition of firearm regulation"), *appeal docketed*, No. 23-1641 (3d Cir. Apr. 7, 2023); *Or. Firearms Fed'n*, 2022 WL 17454829, at *12-14 (same, as to Oregon large-capacity magazine law).

and the "regular course of practice" in the decades that followed to "settle" the meaning of the right as one that allows for restrictions like Rhode Island's law.

## III. This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as "Outliers"

Challengers in this and other recent Second Amendment cases have sought to dismiss historical regulations as "outliers" insufficient to establish a historical tradition under *Bruen*. *See* Pls.' Br. 31-32; *see also, e.g.*, Pls.' Suppl. Br. 14-15, *Teter v. Shikada*, No. 20-15948 (9th Cir. Sept. 16, 2022), Dkt. 67 (arguing that as many as fifteen historical laws should be dismissed as "outliers"). Plaintiffs assert that a "few, late-breaking state laws do not an enduring tradition make." Pls.' Br. 32. Even if that assertion were correct, it is not implicated in this case, given the robust and extensive record of historical laws. *See, e.g.*, State Br. 32-40; *supra* pp. 8-10. But to the extent this Court wishes to address the issue, to guide district courts in cases with a less extensive record, it should observe that a small number of laws can establish a tradition in light of *Bruen*'s discussion of the historical laws justifying sensitive places.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But

the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. as Amicus Curiae 11-12, *Bruen* (No. 20-843).[15] Moreover, the two laws both sources cited as prohibiting guns in legislative assemblies in the pages the Court referenced were from a single colony, Maryland, and were enacted three years apart, in 1647 and 1650. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235; Br. for Indep. Inst. as Amicus Curiae 11-12, *Bruen* (No. 20-843).[16] Under *Bruen*'s sensitive places analysis, therefore, a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[17]

---

[15] In addition, *Bruen* repeatedly used the singular when referring to the government's burden to produce "a" historical analogue. *See, e.g.*, *Bruen*, 142 S. Ct. at 2133.

[16] Notably, one of the Court's sources stated that, "[i]n general, Americans did not seem to mind people coming armed to attend or participate in legislative matters. The United States Congress had no rules against legislative armament, and through the mid-nineteenth century, it was common for Congressmen to be armed." Kopel & Greenlee, 13 Charleston L. Rev. at 235. Accordingly, the Court's reliance on this source further confirms that widespread acceptance of a practice of carrying guns as a matter of policy does not indicate that the practice was constitutionally protected. *See also infra* pp. 22-23 (explaining that to infer constitutional protection from absence of regulation would run against basic principles of federalism).

[17] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative statement should not be given undue weight, given the Supreme Court's discussion of sensitive places. Moreover, that comment should be read in light of the Court's subsequent

Concluding that a small number of state and local laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551

---

statement that it found an "'overwhelming weight of other evidence regarding the right to keep and bear arms'" that contradicted historical analogues to New York's proper-cause law. *See id.* at 2153-55 (quoting *Heller*, 554 U.S. at 632). Here, there is indisputably no such "overwhelming" evidence of a right to possess large-capacity magazines.

U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.[18]

## CONCLUSION

The Court should affirm the district court's denial of Plaintiffs' motions for preliminary injunction.

Dated: June 28, 2023          Respectfully submitted,

                              /s/ William J. Taylor, Jr.
                              Janet Carter
                              William J. Taylor, Jr.
                              Eleuthera O. Sa
                              Everytown Law
                              450 Lexington Avenue, P.O. Box 4184
                              New York, NY 10017
                              (646) 324-8215
                              wtaylor@everytown.org

                              *Counsel for Amicus Curiae Everytown for Gun Safety*

---

[18] Indeed, any such inference would be untenable in light of the Court's statement, in a decision issued the day after *Bruen*—with five of the same Justices in the majority—that "the fact that many States in the late 18th and early 19th century did not criminalize" certain conduct "does not mean that anyone thought the States lacked the authority to do so." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022).

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because this brief contains 6,126 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

/s/ William J. Taylor, Jr.
William J. Taylor, Jr.
*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2023, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ William J. Taylor, Jr.
William J. Taylor, Jr.
*Counsel for amicus curiae*
*Everytown for Gun Safety*

24