No. 23-1072

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

————————————

OCEAN STATE TACTICAL, LLC, d/b/a Big Bear Hunting and Fishing Supply;
JONATHAN HIRONS; JAMES ROBERT GRUNDY; JEFFREY GOYETTE; MARY BRIMER,
*Plaintiffs-Appellants*,

v.

STATE OF RHODE ISLAND; COLONEL DARNELL S. WEAVER, in his official capacity as
the Superintendent of the Rhode Island State Police; PETER F. NERONHA, in his
official capacity as the Attorney General for the State of Rhode Island,
*Defendants-Appellees*.

————————————

On Appeal from the United States District Court
for the District Court of Rhode Island,
No. 1:22-cv-00246-JJM

————————————

## REPLY BRIEF

————————————

MICHAEL A. KELLY
KELLY SOUZA
 & PARMENTER PC
128 Dorrance St
Suite 300
Providence, RI 02903

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
MARIEL A. BROOKINS
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Appellants*

July 12, 2023

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION .............................................................................................. 1

ARGUMENT ..................................................................................................... 2

I.     HB6614 Violates The Second Amendment. .................................................. 2

     A.    The Second Amendment's Plain Text Unquestionably Covers the Conduct HB6614 Restricts ............................................................ 2

     B.    The Feeding Devices HB6614 Bans Are Unquestionably in Common Use for Self-Defense and Other Lawful Purposes .............. 7

     C.    Rhode Island Cannot Identify an Analogous Historical Tradition ............................................................................................ 13

II.    HB6614 Violates The Takings And Due Process Clauses ........................... 22

III.   The Remaining Preliminary Injunction Factors Support Reversal .............. 26

CONCLUSION ................................................................................................. 27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. Hochul,*
   2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) .................................................. 19

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen.,*
   910 F.3d 106 (3d Cir. 2018) .................................................................. 6

*Barnett v. Raoul,*
   2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) ...................................................... 12

*Caetano v. Massachusetts,*
   577 U.S. 411 (2016) ................................................................... 3, 11

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ............................................................... 1, 3, 9, 10

*Duncan v. Becerra,*
   970 F.3d 1133 (9th Cir. 2020) ............................................................... 15

*E. Enters. v. Apfel,*
   524 U.S. 498 (1998) ......................................................................... 25

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin,*
   733 F.3d 393 (2d Cir. 2013) ............................................................... 26

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011) .............................................................. 26

*Heller v. District of Columbia,*
   670 F.3d 1244 (D.C. Cir. 2011) ........................................................... 8

*Horne v. Dep't of Agriculture,*
   576 U.S. 350 (2015) .................................................................. 22, 23

*Horne v. Dep't of Agriculture,*
   750 F.3d 1128 (9th Cir. 2014) ............................................................. 22

*Kelo v. City of New London,*
   545 U.S. 469 (2005) ......................................................................... 22

*Kolbe v. Hogan*,
813 F.3d 160 (4th Cir. 2016) ...............................................................7

*Koons v. Platkin*,
2023 WL 3478604 (D.N.J. May 16, 2023) ......................................19

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982)............................................................................24

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S.Ct. 2111 (2022) .................................................................. *passim*

*Nat'l Rifle Ass'n v. Bondi*,
61 F.4th 1317 (11th Cir. 2023)..........................................................21

*Peoples Rights Org., Inc. v. City of Columbus*,
152 F.3d 522 (6th Cir. 1998)..............................................................25

*Staples v. United States*,
511 U.S. 600 (1994)............................................................................16

*Worman v. Healey*,
922 F.3d 26 (1st Cir. 2019) ...............................................................10

**Statutes**

1917 N.C. Sess. Laws 309, ch. 209 .........................................................20

1927 N.J. Laws 180-81, ch. 95 ................................................................20

1932 La. Acts 337-38 ...............................................................................20

1933 Minn. Laws ch. 190 .........................................................................20

1933 Ohio Laws 189 .................................................................................20

1933 S.D. Sess. Laws 245-47, ch. 206 ....................................................20

1934 S.C. Acts 1288.................................................................................20

1934 Va. Acts 137-39, ch. 96 ..................................................................20

R.I. Gen. Laws §11-47.1-2........................................................... 1, 5, 18

R.I. Gen. Laws §11-47.1-3 ................................................................. *passim*

**Other Authorities**

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015) ...........................................16

Decl. of Brian DeLay, *Barnett v. Raoul*, No. 23-cv-209 (S.D. Ill. Mar. 2, 2023), Dkt.37-13 .............................15

Decl. of Robert J. Spitzer, *Barnett v. Raoul*, No. 23-cv-209 (S.D. Ill. Mar. 2, 2023), Dkt.37-12 .............................12

Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *in Arms-ban Cases—Again* (June 18, 2023), bit.ly/42OrITT .................................14

NSSF, *Firearm Production in the United States* (2020), https://bit.ly/3LwJvKh .............................................................7

NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022), https://bit.ly/3GLmErS .............................................8

**INTRODUCTION**

Just last year, the Supreme Court confirmed once and for all that "the Second Amendment protects the possession and use of weapons that are 'in common use.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)).  Rather than respect that clear teaching, Rhode Island veered far in the opposite direction, banning all devices that feed ammunition into semiautomatic firearms and are "capable of holding … more than ten (10) rounds," R.I. Gen. Laws §11-47.1-2(2), -3(b)(1)(i), even though tens of millions of Americans own hundreds of millions of those devices as integral components of the firearms they keep and bear for self-defense.  Under a straightforward application of *Bruen*, HB6614 is profoundly out of step with our nation's history of firearm regulation and a violation of the Second Amendment.

In an effort to salvage HB6614, the state asks this Court to ignore what the Supreme Court has repeatedly identified as "the Second Amendment's definition of 'arms,'" *Bruen*, 142 S.Ct. at 2132, in favor of a definition more to its liking.  The state asks this Court to pretend that people do not "use" their firearms when they keep and carry them for self-defense, even though the Supreme Court has explicitly defined the Second Amendment right as a right to "be[] armed and ready for offensive or defensive action," *id.* at 2134, not just to fire at would-be attackers.  It asks this Court to deem a smattering of unrelated historical regulations that did not

ban arms in common use sufficiently analogous to a flat ban. And it asks this Court to indulge in the fiction that feeding devices that have been around for a century and remain lawful in most of the country are "dramatic technological changes." *Id.* at 2132. To accept those strained arguments would be to deny *Bruen*, not apply it.

HB6614 also violates the Takings Clause, as it forces residents to dispossess themselves of their lawfully acquired property without compensation, and the Due Process Clause, as it is impermissibly retroactive and vague. The state has no answer for any of that—yet, in the meantime, its citizens are categorized as criminals for continuing to keep common arms in aid of self-defense. This Court should reverse.

## ARGUMENT

## I.    HB6614 Violates The Second Amendment.

### A.    The Second Amendment's Plain Text Unquestionably Covers the Conduct HB6614 Restricts.

Under *Bruen*, a plaintiff's threshold burden is slight: All one must show to establish a prima facie case is that "the Second Amendment's plain text covers" the "conduct" the challenged law restricts. *Bruen*, 142 S.Ct. at 2126. If it does, then "the Constitution presumptively protects" what the law restricts and "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

Appellants easily satisfy that burden. HB6614 prohibits the general public from keeping and bearing feeding devices that hold more than ten rounds. Because

2

the Second Amendment's text plainly covers keeping and bearing, the only question is whether those devices "constitute bearable arms," as "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Id.* at 2132 (quoting *Heller*, 554 U.S. at 582). The answer is decidedly yes. As *Bruen* made clear, "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Id.* (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (per curiam) (stun guns)). That is because "[t]he 18th-century meaning is no different from the meaning today." *Heller*, 554 U.S. at 581. "[T]hen as now," the term "arms" broadly encompasses all "'[w]eapons of offence, *or* armour of defence,'" or "'any thing that a man wears for his defence, *or* takes into his hands, *or* useth in wrath to cast at or strike another.'" *Id.* (emphases added) (quoting dictionaries from the 1770s). That "general definition" unquestionably includes the devices that actively feed ammunition into the firing chamber of a semiautomatic firearm. After all, when a citizen takes into her hands a semiautomatic firearm equipped with an ammunition feeding device, she holds both the frame of the firearm and the feeding device attached (or affixed) to it, as well as the bullets within that, all for the lawful purpose of armed self-defense.

The state insists that the Second Amendment does not cover *any* feeding device, regardless of capacity, because one "cannot be used as a weapon alone,

3

without the lower receiver or other constituent parts of a firearm." State.Br.21. But the Constitution draws no "distinction between weapons on the one hand and firearm accessories on the other." State.Br.22. All bearable instruments that facilitate armed self-defense are covered, even if they are not independently capable of warding off an assailant. *Bruen*, 142 S.Ct. at 2132. Under Rhode Island's contrary view, a state could ban barrels, or grips, or even triggers. *See* JA529 (state expert arguing that "arms" does not encompass "parts," including "the trigger of a gun"). After all, none of those is *itself* a weapon, and "you can't hurt anybody with [them] unless you hit them over the head with [them]" any more than you can with a magazine. State.Br.21-22 (quoting A38). In the state's view, then, a ban on any (or perhaps all) of those integral firearm components would not even implicate the Second Amendment. That is obviously wrong.[1]

Rhode Island asserts that feeding devices fall outside the Amendment's presumptive protection because "a firearm can fire bullets without a detachable

---

[1] The state tries to deny that this is the logical consequence of its position, but its bare assertion that "[t]here should be no concern that" adopting its position "would open some back-door to regulating an entire class of firearms," State.Br.25 n.4, is not reassuring. If the state banned triggers, then, under its crabbed view of "arms," plaintiffs would *not* "be able to demonstrate that the regulation in fact precluded their ownership of a particular type of covered weapon." State.Br.25 n.4. Indeed, HB6614 *does* ban an entire class of firearms: semiautomatics with integrated (i.e., non-detachable) feeding devices that hold more than ten rounds. Yet the state vigorously, but unpersuasively, defends even that part of the statute. *See infra* p.6.

magazine"—in other words, because they are not *necessary* for armed self-defense. State.Br.21 (quoting A37). That is both wrong and beside the point. Without a feeding device, semiautomatic firearms (the only kind HB6614 governs, *see* R.I. Gen. Laws §11-47.1-2(2), -3(a)) can fire *at most one bullet* before needing to be reloaded. In all events, the threshold textual inquiry does not ask what is "necessary" for self-defense; it asks whether a bearable instrument "facilitate[s] armed self-defense." *Bruen*, 142 S.Ct. at 2132. And semiautomatic firearms designed and equipped with ammunition feeding devices plainly fit that bill.

The state tries to defend its atextual position by resorting to history, but its argument is as unpersuasive as it is nonsensical. Rhode Island tries to analogize modern ammunition feeding devices to Founding-era cartridge boxes, which it says were generally considered "accoutrements," "*separate* from arms." State.Br.21-23. But cartridge boxes were exactly what they sound like: boxes in which citizens could store ammunition not in use. Ammunition feeding devices are quite different. As their name connotes, they *actively feed* ammunition to the firing chamber of a firearm. When a user pulls the trigger, the round in the chamber fires, and the semiautomatic action combines with the feeding device to *feed* a new round to the chamber. Founding-era cartridge cases, by contrast, were never attached (let alone affixed) to a firearm, and they played no role in its operation; they were literally just boxes for storing ammunition not in use. Saying that a cardboard box is analogous

5

to a device that plays an active role in firing because both "hold" ammunition is thus like saying that a gas can is analogous to a carburetor because both "hold" fuel.

Rhode Island's position is particularly strained given that HB6614 bans not just detachable, but fixed (or "integrated") feeding devices. *See* Opening.Br.23; *supra* n.1. Fixed feeding devices cannot be removed without rendering the firearm inoperable. To say that such a device is an "accessory" to a firearm, State.Br.25, is thus like saying that an engine is an accessory to an automobile—nonsense. If a fixed feeding device is removed, the firearm *cannot fire even a single round*.

In short, what the Third Circuit held four years before *Bruen* is even more obviously correct in the wake of *Bruen*: "Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018). That is true regardless of how many rounds a feeding device holds. A bearable instrument that facilitates self-defense in Size Small does not cease accomplishing that end in Size Large. If anything, having more rounds at the ready *better* facilitates a citizen's ability to defend herself in case of confrontation—regardless of whether she ends up needing to expend every round.

Rhode Island's only response is that "a firearm does not *need* a magazine containing more than ten rounds to be useful." State.Br.21 (emphasis added)

(quoting A37). But, again, what is "necessary" for self-defense makes no difference to the threshold textual inquiry. What matters is whether a bearable instrument "facilitate[s] armed self-defense." *Bruen*, 142 S.Ct. at 2132. Feeding devices indisputably do. Keeping and bearing them is thus presumptively protected.

> **B.      The Feeding Devices HB6614 Bans Are Unquestionably in Common Use for Self-Defense and Other Lawful Purposes.**

Because the feeding devices HB6614 bans satisfy "the Second Amendment's definition of 'arms,'" the state must prove that it nonetheless can ban them "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126, 2132. It cannot meet that burden. The Supreme Court has already decided which "arms" a state may ban "consistent with this Nation's historical tradition of firearm regulation": those that are (at a minimum) "highly unusual in society at large," as opposed to "in common use today" for self-defense and other lawful purposes. *Id.* at 2143. The critical question, then, is whether the arms HB6614 bans are in common use for lawful purposes today.

The answer is exceedingly easy, as the feeding devices HB6614 bans are exceedingly common. Tens of millions of Americans own *hundreds of millions* of these arms. *See, e.g.*, NSSF, *Firearm Production in the United States* 7 (2020), https://bit.ly/3LwJvKh. That is why "[v]irtually every federal court to have addressed this question has concluded" that they "are in common use." *Kolbe v. Hogan*, 813 F.3d 160, 174-75 (4th Cir. 2016) (collecting cases). And the numbers

are trending upward:  Recent data indicates that 75% of modern rifle magazines have a standard capacity above ten rounds.  *See* NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* 31 (July 14, 2022), https://bit.ly/3GLmErS.  In short, what the D.C. Circuit recognized over a decade ago rings even more true today:  While "[t]here may well be some capacity above which magazines are not in common use" among law-abiding Americans, "that capacity surely is not ten." *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011).

Rhode Island does not deny any of this.  Instead, it accuses Appellants of a "blatant omission" by failing to acknowledge "*Bruen*'s emphasis … that the weapons in question … are 'in common use *for self-defense* today.'"  State.Br.27 (quoting *Bruen*, 142 S.Ct. at 2143).  That is a serious charge—and it is demonstrably false.  *See, e.g.*, Opening.Br.29 ("[T]he tradition of the American people is that law-abiding citizens may keep and bear arms that are commonly possessed *for self-defense*." (emphasis added)).  Appellants have never "reli[ed] on sheer numbers" alone.  State.Br.27.  Appellants have consistently (and correctly) argued that "the typical individual who possesses these commonplace arms does so for lawful purposes."  *E.g.*, Opening.Br.29 (citing sources confirming this point).  Rhode Island may think this whole "line of inquiry" is "absurd[]," State.Br.28, but it has no response to the fact that *it comes directly from the Supreme Court*.  *Heller* made clear

that the only arms "the Second Amendment does not protect" are those that are "not typically possessed by law-abiding citizens for lawful purposes."  554 U.S. at 625.

Rhode Island seems to think that *Bruen*'s reference to "common *use*" compels a categorically different analysis and effectively erases *Heller*'s reference to "typical possess[ion] by law-abiding citizens for lawful purposes."  In the state's telling (and the district court's), "ownership" is irrelevant, and the only "use" that matters is firing at an assailant during an armed confrontation.  State.Br.26-27.  The state thus argues that the feeding devices HB6614 bans are not in common use because people do not frequently fire more than ten rounds in self-defense situations.  State.Br.28-29.

The problems with that argument are manifest.  First, it elides the text of the Constitution.  The Second Amendment protects the right "to keep and bear Arms," not just to fire them when the need for self-defense arises.  U.S. Const. amend. II.  That is precisely why the Supreme Court has held that "bear[ing] arms" includes not just firing them at would-be attackers, but "carry[ing]" arms equipped with ammunition "for the purpose … of *being armed and ready* for offensive or defensive action."  *Bruen*, 142 S.Ct. at 2134 (emphasis added) (ellipsis in original) (quoting *Heller*, 554 U.S. at 584).  Under a straightforward reading of both the Constitution and *Bruen*, then, a citizen "uses" her firearm for the Second Amendment's *ne plus*

*ultra* purpose every time she *keeps* it inside her home or *carries* it outside her home "at the ready for self-defense"—i.e., every time she lawfully keeps or bears it. *Id.*

The state's narrow view of "use" also makes nonsense of the very passage on which it relies. As noted, *Bruen* juxtaposed the phrase "weapons that are those 'in common use at time'" with the phrase "those that 'are highly unusual in society at large.'" 142 S.Ct. at 2143. That juxtaposition makes sense only if the "uses" that matter include *keeping* and *bearing*, as the latter phrase ("are highly unusual") is nonsensical vis-à-vis a frequency-of-*firing* inquiry. Indeed, *Bruen* held that citizens have a fundamental right to carry handguns outside the home for self-defense *without ever even asking how frequently people fire them in actual self-defense situations*. It sufficed in *Bruen*, just as it did in *Heller*, that "handguns are the most popular weapon chosen by Americans for self-defense." *Heller*, 554 U.S. at 629; *see also Bruen*, 142 S.Ct. at 2143. How frequently people keep versus carry firearms, or fire them at ranges versus at attackers, is legally irrelevant; an individual lawfully "uses" her firearm anytime she does *any* of those things.[2]

---

[2] The state points to dicta in *Worman v. Healey* that "the record" there did "not show … that the proscribed weapons have commonly been used for home self-defense purposes." 922 F.3d 26, 37 (1st Cir. 2019); *see* State.Br.27-28. That this Court may have taken a narrow view of "use" in passing and pre-*Bruen* is of no moment.

Rhode Island tries a parade of horribles, but the problem with its concededly "absurd[]" hypothetical of "an innovative new weapon with increased accuracy that was immediately banned before it could gain widespread adoption," State.Br.28, is self-evident:  The state's imagined "immediate[] ban[]" is clearly unconstitutional. While *Bruen* focused on the need for a firearm to be "unusual" to be proscribable, the historical test asks whether a firearm "is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment).  Accordingly, states cannot freeze firearms technology in time by banning new models before they can enter the market and become common, as they would still need to show that a new model is "dangerous" in some way that meaningfully differentiates it from arms that are in common use.  Far from being circular, then, the common-use test appropriately trusts the American people's judgment in selecting the firearms they think are appropriate for lawful use.

The common-use test also makes clear that whether an arm is useful in military service is not relevant to whether it is in common use among law-abiding citizens for lawful civilian purposes.  The state assumes that because some courts have said that some arms are "most useful" in military settings, those arms "are not useful for self-defense."  State.Br.29.  That does not follow.  Most arms are useful in both civilian and military settings; there is a reason that soldiers are issued handguns

in addition to other arms. In all events, whether a particular arm may be popular with (or rejected by) the military makes no difference to the constitutional inquiry.

That illustrates the root problem with the state's "thought experiment" positing a "bonanza giveaway" of machineguns. State.Br.28. The defining feature of a machinegun is that it fires a continuous stream of bullets when the trigger is depressed. That feature is highly useful for suppressive fire in a war zone, but highly *dis*advantageous for personal self-defense, because it makes it much more difficult "to accurately shoot and hit [one's] intended target in case of confrontation," and "the 'meaningful exercise' of the right to armed self-defense is wholly dependent on the ability of citizens to utilize their arms and hit their intended target." *Barnett v. Raoul*, 2023 WL 3160285, at *9 (S.D. Ill. Apr. 28, 2023). *That* is in large part why Americans never chose machineguns en masse even before they were banned. *See* Decl. of Robert J. Spitzer ¶15, *Barnett v. Raoul*, No. 23-cv-209 (S.D. Ill. Mar. 2, 2023), Dkt.37-12 (machineguns were a commercial "failure from the start" among law-abiding citizens). While a few gangsters did commit heinous acts with them, "[b]y 1925"—when states began to ban them—only a few thousand "had sold" in the U.S. *Id.* That is a far cry from semiautomatics capable of firing more than ten rounds without reloading, which millions of law-abiding citizens in this country have kept and borne for self-defense and other lawful purposes for more than a century.

12

More fundamentally, Rhode Island's theory that the scope of the right to keep and bear arms depends on what the government decides is necessary to exercise it, *see* State.Br.29-30, 38, is irreconcilable with the Supreme Court's clear holdings that the Second Amendment protects a fundamental right.  When *Bruen* rejected means-end balancing as "one step too many," it took "out of the hands of the government" the power to decide what is *necessary* to the people for self-defense.  142 S.Ct. at 2127, 2129.  After all, the whole point of the Second Amendment is to keep the government from disarming the people.  It is little surprise, then, that the framing generation thought it was for the people, not the government, to decide what arms they may keep and bear.  Rhode Island may not like that holding, but a litigant's displeasure with the law of the land does not relieve this Court of its obligation to faithfully follow Supreme Court precedent—especially when, as here, the displeased litigant is a sovereign government, and its objection is to a Supreme Court holding that interprets a fundamental constitutional right more broadly than it would like.

### C.    Rhode Island Cannot Identify an Analogous Historical Tradition.

The feeding devices HB6614 newly bans are bearable instruments that facilitate armed self-defense and in common use today for self-defense.  Under a straightforward application of *Bruen*, that should be the end of the analysis.  In the context of a flat ban on the acquisition or even possession of classes of arms, whether the arms are commonly kept and borne for lawful purposes *is* the historical test.  *See*

Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *in Arms-ban Cases—Again* (June 18, 2023), bit.ly/42OrITT. But even if further historical inquiry were necessary, Rhode Island has not come close to showing any historical tradition of prohibiting the sort of devices it has banned. To the contrary, the historical record reveals a long tradition of *welcoming* technological advancements aimed at enhancing law-abiding citizens' ability to accurately fire repeatedly.

    1. At the outset, the state's focus on when technology allowing civilians to accurately fire repeatedly without needing to reload *became common* is misplaced. *See* Opening.Br.34-36. To be sure, arms that could reliably and accurately shoot multiple times without reloading were not common at the Founding. But the fact that a class of arms may have been dangerous or unusual *in the past* makes zero difference to the constitutionality of an effort to ban those arms *today*. *Bruen* could not be clearer about this: "[E]ven if [early-American] laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in [early America], they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." 142 S.Ct. at 2143. The fact that repeating firearms with large capacities did not dominate the domestic market in the nation's early years is thus of no constitutional significance.

14

2. In all events, the state's claim that "[r]epeating firearms with large capacities have always been regarded as dangerous and unusual" is divorced from reality. State.Br.32. The relevant history is not debatable. As a historian offered *by Illinois* in a challenge to its ban and *by Oregon* in a challenge to its similar ban has testified, "high-capacity firearms became reliable consumer items prior to the ratification of the Fourteenth Amendment." Decl. of Brian DeLay at 22, *Barnett v. Raoul*, No. 23-cv-209 (S.D. Ill. Mar. 2, 2023), Dkt.37-13 (capitalization altered). To be sure, high-capacity repeating firearms were still relatively rare in the 1860s. State.Br.33-36. But that changed quickly. "[A]round 126,000" of the "Lightning Slide Action Rifle," which "had a twelve- or fifteen-round tube magazine and used a pump-action to cycle rounds into the chamber," were sold "between 1884-1904." DeLay Decl., *supra*, ¶62. Sales of the Winchester 1873 ("the gun that won the west"), which came with a ten-plus-round magazine, dwarfed even that. *Duncan v. Becerra*, 970 F.3d 1133, 1148 (9th Cir. 2020) ("over 1.7 million" sold).[3]

Repeating firearms with large capacities became even more common in the twentieth century, driven by the advent of semiautomatic technology and detachable magazines, both of which "emerged in the 1880s and began to be integrated into firearms for the consumer market by the end of the century." DeLay Decl., *supra*,

---

[3] The state objects to citing to the *Duncan* panel opinion, State.Br.32, but it notably does not contest any of the historical facts that opinion recounted.

¶72. The proliferation of semiautomatic arms with larger capacities increased as the years went on—so much so that the Supreme Court in 1994 described one popular model of semiautomatic rifle that comes standard with a 20- or 30-round magazine as "widely accepted as lawful." *Staples v. United States*, 511 U.S. 600, 612 (1994).

3. Yet neither Congress nor a single state prohibited feeding devices of any capacity (or any class of semiautomatic firearms) until the Bush Administration. Historical laws restricting how many rounds semiautomatics could fire without reloading were likewise exceedingly rare—and all of those outliers did so via means considerably less restrictive than a ban. *See* Opening.Br.30-33; David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 864-67 (2015).

The state does not deny any of this. Instead, it frames the history of regulation at a cartoonishly high level of generality and cuts off half of the relevant inquiry. The state speaks of "regulation of capacity" generally, State.Br.36, as if all regulation is analogous to all other regulation. That is not just a slip of a tongue; in its long discussion of laws that "regulated" capacity in one way or another, the state does not cite *a single law* that banned a class of arms outright based on its firing capacity. But *Bruen* was pellucid: For regulations to be "relevantly similar under the Second Amendment," they must at a minimum impose the same kind of "burden [on] a law-abiding citizen's right to armed self-defense." 142 S.Ct. at 2132-33. *None* of the

state's proffered analogues, however, is remotely similar to its ban on protected ammunition feeding devices.

For example, the state invokes militia "storage regulations" and claims that they were intended to keep multi-shot rifles out of civilian hands. State.Br.35. In reality, the "non-militia purpose" from which Louisiana's militia secured its store of arms, State.Br.35-36, was Confederate "insurrection[]," JA400. A state militia acting to keep its own arms out of the hands of "insurrection[ists]," JA387, is obviously not analogous to a law that bans the general public from acquiring long-lawful arms. The state cites the seizure of "civilian shipments" of Winchester rifles, State.Br.36, but (again) it fails to mention that the "civilians" in question were Klansmen intent on overthrowing the South Carolina government and the "crates of Winchesters" were shipped "with false labels" to get around anti-Klan laws, JA386-87. All should agree that the interception of contraband arms headed to domestic terrorists is not akin to a law that bars the general public from possessing a class of arms that has been common and lawful for more than 100 years.

The state's reliance on "laws regarding capacity in relation to hunting," State.Br.36, is no more persuasive. A law that prohibits *hunting* with an 11-round feeding device does not "impose a comparable burden on the right of armed self-defense" to one that prohibits people *from keeping or bearing* such arms at all. *Bruen*, 142 S.Ct. at 2133. Indeed, in discussing these hunting laws, Rhode Island

gives away the game.  The state says these restrictions support a tradition that *one type of* "*use*" of "a firearm … 'specially designed'" in a way that makes it "'proportionately' more dangerous than expected" "may be restricted."  State.Br.37 (emphasis added).  Even assuming there were an American tradition of restricting people's ability *to hunt with* multi-shot arms, a tradition of restricting *that one use* cannot be stretched to support a tradition of banning such arms outright.[4]

Laws "regulating concealed carry," State.Br.38, fail as analogues for the same reasons.  A restriction on concealed carry takes away one-half of one-half of the right to keep and bear arms.  (The right to keep and the right to carry openly remain intact.)  That is not remotely similar in "how" they regulate to a law that bans possession.  Indeed, *Bruen* expressly rejected such laws as an analogue to *carry* bans, 142 S.Ct. at 2143-47; a fortiori, they fail as to *possession* bans.

Finally, the state and its *amici* turn to the "anti-machine gun laws" of the 1920s and 1930s.  Massachusetts.Br.22; *see* State.Br.37-38.  While many (though not all) of these laws were indeed bans on arms, that is where the similarities end.  HB6614 applies only to feeding devices for "semi-automatic firearm[s]."  R.I. Gen. Laws §11-47.1-2(2).  Unlike with *fully* automatics, very few Prohibition-era laws imposed

---

[4] *Amici*'s reliance on gunpowder-storage laws, *see* Massachusetts.Br.18-20, is even more inapt.  Laws designed to ensure that combustible material would not combust when *not* in use are self-evidently different in how they burden the right to armed self-defense from laws that confine the universe of arms citizens may use.

capacity restrictions on *semi*automatics—and the handful that did were either repealed or replaced with laws regulating only fully automatic weapons. Opening.Br.31.

Rhode Island brushes aside the fact that *all* of those restrictions "were rolled back." State.Br.37. But *Bruen* was clear: Even a relevantly similar historical analogue must be "well-established and representative." 142 S.Ct. at 2133. For good reason, as upholding a restriction just because a state manages to locate a few similar laws in the past would "risk[] endorsing outliers that our ancestors would never have accepted." *Id.*; *see, e.g.*, *Antonyuk v. Hochul*, 2022 WL 16744700, at *45 (N.D.N.Y. Nov. 7, 2022); *Koons v. Platkin*, 2023 WL 3478604, at *62-68 (D.N.J. May 16, 2023). Simply put, anti-machinegun laws are not representative of how our nation has regulated semiautomatics. Again, semiautomatic technology and the detachable magazine both predate bearable machineguns. *See supra* pp.15-16. Yet while most states and Congress swiftly outlawed the latter, almost none imposed any regulation on the former—and exactly none banned them—until the 1990s.

In arguing to the contrary, the state prevaricates. The state notes that three states "defin[ed] a machine gun" in this era "by its capacity to fire a certain number of rounds without reloading," and asserts that "[n]ine other states followed" suit, implying that those "[n]ine other[s]" banned semiautomatic firearms. State.Br.37.

That is demonstrably false. Of the "nine others" cited, one was a hunting regulation[5]; two applied only to firearms from which one pull of the trigger could discharge multiple shots, i.e., *automatics*[6]; two more used slightly different wording, banning "all firearms commonly known as machine rifles, machine guns and sub-machine guns,"[7] but likewise were never understood to cover semiautomatics; a sixth applied only to semiautomatics that were "altered or modified to increase the [capacity] from the original design as manufactured by the manufacturers"[8]; a seventh merely required citizens to obtain a special license, but prohibited neither sale nor possession[9]; the eighth (and last true state law of the bunch) prohibited only using a semiautomatic to perpetrate a "crime of violence."[10]  *None* of those is remotely similar to an outright ban. And, again, none remained on the books for long.

That leaves the D.C. law discussed in Appellants' Opening Brief (at 31 n.9), the ninth "state" law Rhode Island cites. That law did reach semiautomatics, but it "was not understood to sweep up ammunition feeding devices as an original matter";

---

[5] 1917 N.C. Sess. Laws 309, ch. 209, §1 ("[I]t shall be unlawful to kill quail with any gun or guns that shoot over two times before reloading.").

[6] 1927 N.J. Laws 180-81, ch. 95, §§ 1-2 ("instrument not requiring that the trigger be pressed for each shot"); 1933 S.D. Sess. Laws 245-47, ch. 206, §§1-8 ("by a single function of the firing device").

[7] 1932 La. Acts 337-38, §1; 1934 S.C. Acts 1288, §§1-6.

[8] 1933 Minn. Laws ch. 190, §1(b).

[9] 1933 Ohio Laws 189.

[10] 1934 Va. Acts 137-39, ch. 96, §1.

it was not so extended until "the District achieved home rule in 1975." More important, it was *the only law enacted in this country before 1990 that restricted law-abiding citizens' access to feeding devices of any capacity*. Opening.Br.31 n.9. That point bears repeating: No state banned feeding devices of any capacity *until the 1990s*—even though magazines that hold more than ten rounds were widespread in this country before Henry Ford sold his first Model A, the Wright Brothers took their first flight at Kitty Hawk, or Albert Einstein realized that E=mc$^2$. Rhode Island never acknowledges this reality. Instead, it asserts that the "absence of regulation" can somehow justify new regulation. State.Br.39. That bold claim does not pass the straight-face test, let alone pass muster under *Bruen*. After all, the "absence of regulation" imposes *no* "burden on the right of armed self-defense." *Bruen*, 142 S.Ct. at 2133. But the burdens HB6614 imposes are very real.

4. Finally, the state cannot justify its ban as owing to "unprecedented societal concerns." *See id.* at 2132. Even accepting the dubious proposition that there is some causal link between the recent rise in mass shootings and arms that have been in common use for a century, State.Br.41-43, the unfortunate reality is that mass murder has been a fact of life in the U.S. for a very long time. *See Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1319 (11th Cir. 2023). Nevertheless, before the 1990s, no state banned ammunition feeding devices of any size, and there were almost no efforts to restrict the firing capacity of semiautomatic arms in any way.

**II.     HB6614 Violates The Takings And Due Process Clauses.**

1. HB6614 forces the residents of Rhode Island to dispossess themselves of lawfully acquired property, without compensation from the state. R.I. Gen. Laws §11-47.1-3(a), (b)(1). What was true in *Horne v. Department of Agriculture*, 576 U.S. 350 (2015), is thus true here: A state has compelled its citizens to transfer away their property. That is a physical taking for which just compensation must be paid.

The state tries to distinguish *Horne* on the ground that the law there required growers to "transfer[]" their property "to the Government" alone. State.Br.45. But as Appellants have explained, it made no difference in *Kelo* that the law allowed for a sale of the property to a "private nonprofit entity." *Kelo v. City of New London*, 545 U.S. 469, 473-75 (2005); *see* Opening.Br.39. A statute that says, "You can give your property to the government, or you can give it to someone else, but you cannot keep it in this state unless you permanently alter it," effects a taking for which compensation must be paid no less than a law that imposes only the first option.

The state waives away *Kelo* as dealing with "real property." State.Br.45. But *Horne* could not make clearer that that distinction makes no difference. The Ninth Circuit in *Horne* held that the law effected no taking because (it said) "the Takings Clause affords less protection to personal than to real property." 750 F.3d 1128, 1139 (9th Cir. 2014). The Supreme Court rejected that view in no uncertain terms: When

it comes to a "physical taking," i.e., a dispossession, the Constitution draws no distinction between real and personal property. 576 U.S. at 357-61.

The option to move the now-banned property to a state where it is lawful "to own or possess [it]," R.I. Gen. Laws §11-47.1-3(b)(1)(iii), does not save HB6614. Like a forced sale or surrender, a forced transfer of property out of state directly interferes with the owner's right *to possess* the property, not just her right *to use* it as she pleases. Opening.Br.39-40. The notion that forcing residents to take their property out of state "allow[s] retention of the [property]," State.Br.45-46 (quoting A48), makes a mockery of the Constitution and the fundamental rights it protects.

That is likely why *even the state* refers to HB6614 as a "complete possessory ban." State.Br.52. To be sure, HB6614 allows Rhode Islanders to "[p]ermanently modif[y]" their lawfully acquired feeding devices to hold no more than ten rounds. R.I. Gen. Laws §11-47.1-3(b)(1)(i). But even assuming that provision could survive vagueness review, *but see infra* pp.25-26, being forced to permanently alter property is no less a taking than being forced to give it away. It made no difference in *Horne* that the growers could have "plant[ed] different crops" or sold "their raisin-variety grapes as table grapes or for use in juice or wine." 576 U.S. at 365. If a newly enacted law prevents you from keeping what you had as it was when you lawfully acquired it, then the law effects a taking. In all events, even the district court was forced to admit that "some LCMs … cannot be modified" to comply with that

23

provision.  A46; Opening.Br.40.  For those feeding devices, literal dispossession is the only option.  The state simply ignores this reality.

Rhode Island tries to fall back on the police power.  State.Br.47-48.  But whether a law effects a taking is "a separate question" from whether the state has the power to enact it—and an uncompensated taking is unconstitutional "without regard to the public interests that it may serve."  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425-26 (1982); *see* Opening.Br.41-44.  That is all the more true here, where the property required to be dispossessed is independently constitutionally protected.

2. HB6614 violates the Due Process Clause for similar reasons, as it reaches back to long-closed, lawful transactions and renders their result illegal—and deems everyone who lawfully possessed the newly banned feeding devices to be a criminal unless they dispossess themselves of their lawfully acquired property. Opening.Br.44-46.  It is hard to think of a more obviously retroactive (or obviously problematic) command.

Rhode Island claims HB6614 "does not upset reasonable reliance or settled expectations."  State.Br.51.  That claim is inexplicable.  For years, residents were free to purchase and possess ammunition feeding devices of any capacity.  The state's 180-degree turn unsettles every expectation its citizens had when they purchased and continuously possessed those devices.  By "chang[ing] the legal

consequences" of "transactions long closed" and "destroy[ing]" the reliance interests and reasonable certainty that are the foundation of property ownership, HB6614 violates due process. *E. Enters. v. Apfel*, 524 U.S. 498, 502 (1998).

3. HB6614 is also impermissibly vague. As noted, HB6614 allows people to "[p]ermanently modif[y]" their lawfully acquired feeding devices "such that [they] cannot hold more than ten (10) rounds of ammunition." R.I. Gen. Laws §11-47.1-3(b)(1)(i). But state law defines neither "[p]ermanent[] modifi[cation]" nor "ammunition." That is a problem. If what HB6614 requires is a change that can never be undone, it is hard to see how anyone could ever satisfy that standard. After all, something added on can always be taken off with enough time and effort. And if even welding a baseplate onto a feeding device is insufficient to *permanently* shrink its capacity, then HB6614's supposed modification option is no option at all, and the provision is "a trap for the unwary," effectively forcing citizens to dispossess themselves altogether rather than risk violating an unclear criminal prohibition. *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 536 (6th Cir. 1998).

The state could have tried to clear this up. Instead, all it offers is the *ipse dixit* that "the phrase 'permanently modifies' is unmistakably clear." State.Br.53. If that were true, then it should have been easy to answer Appellants' questions about the provision's scope. *See* Opening.Br.46-47. Yet the state does not even acknowledge

25

them.  In the context of a criminal prohibition that burdens fundamental constitutional rights, that is nowhere near enough to satisfy due process.

## III.    The Remaining Preliminary Injunction Factors Support Reversal.

As one would expect in a contest between law-abiding citizens' ability to exercise constitutional rights and the state's interest in enforcing a novel restriction on those recently reaffirmed rights, the remaining factors strongly favor injunctive relief.  HB6614 is causing Appellants irreparable harm, and "[i]nfringements of" "the right to possess firearms for protection" inflict irreparable harm as a matter of law.  *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011); *see also Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 423 (2d Cir. 2013) (economic injuries are irreparable in face of Eleventh Amendment).  And because HB6614 tramples on fundamental rights, and it is always in the public interest to prevent the violation of constitutional rights, the remaining factors favor Appellants.

In arguing to the contrary, the state claims that "Ocean State Tactical … delayed between filing its complaint and moving for injunction."  State.Br.18.  That is, to borrow a phrase, "ahistoric fantasy."  State.Br.32.  Appellants filed suit *a mere three days* after HB6614 was enacted, and moved for interim relief mere weeks later.  That is hardly a delay at all, let alone a delay sufficiently serious to "cut against findings of *immediate*, irreparable harm" in a constitutional case.  State.Br.18.

## CONCLUSION

The Court should reverse and remand with instructions to enjoin HB6614.

Respectfully submitted,

s/Erin E. Murphy

|  |  |
|---|---|
| MICHAEL A. KELLY | PAUL D. CLEMENT |
| KELLY SOUZA | ERIN E. MURPHY |
|  & PARMENTER PC |   *Counsel of Record* |
| 128 Dorrance St | MATTHEW D. ROWEN |
| Suite 300 | MARIEL A. BROOKINS |
| Providence, RI 02903 | CLEMENT & MURPHY, PLLC |
|  | 706 Duke Street |
|  | Alexandria, VA 22314 |
|  | (202) 742-8900 |
|  | erin.murphy@clementmurphy.com |

*Counsel for Appellants*

July 12, 2023

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,493 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman size 14-point font with Microsoft 2016.


Date: July 12, 2023

s/Erin E. Murphy
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on July 12, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy